Kevin G. Little, SBN 149818
**LAW OFFICE OF KEVIN G. LITTLE**
Post Office Box 8656
Fresno, California   93747
Telephone:  (559) 342-5800
Facsimile:   (559) 242-2400
E-Mail:  kevin@kevinglittle.com

David J. Weiland, SBN 160447
**COLEMAN & HOROWITT, LLP**
499 West Shaw Avenue, Suite 116
Fresno, California 93704
Telephone: (559) 248 4820
Facsimile:  (559) 248-4830
E-Mail: dweiland@ch-law.com

Attorneys for Plaintiffs Terance Frazier and
the Central Valley Community Sports Foundation

**IN THE UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION**

| | |
|---|---|
| TERANCE FRAZIER; CENTRAL VALLEY COMMUNITY SPORTS FOUNDATION, a California Domestic Non-Profit Corporation, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF FRESNO; FORMER MAYOR LEE BRAND; MAYOR JERRY DYER; FORMER CITY MANAGER WILMA QUAN; FORMER CITY MANAGER THOMAS ESQUEDA; CITY MANAGER GEORGEANNE WHITE; FORMER ASSISTANT CITY MANAGER JAMES SCHAAD; FORMER CHIEF OF STAFF TIM ORMAN; CITY COUNCILMAN GARRY BREDEFELD; CITY COUNCILMAN MIKE KARBASSI; FRESNO COUNTY DISTRICT ATTORNEY LISA SMITTCAMP; DOES 7-20, inclusive, <br><br> Defendants. | Case No. 1:20-cv-01069-DAD-SAB <br><br> **FIRST AMENDED COMPLAINT FOR DAMAGES** <br><br> • **42 U.S.C. § 1983** <br>   **FIRST AMENDMENT RETALIATION** <br><br> • **42 U.S.C. §§ 1981, 1983** <br>   **DISCRIMINATORY DENIAL OF CONTRACT AND EQUAL PROTECTION RIGHTS** <br><br> JURY TRIAL DEMANDED |

FIRST AMENDED COMPLAINT FOR DAMAGES

1  TO THE HONORABLE COURT:

2      In accordance with the Court's April 15, 2022 Order Granting in Part and Denying in Part

3  Defendants' Motion to Dismiss, Plaintiffs Terance Frazier and the Central Valley Community

4  Sports Foundation, through their undersigned counsel, hereby make the following amended

5  allegations and claims against the defendants, City of Fresno, Former Mayor Lee Brand,

6  Mayor Jerry Dyer, Former City Manager Wilma Quan, Former City Manager Thomas

7  Esqueda, City Manager Georgeanne White, Assistant City Manager James Schaad, Chief of

8  Staff Tim Orman, City Councilman Garry Bredefeld, City Councilman Mike Karbassi, Fresno

9  County District Attorney Lisa Smittcamp, and Does 7-20.

10  **JURISDICTION AND VENUE**

11      1.    This Court has jurisdiction in the matter pursuant to 28 U.S.C. §§ 1331 and

12  1343, as this is a proceeding that arises under federal civil rights law.

13      2.    This Court has venue in this matter pursuant to 28 U.S.C. § 1391(b), as a

14  substantial part of the acts and omissions giving rise to this proceeding occurred in this

15  judicial district.

16  **PARTIES**

17      3.    Plaintiff Terance Frazier ("Mr. Frazier") is a citizen and resident of the State of

18  California, County of Fresno.  Mr. Frazier is a longtime real estate investor, entrepreneur,

19  philanthropist, and community activist based in the Central Valley.  Mr. Frazier is also a

20  retired professional baseball player and an alumnus of California State University, Fresno,

21  from which he obtained a bachelor's degree in criminal justice while starring on its varsity

22  baseball team.  Through his efforts, Mr. Frazier has helped restore thousands of distressed

23  properties in the City of Fresno, and he also has ownership interests in numerous major

24  commercial venues such as Campus Pointe, Midstate Bowl, as well as the subject Granite

25  Park development. Mr. Frazier also has spearheaded many efforts to revitalize downtown

26  Fresno. Among Mr. Frazier's many community activities is his founding and presiding over

27  the Central Cal Baseball Academy, which has helped numerous youths attain their

28  FIRST AMENDED COMPLAINT FOR DAMAGES

1  educational and baseball career goals.  Mr. Frazier is African-American.

2      4.    Plaintiff Central Valley Community Sports Foundation ("CVCSF") is a

3  California nonprofit public benefit corporation founded in 2015, with its principal place of

4  business in Fresno, California.  Mr. Frazier serves in volunteer capacity as the President,

5  Chief Executive Officer and Chief Financial Officer of CVCSF.  CVCSF is a minority-

6  founded entity, and its goals are to provide sports and entertainment facilities and programs

7  for the citizens of the Central Valley.

8      5.    Defendant City of Fresno is a local municipal body and a political subdivision

9  of the State of California.  The City of Fresno is the owner of a recreational complex

10  commonly known as Granite Park, located at 3978 N. Cedar Avenue in Fresno, California.

11  The City of Fresno is sued herein based on its municipal customs, policies, and practices,

12  both written and unwritten, which were the moving force behind the constitutional violations

13  committed by the individual defendants, as set forth in more detail herein.

14      6.    Defendant Former Mayor Lee Brand ("Former Mayor Brand") was the 25th

15  mayor of the City of Fresno, having been sworn into office on January 3, 2017 and remained

16  in office until January 5, 2021.  Mayor Brand is a citizen and resident of the City and County

17  of Fresno.  Mayor Brand has previously served on the Fresno City Council, as Chairman of

18  the Fresno Redevelopment Agency, and as a Commissioner on the Fresno City Planning

19  Commission.  Mayor Brand is also a longtime licensed real estate broker, general contractor,

20  and property manager in his private life.   Mayor Brand is sued in his individual capacity, and

21  Mr. Frazier and CVCSF are informed and believe that this defendant was at all times alleged

22  herein acting under color of state law and as a policy maker of the City of Fresno.

23      7.    Defendant Mayor Jerry Dyer ("Mayor Dyer") is the 26th mayor of the City of

24  Fresno, having been sworn into office on January 5, 2021.  Mayor Dyer is a citizen and

25  resident of the City and County of Fresno.  Mayor Dyer was previously the Chief of Police of

26  the Fresno Police Department for 18 years, after having served in other capacities in the

27  department for 22 years.  Mayor Dyer is sued in his individual capacity and Mr. Frazier and

28

FIRST AMENDED COMPLAINT FOR DAMAGES

1  CVCSF are informed and believe that this defendant was at all times alleged herein acting

2  under color of state law as a policy maker of the City of Fresno.  The individual defendant

3  formerly named as Doe 1 is now renamed as Mayor Dyer.

4    8.    Defendant Former City Manager Wilma Quan ("Former City Manager Quan")

5  became the City of Fresno's City Manager in July 2017 and remained in that capacity until

6  January 2021.  Former City Manager Quan previously served as both the Assistant City

7  Manager and Deputy City Manager of the City of Fresno, and she has also worked with the

8  City of Fresno's Downtown and Community Revitalization Department, as well as the public

9  sector.  Former City Manager Quan is sued in her individual capacity, and Mr. Frazier and

10  CVCSF are informed and believe that this defendant was at all times alleged herein acting

11  under color of state law and as a policy maker of the City of Fresno.

12    9.    Defendant Former City Manager Thomas Esqueda ("Former City Manager

13  Esqueda") became the City of Fresno's City Manager in January 2021 and remained in that

14  capacity until February 2022.  Former City Manager Esqueda previously served as the

15  Director of the City of Fresno's Department of Public Utilities, as the Associate Vice

16  President for Water and Sustainability at California State University – Fresno, as well as in

17  various positions in the public sector.  Former City Manager Esqueda is sued in his individual

18  capacity, and Mr. Frazier and CVCSF are informed and believe that this defendant was at all

19  times alleged herein acting under color of state law and as a policy maker of the City of

20  Fresno.  The individual defendant formerly named as Doe 2 is now renamed as Former City

21  Manager Esqueda.

22    10.   Defendant City Manager Georgeanne White ("City Manager White") became

23  the City of Fresno's City Manager in February 2022.  City Manager White previously served

24  as Assistant City Manager, City Council Chief of Staff, Assistant Department Director of the

25  Department of Public Utilities, and Chief of Staff for former Mayors Alan Autry and Ashley

26  Swearengin, as well as in various positions in the public sector.  City Manager White is sued

27  in her individual capacity, and Mr. Frazier and CVCSF are informed and believe that this

28

FIRST AMENDED COMPLAINT FOR DAMAGES

-4-

1  defendant was at all times alleged herein acting under color of state law and as a policy

2  maker of the City of Fresno.  The individual defendant formerly named as Doe 3 is now

3  renamed as City Manager White.

4  　　　　11.  Defendant Former Assistant City Manager Jim Schaad ("Former Asst. City

5  Manager Schaad") became the City of Fresno's Assistant City Manager in August 2018 and

6  served in that capacity until January 2021.  Former Asst. City Manager Schaad is currently

7  the City Manager of the City of Marysville, California.  Former Asst. City Manager Schaad

8  previously had served as the City of Fresno's Director of Transportation, Assistant Director of

9  Transportation, and as a supervisor in the Fleet Management Division, as well as in the

10 private sector.  Asst. City Manager Schaad is sued in his individual capacity, and Mr. Frazier

11 and CVCSF are informed and believe that this defendant was at all times alleged herein

12 acting under color of state law and as a policy maker or co-policy maker of the City of

13 Fresno.

14 　　　　12.  Defendant Former Chief of Staff Tim Orman ("Former Staff Chief Orman")

15 became Former Mayor Brand's Chief of Staff in January 2017, after having served as Mayor

16 Brand's campaign consultant during the 2016 mayoral election campaign.  Former Staff

17 Chief Orman was Mayor Dyer's Chief of Staff from January 2021 through February 1, 2022.

18 Former Staff Chief Orman is sued in his individual capacity, and Mr. Frazier and CVCSF are

19 informed and believe that this defendant was at all times alleged herein acting under color of

20 state law and as a policy maker or co-policy maker of the City of Fresno.

21 　　　　13.  Defendant City Councilman Garry Bredefeld ("Councilman Bredefeld") is

22 presently in his second tenure as the Councilman for District 6, which corresponds to the

23 northeastern section of Fresno.  Councilman Bredefeld served on the City Council from 1997

24 through 2001 and since 2017.  Councilman Bredefeld is a retired psychologist, with a

25 doctorate in psychology. Councilman Bredefeld is sued in his individual capacity, and Mr.

26 Frazier and CVCSF are informed and believe that this defendant was at all times alleged

27 herein acting under color of state law and as a policy maker or co-policy maker of the City of

28

FIRST AMENDED COMPLAINT FOR DAMAGES

1  Fresno. The individual defendant formerly named as Doe 4 is now renamed as Councilman

2  Bredefeld.

3       14.   Defendant City Councilman Mike Karbassi ("Councilman Karbassi") currently

4  serves as the Councilman for District 2, which corresponds to the northwestern section of

5  Fresno.  Councilman Karbassi has served on the City Council since 2019.  Councilman

6  Karbassi is an entrepreneur in his private life, and he has declared his candidacy for

7  California's 27th Assembly District. Councilman Karbassi is sued in his individual capacity,

8  and Mr. Frazier and CVCSF are informed and believe that this defendant was at all times

9  alleged herein acting under color of state law and as a policy maker or co-policy maker of the

10  City of Fresno.  The individual defendant formerly named as Doe 5 is now renamed as

11  Councilman Karbassi.

12       15.   Defendant Fresno County District Attorney Lisa Smittcamp ("District Attorney

13  Smittcamp") currently serves as the head of the Fresno County District Attorney's Office.

14  District Attorney Smittcamp was sworn into office in January 2015.  District Attorney

15  Smittcamp was formerly a Deputy District Attorney in Madera County and Fresno County.

16  District Attorney Smittcamp is sued in her individual capacity, and Mr. Frazier and CVCSF

17  are informed and believe that this defendant was at all times alleged herein acting under color

18  of state law and as a policy maker or co-policy maker of the Fresno County District

19  Attorney's Office.  The individual defendant formerly named as Doe 6 is now renamed as

20  District Attorney Smittcamp.

21       16.   Mr. Frazier and CVCSF are ignorant of the true names and capacities of

22  defendants sued herein as DOES 7-20, and therefore sue said defendants by such fictitious

23  names. Along with the named individual defendants, each of the fictitious defendants are

24  legally responsible and liable for the injuries and damages alleged herein. Mr. Frazier and

25  CVCSF will amend this complaint to allege the true names and capacities of these defendants

26  when they are ascertained. These fictitious defendants are all sued in their personal capacities

27  for acts performed under color of law.

28

FIRST AMENDED COMPLAINT FOR DAMAGES

## FACTUAL ALLEGATIONS

17.   Effective December 7, 2015, CVCSF entered into a twenty-five-year Ground Lease with the City of Fresno regarding Granite Park, a 20-acre facility located within the City.  The Ground Lease is attached hereto as Exhibit A, and its contents are incorporated herein, pursuant to Federal Rule of Civil Procedure 10(c).

18.   By any reasonable measure, the Ground Lease provided the City of Fresno with substantial benefits.  At the time of this Ground Lease, Granite Park was a large, unused public property, and it was costing the City of Fresno hundreds of thousands of dollars annually just to maintain it in a minimal fashion, just so that it would not become hazardous.  As of the date of the Ground lease, Granite Park had accrued significant deferred maintenance.  Under the Ground Lease, CVCSF pledged to make up to $2.7 million in capital improvements to remedy the deferred maintenance problems, and reassured that it would not cost the City of Fresno anything other than a yearly $62,500 lease credit.  Moreover, at the conclusion of the Ground Lease term, title to any improvements would revert to the City of Fresno free and clear of any liens or expenses.  The Ground Lease also provided a potential for additional financial benefit to the City from income derived from billboard and signage rights, and concession receipts.  The Ground Lease contemplated no payments of public monies to CVCSF and hence contained no requirements pertaining to financial documentation, disclosures, or audits.

19.   As part of the Ground Lease, the City of Fresno also agreed to make reasonable efforts to provide recycled water, known as "purple water" for irrigation of Granite Park, which consists primarily of multiple baseball and soccer fields that otherwise would have to be irrigated by CVCSF at significant expense.  As part of its promise to make reasonable efforts to provide purple water to Granite Park, the City of Fresno also agreed to be responsible for any infrastructure improvements needed to make it available to the site.  The purple water provisions in the Ground Lease were material – indeed, essential -- to CVCSF's decision to enter into the agreement, since the long-term cost of obtaining water for Granite

FIRST AMENDED COMPLAINT FOR DAMAGES

1    Park's multiple grass playing fields from other sources is quite considerable.

2        20.    Under the Ground Lease, CVCSF owns an outright option to purchase Granite

3    Park, as well as a right of first refusal to purchase it.  The inclusion of these rights in the

4    Ground Lease provides a means for CVCSF's long term benefit from its efforts, as well as

5    potential handsome payment to the City for the improved property.  However, these valuable

6    purchase rights would be eliminated by CVCSF's default under the Ground Lease.

7        21.    In connection with the Ground Lease, CVCSF and the City of Fresno also

8    entered into a Service Agreement for recreational services and programming at Granite Park.

9    A copy of the Service Agreement is attached as Exhibit B, and its contents are incorporated

10   herein, pursuant to Federal Rule of Civil Procedure 10(c).

11       22.    Essentially, under the Service Agreement, CVCSF agreed to bear the cost of

12   any required maintenance, recreational activities, or programs at Granite Park, except that the

13   City of Fresno would pay an annual fee of $150,000 toward these expenses.  This $150,000

14   annual fee was significantly less than the City of Fresno had been spending to maintain

15   Granite Park in a minimal way for the prior several years, and it was recognized that amount

16   would not come close to covering the total expenses to be incurred.  The scope of services for

17   which CVCSF agreed to be responsible included providing year-round sports and

18   recreational programming for City of Fresno residents and sponsored users at no cost, and in

19   compliance with the City of Fresno's specifications.  CVCSF was also responsible for paying

20   the cost of and screening, hiring, and employing adequate staffing for these activities.  Under

21   the Service Agreement, CVCSF also agreed to maintain adequate financial records related to

22   its expenses for at least three years or longer if otherwise required by law.

23       23.    CVCSF complied with its contractual obligations in good faith, but the City of

24   Fresno did not. CVCSF raised more than $2 million for capital improvements, including

25   substantial personal funds from Mr. Frazier himself.  CVCSF complied with its sports and

26   recreational programming obligations, despite a lack of cooperation from the City of Fresno's

27   Parks and Recreation Department.  CVCSF complied with its maintenance and security

28

FIRST AMENDED COMPLAINT FOR DAMAGES

1   obligations, again without any cooperation and despite the City of Fresno's failure to make

2   any effort to provide cost-saving purple water.  The City of Fresno also failed to cooperate in

3   granting permits for proposed billboards and signage on the site, which further decreased

4   anticipated revenue.

5        24.    Due in no small part to the City of Fresno's failures to comply with its

6   contractual obligations in good faith, CVCSF incurred larger than anticipated losses.  In mid-

7   2018, Mr. Frazier – acting on behalf of CVCSF – exercised his First Amendment right to

8   petition the government for redress and requested that the City of Fresno renegotiate the

9   Service Agreement to increase its annual fee thereunder to $300,000.  The primary reasons

10  why this negotiation was requested was because the cost of procuring water for Granite Park

11  had not been lessened by the anticipated provision of purple water from the City of Fresno,

12  and there had been no anticipated billboard or signage revenue.

13       25.    In response to this renegotiation request, the City of Fresno requested an audit

14  of CVCSF's operational records pertaining to Granite Park.  Later interaction with City of

15  Fresno officials has revealed that this audit request was spearheaded by Mayor Brand, City

16  Manager Quan, Asst. City Manager Schaad, and Staff Chief Orman.  The purported purpose

17  of the audit was to justify the requested increase in the annual Service Agreement payment.

18  However, Mayor Brand, City Manager Quan, Asst. City Manager Schaad, and Staff Chief

19  Orman insisted that the audit be weaponized and have the objective of uncovering proof of

20  unlawful or unethical conduct by Mr. Frazier, rather than assessing the Granite Park project.

21  Furthermore, Mayor Brand, City Manager Quan, Asst. City Manager Schaad, and Staff Chief

22  Orman instructed the City Auditor – contrary to standard audit procedures – to forego

23  randomized sampling and instead utilize subjective sampling that has the obvious potential

24  for capriciousness, and which places the entire draft audit in question.

25       26.    Upon being informed of the audit, CVCSF promptly provided the City auditors

26  with several years of records, even those preceding the effective date of the Ground Lease

27  and Service Agreement.  In an effort to expedite the renegotiation process in good faith,

28

FIRST AMENDED COMPLAINT FOR DAMAGES

1  CVCSF provided records that had not been fully reviewed or finalized by its accountant or

2  attorneys, because it was so evident that the Granite Park was unprofitable.  Indeed, it was

3  obvious that CVCSF had not earned any revenue from the free sports and recreational

4  programming, and the lack of any purple water savings and billboard/signage revenue made

5  it obvious to anyone with any awareness of Granite Park's first three years of operations that

6  it was running a significant deficit.

7       27.    The expedited and unreviewed financial information provided was not perfect,

8  but it substantiated that the Granite Park project was running a genuine and substantial

9  deficit.  In response to the information provided by CVCSF, the City prepared a draft audit in

10  November 2018 that invited responses to various provisional findings.

11       28.    CVCSF conceded that its expedited information needed to be refined and

12  finalized and therefore withdrew its request to renegotiate the Service Agreement in a

13  November 26, 2018 letter.  The November 26, 2018 letter specifically proposed that CVCSF

14  and the City of Fresno auditors would work together "to develop and maintain the set of

15  procedures, controls and reports that would allow a qualified opinion to be rendered at a

16  future date."  The November 26, 2018 letter from CVCSF also included updated financial

17  statements and documentation that CVCSF proposed to review with the City.

18       29.    No further collaboration occurred pertaining to the draft audit.  To the contrary,

19  in late November 2018, CVCSF and Mr. Frazier were informed by the City of Fresno that the

20  audit would be "placed on hold" for six months.  As a result, CVCSF's pending responses to

21  the draft audit inquiries, which would have shown that the audit was erroneous in several

22  respects, were never finalized or submitted to the City.  Instead, after the audit was placed on

23  hold, CVCSF returned its attention to complying with its obligations under the Ground Lease

24  and Service Agreement and improving and providing services at Granite Park.

25       30.    Around the same period that the draft audit was circulated, Mr. Frazier was

26  involved in a lawsuit with a former Fresno restauranteur, Sammy Franco, to whom Mr.

27  Frazier had loaned approximately $300,000 as an investor in Mr. Franco's failed restaurant.

28
FIRST AMENDED COMPLAINT FOR DAMAGES

1  As reprisal for Mr. Frazier's suing him for this debt in August 2018, Franco immediately took

2  on Mr. Frazier through social media. In January 2019, knowing that an audit of the Granite

3  Park operations was pending, Mr. Franco submitted a Public Records Act request with the

4  City of Fresno requesting a copy of the audit report, at a time when the audit was still in

5  process and only a draft report had been done.

6      31.    Under California Government Code § 36525(b)(2), any work product or any

7  draft audit report, like the City's pending audit of CVCSF, is not considered a public record

8  eligible to be disclosed.  This provision exists precisely because many times an audit is an

9  ongoing process with several rounds of information provided in response to auditor inquiries.

10  The external audit process can sometimes take several months to complete, and the release of

11  any interim, draft version of an audit to the public and representing that its conclusions are

12  final is by definition false and misleading.

13      32.    Consistent with the letter and spirit of section 36525(b)(2), the members of the

14  City Auditor's Office, including Assistant Controller Mavet Mora, expressed concern

15  regarding the release of the draft audit to Mayor Brand, City Manager Quan, Asst. City

16  Manager Schaad, and Staff Chief Orman, but those concerns were disregarded.  Instead,

17  Mayor Brand, City Manager Quan, Asst. City Manager Schaad, Staff Chief Orman insisted

18  that the draft audit be deemed final, even though the process was ongoing and had actually

19  been suspended by the City of Fresno.  Indeed, Ms. Mora herself later revealed in her own

20  complaint that she was opposed to the release of the draft audit precisely because it was not

21  final, and she suffered retaliation as a result.  The Fresno City Council appointed a third-party

22  investigative law firm to evaluate Ms. Mora's claims, and that investigation uncovered facts

23  showing that representatives of the Mayor's and City Manager's Office had altered the

24  language and conclusions of the City Auditor and had concealed those alterations from the

25  City Council, including in the draft audit of the Granite Park project.

26      33.    The purpose of Mayor Brand, City Manager Quan, Asst. City Manager Schaad,

27  and Staff Chief Orman in having the draft audit deemed final – although it decidedly was not

28

1  -- was so that it could be hastily disclosed to Mr. Franco in response to his Public Records

2  Request.  Mayor Brand, City Manager Quan, Asst. City Manager Schaad, and Staff Chief

3  Orman all knew well that the provisional findings expressed in the draft audit were based on

4  a substandard sampling methodology and that the process for requesting clarifying

5  information had been discontinued by the City of Fresno itself.

6      34.    There was thus no good faith reason for Mayor Brand, City Manager Quan,

7  Asst. City Manager Schaad, or Staff Chief Orman to believe that the draft audit results had

8  been finalized, or that finalized results would be the same as the provisional findings of the

9  draft report.  Furthermore, Mayor Brand, City Manager Quan, Asst. City Manager Schaad,

10  Staff Chief Orman knew that the release of the draft audit report as an allegedly final report

11  would be extremely damaging to Mr. Frazier and CVCSF.

12      35.    The premature and misleading draft audit report was disclosed by the City of

13  Fresno to Mr. Franco, who immediately posted it and its false findings on social media

14  attacking Mr. Frazier and CVCSF's Granite Park project.  Soon thereafter, the draft audit was

15  prominently reported in the Fresno Bee.

16      36.    Even assuming, contrary to California Government Code § 36525, that the draft

17  audit report could have been released under applicable law, Mayor Brand, City Manager

18  Quan, Asst. City Manager Schaad, Staff Chief Orman and the City of Fresno had the option

19  of providing Mr. Frazier and CVCSF advance notice so that they could file a reverse Public

20  Records Act action to enjoin its release until the legality thereof could be tested in court.

21  However, Mr. Frazier and CVCSF were provided no such opportunity and were instead

22  completely blindsided by the release of the draft audit report.  By the time Mr. Frazier and

23  CVCSF learned that the draft audit report was being released, it was too late to raise any

24  formal legal challenge.  Mr. Frazier's and CVCSF's extrajudicial protests also went ignored.

25      37.    Since its January 2019 release to the public, the draft audit report has had very

26  negative economic impacts on Mr. Frazier, and on CVCSF.   Mr. Frazier has been denied

27  loans for other projects based upon the bad press associated with the draft audit repot; and

28

FIRST AMENDED COMPLAINT FOR DAMAGES

1  CVCSF has lost tournament revenue due to a reduction in bookings for softball and baseball

2  tournaments. The total financial losses are estimated at $4,350,000 for Mr. Frazier, and

3  $6,750,000 for CVCSF.

4        38.    After the release of the draft audit, Mr. Frazier made numerous requests to

5  Mayor Brand, City Manager Quan, Asst. City Manager Schaad, Staff Chief Orman and the

6  City of Fresno for the release of a public statement advising that CVCSF is in good standing

7  regarding its lease obligations. Those requests were repeatedly refused, although the Fresno

8  City Attorney, Douglas Sloan, stated in both closed and public City Council meetings

9  sessions that CVCSF is in substantial compliance with the Ground Lease and Service

10  Agreement.

11        39.    In addition to the City of Fresno's failure to comply with its contractual

12  obligations and the defendants' unlawful and damaging release of the draft audit report, they

13  took several steps attempting to break their agreements with CVCSF, and, as alleged herein

14  these efforts have continued into the current mayoral administration.  In early 2019, Mayor

15  Brand, City Manager Quan, Asst. City Manager Schaad, Staff Chief Orman and the City of

16  Fresno referred the draft audit report to the Fresno County District Attorney's Office for

17  "investigation" without disclosing the draft nature of the audit and the substandard

18  methodologies utilized.  This referral was also leaked to the press and appeared prominently

19  in the Fresno Bee, causing additional damages to the reputations and businesses of Mr.

20  Frazier and CVCSF.  Mr. Frazier, both individually and on behalf of CVCSF, has consistently

21  decried the leaking of the draft audit and the subsequent investigations as baseless,

22  inappropriate, and discriminatory.

23        40.    Mr. Frazier and CVCSF were also baselessly attacked by Asst. City Manager

24  Schaad in a March 5, 2019 meeting, during which the draft audit was again invoked as

25  "proof" of CVCSF's noncompliance with the Ground Lease and Service Agreement.

26  Promised follow-up meetings with Mayor Brand, City Manager Quan, Asst. City Manager

27  Schaad, Staff Chief Orman and the City of Fresno for purpose of reviewing the Ground Lease

28

FIRST AMENDED COMPLAINT FOR DAMAGES

1  and Service Agreement have not come to fruition.  Instead, these defendants have

2  consistently in the last three years attempted to create capricious grounds for asserting

3  defaults of the Ground Lease and Service Agreement by seeking unrealistic and unnecessary

4  projections of the Granite Park project's future development.

5       41.    Despite its pledge in the Ground Lease to make reasonable efforts to provide

6  Granite Park with purple water, the City has since disclosed that the provision of such water

7  was at all pertinent times infeasible and cost prohibitive.  In fact, the City of Fresno has no

8  system for delivering purple water from its wastewater treatment plant to other sites where it

9  could be utilized.  In September 2019, a City of Fresno spokesperson stated that "The

10  [Ground Lease] also says the city will provide recycled water through a purple pipe system

11  WHEN AVAILABLE. It is not currently available in that area and the cost to bring it from the

12  Wastewater Treatment Facility would cost millions of dollars."  In reliance on the City of

13  Fresno's negotiation representations and the terms of the Ground Lease, Mr. Frazier and

14  CVCSF have spent $200,000 per year on water for Granite Park, as well as the cost of

15  building connections to the City of Fresno's purple water.  At all times, Mr. Frazier and

16  CVCSF reasonably expected that the initial large water expenditures associated with Granite

17  Park would be mitigated by the impending connection to the City of Fresno's recycled water,

18  and they were never told that the provision of such water was infeasible.

19       42.    Mr. Frazier and CVCSF also learned that Mayor Brand, City Manager Quan,

20  Asst. City Manager Schaad, Staff Chief Orman and the City of Fresno had a collective

21  agenda to try to reclaim Granite Park in order to lease it to the Fresno Football Club ("FFC"),

22  a minor league affiliate of Major League Soccer that is owned by members of the majority

23  race.  Ironically, FFC announced it was folding in October 2019, reportedly leaving hundreds

24  of thousands of unpaid bills behind.  Mayor Brand and Staff Chief Orman were actively

25  involved in trying to procure Granite Park for FFC. Indeed, Mayor Brand, City Manager

26  Quan, Asst. City Manager Schaad, Staff Chief Orman and other City of Fresno staff all met

27  with FFC representatives numerous times regarding the Granite Park site and had been

28

FIRST AMENDED COMPLAINT FOR DAMAGES

1  observed driving around the Granite Park area surveying the complex.  These activities are

2  all despite the City of Fresno's contractual commitment to CVCSF for another 20 years, and

3  CVCSF's absolute and contingent purchase rights under the Ground Lease.

4      43.    At all pertinent times since January 2019 and continuing to the present time,

5  Mr. Frazier, on his own behalf and on behalf of CVCSF, has been critical of the defendants'

6  mishandling of the Granite Park project, their failure to abide by the terms of the Ground

7  Lease and Service Agreement, the unwarranted release of the draft audit, and the impropriety

8  of the investigations undertaken based on the released draft audit.  These criticisms have been

9  met with continuing and increased resistance, opposition, discrimination, and retaliation as

10  described elsewhere herein.

11      44.    The examples of discrimination and retaliation by the City of Fresno and the

12  individual defendants are multitudinous, and the following paragraphs contain only a partial

13  summary.  In July 2019, despite Frazier's request on behalf of CVCSF, the City of Fresno

14  refused to do what was necessary to process an intended application for Recreational

15  Infrastructure Revenue Enhancement (RIRE) funds from the State of California, which would

16  have increased the funding available to Granite Park for improvements and programming.

17  No explanation was ever provided for the City of Fresno's refusal to cooperate, and without

18  the City's cooperation the application could not be submitted.  Plaintiffs are informed and

19  believe this inaction was at the direction of defendants Former Mayor Brand, Former City

20  Manager Quan, Former Chief of Staff Orman and/or Former Asst. City Manager Schaad, on

21  behalf of and as policy makers for the City of Fresno.

22      45.    In August 2020, the City of Fresno refused to assist in the initiation and

23  processing of a Pacific Gas & Electric grant that could have substantially decreased the

24  amount of energy bills corresponding to Granite Park.  Plaintiffs are informed and believe

25  this inaction was at the direction of defendants Former Mayor Brand, Former City Manager

26  Quan, Former Chief of Staff Orman and/or Former Asst. City Manager Schaad, on behalf of

27  and as policy makers for the City of Fresno.

28

FIRST AMENDED COMPLAINT FOR DAMAGES

46.    In August 2020 when the Republican National Committee requested disclosure of the draft audit, the City of Fresno gave Mr. Frazier and CVCSF the meaningless option of taking steps to prevent disclosure, even though the draft audit was already in the public domain by that point.  No similar opportunity was afforded Mr. Frazier and CVCSF at the time Mr. Franco made the initial request for disclosure of the draft audit.  Plaintiffs are informed and believe this action was at the direction of defendants Former Mayor Brand, Former City Manager Quan, Former Chief of Staff Orman and/or Former Asst. City Manager Schaad, on behalf of and as policy makers for the City of Fresno.

47.    In August 2020 Former Mayor Brand, Former City Manager Quan, Former Asst. City Manager Schaad and/or former Chief of Staff Orman attempted to intervene in a closed session of the Fresno City Council to participate in discussions of the handling of this federal lawsuit, although as defendants they had a clear conflict of interest.  These actions resulted in the submission of a complaint to the California Fair Political Practices Commission (FPPC) on behalf of Mr. Frazier and CVCSF, which resulted only in further discrimination and retaliation against them.

48.    In February 2021, Mr. Frazier had agreed in principle with United Health Centers to develop eight acres near Kearney and Crystal Avenues in the southwest area of the City of Fresno.  United Health Centers has been aggressively expanding in the Central Valley in recent years, and it had plans to open new locations in southwest and southeast Fresno this year.  The southeast Fresno location, at Kings Canyon and Minnewawa Avenues has been developed on schedule, but the southwest location intended for the aforementioned eight-acre lot was stalled after former City Manager Thomas Esqueda told company representatives that they should not get involved in any projects with Mr. Frazier.  Mayor Dyer has similarly told intended developers to avoid doing business with Mr. Frazier, stating that "where there's smoke there's fire."  To date, the eight-acre lot purchased over a year ago remains undeveloped.

49.    In February and March of 2021, the City of Fresno withheld $44,498.56 in

1    funds that were payable to CVCSF, which were needed to pay PG&E bills for Granite Park.

2    The stated reason for this withholding was baseless and resulted in a notice of lease default

3    being submitted by CVCSF on March 5, 2021.  This notice only resulted in further

4    discrimination and retaliation against Mr. Frazier and CVCSF.  Plaintiffs are informed and

5    believe this inaction was at the direction of defendants Mayor Dyer, Former City Manager

6    Esqueda, and/or Former Chief of Staff Orman, on behalf of and as policy makers for the City

7    of Fresno.

8          50.    In approximately May 2021, Mayor Dyer was overheard in City Hall

9    discussing a plan to have CVCSF's Granite Park lease terminated and/or CVCSF declared in

10   default, at a time when the City of Fresno was purportedly engaging in negotiations with Mr.

11   Frazier and CVCSF to amend the lease and settle this lawsuit.

12         51.    On June 21, 2021, the City of Fresno agreed in principle with Mr. Frazier and

13   CVCSF to amend the Ground Lease and settle this lawsuit.  The City of Fresno presented Mr.

14   Frazier and CVCSF with an amended Ground Lease and proposed settlement agreement,

15   which they requested be signed by them and their counsel prior to the June 24, 2021 session

16   of the City Council to vote on the upcoming fiscal year's budget.  The proposed amended

17   Ground Lease and accompanying proposed settlement agreement are attached hereto as

18   Exhibit C.  The contents of these documents are incorporated herein, pursuant to Federal

19   Rule of Civil Procedure 10(c).  The amended Ground Lease proposed to substitute CVCSF's

20   successor tenant, along with payment of $2,000,000 in advanced signage revenue that would

21   be repaid over time.  The proposed settlement agreement provided for the payment of

22   $2,300,000 in debt that had been incurred by CVCSF and Mr. Frazier in improving,

23   maintaining, and running Granite Park for six years.  The amended lease and proposed

24   settlement represented an excellent resolution for the City of Fresno, since the contemplated

25   disbursements would have been no more than what it would have had to pay itself to

26   improve, maintain and run the part over the period of the Ground Lease, while at the same

27   time settling a potentially expensive lawsuit and arriving at an amicable arrangement for the

28

FIRST AMENDED COMPLAINT FOR DAMAGES

1  future of Granite Park.

2      52.    Representatives of the City of Fresno represented that the amended lease and

3  settlement, and the related disbursements of funds, had the support of the majority of the City

4  Council for inclusion in the pending budget.  The approval of the City budget only requires a

5  majority vote of the City Council, whereas any special disbursement outside of the City's

6  budget, requires approval by two-thirds of the Council.  However, the same date as the

7  tendering and signing of the amended Ground Lease and proposed settlement agreement,

8  Former City Manager Esqueda – despite personally participating in the negotiations that

9  resulted in the tentative settlement – contacted District Attorney Smittcamp and sought her

10 assistance in removing the approval of the amended Ground Lease and proposed settlement

11 agreement from the June 24, 2021 City Council agenda.  Plaintiffs are informed and believe

12 these actions were at the direction of defendants Mayor Dyer, Former City Manager Esqueda,

13 Former Chief of Staff Orman, Councilman Bredefeld, and Councilman Karbassi, on behalf of

14 and as policy makers for the City of Fresno.  Plaintiffs are further informed and believe that

15 District Attorney Smittcamp assisted in these actions based on the Plaintiffs' criticisms of the

16 legitimacy of the 2019 draft audit investigation by her office, both informally and in this

17 lawsuit, and also to assist other defendants in continuing to discriminate and retaliate against

18 Plaintiffs for their above-detailed protected conduct.

19     53.    On June 23, 2021, the day before the City Council budget, including the

20 amended Ground Lease and proposed settlement agreement, was to be voted on and

21 approved, District Attorney Smittcamp issued a press release and simultaneously sent letters

22 to the members of the City Council and other officials.  This document is attached hereto as

23 Exhibit D and incorporated herein pursuant to Federal Rule of Civil Procedure 10(c).  The

24 press release and letter announced that her office was investigating alleged "potential Brown

25 Act violations by members of the Fresno City Council related to dealings involving Granite

26 Park."  No allegations were specified, nor was it explained why mere allegations were

27 deemed sufficient to make public.  Furthermore, in the press release and letter, District

28

FIRST AMENDED COMPLAINT FOR DAMAGES

1  Attorney Smittcamp took the unprecedented step of requesting that the City Council postpone

2  consideration of any issues related to Granite Park pending the outcome of her office's

3  investigation.  Solely because of the unspecified threat of a pending criminal investigation,

4  the approval of the amended Ground Lease, the proposed settlement agreement, and any

5  disbursements related thereto were removed from the June 24, 2021 City Council agenda, as

6  specifically requested by District Attorney Smittcamp.  Plaintiffs are informed and believe

7  these actions were at the direction of defendants Mayor Dyer, Former City Manager Esqueda,

8  Former Chief of Staff Orman, Councilman Bredefeld, and/or Councilman Karbassi, on behalf

9  of and as policy makers for the City of Fresno.  Concurrent with District Attorney

10 Smittcamp's damaging press release, Councilman Bredefeld made his own press release

11 characterizing the amended Ground Lease and proposed settlement as an "egregious betrayal

12 of the taxpayer" despite the clear benefit of the arrangement to the City.  Plaintiffs are further

13 informed and believe that District Attorney Smittcamp assisted in these actions based on the

14 Plaintiffs' criticisms of the legitimacy of the 2019 draft audit investigation by her office, both

15 informally and in this lawsuit, and also to assist other defendants in continuing to

16 discriminate and retaliate against Plaintiffs for their above-detailed protected conduct.

17    54.    Beginning in approximately the fall of 2021, officials from the City of Fresno

18 began working to encourage CVCSF's lenders to issue notices of default as to loans related to

19 Granite Park, so that it could in turn find that CVCSF defaulted on the Ground Lease.

20 Plaintiffs are informed and believe that these efforts are ongoing, and that the City of Fresno

21 has actively sought to enlist other parties to assume CVCSF's debt and replace it as the tenant

22 of Granite Park.  Plaintiffs are informed and believe these actions were at the direction of

23 defendants Mayor Dyer, Former City Manager Esqueda, Former Chief of Staff Orman,

24 Councilman Bredefeld, and Councilman Karbassi, on behalf of and as policy makers for the

25 City of Fresno.

26    55.    In November 2021, a commercial building in downtown Fresno owned by Mr.

27 Frazier was consumed by an arson fire.  The City insisted that Mr. Frazier immediately pay in

28

FIRST AMENDED COMPLAINT FOR DAMAGES

1  full for cleanup and asbestos remediation, or that he otherwise would be billed an exorbitant

2  cost for the same by the City.  Plaintiffs are informed and believe these actions were at the

3  direction of defendants Mayor Dyer, Former City Manager Esqueda, Former Chief of Staff

4  Orman, Councilman Bredefeld, and Councilman Karbassi, on behalf of and as policy makers

5  for the City of Fresno.

6       56.    In January 2022, City officials advised Steve Thatcher, the owner of the

7  company --Activated Events -- that stages the Boots in the Park Music Festival, that his

8  company would have "a hard time" obtaining approval for its festival at Granite Park,

9  although the festival had been held there in past years.  As a result of discouragement by City

10  officials and the efforts of Councilman Bredefeld to move the festival to Woodward Park, the

11  event is being held next week on May 13, 2022 at Woodward Park instead of at Granite Park.

12  The loss of this event, despite the tentative commitment of Activated Events to hold it at

13  Granite Park again this year, has resulted in a significant loss of revenue.  Plaintiffs are

14  informed and believe these actions were at the direction of defendants Mayor Dyer, Former

15  City Manager Esqueda, City Manager White, Former Chief of Staff Orman, Councilman

16  Bredefeld, and Councilman Karbassi, on behalf of and as policy makers for the City of

17  Fresno.

18       57.    On March 2, 2022, District Attorney Smittcamp issued another press release,

19  this time announcing that her office's investigation of the City Council for alleged violations

20  of the Brown Act related to Granite Park was closed, but more prominently mentioning the

21  purported ongoing nature of a federal investigation regarding the 2019 draft audit of CVCSF.

22  This document is attached hereto as Exhibit E and incorporated herein pursuant to Federal

23  Rule of Civil Procedure 10(c).  The United States Department of Justice has a longstanding

24  policy of not disclosing the status of ongoing investigations, so it is questionable how District

25  Attorney Smittcamp would be privy to such information, or why she saw fit to disclose it in a

26  press release.  It is unknown why the federal government would be interested in any issue

27  related to a draft audit that determined the existence of – at most -- minor accounting issues

28

1  that would hardly influence any creditor and which do not suggest any illegal intent.

2  Plaintiffs are informed and believe that to the extent any federal investigation ever existed it

3  was at the urging of City officials intending to harm, discriminate and retaliate against

4  Plaintiffs.  Plaintiffs are informed and believe these actions were at the direction of

5  defendants Mayor Dyer, Former City Manager Esqueda, Former Chief of Staff Orman, City

6  Manager White, Councilman Bredefeld, and/or Councilman Karbassi, on behalf of and as

7  policy makers for the City of Fresno.  Plaintiffs are further informed and believe that District

8  Attorney Smittcamp assisted in these actions based on the Plaintiffs' criticisms of the

9  legitimacy of the 2019 draft audit investigation by her office, both informally and in this

10 lawsuit, and also to assist other defendants in continuing to discriminate and retaliate against

11 Plaintiffs for their above-detailed protected conduct.

12     58.     District Attorney's March 2, 2022 press release also improperly proposed that

13 the City of Fresno charter be amended to give Mayor Dyer, her close friend, authority to hire

14 and fire the City Attorney.  No City in California has such an arrangement, which would

15 centralize excessive power in Mayor Dyer's office and give him the authority to weaponize

16 the City Attorney against other branches of local government and employees.  Plaintiffs are

17 informed and believe that District Attorney Smittcamp made this proposal in part to make it

18 easier for Mayor Dyer and other defendants to discriminate and retaliate against Plaintiffs.

19 Indeed, Mayor Dyer has repeatedly stated that if he had the authority he would have already

20 defaulted Plaintiffs and taken back Granite Park.  Plaintiffs are informed and believe these

21 actions were at the direction of defendants Mayor Dyer, Former City Manager Esqueda,

22 Former Chief of Staff Orman, City Manager White, Councilman Bredefeld, and/or

23 Councilman Karbassi, on behalf of and as policy makers for the City of Fresno.  Plaintiffs are

24 further informed and believe that District Attorney Smittcamp assisted in these actions based

25 on the Plaintiffs' criticisms of the legitimacy of the 2019 draft audit investigation by her

26 office, both informally and in this lawsuit, and also to assist other defendants in continuing to

27 discriminate and retaliate against Plaintiffs for their above-detailed protected conduct.

28

FIRST AMENDED COMPLAINT FOR DAMAGES

59.   In March and April 2022, the City has also engaged in a pattern of harassment of Plaintiffs and releasing media statements non-controversial compliance issues to the media in an effort to damage them.  Specifically, the City – Mayor Dyer, City Manager White, Councilman Bredefeld, and Councilman Karbassi – each made repeated indignant statements to the media regarding the alleged absence of insurance and alcohol insurance coverage and a related contention that CVCSF was in default of the Ground Lease.  However, Granite Park was at all times insured and there was only a minor endorsement change that was required in the Commercial General Liability policy.  Furthermore, liquor liability coverage was always part of the Granite Park insurance coverage -- the City capriciously required difficult to obtain additional excess coverage that it does not require of other City tenants who sell significantly more alcohol than the average of $500-$700 per day that Granite Park sells. The insurance issues were at all times resolvable, and the City was never uninsured, yet City officials saw fit to make damaging statements to the media and, for a short while, prohibit alcohol sales at Granite Park.  Plaintiffs are informed and believe these actions were at the direction of defendants Mayor Dyer, Former City Manager Esqueda, Former Chief of Staff Orman, City Manager White, Councilman Bredefeld, and/or Councilman Karbassi, on behalf of and as policy makers for the City of Fresno.

60.   The City continues to harass Plaintiffs regarding non-issues in April and May 2022, although not yet publicly.  Specifically, the City has taken issue with the alleged consumption of personal alcoholic beverages by Granite Park visitors, despite the existence of appropriate prohibitory signage and there being no indication of laxity on behalf of Granite Park staff, who have no police powers.  The City has also made an issue of special event parking, once again in the absence of any indication of noncompliance or bad faith by Plaintiffs.  Plaintiffs are informed and believe these actions were at the direction of defendants Mayor Dyer, Former City Manager Esqueda, Former Chief of Staff Orman, City Manager White, Councilman Bredefeld, and/or Councilman Karbassi, on behalf of and as policy makers for the City of Fresno.

61.    All of the foregoing misconduct has occurred during a time when the City of Fresno has otherwise aggressively encouraged new development and the improvement of both public and private properties.  To the contrary, the current stated policy of the City is "to honor developers' time and budgets, and to work together to 'get to yes.'"  Mayor Dyer's administration, similar to preceding administrations, has had a public and cozy relationship with majority race developers, such as Darius Assemi, Cliff Tutelian and Leland Parnagian. Councilman Karbassi has accepted the maximum individual donation from Mr. Assemi, with whom he also co-hosts a radio show, for his Assembly campaign.  City Manager White is president of a Kashian family charitable foundation, although Mr. Kashian is a prominent majority race local developer who regularly does business with the City.  No other developer, and certainly not one of another race who has declined to exercise his protected First Amendment rights to criticize and petition for redress, has been treated similarly.  No other developer has been publicly undermined and had issues pertaining to him referred for federal and local investigations, much less publicly.

62.    As a result of the defendants' above-described misconduct, Mr. Frazier and CVCSF have been substantially damaged.  Mr. Frazier's and CVCSF's property interests in the Granite Park Ground Lease and in its mandatory and conditional purchase rights thereunder, have been devalued due to disclosures that have decreased the value of the project.  CVCSF has lost lucrative sponsorships as a result of the negative publicity generated by the City's misconduct, and Valleywide Beverages opted not to pursue a purchase of the Granite Park facility for the same reason.  Furthermore, both Mr. Frazier and CVCSF have been damaged in their abilities to pursue and profit from their chosen professions and businesses.  Additionally, Mr. Frazier and CVCSF have been impaired in their abilities to profit from other business opportunities unrelated to Granite Park. Finally, Mr. Frazier has suffered general damages, including humiliation, damage to reputation, anger, embarrassment, and related emotional distress.  All of these damages are accruing in nature, and they are all compensable under the federal and state laws asserted herein.

FIRST AMENDED COMPLAINT FOR DAMAGES

1

## CAUSES OF ACTION

2

**First Cause of Action**
**2 U.S.C. § 1983 – First Amendment Retaliation**
**(On Behalf of Mr. Frazier and CVCSF Against All Defendants)**

3

4        63.      Plaintiffs incorporate the foregoing paragraphs as if set forth herein.

5        64.      Former Mayor Lee Brand, Mayor Jerry Dyer, Former City Manager Wilma

6    Quan, Former City Manager Thomas Esqueda, City Manager Georgeanne White, Assistant

7    City Manager James Schaad, Chief of Staff Tim Orman, City Councilman Garry Bredefeld,

8    City Councilman Mike Karbassi, Fresno County District Attorney Lisa Smittcamp, and Does

9    7-20 at all pertinent times were acting in their capacities as public employees and under color

10   of state law.

11       65.      In making a request for renegotiation of the Ground Lease and Service

12   Agreement in mid-2018, in protesting the release of the draft audit in January 2019, in filing

13   this federal action in 2020, in complaining to the FPPC in 2020, in asserting default against

14   the City of Fresno in 2021, and in at all times alleged above disputing and criticizing the

15   defendants in the media, in Mr. Frazier and CVCSF were exercising their First Amendment

16   rights to petition the government for redress, to protest government impropriety, and to

17   criticize government officials.  Under applicable law, the assertion of these rights cannot be

18   the subject of retaliation by government actors.

19       66.      To be sure, the actions of Mayor Lee Brand, Mayor Jerry Dyer, Former City

20   Manager Wilma Quan, Former City Manager Thomas Esqueda, City Manager Georgeanne

21   White, Assistant City Manager James Schaad, Chief of Staff Tim Orman, City Councilman

22   Garry Bredefeld, City Councilman Mike Karbassi, Fresno County District Attorney Lisa

23   Smittcamp, and Does 7-20, and the City of Fresno in response to Mr. Frazier's and CVCSF's

24   exercise of their First Amendment rights would have chilled a person of ordinary firmness

25   from continuing to engage in protected activity.  After they began to assert their First

26   Amendment rights, Mr. Frazier and CVCSF were subject to an audit that belied the obvious

27

28
FIRST AMENDED COMPLAINT FOR DAMAGES

1  fact that they were losing money on the Granite Park project.   Mr. Frazier and CVCSF also

2  had their reputations and professional and business standing harmed by the release of a

3  partial, substandard, draft audit as purportedly final and adverse.  Mr. Frazier and CVCSF

4  also had that same draft audit referred to the Fresno County District Attorney and United

5  State Attorney, without a disclosure that it was neither final nor complete.  Mr. Frazier and

6  CVCSF have been the subject of negative republications in the media, which have further

7  damaged their liberty and property interests.  Mr. Frazier and CVCSF have also been under

8  the continuous threat of the forfeiture of their contractual and property rights, as well as

9  harassing and meritless allegations of contractual default.

10      67.    Mr. Frazier's and CVCSF's protected activity was a substantial, motivating

11  factor in the retaliation described in the preceding paragraphs.  Motivation, like any mental

12  state, may be inferred from the salient surrounding facts, and those facts show that there was

13  a sudden and otherwise inexplicable difference in how Mr. Frazier and CVCSF were treated

14  by the defendants once they began petitioning for redress, complaining of impropriety, and

15  criticizing public officials.

16      68.    Mayor Lee Brand, Mayor Jerry Dyer, Former City Manager Wilma Quan,

17  Former City Manager Thomas Esqueda, City Manager Georgeanne White, Assistant City

18  Manager James Schaad, Chief of Staff Tim Orman, City Councilman Garry Bredefeld, City

19  Councilman Mike Karbassi, Fresno County District Attorney Lisa Smittcamp, and Does 7-20

20  were all acting in their capacities as policymakers on behalf of the City of Fresno in

21  spearheading the retaliation against Mr. Frazier and CVCSF.  When a policymaker acts or

22  purports to act as a high-ranking or ultimate municipal authority whose actions are not

23  reasonably subject to review or overruling, his or her actions can fairly be said to constitute

24  the policy of the public entity under the *Paprotnik* rule.  The campaign of retaliation against

25  Mr. Frazier and CVCSF was not only municipal policy, but it was the moving force behind

26  the constitutional deprivation alleged in this cause of action.  Therefore, the City of Fresno is

27  liable for the violation of Mr. Frazier's and CVCSF's First Amendment rights, in addition to

28

the individual defendants.

69.    As a result of the misconduct of Mayor Lee Brand, Mayor Jerry Dyer, Former City Manager Wilma Quan, Former City Manager Thomas Esqueda, City Manager Georgeanne White, Assistant City Manager James Schaad, Chief of Staff Tim Orman, City Councilman Garry Bredefeld, City Councilman Mike Karbassi, Fresno County District Attorney Lisa Smittcamp, and Does 7-20, both Mr. Frazier and CVCSF sustained harm and injury, both to their protected property interests in the Granite Park project, but also their liberty interest in practicing their professions and businesses.  Mr. Frazier also sustained general damages, including humiliation, embarrassment, anger, and related emotional distress.

70.    The intentional misconduct of the individual defendants was intended to cause Mr. Frazier and CVCSF harm and was therefore malicious and despicable.  Accordingly, an award of punitive damages is requested.

71.    Mr. Frazier and CVCSF also request an award of attorney's fees, costs, and ancillary relief under 42 U.S.C. § 1988.

**Second Cause of Action**
**42 U.S.C. §§ 1981, 1983 – Discriminatory Denial of Contract Rights and Denial of Equal Protection, both as a Class and as an Individual**
**(On Behalf of CVCSF Against All Defendants)**

72.    Plaintiffs incorporate the foregoing paragraphs as if set forth herein.

73.    Mayor Lee Brand, Mayor Jerry Dyer, Former City Manager Wilma Quan, Former City Manager Thomas Esqueda, City Manager Georgeanne White, Assistant City Manager James Schaad, Chief of Staff Tim Orman, City Councilman Garry Bredefeld, City Councilman Mike Karbassi, Fresno County District Attorney Lisa Smittcamp, and Does 7-20, at all pertinent times were acting in their capacities as public employees and under color of state law.

74.    CVCSF, as a minority-founded non-profit entity, has right under 42 U.S.C. § 1981 to equality in the making and enforcement of contracts, which includes rights pertaining

1   to the making, performance, modification, and termination of contracts, and the enjoyment of

2   all benefits, privileges, terms, and conditions of the contractual relationship.  Mr. Frazier,

3   both as a minority and an individual singled out without any rational basis, has equal

4   protection rights against government mistreatment.  These private rights of action are

5   enforceable against public actors and public entities under the *Jett* rule through 42 U.S.C. §

6   1983, and, with respect to the alleged deprivations of equal protection, under section 1983

7   generally.

8        75.    The facts attendant to the above-alleged misconduct show that racial and

9   individual animus was the but-for cause thereof.  Specifically, there has not been a similarly

10  situated Caucasian or majority owned business subject to audit for requesting renegotiation of

11  an agreement that was clearly nowhere near as profitable as anticipated.  There also has not

12  been a weaponized audit of a project managed by a similarly situated Caucasian or majority

13  owned business that in reality was an effort to document law or ethics violations.  Nor has

14  any similarly situated Caucasian or majority owned business had an incomplete, substandard

15  draft audit published that was likewise damaging in nature.  There also has not been a

16  similarly situated Caucasian or majority owned business that has had an investigation

17  suspended by the City of Fresno nonetheless referred to the Fresno County District

18  Attorney's Office and United States Attorney's Offices for possible criminal investigation.

19  There also has not been a Caucasian or majority owned business with a similar 25-year

20  contract that was attempted to be broken in favor of a business owned by persons of another

21  race.  Further, there has not been a Caucasian or majority owned business similarly harassed

22  and disparaged in the media on the basis of an incomplete investigation and other untruths

23  that were known to be similarly harmful to the subject's reputation and business prospects, or

24  based on typical business compliance issues that are typically handled discreetly and without

25  publicity.  Finally, there has been no other developer in Fresno of any race or any other

26  identity, who has been the subject of repeated disparagement intended to discourage third

27  parties from doing business with him.  These circumstances strongly suggest that race was

28

FIRST AMENDED COMPLAINT FOR DAMAGES

1  not merely the motivating factor behind the defendants' actions – it was the but-for cause

2  therefor.  These facts also show that Mr. Frazier's "class of one" status as an individual being

3  singled out was the but-for case of the mistreatment alleged herein above.

4       76.    Mayor Lee Brand, Mayor Jerry Dyer, Former City Manager Wilma Quan,

5  Former City Manager Thomas Esqueda, City Manager Georgeanne White, Assistant City

6  Manager James Schaad, Chief of Staff Tim Orman, City Councilman Garry Bredefeld, City

7  Councilman Mike Karbassi, Fresno County District Attorney Lisa Smittcamp, and Does 7-20

8  were all acting in their capacities as policymakers on behalf of the City of Fresno in

9  spearheading the above-summarized disparate treatment against CVCSF.  When a

10 policymaker acts or purports to act as a high-ranking or ultimate municipal authority whose

11 actions are not reasonably subject to review or overruling, his or her actions can fairly be said

12 to constitute the policy of the public entity under the *Paprotnik* rule.  The campaign of

13 disparate treatment against CVCSF and Mr. Frazier was not only municipal policy, but it was

14 the moving force behind the constitutional deprivations alleged in this cause of action.

15 Therefore, the City of Fresno is liable for the violation of CVCSF's section 1981 rights and

16 Mr. Frazier's equal protection rights under section 1983, in addition to the individual

17 defendants.

18      77.    As a result of the misconduct of Mayor Lee Brand, Mayor Jerry Dyer, Former

19 City Manager Wilma Quan, Former City Manager Thomas Esqueda, City Manager

20 Georgeanne White, Assistant City Manager James Schaad, Chief of Staff Tim Orman, City

21 Councilman Garry Bredefeld, City Councilman Mike Karbassi, Fresno County District

22 Attorney Lisa Smittcamp, and Does 7-20, CVCSF and Mr. Frazier sustained harm and injury,

23 both to their protected property interests in the Granite Park project, and also their liberty

24 interests in practicing their chosen professions and businesses.

25      78.    The intentional misconduct of the individual defendants was intended to cause

26 CVCSF and Mr. Frazier harm and was therefore malicious and despicable.  Accordingly, an

27 award of punitive damages is requested.

28
FIRST AMENDED COMPLAINT FOR DAMAGES

1    79.    CVCSF and Mr. Frazier also request an award of attorney's fees, costs, and

2  ancillary relief under 42 U.S.C. § 1988.

3                          **PRAYER FOR RELIEF**

4        WHEREFORE, Plaintiffs pray for the following relief:

5        1.    For general and special damages against each defendant in an amount proven at

6  trial.

7        2.    For punitive damages against the individual and fictitious defendants, in an

8  amount appropriate to punish and to deter others from engaging in similar misconduct.

9        3.    For costs and attorney's fees pursuant to 42 U.S.C. § 1988 and as otherwise

10  authorized by statute or law.

11        4.    For prejudgment interest as allowed by applicable law.

12        5.    For other such relief as the Court may deem proper.

13                        **DEMAND FOR JURY TRIAL**

14      Plaintiffs demand a jury trial to the greatest extent permissible under the Seventh

15  Amendment and applicable state constitutional and statutory law.

16      In Fresno, California, this 6th day of May 2022.

17                                    Respectfully Submitted,

18                                    **LAW OFFICE OF KEVIN G. LITTLE**

19                                    */s/ Kevin G. Little*
20                                    Kevin G. Little

21                                    **COLEMAN & HOROWITT, LLP**

22                                    */s/ David J. Weiland*
                                      David J. Weiland
23                                    Attorneys for Plaintiffs Terance Frazier and
                                      The Central Valley Community Sports Foundation
24

25

26

27

28
FIRST AMENDED COMPLAINT FOR DAMAGES

EXHIBIT A

# GROUND LEASE
## by and between
## THE CITY OF FRESNO
### and
## CENTRAL VALLEY COMMUNITY SPORTS FOUNDATION
## Regarding GRANITE PARK

This Ground Lease ("Lease") is made as of the 7th day of December 2015, (the "Effective Date") by and between the CITY OF FRESNO, a municipal corporation ("Landlord"), and CENTRAL VALLEY COMMUNITY SPORTS FOUNDATION, a California non-profit corporation ("Tenant").

## RECITALS

A.    Landlord is the owner of record of all of that certain real property commonly known as Granite Park (the "Property") situated in Fresno, California.

B.    Tenant wishes to develop the Property as a regional recreational asset providing a wide array of recreational opportunities and valuable public activity space, including baseball fields, volleyball courts, and associated commercial development.

C.    Landlord wishes to lease a portion the Property to Tenant (the "Premises"), together with all rights, privileges, and easements appurtenant thereto, and improvements thereon, on the terms and conditions set forth herein.

## AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.    <u>Lease of Premises</u>.  Landlord hereby leases, transfers and demises to Tenant, and Tenant hereby leases and takes from Landlord, the Premises for the terms and upon the agreements, covenants and conditions set forth in this Lease.  A description of the Premises is more fully set forth in Exhibit A attached hereto.

2.    <u>Term</u>.  The Initial Term of this Lease shall be twenty-five years (the "Initial Term") commencing on the Effective Date.  This Lease shall automatically renew for five additional ten-year Terms thereafter, unless either party gives notice to the other at least three months prior to the end of the current term of that party's desire to modify or terminate all or any portion of this Lease at the end of the current Term.  Together, the Initial Term and any extensions shall be referred to herein as the "Term."

3.    <u>Rent</u>.  Rent shall be accrued at $62,500 annually and credited against the value of the Capital Improvements constructed on the Premises by Tenant, estimated at $2.7 million, and more fully described in Section 10.2 of this Lease.  Rent shall be increased annually at a rate of 2.75%.  At the conclusion of the Initial Term, rent shall be renegotiated, taking into account the value of (i) any capital improvements made during the Initial Term in addition to the $2.7 million in Capital Improvements contemplated in this Lease, and (ii) any capital improvements contemplated over the next extension

1

term.  Tenant shall be given rent credit for the value/anticipated value of those improvements.

4.     <u>Taxes and Assessments</u>.

4.1     Tenant covenants and agrees to pay and discharge, during the entire Term, before delinquency, all taxes, assessments, water charges, sewer charges, utility rates and fees, levies or other charges, general, special, ordinary, extraordinary and otherwise, of every kind and character which are or may during the Term be levied, charged, assessed or imposed upon or against the Premises or any buildings or improvements which are now or hereafter located thereon, or against any of Tenant's personal property now or hereafter located thereon, or which may be levied, charged, assessed or imposed upon or against the leasehold estate created hereby.  In addition, Tenant shall pay any tax assessed exclusively on rental income of Landlord to the extent such income is allocable to this Lease, if and only if such tax is assessed by State or local authorities upon the elimination and in lieu of taxation based on the ownership of real property.  At the commencement and at the end of the Term, such taxes, assessments and other charges to be paid by Tenant shall be prorated on the basis of the fiscal year of the taxing authority in question so that, at the commencement and at the end of the Term, as to any such taxes, assessments and other charges levied or assessed for a fiscal year preceding the commencement or extending beyond the end of the Term, Tenant will pay only such proportion of such taxes, assessments and other charges as the portion of such fiscal year following the commencement and preceding the end of the Term bears to the entire fiscal year.

4.2     Landlord shall have the right, but not the obligation, at all times during the Term to pay any taxes, assessments or other charges levied or assessed upon or against the Premises or any buildings or improvements which are now or hereafter located thereon, and to pay, cancel and clear off all tax sales liens, charges and claims upon or against the Premises or any buildings or improvements which are now or hereafter located thereon, and to redeem the Premises from the same, or any of them, from time to time, without being obligated to inquire as to the validity of the same.  Any sum so paid by Landlord shall become due and payable by Tenant on the next day after any such payment by Landlord.

4.3     Tenant shall be subject to and responsible for compliance with any Granite Park Common Area regulations.  City shall pay Granite Park Common Area Maintenance (CAM) charges applicable to the Premises.

5.     <u>Quiet Enjoyment</u>.  Landlord covenants that upon payment by Tenant of the rent herein reserved and upon performance and observance by Tenant of all of the agreements, covenants and conditions herein contained on the part of Tenant to be performed and observed, Tenant shall peaceably hold and quietly enjoy the Premises during the entire Term without hindrance, molestation or interruption by Landlord or by anyone lawfully or equitably claiming by, through or under Landlord.

6.     <u>Use</u>.  Tenant shall have the right to use the Premises for any lawful purpose; provided, however, in no event shall the Premises be used for any purpose or use (nor shall any activity be carried on upon the Premises) which in any manner causes,

creates or results in a public or private nuisance, or diminishes the value of Landlord's fee estate.

6.1    Billboard and Signage Rights.  Tenant shall own the exclusive right to, sublease or operate limited areas on the Premises for digital or other billboard signage. The exact location and dimensions of digital billboard signage is to be mutually agreed upon by Landlord and Tenant.  The number and location of other billboards and signs shall be approved by City at its discretion.  Tenant may, at its election, participate in the City's RFP process for selection of an electronic billboard contractor.

6.2    For each year the digital billboard is in operation, Tenant shall retain $60,000 in revenue generated by the billboard, which shall be used to partially fund a capital reserve account.  Any revenue in excess of $60,000 annually shall be split equally between Landlord and Tenant.  All revenue generated from the sublease or operation of billboards and signs shall be reinvested into the Premises, for uses including but not limited to, payment of debt service, operating expenses, funding capital improvements, and community and municipal recreational programming. Signage must comply with the regulations of any state, federal or local agency with jurisdiction over such matters, such as Caltrans.  Obtaining approval from other state, federal or local agencies shall be the sole responsibility of Tenant.

6.3    Concessions.  All concessions shall be subject to the prior approval of Landlord, and such approval shall not be unreasonably withheld.

6.4    Proximity to Airport.  Because of the proximity of the Premises to Fresno Yosemite International Airport ("Airport"), Tenant acknowledges it shall not engage in or conduct or permit the conduct of any activity on the Premises which will interfere in any manner with the operation of the Airport or with aircraft operations or related operations conducted on the airport by Landlord or its lessees, and shall not make use of the Premises in any manner which might interfere with the landing and taking off of aircraft from the Airport, or otherwise constitute an airport hazard.

7.    Title to Buildings and Improvements.

7.1    Title to all buildings, structures and improvements that now, or may from time to time constitute a part of the Premises, shall be and remain in Tenant until the termination of this Lease.  Upon the termination of this Lease, title to all such property, buildings, structures and improvements shall pass to and vest in Landlord without cost or charge to it, free and clear of all liens, and in good condition, reasonable wear and tear excepted.

7.2    Tenant, on termination of this Lease, shall execute and deliver any and all deeds, bills of sale, assignments, and other documents which in Landlord's sole judgment may be necessary or appropriate to transfer, to evidence or to vest in Landlord clear title to any of the property described in the foregoing subsection 7.1 located on the Premises at the time of such termination.

7.3    Tenant, in addition, shall deliver to Landlord on termination of this Lease originals or certified copies of any plans, reports, surveys, contracts or other items relating to the ownership or operation of the Premises.

7.4     Upon the termination of this Lease, Landlord reserves the right to require Tenant to demolish and clear the site of any buildings, structures or improvements made by Tenant, at Tenant's expense.

8.      <u>Permits, Licenses, etc</u>.  When requested by Tenant, Landlord will from time to time during the Term execute and deliver all applications for permits, licenses or other authorizations relating to the Premises required by any municipal, county, state, or Federal authorities, or required in connection with the construction, reconstruction, repair or alteration of any buildings or improvements now or hereafter constituting a part of the Premises.  When requested by Tenant, Landlord will from time to time during the Term execute, acknowledge and deliver any and all instruments required to grant rights-of-way and easements in favor of municipal and other governmental authorities or public utility companies incident to the installation of water lines, fire hydrants, sewers, electricity, telephone, gas, and other facilities and utilities reasonably required for the use and occupancy of the Premises.  Tenant shall reimburse Landlord for any sum paid by Landlord in respect of the matters specified in this Section 8, including reasonable attorney fees.

9.      <u>Maintenance, Repairs, Governmental Regulations and Waste</u>.

9.1     Tenant shall, during the Term, at its own cost and expense and without any cost or expense to Landlord:

9.1.1 Assume all maintenance, security, repair, landscaping, and associated costs for the Premises.  This includes but is not limited to keeping and maintaining all buildings and improvements now or hereafter located on the Premises and all appurtenances thereto in good and neat order and repair and shall allow no nuisances to exist or be maintained therein.  Tenant shall likewise keep and maintain the grounds, sidewalks, roads and parking and landscaped areas on the Premises in good and neat order and repair.  Landlord shall not be obligated to make any repairs, replacements or renewals of any kind, nature or description whatsoever to the Premises or any buildings or improvements now or hereafter located thereon, and Tenant hereby expressly waives all right to make repairs at Landlord's expense under sections 1941 and 1942 of the California Civil Code, or any amendments thereof; and

9.1.2 Comply with and abide by all federal, state, county, municipal and other governmental statutes, ordinances, laws and regulations, including without limitation, the Americans with Disabilities Act, affecting the Premises, all buildings and improvements now or hereafter located thereon, or any activity or condition on or in the Premises.

9.2     The Premises have not undergone inspection by a Certified Access Specialist (CASp).

9.3     Landlord agrees to make reasonable efforts to provide 'purple' water for irrigation of the Premises when available.  Landlord will pay for all infrastructure improvements needed to make such 'purple' water available to the site.

9.4     Tenant agrees that it will not commit or permit waste upon the Premises.

4

10.    Improvements, Changes, Alterations, Demolition and Replacement.

10.1    Tenant shall have the right at any time and from time to time during the Term to make such improvements to the Premises and such changes and alterations, structural or otherwise, to any buildings, improvements, fixtures and equipment now or hereafter located on the Property as Tenant shall deem necessary or desirable.

10.2    Following the Effective Date, Tenant shall proceed with due diligence and dispatch to complete the construction on the Premises of the following:  (i) completely refurbish three baseball fields, with irrigation, fencing, turf, and lighting; (ii) new construction of basketball/volleyball and sand volleyball courts, with ; (iii) construction of a new restaurant, shop and sundry facility, including dining patio; (iv) site electrical and plumbing for all requisite fire, storm water, and sanitary sewer lines; (v) walking/jogging paths; and (vi) signage, fencing, and site clean-up, (collectively, the "Capital Improvements").   Capital Improvements shall be valued at least at $2.7 million, and Tenant shall complete construction of such improvements not later than two years from the Effective Date.

10.3    Any demolition activity and all improvements, changes and alterations (other than changes or alterations of movable trade fixtures and equipment, or improvements, changes or alterations involving costs less than Ten Thousand Dollars ($10,000)) shall be undertaken in all cases subject to the following additional conditions which Tenant covenants to observe and perform:

10.3.1 No improvement, change or alteration, and no demolition and replacements shall be undertaken until Tenant shall have procured and paid for, so far as the same may be required from time to time, all municipal and other governmental permits and authorizations of the various municipal departments and governmental subdivisions having jurisdiction.  When requested by Tenant, Landlord agrees to join in the application for such permits or authorizations whenever such action is necessary.

10.3.2 All work done in connection with any improvement, change, alteration or demolition and replacement shall be done promptly and in a good and workmanlike manner and in compliance with all laws, ordinances, orders, rules, regulations and requirements of all Federal, state and municipal governments and the appropriate departments, commissions, boards and officers thereof.  All such work shall be at the sole cost and expense of Tenant.  Any improvement or repair shall be constructed by a contractor licensed and bonded by the California Contractor's State License Board.  Tenant may be subject to Conditional Use Permit approval.  Certain planning, land use, zoning, conditional use permits, and public actions required in connection with any Tenant improvement project are discretionary government actions.  Nothing in this Lease obligates City or any other governmental entity to grant final approval of any matter described herein.  Such actions are legislative, quasi-judicial, or otherwise discretionary in nature.  City shall not be liable, in law or equity, to Tenant or any of its executors, administrators, transferees, successors-in-interest, or assigns for any failure of any governmental entity to grant approval on any matter subject to discretionary approval.

5

10.3.3 Tenant shall be solely responsible for determining whether payment of prevailing wage is required.   Tenant shall indemnify, hold harmless, and defend (with counsel reasonably acceptable to Landlord) the Landlord against any claim for damages, compensation, fines, penalties or other amounts arising out of the failure or alleged failure of any person or entity (including Tenant, its contractors and subcontractors) to pay prevailing wages as required by law or to comply with the other applicable provisions of Labor Code Sections 1720 et seq., and the implementing regulations of the Department of Industrial Relations.

10.3.4 Tenant will notify Landlord at least seven days prior to the commencement of any construction.   Landlord shall have the right to post and keep posted on the Premises, and record, a Notice of Non-responsibility.  Tenant shall keep the Premises free from any and all liens and encumbrances arising out of or in any way connected with the work performed, materials furnished or obligations incurred by Tenant in connection with any alteration, addition or improvement to the Premises.

10.3.5 Tenant shall prepare a work plan and cost estimate which describes in detail and with specificity the nature, scope, location, estimated costs and purpose of all of Tenant's improvements and activities to be performed on the Premises, including, without limitation, the specific areas in which Tenant and Tenant's representatives may have access and may conduct Tenant's activities and a schedule of Tenant's activities (the "Work Plan").  The Work Plan will be submitted to Landlord for preliminary approval, care of the City Manager, 2600 Fresno Street, Fresno, California 93721.  Tenant acknowledges and agrees Landlord's review of the Work Plan is solely for the purpose of protecting Landlord's interests, and shall not be deemed to create any liability of any kind on the part of Landlord, or to constitute a representation on the part of Landlord that the Work Plan is adequate or appropriate for any purpose, or complies with applicable legal requirements.  Tenant and Tenant's representatives shall not commence activities associated with Tenant's improvements on the Premises without the prior written consent of Landlord to the Work Plan as set forth above, which consent shall not be unreasonably withheld.   Tenant agrees and covenants all of Tenant's activities shall be performed in strict compliance to the approved Work Plan.  Tenant shall not modify the Work Plan without the prior written approval of Landlord.

10.3.6 Tenant covenants and agrees Tenant shall conduct Tenant's activities in compliance with the Work Plan approved by Landlord and in such a manner so as to protect the Premises, the Property, the environment and human health and safety.  Except as may be expressly provided in such Work Plan, Tenant shall not cause or permit any Hazardous Substances, as defined herein, to be brought upon, produced, stored, used, discharged or disposed of on, or in the vicinity of, the Premises.  In the event Landlord determines Tenant's activities in any way endanger the Premises, the Property, the environment, or human health and safety, Landlord may, at Landlord's sole discretion, require Tenant halt Tenant's activities until appropriate protective measures may be taken to eliminate such endangerment to Landlord's satisfaction.   Tenant shall hold

6

Landlord harmless for any claims in any way resulting from any delay under this section. Landlord's right to halt activities under this section shall not in any way alter or affect Tenant's insurance or indemnity obligations under this Lease, nor shall it relieve Tenant from any of Tenant's obligations hereunder that pertain to health, safety, or the protection of the environment.

10.3.7 Landlord reserves the right to restrict access to the Premises in the event of fire, earthquake, storm, riot, civil disturbance, or other casualty or emergency, or in connection with City's response thereto, or if emergency repairs or maintenance are required to City facilities within or in the vicinity of the Premises, or otherwise when Landlord deems it advisable to do so.

10.3.8 In addition to the insurance coverage referred to in Section 15 below, Workers' Compensation Insurance covering all persons employed in connection with the work and with respect to whom death or injury claims could be asserted against Landlord, Tenant or the Premises, and a general liability policy coverage, naming Landlord with limits of not less than Three Million Dollars ($3,000,000), shall be maintained by Tenant, at Tenant's sole cost and expense, at all times when any work is in process in connection with any improvement, change, alteration or demolition and replacement. All such insurance shall be obtained and kept in force as otherwise provided in Section 15 below.

10.4   If construction of the Capital Improvements is not completed within two years of the Effective Date, Landlord reserves the right to reenter the Premises, so long as Tenant is compensated for the fair market value of improvements that have been completed. Landlord reserves the right to demolish incomplete improvements at Tenant's expense, rather than completing construction of improvements.

10.5   Tenant is prohibited from demolishing or removing any improvements without the prior written consent of Landlord.

10.6   Construction of all improvements shall be done in such a manner as to reduce interference to the Property and other tenants on the Property.

11.   Damage or Destruction. No loss or damage by fire or other cause required to be insured against hereunder resulting in either partial or total destruction of any building, structure, or other improvement on the Property, shall operate to terminate this Lease, or to relieve or discharge Tenant and/or Landlord from the payment of rents or amounts payable as rent as they become due and payable, or from the performance and observance of any of the agreements, covenants and conditions herein contained on the part of Tenant and/or Landlord to be performed and observed. Tenant and Landlord hereby waive the provisions of subsection 2 of section 1932 and subsection 4 of section 1933 of the California Civil Code, as amended from time to time.

12.   Assignment and Subletting. Tenant shall not assign its interest under this Lease, or sublet any portion of the Premises, without the prior written consent of Landlord.

13.   Mortgage of Leasehold. Subject to the prior written approval of Landlord, Tenant shall have the right to encumber the leasehold estate created by this Lease by a

mortgage, deed of trust or other security instrument, including, without limitation, an assignment of the rents, issues and profits from the Premises, (the "Leasehold Mortgage") to secure repayment of any loan to Tenant, and associated obligations. Lender must be an institutional lender not affiliated with Tenant. Tenant shall give prompt notice to Landlord when the Leasehold Mortgage is extinguished.

14.    Protection of Lender.  During the continuance of any Leasehold Mortgage and until such time as the lien of any Leasehold Mortgage has been extinguished:

14.1    Landlord shall not accept any surrender of this Lease, nor shall Landlord consent to any amendment or modification of this Lease, without the prior written consent of any Lender.

14.2    Notwithstanding any default by Tenant in the performance or observance of any agreement, covenant or condition of this Lease on the part of Tenant to be performed or observed, Landlord shall have no right to terminate this Lease or interfere with the occupancy, use, and enjoyment of the Premises unless (i) an event of default shall have occurred and is continuing, (ii) Landlord shall have given any Lender written notice of such event of default, and (iii) the Lender(s) shall have failed to remedy such default, acquire Tenant's leasehold estate created hereby, or commence foreclosure or other appropriate proceedings, all as set forth in, and within the time specified by, this Section 14.

14.3    Any Lender shall have the right, but not the obligation, at any time prior to termination of this Lease and without payment of any penalty, to pay all of the rents due hereunder, to effect any insurance, to pay any taxes and assessments, to make any repairs and improvements, to do any other act or thing required of Tenant hereunder, and to do any act or thing which may be necessary and proper to be done in the performance and observance of the agreements, covenants and conditions hereof to prevent termination of this Lease.  All payments so made and all things so done and performed by a Lender shall be as effective to prevent a termination of this Lease as the same would have been if made, done and performed by Tenant instead of by a Lender.

14.4    Should any event of default under this Lease occur, any Lender shall have sixty days after receipt of written notice from Landlord setting forth the nature of such event of default, within which to remedy the default; provided that in the case of a default which cannot with due diligence be cured within such sixty day period, the Lender(s) shall have the additional time reasonably necessary to accomplish the cure, provided that (i) such Lender has commenced the curing within such sixty days and (ii) thereafter diligently prosecutes the cure to completion  If the default is such that possession of the Premises may be reasonably necessary to remedy the default, the Lender(s) shall have a reasonable additional time after the expiration of such sixty day period, within which to remedy such default, provided that (i) the Lender(s) shall have fully cured any default in the payment of any monetary obligations of Tenant under this Lease within such sixty day period and shall continue to pay currently such monetary obligations as and when the same are due and (ii) the Lender(s) shall have acquired Tenant's leasehold estate or commenced foreclosure or other appropriate proceedings seeking such acquisition within such period, or prior thereto, and is diligently prosecuting any such proceedings.

14.5   Any event of default under this Lease which is not susceptible to remedy by a Lender shall be deemed to be remedied if (i) within sixty days after receiving written notice from Landlord setting forth the nature of such event of default, or prior thereto, a Lender shall have acquired Tenant's leasehold estate created hereby or shall have commenced foreclosure or other appropriate proceedings seeking such acquisition, (ii) a Lender shall diligently prosecute any such proceedings to completion, and (iii) a Lender shall have fully cured any default in the payment and performance of any monetary or other obligations of Tenant hereunder which do not require possession of the Premises within such sixty day period and shall thereafter continue faithfully to perform all such monetary obligations which do not require possession of the Premises, and (iv) after gaining possession of the Premises, a Lender shall perform all other obligations of Tenant hereunder as and when the same are due.

14.6   If a Lender is prohibited by any process or injunction issued by any court or by reason of any action by any court having jurisdiction of any bankruptcy or insolvency proceeding involving Tenant from commencing or prosecuting foreclosure or other appropriate proceedings the times specified in subsections above for commencing or prosecuting such foreclosure or other proceedings shall be extended for the period of such prohibition; provided that Lender shall have fully cured any default in the payment of any monetary obligations of Tenant under this Lease and shall continue to pay currently such monetary obligations as and when the same fall due.

14.7   Landlord shall mail by certified or registered post, return receipt requested, or personally deliver to any Lender a duplicate copy of any and all notices in writing which Landlord may from time to time give to or serve upon Tenant pursuant to the provisions of this Lease, and such copy shall be mailed or delivered to any Lender at, or as near as possible to, the same time such notices are given or served by Landlord.  No notice by Landlord to Tenant hereunder shall be deemed to have been given unless and until a copy thereof shall have been so mailed or delivered to any Lender.  Upon the execution of any Leasehold Mortgage, Landlord shall be informed in writing of the vesting of the security interest evidenced by the Leasehold Mortgage and of the address to which all notices to the Lender are to be sent.  Notwithstanding any other provision of this Section 14, any Lender shall be deemed to have waived any right to receive notice pursuant to this Section unless and until Landlord has received such information.

14.8   Foreclosure of the Leasehold Mortgage, or any sale thereunder, whether by judicial proceedings or by virtue of any power contained in the leasehold mortgage, or any assignment or conveyance of the leasehold estate created by this Lease from Tenant to a Lender or other purchaser through, or in lieu of, foreclosure or other appropriate proceedings of a similar nature shall not constitute a breach of any provision of or a default under this Lease.  Upon such foreclosure, sale or conveyance Landlord shall recognize the Lender, or any other foreclosure sale purchaser, as Tenant hereunder.  In the event a Lender becomes Tenant under this Lease, such Lender shall be liable for the obligations of Tenant under this Lease only for the period of time that such Lender remains Tenant.  Such Lender shall have the right to assign this Lease at any time after becoming Tenant, subject to the approval of Landlord, and shall be fully released from liability under the Lease from and after the date of such assignment.

14.9    Should Landlord terminate this Lease by reason of any default by Tenant hereunder, Landlord shall, upon written request by a Lender given within thirty days after such termination, immediately execute and deliver a new lease of the Premises to such Lender, or its nominee, purchaser, assignee or transferee, for the remainder of the Term with the same agreements, covenants and conditions (except for any requirements which have been fulfilled by Tenant prior to termination) as are contained herein and with priority equal to that hereof; provided, however, that such Lender shall promptly cure any defaults of Tenant susceptible to cure by such Lender and that such Lender's right to possession of the Premises under the new lease shall commence only upon Tenant's vacating of the Premises.    Upon execution and delivery of such new lease Landlord, at the expense of the new lessee, which expenses shall be paid by the new Tenant as they are incurred, shall take such action as shall be necessary to cancel and discharge this Lease and to remove Tenant named herein from the Premises.

14.10 Landlord and Tenant will cooperate in including in this Lease by suitable amendment from time to time any provision which may reasonably be necessary to implement the provisions of this Section 14; provided, however, that such amendment shall not in any way affect the Term hereby demised nor affect adversely in any material respect any rights of Landlord under this Lease.

15.    Insurance.

15.1    Throughout the life of this Lease, Tenant and each of its contractors and subcontractors shall pay for and maintain in full force and effect all insurance as required in the attached Exhibit "B" or as may be authorized or required in writing by Landlord's Risk Manager or his/her designee at any time and in his/her sole discretion.

15.2    If at any time during the life of this Lease or any extension, Tenant or any of its contractors or subcontractors fail to maintain any required insurance in full force and effect, all Tenant's activities under this Lease shall be discontinued immediately, until notice is received by Landlord that the required insurance has been restored to full force and effect and that the premiums therefor have been paid for a period satisfactory to Landlord.  Any failure to maintain the required insurance shall be sufficient cause for Landlord to terminate this Lease.  No action taken by Landlord pursuant to this section shall in any way relieve Tenant of its responsibilities under this Lease.  The phrase "fail to maintain any required insurance" shall include, without limitation, notification received by Landlord that an insurer has commenced proceedings, or has had proceedings commenced against it, indicating that insurer is insolvent.

15.3    The fact that insurance is obtained by Tenant shall not be deemed to release or diminish the liability of Tenant, including, without limitation, liability under the indemnity provisions of this Lease.  The duty to indemnify indemnitees (as defined in this Lease) shall apply to all claims and liability regardless of whether any insurance policies are applicable.  The policy limits do not act as a limitation upon the amount of indemnification to be provided by Tenant. Approval or purchase of any insurance contracts or policies shall in no way relieve from liability nor limit the liability of Tenant, or its contractors or subcontractors.

15.4    Upon request of Landlord, Tenant shall immediately furnish Landlord with a complete copy of any insurance policy required under this Lease, including all endorsements, with said copy certified by the underwriter to be a true and correct copy of the original policy.  This requirement shall survive expiration or termination of this Lease.

15.5    Tenant is also responsible for the compliance of Tenant's consultants, contractors and subcontractors with the insurance requirements in this section, except that any required certificates and applicable endorsements shall be on file with Tenant and Landlord prior to the commencement of any work or services by the respective contractor or subcontractor.

16.    <u>Mechanics' and Other Liens</u>.  Tenant shall promptly discharge or remove by bond or otherwise prior to foreclosure thereof any and all mechanics', materialmen's and other liens for work or labor done, services performed, materials, appliances, teams or power contributed, used or furnished to be used in or about the Premises for or in connection with any operations of Tenant, any alterations, improvements, repairs or additions which Tenant may make or permit or cause to be made, or any work or construction by, for or permitted by Tenant on or about the Premises, and to save and hold Landlord and all of the Premises and all buildings and improvements thereon free and harmless of and from any and all such liens and claims of liens and suits or other proceedings pertaining thereto.  Tenant covenants and agrees to give Landlord written notice not less than twenty days in advance of the commencement of any construction, alteration, addition, improvement or repair costing in excess of Twenty Five Thousand Dollars ($25,000) in order that Landlord may post appropriate notices of Landlord's non-responsibility.

17.    <u>Indemnity</u>.

17.1    To the furthest extent allowed by law, Tenant shall indemnify, hold harmless and defend Landlord and its officers, officials, employees, agents and volunteers from any and all loss, liability, fines, penalties, forfeitures, costs and damages (whether in contract, tort or strict liability, including but not limited to personal injury, death at any time and property damage, including damage by fire or other casualty) incurred by Landlord, Tenant or any other person, and from any and all claims, demands and actions in law or equity (including attorney's fees and litigation expenses), arising or alleged to have arisen directly or indirectly out of Tenant's:  (i) occupancy, maintenance, use, renovation and/or improvement of the Property; or (ii) performance of, or failure to perform, this Lease.  Tenant's obligations under the preceding sentence shall not apply to the active negligence of Landlord, and shall not apply to any loss, liability, fines, penalties, forfeitures, costs or damages caused by the sole negligence or willful misconduct, of Landlord.

17.2    If Tenant should contract any work on the Property or subcontract any of its obligations under this Lease, Tenant shall require each consultant, contractor and subcontractor to indemnify, hold harmless and defend Landlord and  its officers, officials, employees, agents and volunteers in accordance with the terms of the preceding paragraph.

11

17.3   Tenant's occupancy, maintenance, use, renovation and improvement of the Property shall be at Tenant's sole risk and expense.  Tenant accepts all risk relating to Tenant's:  (i) occupancy, maintenance, use, renovation and/or improvement of the Property; and (ii) the performance of, or failure to perform, this Lease.  Landlord shall not be liable to Tenant or Tenant's insurer(s) for, and Tenant and his insurer(s) hereby waives and releases Landlord from, any and all loss, liability, fines, penalties, forfeitures, costs or damages resulting from or attributable to an occurrence on or about the Property in any way related to the Tenant's operations and activities.  Tenant shall immediately notify Landlord of any occurrence on the Property resulting in injury or death to any person or damage to property of any person.

17.4   The provisions of this Section 17 shall survive the expiration or termination of this Lease.

18.   <u>Eminent Domain</u>.

18.1   If the whole of the Premises should be taken by any public or quasi-public authority under the power or threat of eminent domain during the Term, or if a substantial portion of the Premises should be taken so as to materially impair the use of the Premises contemplated by Tenant, and thereby frustrate Tenant's purpose in entering into this Lease, then, in either of such events, this Lease shall terminate at the time of such taking.  In such event, of the compensation and damages payable for or on account of the Property, exclusive of the buildings and improvements thereon, Tenant and Lender, as their interests may appear, shall receive a sum equal to the worth at the time of the compensation award of the amount by which the fair rental value of the Premises exceeds the rental payable pursuant to the terms of this Lease for the balance of the Term; the balance of such compensation and damages shall be payable to and be the sole property of Landlord.  All compensation and damages payable for or on account of the buildings and improvements located on the Property and constituting a part of the Premises shall be divided among Landlord, Tenant, and Lender as follows:

18.1.1 All compensation and damages payable for or on account of buildings and improvements having a remaining useful life less than the remaining Term as of the date of such taking shall be payable to and be the sole property of Tenant and Lender, as their interests may appear; and

18.1.2 A proportionate share of all compensation and damages payable for or on account of buildings and improvements having a remaining useful life greater than the remaining Term as of the date of such taking, determined by the ratio that the then remaining Term bears to the then remaining useful life of such buildings and improvements, shall be payable to and be the sole property of Tenant and Lender, as their interests may appear, and the remaining share thereof shall be payable to and be the sole property of Landlord.

18.2   If less than the whole of the Premises should be taken by any public or quasi-public authority under the power or threat of eminent domain during the Term and this Lease is not terminated as provided in subsection (a) above, Tenant shall promptly reconstruct and restore the Premises, with respect to the portion of the Premises not so taken, as an integral unit of the same quality and character as existed prior to such

12

taking. The Minimum Rent payable by Tenant following such taking shall be equitably reduced by agreement of Landlord and Tenant in accordance with the reduced economic return to Tenant, if any, which will occur by reason of such taking. The compensation and damages payable for, or on account of, such taking shall be applied to the reconstruction and restoration of the Premises by Tenant pursuant to this subsection (b) by application, first, of any sums payable for or on account of the buildings and improvements situated on the Property, and second, of any sums payable for or on account of the Property exclusive of such buildings and improvements. The remainder, if any, after reconstruction and restoration shall be divided among Landlord, Tenant and Lender in the manner provided in subsection (a) above.

18.3    No taking of any leasehold interest in the Premises or any part thereof shall terminate or give Tenant the right to surrender this Lease, nor excuse Tenant from full performance of its covenants for the payment of rent and other charges or any other obligations hereunder capable of performance by Tenant after any such taking, but in such case all compensation and damages payable for or on account of such taking shall be payable to and be the sole property of Tenant and Lender.

19.    <u>Landlord's Right of Inspection</u>.  Landlord may, at any reasonable time and from time to time during the Term, enter upon the Premises for the purpose of inspecting the buildings or improvements now or hereafter located thereon and for such other purposes as may be necessary or proper for the reasonable protection of its interests.

20.    <u>Tenant's Defaults and Landlord's Remedies</u>.  It shall be an event of default hereunder (each an "Event of Default") if (i) default shall be made by Tenant in the punctual payment of any rent or other moneys due hereunder and shall continue for a period of ten days after written notice thereof to Tenant; (ii) default shall be made by Tenant in the performance or observance of any of the other agreements, covenants or conditions of this Lease on the part of Tenant to be performed and observed and such default shall continue for a period of thirty days after written notice thereof to Tenant, or, in the case of a default which cannot be cured by the payment of money and cannot be cured within thirty days, shall continue for an unreasonable period after such written notice; (iii) Tenant shall abandon the Premises; (iv) Tenant shall admit in writing its inability to pay its debts generally as they become due, file a petition in bankruptcy, insolvency, reorganization, readjustment of debt, dissolution or liquidation under any law or statute of the federal government or any state government or any subdivision of either now or hereafter in effect, make an assignment for the benefit of its creditors, consent to, or acquiesce in the appointment of a receiver of itself or of the whole or any substantial part of the Premises; (v) a court of competent jurisdiction shall enter an order, judgment or decree appointing a receiver of Tenant or of the whole or any substantial part of the Premises, and such order, judgment or decree shall not be vacated, set aside or stayed within sixty days from the date of entry of such order, judgment or decree, or a stay thereof be thereafter set aside; (vi) a court of competent jurisdiction shall enter an order, judgment or decree approving a petition filed against Tenant under any bankruptcy, insolvency, reorganization, readjustment of debt, dissolution or liquidation law or statute of the Federal government or any state government or any subdivision of either now or hereafter in effect, and such order judgment or decree shall not be vacated, set aside or stayed within sixty days from the

date of entry of such order, judgment or decree, or a stay thereof be thereafter set aside; or (vii) under the provisions of any other law for the relief or aid of debtors, a court of competent jurisdiction shall assume custody or control of Tenant or of the whole or any substantial part of the Premises, and such custody or control shall not be terminated within sixty days from the date of assumption of such custody or control. Upon the occurrence of any Event of Default by Tenant hereunder, Landlord shall have the following rights and remedies, in addition to all other rights and remedies of Landlord provided hereunder or by law:

20.1    The right to terminate this Lease, in which event Tenant shall immediately surrender possession of the Premises, and pay to Landlord all rent and all other amounts payable by Tenant hereunder to the date of such termination;

20.2    The remedies described in California Civil Code Section 1951.2, including, without limitation, the right to recover the worth at the time of award of the amount by which the unpaid rent for the balance of the Term after the time of award exceeds the amount of such rental loss for the same period that Tenant proves could be reasonably avoided, as computed pursuant to subdivision (b) of section 1951.2 of the California Civil Code;

20.3    The remedies described in California Civil Code Section 1951.4, including, without limitation, the right to collect, by suit or otherwise, each installment of rent or other sums that become due hereunder, or to enforce, by suit or otherwise, performance or observance of any agreement, covenant or condition hereof on the part of Tenant to be performed or observed; or

20.4    The right to cause a receiver to be appointed in any action against Tenant to take possession of the Premises or to collect the rents or profits therefrom. Neither appointment of such receiver nor any other action taken by Landlord shall constitute an election on the part of Landlord to terminate this Lease unless written notice of termination is given to Tenant.

20.5    Landlord's remedies contained in subsections 20.1 through and including 20.4 shall be subject to any stay order issued by a bankruptcy court.

21.    <u>Nonwaiver</u>. If any action or proceeding is instituted or if any other steps are taken by Landlord or Tenant, and a compromise part payment or settlement thereof shall be made, either before or after judgment, the same shall not constitute or operate as a waiver by Landlord or Tenant of any agreement, covenant or condition of this Lease or of any subsequent breach thereof. No waiver of any default under this Lease shall constitute or operate as a waiver of any subsequent default hereunder, and no delay, failure or omission in exercising or enforcing any right, privilege, or option under this Lease shall constitute a waiver, abandonment or relinquishment thereof or prohibit or prevent any election under or enforcement or exercise of any right, privilege, or option hereunder. No waiver of any provision hereof by Landlord or Tenant shall be deemed to have been made unless and until such waiver shall have been reduced to writing and signed by Landlord or Tenant, as the case may be. The receipt by Landlord of rent with knowledge of any default under this Lease shall not constitute or operate as a waiver of such default. Payment by Tenant or receipt by Landlord of a lesser amount

than the stipulated rent or other sums due Landlord shall operate only as a payment on account of such rent or other sums. No endorsement or statement on any check or other remittance or in any communication accompanying or relating to such payment shall operate as a compromise or accord and satisfaction unless the same is approved in writing by Landlord, and Landlord may accept such check, remittance or payment without prejudice to its right to recover the balance of any rent or other sums due by Tenant and pursue any remedy provided under this Lease or by law.

22.    <u>No Merger</u>.

22.1    There shall be no merger of the leasehold estate created by this Lease with any other estate in the Premises, including the fee estate, by reason of the fact that the same person may own or hold the leasehold estate created by this Lease, or an interest in such leasehold estate, and such other estate in the Premises, including the fee estate, or any interest in such other estate; and no merger shall occur unless and until Landlord, Tenant and any Lender shall join in a written instrument effecting such merger and shall duly record the same.

22.2    No termination of this Lease shall cause a merger of the estates of Landlord and Tenant, unless Landlord so elects and any such termination shall, at the option of Landlord, either work a termination of any sublease in effect or act as an assignment to Landlord of Tenant's interest in any such sublease. Notwithstanding the foregoing, in the event of the termination of this Lease and the execution of a new lease with Lender or its nominee, the termination of this Lease shall neither work a merger of estates nor a termination of any subleases in effect unless Lender so elects.

23.    <u>No Partnership</u>. It is expressly understood and agreed that Landlord does not, in any way or for any purpose by executing this Lease, become a partner of Tenant in the conduct of Tenant's business, or otherwise, or a joint venturer or a member of a joint enterprise with Tenant. Design, construction and site preparation for improvements and repairs at the Premises as well as ongoing operations and staffing will be at Tenant's sole cost and expense. Landlord may assist Tenant with grant opportunities which from time to time become available.

24.    <u>Covenants Run With Land</u>.

24.1    The agreements, covenants and conditions in this Lease contained are and shall be deemed to be covenants running with the land and the reversion and shall be binding upon and shall inure to the benefit of Landlord and Tenant and their respective successors and assigns and all subsequent Landlords and Tenants respectively hereunder.

24.2    All references in this Lease to "Tenant" or "Landlord" shall be deemed to refer to and include successors and assigns of Tenant or Landlord, respectively, without specific mention of such successors or assigns.

25.    <u>Notices</u>. Except as otherwise provided hereunder; any notice or communication to Landlord, Tenant or Lender shall be in writing and be mailed by certified mail, postage prepaid. Notices or communications shall be addressed to Landlord at:

> City of Fresno
> 2600 Fresno Street
> Fresno, California 93721
> Attention: City Manager

or such other address or addresses as Landlord shall from time to time designate, or to such agent of Landlord as it may from time to time designate, by notice in writing to Tenant.  Notices or communications shall be addressed to Tenant at:

> Central Valley Community Sports Foundation
> 1411 L Street, Suite M
> Fresno, California  93721
> Attention: Terance Frazier, Chairman and Founder

or such other address or addresses as Tenant shall from time to time designate, or to such agent of Tenant as it may from time to time designate, by notice in writing to Landlord.  Notices or communications to Lender shall be addressed to Lender at such address as Lender shall from time to time designate by notice in writing to Landlord.  Any notice mailed in the manner above set forth shall be deemed to have been received unless returned to the sender by the post office.

26.     Limitation of Landlord's Liability.   In the event of any transfer of Landlord's interest in this Lease, the Landlord herein named (and in case of any subsequent transfer, the then transferor) shall be automatically freed and relieved from and after the date of such transfer of all personal liability for the performance of any covenants or obligations on the part of Landlord contained in this Lease thereafter to be performed; provided, however, that any funds in the hands of Landlord or the then transferor at the time of such transfer, in which Tenant has an interest shall be turned over to the transferee and any amount then due and payable to Tenant by Landlord or the then transferor under any provision of this Lease shall be paid to Tenant; and provided, further, that upon any such transfer, the transferee shall expressly assume, subject to the limitations of this Section, all of the agreements, covenants and conditions in this Lease to be performed on the part of Landlord, it being intended hereby that the covenants and obligations contained in this Lease on the part of Landlord shall, subject as aforesaid, be binding on each Landlord, its successors and assigns, only during its period of ownership.

27.     Estoppel Certificates.   Tenant or Landlord, as the case may be, will execute, acknowledge and deliver to the other and/or to Lender, promptly upon request, its certificate certifying (a) that this Lease is unmodified and in full force and effect (or, if there have been modifications, that this Lease is in full force and effect, as modified, and stating the modifications), (b) the dates, if any, to which the Minimum Rent, Percentage Rent, and other monetary obligations have been paid, (c) whether there are then existing any charges, offsets or defenses against the enforcement by Landlord of any agreement, covenant or condition hereof on the part of Tenant to be performed or observed (and, if so, specifying the same), and (d) whether there are then existing any defaults by Tenant in the performance or observance by Tenant of any agreement, covenant or condition hereof on the part of Tenant to be performed or observed and

whether any notice has been given to Tenant of any default which has not been cured (and, if so, specifying the same). Any such certificate may be relied upon by a prospective purchaser, mortgagee or trustee under a deed of trust of the Premises or any part thereof.

28.    Holding Over.    This Lease shall terminate without further notice upon the expiration of the Term, and any holding over by Tenant after the expiration of the Term shall not constitute a renewal hereof or give Tenant any rights hereunder or in or to the Premises, except as otherwise herein provided, it being understood and agreed that this Lease cannot be renewed, extended or in any manner modified except in writing signed by Landlord and Tenant.

29.    Default Interest.    In the event that Landlord or Tenant shall fail to pay any monetary obligations owed to the other hereunder within ten days of the date that such amounts are due and payable, each shall pay to the other, in addition to such amounts, interest thereon at 2% above the "prime rate" of interest, or the maximum interest rate permitted by law, whichever is less, from the first day of the month in which such monetary obligation was payable to the date of actual payment thereof by one to the other.

30.    Severability.    In case any one or more of the provisions contained in this Lease shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Lease, but this Lease shall be construed as if such invalid, illegal, or unenforceable provisions had not been contained herein.

31.    Time of the Essence.    Time is of the essence of each and all of the agreements, covenants, and conditions of this Lease.

32.    Attorney Fees.    In the event of any action or proceeding at law or in equity between Landlord and Tenant to enforce any provision of this Lease or to protect or establish any right or remedy of either party hereunder, the unsuccessful party to such litigation shall pay to the prevailing party all costs and expenses, including reasonable attorney fees, incurred therein by such prevailing party, and if such prevailing party shall recover judgment in any such action or proceeding, such costs, expenses and attorney fees shall be included in and as a part of such judgment.

33.    Integration.    This instrument constitutes the entire agreement between Landlord and Tenant with respect to the subject matter hereof and supersedes all prior offers and negotiations, oral or written.    This Lease may not be amended or modified in any respect whatsoever except by an instrument in writing signed by Landlord, Tenant and, if required by any Lender, by Lender.

34.    Amendments.    This Lease may be modified only in writing and only if signed by the parties at the time of the modification.

35.    Governing Law.    This Lease shall be governed by and construed in accordance with the laws of the State of California.    Venue shall be Fresno County.

36.    Option to Purchase.    Commencing with the date that is two years from the Effective Date, and continuing throughout the Term of the Lease, Landlord hereby

grants to Tenant the exclusive right to purchase the Property at a price and under the terms and conditions set forth herein.  This option is granted in consideration of Tenant's payment for the improvements made by Tenant to the site.  If Tenant is not in breach of this Lease, it may exercise this option by execution and tender to Landlord of a written notice of Tenant's intent in accordance with the procedure set forth in section 25 of this Lease.  The purchase price shall be determined based upon the average value established by two appraisals, one obtained by Landlord and one obtained by Tenant, following the delivery of Tenant's notice of intent to purchase as set forth herein.  This option may not be assigned by Tenant.

37.  Tenant's Right of First Refusal.  Subject to the rights set forth in subsection 37.3 below, in the event Landlord desires to sell, transfer, or convey Landlord's interest in the Premises, or any portion thereof, Landlord shall have the right to sell, transfer or convey Landlord's interest, or any portion thereof, only after complying with the following requirements:

37.1   In the event Landlord desires to sell the Premises, or any portion of its interest in the Premises, Landlord shall give written notice of its intent to sell (the "Notice of Intent to Sell") to Tenant, and Tenant shall have the option to purchase the Premises or such interest at the then-appraised value, as determined by a qualified appraiser acceptable to both Landlord and Tenant.  If Tenant elects to exercise its option, it shall give Landlord written notice of such election within sixty days after receipt of the Notice of Intent to Sell.  If Tenant fails to exercise its option within such sixty day period, (a) Landlord shall be free to solicit and accept an offer to sell the Premises or interest therein at the then-appraised value or greater, at any time within ninety days after expiration of the sixty day period, and (b) Tenant shall, upon request, deliver to Landlord a written acknowledgement of Tenant's failure to exercise its option and Landlord's right to sell the Premises or interest therein pursuant to this section.

37.2   In the event Landlord desires to sell the Premises, or any portion of its interest in the Premises, and has received an acceptable bona fide offer to purchase the Premises or such interest (the "Offer"), Landlord shall give Notice of Intent to Sell to Tenant, together with an executed copy of the Offer setting forth all of the terms of the proposed purchase and identifying the prospective purchaser.  Tenant shall have the right to purchase the Premises or such interest on the same terms and conditions as set forth in the Offer.  If Tenant elects to exercise its right, it shall give Landlord written notice of such election within sixty days after receipt of the Notice of Intent to Sell.  If Tenant fails to exercise its right within such sixty day period, (a) Landlord shall be free to accept an offer to sell the Premises or interest therein on the terms set forth in the Offer at any time within ninety days after the expiration of such sixty day period, and (b) Tenant shall, upon request, deliver to Landlord a written acknowledgement of Tenant's failure to exercise the option and Landlord's right to sell the Premises or interest therein pursuant to this section.

37.3   Notwithstanding the foregoing, Landlord shall be free to convey, transfer or assign the Premises or any portion of its interest in the Premises without compliance with subsection 37.1 in the event such conveyance, transfer or assignment is made to any mortgagee of Landlord's fee estate in the Premises, provided that the lien of any

fee mortgage or other security instrument shall expressly remain subordinate to Tenant's leasehold interest herein created.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

LANDLORD:
CITY OF FRESNO, a municipal corporation

By: _Bruce Rudd_
      Bruce Rudd, City Manager

ATTEST:
YVONNE SPENCE, CMC
City Clerk

By _Marco Martinez-Velasquez_
    (Deputy) _Marco Martinez-Velasquez_
        _12/10/15_

APPROVED AS TO FORM:
DOUGLAS T. SLOAN
City Attorney

By _____
    Katherine B. Doerr
    Assistant City Attorney

TENANT:
CENTRAL VALLEY COMMUNITY
SPORTS FOUNDATION, a California non-profit corporation

By: _____
    Terance Frazier, Chairman & Founder

By: _____

Name: _____T Cox_____

Title: _____Board Member_____
(if corporation or LLC, CFO, Treasurer, Secretary or Assistant Secretary)

Exhibit A: Description of the Premises
Exhibit B: Insurance Requirements

KBD:ns [69063ns/kbd]

EXHIBIT A

DESCRIPTION OF PREMISES AND SITE PLAN



**EXHIBIT "B"**
**INSURANCE REQUIREMENTS**

**Lease between City of Fresno ("City")**

**and Central Valley Community Sports Foundation ("Tenant")**

Granite Park

***Minimum Scope of Insurance***

Coverage shall be at least as broad as:

1.  The most current version of Insurance Services Office (ISO) Commercial General Liability Coverage Form CG 00 01, which shall include insurance for "bodily injury," "property damage" and "personal and advertising injury" with coverage for premises and operations, products and completed operations, fire legal liability and contractual liability (including, without limitation, indemnity obligations under the Lease).

2.  Property insurance with a Cause of Loss – Special or All Risk Form. **Only required of Tenant and not of Tenant's consultants, contractors or subcontractors.**
    Workers' Compensation insurance as required by the California Labor Code and Employer's Liability Insurance.

***Minimum Limits of Insurance***

Tenant shall maintain limits of liability of not less than:

1.  General Liability:

    $3,000,000 per occurrence for bodily injury and property damage

    $3,000,000 per occurrence for personal and advertising injury

    $2,000,000 aggregate for products and completed operations

    $2,000,000 general aggregate applying separately to the work performed under the Lease

2.  Property:   Limits of insurance in an amount equal to the full (100%) replacement cost (without deduction for depreciation).

3.  Employer's Liability:

    $1,000,000 each accident for bodily injury

    $1,000,000 disease each employee

    $1,000,000 disease policy limit

### Umbrella or Excess Insurance

In the event Tenant purchases an Umbrella or Excess insurance policy(ies) to meet the "Minimum Limits of Insurance," this insurance policy(ies) shall "follow form" and afford no less coverage than the primary insurance policy(ies).

### Deductibles and Self-Insured Retentions

Tenant shall be responsible for payment of any deductibles contained in any insurance policies required hereunder and Tenant shall also be responsible for payment of any self-insured retentions. Any deductibles or self-insured retentions must be declared to, and approved by, the City's Risk Manager or his/her designee. At the option of the City's Risk Manager or his/her designee, either (i) the insurer shall reduce or eliminate such deductibles or self-insured retentions as respects City, its officers, officials, employees, agents and volunteers; or (ii) Tenant shall provide a financial guarantee, satisfactory to City's Risk Manager or his/her designee, guaranteeing payment of losses and related investigations, claim administration and defense expenses. At no time shall City be responsible for the payment of any deductibles or self-insured retentions.

### Other Insurance Provisions

The General Liability insurance policy is to contain, or be endorsed to contain, the following provisions:

1.   City, its officers, officials, employees, agents and volunteers are to be covered as additional insureds.

2.   The coverage shall contain no special limitations on the scope of protection afforded to City, its officers, officials, employees, agents and volunteers.

3.   Tenant's insurance coverage shall be primary and no contribution shall be required of City.

The Property insurance policy is to contain, or be endorsed to contain, the following provisions:

1. City shall be named as a loss payee.

2. The coverage shall contain:

   (i)     No coinsurance penalty.

   (ii)    No limitations or exclusions for vacancy.

   (iii)   No special limitations on the scope of protection afforded to City.

The Workers' Compensation insurance policy is to contain, or be endorsed to contain, the following provision:  Tenant and its insurer shall waive any right of subrogation against City, its officers, officials, employees, agents and volunteers.

All policies of insurance required hereunder shall be endorsed to provide that the coverage shall not be cancelled, non-renewed, reduced in coverage or in limits except after 30 calendar day written notice by certified mail, return receipt requested, has been given to City. Upon issuance by the insurer, broker, or agent of a notice of cancellation, non-renewal, or reduction in coverage or in limits, Tenant shall furnish City with a new

certificate and applicable endorsements for such policy(ies).  In the event any policy is due to expire during the work to be performed for City, Tenant shall provide a new certificate, and applicable endorsements, evidencing renewal of such policy not less than 15 calendar days prior to the expiration date of the expiring policy.

### Acceptability of Insurers

All policies of insurance required hereunder shall be placed with an insurance company(ies) admitted by the California Insurance Commissioner to do business in the State of California and rated not less than "A-VII" in Best's Insurance Rating Guide.

### Verification of Coverage

Tenant shall furnish City with all certificate(s) and **applicable endorsements** effecting coverage required hereunder.  All certificates and **applicable endorsements** are to be received and approved by the City's Risk Manager or his/her designee prior to City's execution of the Lease and before work commences.

# EXHIBIT B

**SERVICE AGREEMENT**
**CITY OF FRESNO, CALIFORNIA**
**Recreational Services and Programming at Granite Park**

THIS AGREEMENT is made and entered into the _7_ day of December 2015 , by and between the CITY OF FRESNO, a California municipal corporation (hereinafter referred to as "CITY"), and Central Valley Community Sports Foundation, a California nonprofit corporation (hereinafter referred to as "SERVICE PROVIDER").

**RECITALS**

WHEREAS, CITY desires to obtain recreational services and programming at City-owned property known as Granite Park (the "Facility"); and

WHEREAS, SERVICE PROVIDER is engaged in the business of promoting a healthy, livable community with opportunities for physical activity as well as personal and cultural enrichment, and hereby represents that it desires to and is professionally and legally capable of performing the services called for by this Agreement; and

WHEREAS, this Agreement will be administered for CITY by its Parks, After-school, Recreation and Community Services Department (hereinafter referred to as "Administrator") or designee.

**AGREEMENT**

NOW, THEREFORE, in consideration of the foregoing and of the covenants, conditions, and premises hereinafter contained to be kept and performed by the respective parties, it is mutually agreed as follows:

1.    Scope of Services. SERVICE PROVIDER shall perform to the satisfaction of CITY the services described in **Exhibit A**, including all work incidental to, or necessary to perform, such services even though not specifically described in **Exhibit A**.

2.    Term of Agreement and Time for Performance. This Agreement shall be effective from the date SERVICE PROVIDER notifies City in writing the improvements at the Facility are substantially complete, and SERVICE PROVIDER is prepared to begin providing the services as described in **Exhibit A** ("Effective Date"), and shall continue in full force and effect through the date that is ten years from the Effective Date.

3.    Compensation.

(a)    SERVICE PROVIDER'S sole compensation for satisfactory performance of all services required or rendered pursuant to this Agreement shall be an annual fee of $150,000 (the "Annual Fee"). Such fee includes all expenses incurred by SERVICE PROVIDER in performance of the services.

(b)    Payment of the first installment of the Annual Fee shall be made on the Effective Date, and annually thereafter on the anniversary of the Effective Date.

(c)    The parties may modify this Agreement to increase or decrease the scope of services or provide for the rendition of services not required by this Agreement, which modification shall include an adjustment to SERVICE PROVIDER'S compensation. Any change in the scope of services must be made by written amendment to the Agreement signed by an authorized representative for each party. SERVICE PROVIDER shall not be entitled to any additional compensation if services are performed prior to a signed written amendment.

4.    Termination, Remedies and Force Majeure.

(a)    This Agreement shall terminate without any liability of CITY to SERVICE PROVIDER upon the earlier of : (i) SERVICE PROVIDER'S filing for protection under the federal bankruptcy laws, or any bankruptcy petition or petition for receiver commenced by a third party against SERVICE PROVIDER; (ii) CITY'S non-appropriation of funds sufficient to meet its obligations hereunder during any CITY fiscal year of this Agreement, or insufficient funding for the Project; or (iii) expiration of this Agreement.

(b)    Immediately upon any termination or expiration of this Agreement, SERVICE PROVIDER shall (i) immediately stop all work hereunder; (ii) immediately cause any and all of its subcontractors to cease work; and (iii) return to CITY any and all unearned payments and all properties and materials in the possession of SERVICE PROVIDER that are owned by CITY.    Subject to the terms of this Agreement, SERVICE PROVIDER shall be paid compensation for services satisfactorily performed prior to the effective date of termination. SERVICE PROVIDER shall not be paid for any work or services performed or costs incurred which reasonably could have been avoided.

(c)    In the event of termination due to failure of SERVICE PROVIDER to satisfactorily perform in accordance with the terms of this Agreement, CITY may withhold an amount that would otherwise be payable as an offset to, but not in excess of, CITY'S damages caused by such failure. In no event shall any payment by CITY pursuant to this Agreement constitute a waiver by CITY of any breach of this Agreement which may then exist on the part of SERVICE PROVIDER, nor shall such payment impair or prejudice any remedy available to CITY with respect to the breach.

(d)    Upon any breach of this Agreement by SERVICE PROVIDER, CITY may (i) exercise any right, remedy (in contract, law or equity), or privilege which may be available to it under applicable laws of the State of California or any other applicable law; (ii) proceed by appropriate court action to enforce the terms of the Agreement; and/or (iii) recover all direct, indirect, consequential, economic and incidental damages for the breach of the Agreement. If it is determined CITY improperly terminated this Agreement for default, such termination shall be deemed a termination for convenience.

(e)    SERVICE PROVIDER shall provide CITY with adequate written assurances of future performance, upon Administrator's request, in the event SERVICE PROVIDER fails to comply with any terms or conditions of this Agreement.

(f)    SERVICE PROVIDER shall be liable for default unless nonperformance is caused by an occurrence beyond the reasonable control of SERVICE PROVIDER and without its fault or negligence such as, acts of God or the public enemy, acts of CITY in its contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, unusually severe weather, and delays of common carriers. SERVICE PROVIDER shall notify Administrator in writing as soon as it is reasonably possible after the commencement of any excusable delay, setting forth the full particulars in connection therewith, and shall remedy such occurrence with all reasonable dispatch, and shall promptly give written notice to Administrator of the cessation of such occurrence.

(g)    Default by SERVICE PROVIDER under this Agreement shall be considered grounds for City to terminate any related agreement concerning the Facility.

5.    Professional Skill.  It is further mutually understood and agreed by and between the parties hereto that inasmuch as SERVICE PROVIDER represents to CITY that SERVICE PROVIDER and its subcontractors, if any, are skilled in the profession and shall perform in accordance with the standards of said profession necessary to perform the services agreed to be done by it under this Agreement, CITY relies upon the skill of SERVICE PROVIDER and its subcontractors, if any, to do and perform such services in a skillful manner and SERVICE PROVIDER agrees to thus perform the

Generic Service Provider Total Fee (08-31-15)

2

services and require the same of any subcontractors. Therefore, any acceptance of such services by CITY shall not operate as a release of SERVICE PROVIDER or any subcontractors from said professional standards.

6.    Indemnification. To the furthest extent allowed by law, SERVICE PROVIDER shall indemnify, hold harmless and defend CITY and each of its officers, officials, employees, agents and volunteers from any and all loss, liability, fines, penalties, forfeitures, costs and damages (whether in contract, tort or strict liability, including but not limited to personal injury, death at any time and property damage), and from any and all claims, demands and actions in law or equity (including reasonable attorney's fees and litigation expenses) that arise out of, pertain to, or relate to the negligence, recklessness or willful misconduct of SERVICE PROVIDER, its principals, officers, employees, agents or volunteers in the performance of this Agreement.

If SERVICE PROVIDER should subcontract all or any portion of the services to be performed under this Agreement, SERVICE PROVIDER shall require each subcontractor to indemnify, hold harmless and defend CITY and each of its officers, officials, employees, agents and volunteers in accordance with the terms of the preceding paragraph.

This section shall survive termination or expiration of this Agreement.

7.    Insurance.

(a)    Throughout the life of this Agreement, SERVICE PROVIDER shall pay for and maintain in full force and effect all insurance as required in **Exhibit B**, which is incorporated into and part of this Agreement, with an insurance company(ies) either (i) admitted by the California Insurance Commissioner to do business in the State of California and rated no less than "A-VII" in the Best's Insurance Rating Guide, or (ii) as may be authorized in writing by CITY'S Risk Manager or his/her designee at any time and in his/her sole discretion. The required policies of insurance as stated in Exhibit B shall maintain limits of liability of not less than those amounts stated therein. However, the insurance limits available to CITY, its officers, officials, employees, agents and volunteers as additional insureds, shall be the greater of the minimum limits specified therein or the full limit of any insurance proceeds to the named insured.

(b)    If at any time during the life of the Agreement or any extension, SERVICE PROVIDER or any of its subcontractors fail to maintain any required insurance in full force and effect, all services and work under this Agreement shall be discontinued immediately, and all payments due or that become due to SERVICE PROVIDER shall be withheld until notice is received by CITY that the required insurance has been restored to full force and effect and that the premiums therefore have been paid for a period satisfactory to CITY. Any failure to maintain the required insurance shall be sufficient cause for CITY to terminate this Agreement. No action taken by CITY pursuant to this section shall in any way relieve SERVICE PROVIDER of its responsibilities under this Agreement. The phrase "fail to maintain any required insurance" shall include, without limitation, notification received by CITY that an insurer has commenced proceedings, or has had proceedings commenced against it, indicating the insurer is insolvent.

(c)    The fact insurance is obtained by SERVICE PROVIDER shall not be deemed to release or diminish the liability of SERVICE PROVIDER, including, without limitation, liability under the indemnity provisions of this Agreement. The duty to indemnify CITY shall apply to all claims and liability regardless of whether any insurance policies are applicable. The policy limits do not act as a limitation upon the amount of indemnification to be provided by SERVICE PROVIDER. Approval or purchase of any insurance contracts or policies shall in no way relieve from liability nor limit the liability of SERVICE PROVIDER, its principals, officers, agents, employees, or persons under the supervision of SERVICE PROVIDER, vendors,

suppliers, invitees, consultants, sub-consultants, subcontractors, or anyone employed directly or indirectly by any of them.

(d)    Upon request of CITY, SERVICE PROVIDER shall immediately furnish CITY with a complete copy of any insurance policy required under this Agreement, including all endorsements, with said copy certified by the underwriter to be a true and correct copy of the original policy. This requirement shall survive expiration or termination of this Agreement.

(e)    If SERVICE PROVIDER should subcontract all or any portion of the services to be performed under this Agreement, SERVICE PROVIDER shall require each subcontractor/sub-consultant to provide insurance protection, as an additional insured, to the CITY and each of its officers, officials, employees, agents and volunteers in accordance with the terms of this section, except that any required certificates and applicable endorsements shall be on file with SERVICE PROVIDER and CITY prior to the commencement of any services by the subcontractor. SERVICE PROVIDER and any subcontractor/sub-consultant shall establish additional insured status for CITY, its officers, officials, employees, agents and volunteers by using Insurance Service Office (ISO) Form CG 20 10 11 85 or both CG 20 10 10 01 and CG 20 37 10 01 or by an executed manuscript company endorsement providing additional insured status as broad as that contained in ISO Form CG 20 10 11 85.

8.    Conflict of Interest and Non-Solicitation.

(a)    Prior to CITY'S execution of this Agreement, SERVICE PROVIDER shall complete a City of Fresno conflict of interest disclosure statement in the form as set forth in **Exhibit C**. During the term of this Agreement, SERVICE PROVIDER shall have the obligation and duty to immediately notify CITY in writing of any change to the information provided by SERVICE PROVIDER in such statement.

(b)    SERVICE PROVIDER shall comply, and require its subcontractors to comply, with all applicable (i) professional canons and requirements governing avoidance of impermissible client conflicts; and (ii) federal, state and local conflict of interest laws and regulations including, without limitation, California Government Code Section 1090 et seq., the California Political Reform Act (California Government Code Section 87100 et seq.) and the regulations of the Fair Political Practices Commission concerning disclosure and disqualification (2 California Code of Regulations Section 18700 et seq.). At any time, upon written request of CITY, SERVICE PROVIDER shall provide a written opinion of its legal counsel and that of any subcontractor that, after a due diligent inquiry, SERVICE PROVIDER and the respective subcontractor(s) are in full compliance with all laws and regulations. SERVICE PROVIDER shall take, and require its subcontractors to take, reasonable steps to avoid any appearance of a conflict of interest. Upon discovery of any facts giving rise to the appearance of a conflict of interest, SERVICE PROVIDER shall immediately notify CITY of these facts in writing.

(c)    In performing the work or services to be provided hereunder, SERVICE PROVIDER shall not employ or retain the services of any person while such person either is employed by CITY or is a member of any CITY council, commission, board, committee, or similar CITY body. This requirement may be waived in writing by the City Manager, if no actual or potential conflict is involved.

(d)    SERVICE PROVIDER represents and warrants it has not paid or agreed to pay any compensation, contingent or otherwise, direct or indirect, to solicit or procure this Agreement or any rights/benefits hereunder.

(e)    SERVICE PROVIDER and any of its subcontractors shall have no interest, direct or indirect, in any other contract with a third party in connection with this Agreement unless such interest is in accordance with all applicable law and fully disclosed to and approved by the City Manager, in advance and in writing. Notwithstanding any approval given

by the City Manager under this provision, SERVICE PROVIDER shall remain responsible for complying with Section 8(a), above.

(f)    If SERVICE PROVIDER should subcontract all or any portion of the work to be performed or services to be provided under this Agreement, SERVICE PROVIDER shall include the provisions of this Section 8 in each subcontract and require its subcontractors to comply therewith.

(g)    This Section 8 shall survive expiration or termination of this Agreement.

9.    Recycling Program.    In the event SERVICE PROVIDER maintains an office or operates a facility(ies), or is required herein to maintain or operate same, within the incorporated limits of the City of Fresno, SERVICE PROVIDER at its sole cost and expense shall:

(i)    Immediately establish and maintain a viable and ongoing recycling program, approved by CITY'S Solid Waste Management Division, for each office and facility. Literature describing CITY recycling programs is available from CITY'S Solid Waste Management Division and by calling City of Fresno Recycling Hotline at (559) 621-1111.

(ii)    Immediately contact CITY'S Solid Waste Management Division at (559) 621-1452 and schedule a free waste audit, and cooperate with such Division in their conduct of the audit for each office and facility.

(iii)    Cooperate with and demonstrate to the satisfaction of CITY'S Solid Waste Management Division the establishment of the recycling program in paragraph (i) above and the ongoing maintenance thereof.

10.    General Terms.

(a)    Except as otherwise provided by law, all notices expressly required of CITY within the body of this Agreement, and not otherwise specifically provided for, shall be effective only if signed by the Administrator or his/her designee.

(b)    Records of SERVICE PROVIDER'S expenses pertaining to this Agreement shall be kept on a generally recognized accounting basis and shall be available to CITY or its authorized representatives upon request during regular business hours throughout the life of this Agreement and for a period of three years after final payment or, if longer, for any period required by law.    In addition, all books, documents, papers, and records of SERVICE PROVIDER pertaining to this Agreement shall be available for the purpose of making audits, examinations, excerpts, and transcriptions for the same period of time. If any litigation, claim, negotiations, audit or other action is commenced before the expiration of said time period, all records shall be retained and made available to CITY until such action is resolved, or until the end of said time period whichever shall later occur.    If SERVICE PROVIDER should subcontract all or any portion of the services to be performed under this Agreement, SERVICE PROVIDER shall cause each subcontractor to also comply with the requirements of this paragraph. This Section 11(b) shall survive expiration or termination of this Agreement.

(c)    Prior to execution of this Agreement by CITY, SERVICE PROVIDER shall have provided evidence to CITY that SERVICE PROVIDER is licensed to perform the services called for by this Agreement (or that no license is required). If SERVICE PROVIDER should subcontract all or any portion of the work or services to be performed under this Agreement, SERVICE PROVIDER shall require each subcontractor to provide evidence to CITY that subcontractor is licensed to perform the services called for by this Agreement (or that no license is required) before beginning work.

11.    Nondiscrimination. To the extent required by controlling federal, state and local law, SERVICE PROVIDER shall not employ discriminatory practices in the provision of services,

employment of personnel, or in any other respect on the basis of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, sexual orientation, ethnicity, status as a disabled veteran or veteran of the Vietnam era. Subject to the foregoing and during the performance of this Agreement, SERVICE PROVIDER agrees as follows:

(a)     SERVICE PROVIDER will comply with all applicable laws and regulations providing that no person shall, on the grounds of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, sexual orientation, ethnicity, status as a disabled veteran or veteran of the Vietnam era be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity made possible by or resulting from this Agreement.

(b)     SERVICE PROVIDER will not discriminate against any employee or applicant for employment because of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, sexual orientation, ethnicity, status as a disabled veteran or veteran of the Vietnam era. SERVICE PROVIDER shall ensure that applicants are employed, and the employees are treated during employment, without regard to their race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, sexual orientation, ethnicity, status as a disabled veteran or veteran of the Vietnam era. Such requirement shall apply to SERVICE PROVIDER'S employment practices including, but not be limited to, the following: employment, upgrading, demotion or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. SERVICE PROVIDER agrees to post in conspicuous places, available to employees and applicants for employment, notices setting forth the provision of this nondiscrimination clause.

(c)     SERVICE PROVIDER will, in all solicitations or advertisements for employees placed by or on behalf of SERVICE PROVIDER in pursuit hereof, state that all qualified applicants will receive consideration for employment without regard to race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, sexual orientation, ethnicity, status as a disabled veteran or veteran of the Vietnam era.

(d)     SERVICE PROVIDER will send to each labor union or representative of workers with which it has a collective bargaining agreement or other contract or understanding, a notice advising such labor union or workers' representatives of SERVICE PROVIDER'S commitment under this section and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(e)     If SERVICE PROVIDER should subcontract all or any portion of the services to be performed under this Agreement, SERVICE PROVIDER shall cause each subcontractor to also comply with the requirements of this Section 11.

12.     Independent Contractor.

(a)     In the furnishing of the services provided for herein, SERVICE PROVIDER is acting solely as an independent contractor. Neither SERVICE PROVIDER, nor any of its officers, agents or employees shall be deemed an officer, agent, employee, joint venturer, partner or associate of CITY for any purpose. CITY shall have no right to control or supervise or direct the manner or method by which SERVICE PROVIDER shall perform its work and functions. However, CITY shall retain the right to administer this Agreement so as to verify that SERVICE PROVIDER is performing its obligations in accordance with the terms and conditions thereof.

(b)    This Agreement does not evidence a partnership or joint venture between SERVICE PROVIDER and CITY.  SERVICE PROVIDER shall have no authority to bind CITY absent CITY'S express written consent.  Except to the extent otherwise provided in this Agreement, SERVICE PROVIDER shall bear its own costs and expenses in pursuit thereof.

(c)    Because of its status as an independent contractor, SERVICE PROVIDER and its officers, agents and employees shall have absolutely no right to employment rights and benefits available to CITY employees.  SERVICE PROVIDER shall be solely liable and responsible for all payroll and tax withholding and for providing to, or on behalf of, its employees all employee benefits including, without limitation, health, welfare and retirement benefits.  In addition, together with its other obligations under this Agreement, SERVICE PROVIDER shall be solely responsible, indemnify, defend and save CITY harmless from all matters relating to employment and tax withholding for and payment of SERVICE PROVIDER'S employees, including, without limitation, (i) compliance with Social Security and unemployment insurance withholding, payment of workers compensation benefits, and all other laws and regulations governing  matters of employee withholding, taxes and payment; and (ii) any claim of right or interest in CITY employment benefits, entitlements, programs and/or funds offered employees of CITY whether arising by reason of any common law, de facto, leased, or co- employee rights or other theory.  It is acknowledged that during the term of this Agreement, SERVICE PROVIDER may be providing services to others unrelated to CITY or to this Agreement.

13.    Notices.  Any notice required or intended to be given to either party under the terms of this Agreement shall be in writing and shall be deemed to be duly given if delivered personally, transmitted by facsimile followed by telephone confirmation of receipt, or sent by United States registered or certified mail, with postage prepaid, return receipt requested, addressed to the party to which notice is to be given at the party's address set forth on the signature page of this Agreement or at such other address as the parties may from time to time designate by written notice.  Notices served by United States mail in the manner above described shall be deemed sufficiently served or given at the time of the mailing thereof.

14.    Binding.  Subject to Section 16, below, once this Agreement is signed by all parties, it shall be binding upon, and shall inure to the benefit of, all parties, and each parties' respective heirs, successors, assigns, transferees, agents, servants, employees and representatives.

15.    Assignment.

(a)    This Agreement is personal to SERVICE PROVIDER and there shall be no assignment by SERVICE PROVIDER of its rights or obligations under this Agreement without the prior written approval of the City Manager or his/her designee.  Any attempted assignment by SERVICE PROVIDER, its successors or assigns, shall be null and void unless approved in writing by the City Manager or his/her designee.

(b)    SERVICE PROVIDER hereby agrees not to assign the payment of any monies due SERVICE PROVIDER from CITY under the terms of this Agreement to any other individual(s), corporation(s) or entity(ies).  CITY retains the right to pay any and all monies due SERVICE PROVIDER directly to SERVICE PROVIDER.

16.    Compliance With Law.  In providing the services required under this Agreement, SERVICE PROVIDER shall at all times comply with all applicable laws of the United States, the State of California and CITY, and with all applicable regulations promulgated by federal, state, regional, or local administrative and regulatory agencies, now in force and as they may be enacted, issued, or amended during the term of this Agreement.

17.    Waiver.  The waiver by either party of a breach by the other of any provision of this Agreement shall not constitute a continuing waiver or a waiver of any subsequent breach of either the same or a different provision of this Agreement.  No provisions of this Agreement may be waived

Generic Service Provider Total Fee (08-31-15)

unless in writing and signed by all parties to this Agreement. Waiver of any one provision herein shall not be deemed to be a waiver of any other provision herein.

18.    Governing Law and Venue. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of California, excluding, however, any conflict of laws rule which would apply the law of another jurisdiction. Venue for purposes of the filing of any action regarding the enforcement or interpretation of this Agreement and any rights and duties hereunder shall be Fresno County, California.

19.    Headings. The section headings in this Agreement are for convenience and reference only and shall not be construed or held in any way to explain, modify or add to the interpretation or meaning of the provisions of this Agreement.

20.    Severability. The provisions of this Agreement are severable. The invalidity or unenforceability of any one provision in this Agreement shall not affect the other provisions.

21.    Interpretation. The parties acknowledge that this Agreement in its final form is the result of the combined efforts of the parties, and should any provision of this Agreement be found to be ambiguous in any way, such ambiguity shall not be resolved by construing this Agreement in favor of or against either party, but rather by construing the terms in accordance with their generally accepted meaning.

22.    Attorney's Fees. If either party is required to commence any proceeding or legal action to enforce or interpret any term, covenant or condition of this Agreement, the prevailing party in such proceeding or action shall be entitled to recover from the other party its reasonable attorney's fees and legal expenses.

23.    Exhibits. Each exhibit and attachment referenced in this Agreement is, by the reference, incorporated into and made a part of this Agreement.

24.    Precedence of Documents. In the event of any conflict between the body of this Agreement and any Exhibit or Attachment hereto, the terms and conditions of the body of this Agreement shall control and take precedence over the terms and conditions expressed within the Exhibit or Attachment. Furthermore, any terms or conditions contained within any Exhibit or Attachment hereto which purport to modify the allocation of risk between the parties, provided for within the body of this Agreement, shall be null and void.

25.    Cumulative Remedies. No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

26.    No Third Party Beneficiaries. The rights, interests, duties and obligations defined within this Agreement are intended for the specific parties hereto as identified in the preamble of this Agreement. Notwithstanding anything stated to the contrary in this Agreement, it is not intended that any rights or interests in this Agreement benefit or flow to the interest of any third parties.

27.    Extent of Agreement. Each party acknowledges they have read and fully understand the contents of this Agreement. This Agreement represents the entire and integrated agreement between the parties with respect to the subject matter hereof and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be modified only by written instrument duly authorized and executed by both CITY and SERVICE PROVIDER.

IN WITNESS WHEREOF, the parties have executed this Agreement at Fresno, California, the day and year first above written.

CITY OF FRESNO,
a California municipal corporation

By: _Bruce Rudd_
    Bruce Rudd, City Manager

ATTEST:
YVONNE SPENCE, CMC
City Clerk

By. _Marco Martinez-Velasor_
    Deputy *Marco Martinez-Velasquez*
          *12/10/15*

APPROVED AS TO FORM:
DOUGLAS T. SLOAN
City Attorney

By: _____
    Katherine B. Doerr
    Assistant City Attorney

CENTRAL VALLEY COMMUNITY SPORTS
FOUNDATION, a California non-profit corporation

By: _____

Name: TERANCE FRAZIER

Title: CHAIRMAN & FOUNDER
      (if corporation or LLC, Board Chair, Pres. or
      Vice Pres.)

By: _____

Name: _Tj Cox_

Title: BOARD MEMBER
      (if corporation or LLC, CFO, Treasurer,
      Secretary or Assistant Secretary)

Addresses:

CITY:
City of Fresno
Attention: Manuel Mollinedo, Director
City of Fresno PARCS
1515 E. Divisadero
Fresno, CA 93721
Phone: (559) 621-2900

SERVICE PROVIDER:
Central Valley Community Sports Foundation, a
California nonprofit corporation
Attention: Terance Frazier, Chairman and Founder
1411 L Street, Suite M
Fresno, CA 93721
Phone:
FAX:

Attachments:
1. Exhibit A - Scope of Services
2. Exhibit B - Insurance Requirements
3. Exhibit C - Conflict of Interest Disclosure Form

KBD:ns [69051ns/kbd] 9/17/15

Generic Service Provider Total Fee (08-31-15)

9

**Exhibit A**

### SCOPE OF SERVICES
### Service Agreement between City of Fresno
### and Central Valley Community Sports Foundation
Granite Park

1.    Service Provider shall provide sports and recreational programming for the benefit of City residents, at no cost to City or City-sponsored users, consisting of the minimum:

a.    Spring softball league from 6:00 p.m. to 11:00 p.m. on ten Wednesday nights that the City selects, which the City shall select dates and notify Service Provider by November 15 each year

b.    Winter softball league from 6:00 p.m. to 11:00 p.m. on ten Wednesday nights that the City selects, which the City shall select dates and notify Service Provider by November 15 each year

c.    Spring sand volleyball league from 6:00 p.m. to 11:00 p.m. on ten weekday (excluding Friday) nights that the City selects, which the City shall select dates and notify Service Provider by November 15 each year.

d.    Four weekend youth sand volleyball clinics, which the City shall select dates and notify Service Provider by November 15 each year.

e.    Four weekend youth baseball clinics per year, which the City shall select dates and notify Service Provider by November 15 each year.

f.    Four weekend youth basketball clinics, which the City shall select dates and notify Service Provider by November 15 each year.

g.    A minimum of 400 (four-hundred) hours of After-School Programming hosted at the Facility per year, with activities to be coordinated with City's Parks, After-School, Recreational and Community Services Department.

h.    The following portions of the Facility shall be open to the public at no cost on weekdays from at least 9:00 a.m. to dusk, national holidays excluded:  basketball/volleyball courts, sand volleyball courts, walking paths/trails.

2.    Service Provider shall report any suspicious or illegal behavior or activity at the Facility or surrounding grounds to appropriate authorities, including timely reporting graffiti or vandalism.

3.    Service Provider shall provide reasonable staffing for all programs.  All personnel, either paid or volunteer, shall be qualified to perform the duties assigned to them.  If the services provided hereunder (i) involve direct contact with minors or if minors are supervised as part of the services provided hereunder, or (ii) if services provided hereunder include services in the human services field and involve the care and security of children, the elderly, the disabled, or the mentally impaired, then Service Provider represents and warrants to City that prior to services being provided hereunder by any personnel or volunteers retained by Service Provider that Service Provider has or will conduct a criminal background check as provided in California Penal Code Section 11105.3, as well as an FBI criminal database background check and, has or will verify prior to services being provided that the personnel or

volunteers do not have any criminal record for the offenses listed in California Penal Code Section 11105.3, which include, certain offenses related to the possession or use of controlled substances, sex offenses or any criminal offense involving violence.

4.      Service Provider shall provide such security for the operation of all programs as shall be reasonably necessary to protect program participants, customers, employees, guests, and invitees to the Facility.

**Exhibit B**

**INSURANCE REQUIREMENTS**
**Service Agreement between City of Fresno ("CITY")**
**and CENTRAL VALLEY COMMUNITY SPORTS FOUNDATION ("SERVICE PROVIDER")**
Granite Park

**MINIMUM SCOPE OF INSURANCE**

Coverage shall be at least as broad as:

1.    The most current version of Insurance Services Office (ISO) Commercial General Liability Coverage Form CG 00 01, providing liability coverage arising out of your business operations. The Commercial General Liability policy shall be written on an occurrence form and shall provide coverage for "bodily injury," "property damage" and "personal and advertising injury" with coverage for premises and operations (including the use of owned and non-owned equipment), products and completed operations, and contractual liability (including, without limitation, indemnity obligations under the Agreement) with limits of liability not less than those set forth under "Minimum Limits of Insurance."

2.    The most current version of ISO *Commercial Auto Coverage Form CA 00 01, providing liability coverage arising out of the ownership, maintenance or use of automobiles in the course of your business operations.  The Automobile Policy shall be written on an occurrence form and shall provide coverage for all owned, hired, and non-owned automobiles or other licensed vehicles (Code 1- Any Auto).  If personal automobile coverage is used, the CITY, its officers, officials, employees, agents and volunteers are to be listed as additional insureds.

3.    Workers' Compensation insurance as required by the State of California and Employer's Liability Insurance.

4.    Professional Liability (Errors and Omissions) insurance appropriate to SERVICE PROVIDER'S profession.  Architect's and engineer's coverage is to be endorsed to include contractual liability.

**MINIMUM LIMITS OF INSURANCE**

SERVICE PROVIDER, or any party the SERVICE PROVIDER subcontracts with, shall maintain limits of liability of not less than those set forth below.  However, insurance limits available to CITY, its officers, officials, employees, agents and volunteers as additional insureds, shall be the greater of the minimum limits specified herein or the full limit of any insurance proceeds available to the named insured:

1.    **COMMERCIAL GENERAL LIABILITY**:

      (i)     $1,000,000 per occurrence for bodily injury and property damage;
      (ii)    $1,000,000 per occurrence for personal and advertising injury;
      (iii)   $2,000,000 aggregate for products and completed operations; and,

(iv)    $2,000,000 general aggregate applying separately to the work performed under the Agreement.

2.    **COMMERCIAL AUTOMOBILE LIABILITY**:

$1,000,000 per accident for bodily injury and property damage.

OR*

**PERSONAL AUTOMOBILE LIABILITY** insurance with limits of liability not less than:

(i)     $100,000 per person;
(ii)    $300,000 per accident for bodily injury; and,
(iii)   $50,000 per accident for property damage.

3.    **WORKERS' COMPENSATION INSURANCE** as required by the State of California with statutory limits.

4.    **EMPLOYER'S LIABILITY**:

(i)     $1,000,000 each accident for bodily injury;
(ii)    $1,000,000 disease each employee; and,
(iii)   $1,000,000 disease policy limit.

5.    **PROFESSIONAL LIABILITY** (Errors and Omissions):

(i)     $1,000,000 per claim/occurrence; and,
(ii)    $2,000,000 policy aggregate.

## UMBRELLA OR EXCESS INSURANCE

In the event SERVICE PROVIDER purchases an Umbrella or Excess insurance policy(ies) to meet the "Minimum Limits of Insurance," this insurance policy(ies) shall "follow form" and afford no less coverage than the primary insurance policy(ies). In addition, such Umbrella or Excess insurance policy(ies) shall also apply on a primary and non-contributory basis for the benefit of the CITY, its officers, officials, employees, agents and volunteers.

## DEDUCTIBLES AND SELF-INSURED RETENTIONS

SERVICE PROVIDER shall be responsible for payment of any deductibles contained in any insurance policy(ies) required herein and SERVICE PROVIDER shall also be responsible for payment of any self-insured retentions. Any deductibles or self-insured retentions must be declared on the Certificate of Insurance, and approved by, the CITY'S Risk Manager or his/her designee. At the option of the CITY'S Risk Manager or his/her designee, either:

(i)    The insurer shall reduce or eliminate such deductibles or self-insured retentions as respects CITY, its officers, officials, employees, agents and volunteers; or

(ii)    SERVICE PROVIDER shall provide a financial guarantee, satisfactory to CITY'S Risk Manager or his/her designee, guaranteeing payment of losses and related investigations, claim administration and defense expenses. At no time shall CITY be responsible for the payment of any deductibles or self-insured retentions.

## OTHER INSURANCE PROVISIONS/ENDORSEMENTS

The *General Liability and Automobile Liability insurance policies* are to contain, or be endorsed to contain, the following provisions:

1.    CITY, its officers, officials, employees, agents and volunteers are to be covered as additional insureds. SERVICE PROVIDER shall establish additional insured status for the City and for all ongoing and completed operations by use of ISO Form CG 20 10 11 85 or both CG 20 10 10 01 and CG 20 37 10 01 or by an executed manuscript insurance company endorsement providing additional insured status as broad as that contained in ISO Form CG 20 10 11 85.

2.    The coverage shall contain no special limitations on the scope of protection afforded to CITY, its officers, officials, employees, agents and volunteers. Any available insurance proceeds in excess of the specified minimum limits and coverage shall be available to the Additional Insured.

3.    For any claims related to this Agreement, SERVICE PROVIDER'S insurance coverage shall be primary insurance with respect to the CITY, its officers, officials, employees, agents and volunteers. Any insurance or self-insurance maintained by the CITY, its officers, officials, employees, agents and volunteers shall be excess of SERVICE PROVIDER'S insurance and shall not contribute with it. SERVICE PROVIDER shall establish primary and non-contributory status by using ISO Form CG 20 01 04 13 or by an executed manuscript insurance company endorsement that provides primary and non-contributory status as broad as that contained in ISO Form CG 20 01 04 13.

The *Workers' Compensation insurance policy* is to contain, or be endorsed to contain, the following provision: SERVICE PROVIDER and its insurer shall waive any right of subrogation against CITY, its officers, officials, employees, agents and volunteers.

If the *Professional Liability (Errors and Omissions) insurance policy* is written on a claims-made form:

1.    The retroactive date must be shown, and must be before the effective date of the Agreement or the commencement of work by SERVICE PROVIDER.

2.    Insurance must be maintained and evidence of insurance must be provided for at least five (5) years after completion of the Agreement work or termination of the Agreement, whichever occurs first, or, in the alternative, the policy shall be endorsed to provide not less than a five (5) year discovery period.

3.  If coverage is canceled or non-renewed, and not replaced with another claims-made policy form with a retroactive date prior to the effective date of the Agreement or the commencement of work by SERVICE PROVIDER, SERVICE PROVIDER must purchase "extended reporting" coverage for a minimum of five (5) years after completion of the Agreement work or termination of the Agreement, whichever occurs first.

4.  A copy of the claims reporting requirements must be submitted to CITY for review.

5.  These requirements shall survive expiration or termination of the Agreement.

*All policies of insurance* required herein shall be endorsed to provide that the coverage shall not be cancelled, non-renewed, reduced in coverage or in limits except after thirty (30) calendar days written notice by certified mail, return receipt requested, has been given to CITY. SERVICE PROVIDER is also responsible for providing written notice to the CITY under the same terms and conditions. Upon issuance by the insurer, broker, or agent of a notice of cancellation, non-renewal, or reduction in coverage or in limits, SERVICE PROVIDER shall furnish CITY with a new certificate and applicable endorsements for such policy(ies). In the event any policy is due to expire during the work to be performed for CITY, SERVICE PROVIDER shall provide a new certificate, and applicable endorsements, evidencing renewal of such policy not less than fifteen (15) calendar days prior to the expiration date of the expiring policy.

## VERIFICATION OF COVERAGE

SERVICE PROVIDER shall furnish CITY with all certificate(s) and **applicable endorsements** effecting coverage required hereunder. All certificates and **applicable endorsements** are to be received and approved by the CITY'S Risk Manager or his/her designee prior to CITY'S execution of the Agreement and before work commences. All non-ISO endorsements amending policy coverage shall be executed by a licensed and authorized agent or broker. Upon request of CITY, SERVICE PROVIDER shall immediately furnish City with a complete copy of any insurance policy required under this Agreement, including all endorsements, with said copy certified by the underwriter to be a true and correct copy of the original policy. This requirement shall survive expiration or termination of this Agreement.

**Exhibit C**

**DISCLOSURE OF CONFLICT OF INTEREST**

Granite Park
PROJECT TITLE

| | | YES* | NO |
|---|---|---|---|
| 1 | Are you currently in litigation with the City of Fresno or any of its agents? | ☐ | ☐ |
| 2 | Do you represent any firm, organization or person who is in litigation with the City of Fresno? | ☐ | ☐ |
| 3 | Do you currently represent or perform work for any clients who do business with the City of Fresno? | ☐ | ☐ |
| 4 | Are you or any of your principals, managers or professionals, owners or investors in a business which does business with the City of Fresno, or in a business which is in litigation with the City of Fresno? | ☐ | ☐ |
| 5 | Are you or any of your principals, managers or professionals, related by blood or marriage to any City of Fresno employee who has any significant role in the subject matter of this service? | ☐ | ☐ |
| 6 | Do you or any of your subcontractors have, or expect to have, any interest, direct or indirect, in any other contract in connection with this Project? | ☐ | ☐ |
| * If the answer to any question is yes, please explain in full below. | | | |

Explanation: _____

_____

_____      Signature _____

_____

_____      Date _____

_____

_____      (name) _____

_____

_____      (company) _____

_____

_____      (address) _____

_____

☐ Additional page(s) attached.      (city state zip) _____

Page 1 of 1

Exhibit C

## DISCLOSURE OF CONFLICT OF INTEREST

<u>Granite Park</u>
PROJECT TITLE

| | | YES* | NO |
|---|---|---|---|
| 1 | Are you currently in litigation with the City of Fresno or any of its agents? | ☐ | ☒ |
| 2 | Do you represent any firm, organization or person who is in litigation with the City of Fresno? | ☐ | ☒ |
| 3 | Do you currently represent or perform work for any clients who do business with the City of Fresno? | ☐ | ☒ |
| 4 | Are you or any of your principals, managers or professionals, owners or investors in a business which does business with the City of Fresno, or in a business which is in litigation with the City of Fresno? | ☒ | ☐ |
| 5 | Are you or any of your principals, managers or professionals, related by blood or marriage to any City of Fresno employee who has any significant role in the subject matter of this service? | ☐ | ☒ |
| 6 | Do you or any of your subcontractors have, or expect to have, any interest, direct or indirect, in any other contract in connection with this Project? | ☒ | ☐ |
| * if the answer to any question is yes, please explain in full below. | | | |

Explanation: _Items 4 & 6. We are_
_also leasing a portion of_
_the Granite Park facility._

Signature _____

Date _____

(name) _____

(company) _____

(address) _____

☐ Additional page(s) attached.

(city state zip) _____

Page 1 of 1

EXHIBIT C

**AMENDED AND RESTATED GROUND LEASE AND OPERATING AGREEMENT**
**by and between**
**THE CITY OF FRESNO**
**and**
**CENTRAL VALLEY COMMUNITY SPORTS FOUNDATION**
**and MANAGEMENT VISIONS, LLC.**
**Regarding GRANITE PARK**

This Amended and Restated Ground Lease and Operating Agreement ("Agreement") is made as of the __ day of June 2021, (the "Effective Date") by and between the CITY OF FRESNO, a municipal corporation ("City"), CENTRAL VALLEY COMMUNITY SPORTS FOUNDATION, a California nonprofit corporation ("CVCSF"), and MANAGEMENT VISIONS, LLC., a California limited liability company ("Tenant").

## RECITALS

WHEREAS, City is the owner of the real property commonly known as Granite Park (the "Property") situated in Fresno, California;

WHEREAS, Tenant is a successor to CVCSF; upon the effective date of this Agreement, CVCSF shall no longer have any interest in this Agreement or the Property.

WHEREAS, pursuant to the original Lease dated December 7, 2015, as amended October 28, 2016 ("Original Lease"), and the Service Agreement dated December 7, 2015 ("Original Service Agreement"), CVCSF has developed and improved a portion of the Property as a regional recreational asset providing a wide array of recreational opportunities and valuable public activity space, including baseball fields, soccer fields, and associated commercial development, and Tenant wishes to continue to operate the Property;

WHEREAS, the Property is located in an area of the City that has historically been and continues to be underserved by recreational opportunities and green space. Continued operation of the Property will provide green space for the public, as well as in-demand recreation programming to serve the community, and in particular underprivileged youth;

WHEREAS, City wishes to continue to lease the Property to Tenant for operation as a recreational facility, together with all rights, privileges, and easements appurtenant thereto, and improvements thereon, on the terms and conditions set forth herein.

## AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, City and Tenant hereby agree as follows:

1.      Lease of Property. City hereby leases, transfers and demises to Tenant, and Tenant hereby leases and takes from City, the Property for the terms and upon the agreements, covenants and conditions set forth in this Agreement. A description of the Property is more fully set forth in Exhibit A attached hereto.

2.      Term. The Initial Term of this Agreement shall be twenty years (the "Initial Term") commencing July 1, 2021 ("Effective Date"). This Agreement shall automatically renew for five additional ten-year terms thereafter, unless either party gives written notice to the

1

other at least three months prior to the end of the then current term of that party's desire to modify all or any portion of this Agreement at the end of the current Term, which modifications must be approved by both parties. Together, the Initial Term and any extensions shall be referred to herein as the "Term."

3.      Rent. Rent shall be due at $1 annually, and can be paid in a lump sum at the beginning of the Term, the receipt and sufficiency of which is acknowledged for the initial term of the Agreement.

4.      Taxes, Utilities, Liens, and Assessments.

        4.1     After the City pays off the CDFI loan per Exhibit D, Tenant shall not allow any subsequent encumbrance or lien to be assessed against Tenant's interest in this Agreement or the Property. Neither the Property nor Tenant's interest in this Agreement shall be utilized by Tenant for collateral or security for any loan or obligation.

        4.2     Possessory interest tax owed shall be paid directly by the City, within 30 days following receipt of a tax bill from Tenant, which shall be provided to the City upon receipt by Tenant. Any sales taxes due as a result of Tenant's operation shall be solely the responsibility of Tenant to collect and remit.

        4.3     City shall pay all water, sewer, and electrical utilities for the Property; however, Tenant shall take all reasonable measures to conserve water and power, including compliance with all City of Fresno water use restrictions. The responsible party for such utilities shall be changed to the City of Fresno with all service providers. City shall install a booster pump at City's expense to allow more efficient use of the irrigation system.

        4.4     Tenant shall be subject to and responsible for compliance with any Granite Park Common Area regulations. City shall arrange for and directly pay Granite Park Common Area Maintenance (CAM) charges applicable to the Property. City will negotiate in good faith to secure up to 500 parking spaces to be available for Tenant. Tenant may charge for parking in the Common Area only if consistent with the Granite Park common area agreement.

5.      Quiet Enjoyment. City covenants that upon payment by Tenant of the rent herein reserved and upon performance and observance by Tenant of all of the agreements, covenants and conditions herein contained on the part of Tenant to be performed and observed, Tenant shall peaceably hold and quietly enjoy the Property during the entire Term without hindrance, molestation or interruption by City or by anyone lawfully or equitably claiming by, through or under City.

6.      Management and Operations. Tenant shall have the right to use the Property for the purposes permitted by this Agreement and any applicable Conditional Use Permit, entitlements, laws, and regulations; provided, however, in no event shall the Property be used for any purpose or use (nor shall any activity be carried on upon the Property) which in any manner causes, creates or results in a public or private nuisance, or diminishes the value of City's fee estate. The Property shall be actively used for various recreational sports events and practices, such as, but not limited to, baseball, softball, soccer, football, and special events, which may consist of concerts and similar social events or social gatherings. The Property shall not be utilized for any residential use or occupancy.

2

6.1     The City shall provide for public access from at least dawn to dusk to approximately 250' x 448' of field area south of the leased Property, as shown on the attached diagram.  A fence with at least four gates, eight feet in width or wider, shall be constructed by the City between the leased Property and the public access area to separate the uses. Utilities for both areas shall be shared. Tenant shall not be entitled to utilize any area outside the leased Property (the public access area), except as may be permitted by the City Manager for occasional special events at the leased Property, which permission will not be unreasonably withheld.

6.2     Tenant shall provide sports and recreational programming for the benefit of City residents, including but not limited to baseball and softball leagues, clinics, and tournaments.  Tenant shall provide reasonable staffing for all programs.  All personnel, either paid or volunteer, shall be qualified to perform the duties assigned to them.  If the services provided hereunder (i) involve direct contact with minors or if minors are supervised as part of the services provided hereunder, or (ii) if services provided hereunder include services in the human services field and involve the care and security of children, the elderly, the disabled, or the mentally impaired, then Tenant represents and warrants to City that prior to services being provided hereunder by any personnel or volunteers retained by Tenant that Tenant has or will conduct a criminal background check as provided in California Penal Code Section 11105.3, as well as an FBI criminal database background check and, has or will verify prior to services being provided that the personnel or volunteers do not have any criminal record for the offenses listed in California Penal Code Section 11105.3, which include, certain offenses related to the possession or use of controlled substances, sex offenses or any criminal offense involving violence.

6.3     Tenant shall provide such security for the operation of all special events as shall be reasonably necessary to protect program participants, customers, employees, guests, and invitees to the Property.  Tenant shall report any suspicious or illegal behavior or activity at the Property or surrounding grounds to appropriate authorities, including timely reporting graffiti or vandalism. The City shall provide adequate security staffing and measures, except for special events.

6.4     Billboard and Signage Rights.  Tenant shall own the exclusive right to sublease or operate limited areas on the Property for digital or other billboard signage. The exact location and dimensions of digital billboard signage is to be mutually agreed upon by City and Tenant.  The number and location of other billboards and signs shall be determined as required by applicable provisions of the Fresno Municipal Code.  Signage must comply with the regulations of any state, federal or local agency with jurisdiction over such matters, such as Caltrans. Obtaining approval from state, federal or local agencies shall be the sole responsibility of Tenant. Tenant shall assign to the City Tenant's rights in the existing digital billboard agreement, attached hereto as Exhibit F, so that the billboard company pays the City directly all revenue due under the digital billboard agreement. In exchange, pursuant to an assignment agreement, City will pay to Tenant the sum of $2,000,000, to be paid by 5 p.m. on July 15, 2021, via a trust account with Tenant's law firm, Coleman & Horowitt, LLP. Then, after the City has been paid $2,000,000 of digital billboard revenue, the parties will cancel the assignment, and Tenant will then be entitled to receive all revenue from the digital billboard for the balance of the

3

digital billboard agreement. The above revenue sharing and assignment shall apply to the existing billboard only. Capital improvements made and paid for by Tenant after the effective date of this Agreement, and approved by City Council, shall be credited against the $2,000,000.

6.5    Concessions and Other Revenue. Concessions shall be subject to Tenant's CUP and liquor license for the Property. Tenant may retain all proceeds of concessions, gate fees, tournament fees, and sponsorships for Tenant sponsored events. City may allow for concessions for activities at the public access area that do not directly compete with concessions at Tenant's events.

6.6    Proximity to Airport. Because of the proximity of the Property to Fresno Yosemite International Airport, Tenant acknowledges it shall not engage in or conduct or permit the conduct of any activity on the Property which will interfere in any manner with the operation of the Airport or with aircraft operations or related operations conducted at the Airport by City or its lessees, and shall not make use of the Property in any manner which might interfere with the landing and taking off of aircraft from the Airport, or otherwise constitute an Airport hazard.

6.7    Maintenance and Repairs. The City shall be responsible for all maintenance, landscaping, repairs, and improvements for the Property, except for repairs required as a result of the negligence or intentional acts of Tenant's employees or volunteers. Tenant shall immediately notify the City of all items requiring repair or maintenance. Tenant shall not cause any material alterations or improvements to the Property without prior written City approval. The City may make any alterations or improvements to the Property that do not materially impair Tenant's rights under this Agreement. Within 30 days of the Effective Date of this Agreement, Tenant shall notify the City in writing of all items requiring repair or maintenance, prioritizing items that may create a safety issue. City shall provide Tenant with reasonable advance notice of all maintenance, landscaping, repairs and improvements so that they do not interfere with the ongoing activities of Tenant.

6.8    The public shall be permitted free access to the soccer/multi-use fields, but not Tenant's equipment, and not the baseball fields, from dawn to dusk Monday through Friday, except after 5 p.m. when those portions of the Property are not then reserved and currently in use for organized activities, except during such time those portions of the Property are undergoing improvements or repairs. The City Parks Director shall be kept informed by Tenant at all times when those portions of the Property are not available to the public as set forth in this Section. If the Property is not made available to the public as required, the City Parks Director or designee has the authority to open the facility to make it available. Public access shall not include any use that is reasonably likely to damage or impair the use of the facilities, such as any vehicular use, or use during a time that damage is likely, for example, periods of heavy rain or soon after seeding.

6.9    The baseball and softball fields shall be made available for City sponsored events, at City expense, during all times in which fields are not reserved and actively used by Tenant. Tenant and the City Parks Director shall cooperate to schedule and coordinate use of the fields.

7.    Title to Buildings and Improvements.

4

7.1    Title to all buildings, structures and improvements that now, or may from time to time constitute a part of the Property, shall be and remain with the City.

7.2    Tenant, when requested by the City, shall execute and deliver any and all deeds, bills of sale, assignments, and other documents which in City's sole judgment may be necessary or appropriate to transfer, to evidence or to vest in City clear title to any of the property described in the foregoing Subsection 7.1 located on the Property at the time of such termination.

7.3    Tenant, in addition, shall deliver to City on expiration of this Agreement originals or certified copies of any plans, reports, surveys, contracts or other items relating to the ownership or operation of the Property.

8.    Permits, Licenses, etc.  When requested by Tenant, City will from time to time during the Term execute and deliver all applications for permits, licenses or other authorizations relating to the Property required by any municipal, county, state, or Federal authorities, or required in connection with the construction, reconstruction, repair or alteration of any buildings or improvements now or hereafter constituting a part of the Property.  When requested by Tenant, City will from time to time during the Term execute, acknowledge and deliver any and all instruments required to grant rights-of-way and easements in favor of municipal and other governmental authorities or public utility companies incident to the installation of water lines, fire hydrants, sewers, electricity, telephone, gas, and other facilities and utilities reasonably required for the use and occupancy of the Property.

9.    Governmental Regulations and Waste.

9.1    The Property has not undergone inspection by a Certified Access Specialist (CASp).

9.2    Tenant agrees that it will not commit or permit waste upon the Property.

10.    Additional Conditions.

10.1    Tenant covenants and agrees Tenant shall conduct Tenant's activities in such a manner so as to protect the Property, the Property, the environment and human health and safety.  Tenant shall not cause or permit any Hazardous Substances, as defined herein, to be brought upon, produced, stored, used, discharged or disposed of on, or in the vicinity of, the Property.  In the event City determines Tenant's activities in any way endanger the Property, the Property, the environment, or human health and safety, City may, at City's sole discretion, require Tenant halt its activities until appropriate protective measures may be taken to eliminate such endangerment to City's satisfaction.  Tenant shall hold City harmless for any claims in any way resulting from any delay under this section.  City's right to halt activities under this section shall not in any way alter or affect Tenant's insurance or indemnity obligations under this Agreement, nor shall it relieve Tenant from any of Tenant's obligations hereunder that pertain to health, safety, or the protection of the environment.

10.2    In addition to the insurance coverage referred below, Workers' Compensation Insurance covering all persons employed in connection with the work and with respect to whom death or injury claims could be asserted against City, Tenant or the Property, and a general liability policy coverage, naming City with limits of not less than

5

Two Million Dollars ($2,000,000), shall be maintained by Tenant, at Tenant's sole cost and expense, at all times when any work is in process in connection with any improvement, change, alteration or demolition and replacement. All such insurance shall be obtained and kept in force as otherwise provided below.

10.3   City reserves the right to restrict access to the Property in the event of fire, earthquake, storm, riot, civil disturbance, pandemic, or other casualty or emergency, or in connection with City's response thereto, or if emergency repairs or maintenance are required to City facilities within or in the vicinity of the Property, or otherwise when City deems it advisable to do so.

10.4   Tenant is prohibited from demolishing or removing any improvements without the prior written consent of City.

11.   Damage or Destruction.   No loss or damage by fire or other cause required to be insured against hereunder resulting in either partial or total destruction of any building, structure, or other improvement on the Property, shall operate to terminate this Agreement, or to relieve or discharge Tenant and/or City from the payment of rents or amounts payable as rent as they become due and payable, or from the performance and observance of any of the agreements, covenants and conditions herein contained on the part of Tenant and/or City to be performed and observed. Tenant and City hereby waive the provisions of subsection 2 of section 1932 and subsection 4 of section 1933 of the California Civil Code, as amended from time to time.

12.   Representations of Tenant.   Tenant represents that it is, and for the life of this Agreement shall remain, a California corporation in good standing and licensed to business in the State of California, County of Fresno, and City of Fresno. Tenant shall operate the Property and provide the services outlined in this Agreement. As the services and use of the Property Tenant provides are special and unique, and it is vitally important to the City who the Tenant is, Tenant may not sublet or assign its interests in this Agreement without City Council approval, which approval shall not be unreasonably withheld.

13.   Insurance.

13.1   Throughout the life of this Agreement, Tenant and each of its contractors and subcontractors shall pay for and maintain in full force and effect all insurance as required in the attached Exhibit "B."

13.2   If at any time during the life of this Agreement or any extension, Tenant or any of its contractors or subcontractors fail to maintain any required insurance in full force and effect, following 48 hours' written notice, all Tenant's activities under this Agreement shall be discontinued immediately, until notice is received by City that the required insurance has been restored to full force and effect and that the premiums therefor have been paid for a period satisfactory to City. Tenant's obligation to carry insurance at all times is a material term of this Agreement. Any failure to maintain the required insurance shall cause Tenant's use and occupancy of the Property to be suspended in full until insurance is restored and proof of such is provided to the City; or, alternatively, if the Tenant fails to provide City proof of the required insurance, City may, but is not required to, procure equivalent insurance coverage and bill Tenant for the cost, which shall be paid

6

within 30 days of receipt by Tenant. No action taken by City pursuant to this section shall in any way relieve Tenant of its responsibilities under this Agreement. The phrase "fail to maintain any required insurance" shall include, without limitation, notification received by City that an insurer has commenced proceedings, or has had proceedings commenced against it, indicating that insurer is insolvent.

13.3   The fact that insurance is obtained by Tenant shall not be deemed to release or diminish the liability of Tenant, including, without limitation, liability under the indemnity provisions of this Agreement. The duty to indemnify indemnitees (as defined in this Agreement) shall apply to all claims and liability regardless of whether any insurance policies are applicable. The policy limits do not act as a limitation upon the amount of indemnification to be provided by Tenant. Approval or purchase of any insurance contracts or policies shall in no way relieve from liability nor limit the liability of Tenant, or its contractors or subcontractors.

13.4   Upon request of City, Tenant shall immediately furnish City with a complete copy of any insurance policy required under this Agreement, including all endorsements, with said copy certified by the underwriter to be a true and correct copy of the original policy. This requirement shall survive expiration or termination of this Agreement.

13.5   Tenant is also responsible for the compliance of Tenant's consultants, contractors and subcontractors with the insurance requirements in this section, except that any required certificates and applicable endorsements shall be on file with Tenant and City prior to the commencement of any work or services by the respective contractor or subcontractor.

14.   Indemnity.

14.1   To the furthest extent allowed by law, Tenant shall indemnify, hold harmless and defend City and its officers, officials, employees, agents and volunteers from any and all loss, liability, fines, penalties, forfeitures, costs and damages (whether in contract, tort or strict liability, including but not limited to personal injury, death at any time and property damage, including damage by fire or other casualty) incurred by City, Tenant or any other person, and from any and all claims, demands and actions in law or equity (including attorney's fees and litigation expenses), arising or alleged to have arisen directly or indirectly out of Tenant's:   (i) occupancy, maintenance, use, renovation and/or improvement of the Property; or (ii) performance of, or failure to perform, this Agreement. Tenant's obligations under the preceding sentence shall not apply to the active negligence of City, and shall not apply to any loss, liability, fines, penalties, forfeitures, costs or damages caused by the sole negligence or willful misconduct, of City.

14.2   To the furthest extent allowed by law, City shall indemnify, hold harmless and defend Tenant and its officers, officials, employees, agents and volunteers from any and all loss, liability, fines, penalties, forfeitures, costs and damages (whether in contract, tort or strict liability, including but not limited to personal injury, death at any time and property damage, including damage by fire or other casualty) incurred by Tenant, City or any other person, and from any and all claims, demands and actions in law or equity (including attorney's fees and litigation expenses), arising or alleged to have arisen directly or indirectly out of City's free public use of the Property. City's obligations under the preceding sentence shall not apply to the active negligence of City, and shall not apply

7

to any loss, liability, fines, penalties, forfeitures, costs or damages caused by the negligence, willful misconduct, or dangerous and defective conditions of the Property, of Tenant.

14.3    If Tenant should contract any work on the Property or subcontract any of its rights or obligations under this Agreement, Tenant shall require each consultant, contractor and subcontractor to indemnify, hold harmless and defend City and its officers, officials, employees, agents and volunteers in accordance with the terms of the preceding paragraph.

14.4    If City should contract any work on the Property or subcontract any of its rights or obligations under this Agreement, City shall require each consultant, contractor and subcontractor to indemnify, hold harmless and defend City and its officers, officials, employees, agents and volunteers in accordance with the terms of Subsection 19.2.

14.5    Tenant's occupancy of the Property shall be at Tenant's sole risk and expense. Tenant accepts all risk relating to Tenant's: (i) occupancy, maintenance, and/or use of the Property; and (ii) the performance of, or failure to perform, this Agreement. City shall not be liable to Tenant or Tenant's insurer(s) for, and Tenant and his insurer(s) hereby waives and releases City from, any and all loss, liability, fines, penalties, forfeitures, costs or damages resulting from or attributable to an occurrence on or about the Property in any way related to the Tenant's operations and activities. Tenant shall immediately notify City of any occurrence on the Property resulting in serious injury or death to any person or serious damage to property of any person.

14.6    The provisions of this Section shall survive the expiration or termination of this Agreement.

15.    Eminent Domain.

15.1    If the whole of the Property should be taken by any public or quasi-public authority, except by the City itself, under the power or threat of eminent domain during the Term, or if a substantial portion of the Property should be taken so as to materially impair the use of the Property contemplated by Tenant, and thereby frustrate Tenant's purpose in entering into this Agreement, then, in either of such events, this Agreement shall terminate at the time of such taking. In such event, of the compensation and damages payable for or on account of the Property, exclusive of the buildings and improvements thereon, Tenant and Lender, as their interests may appear, shall receive a sum equal to the worth at the time of the compensation award of the amount by which the fair rental value of the Property exceeds the rental payable pursuant to the terms of this Agreement for the balance of the Term; the balance of such compensation and damages shall be payable to and be the sole property of City. All compensation and damages payable for or on account of the buildings and improvements located on the Property made or paid for by Tenant, and constituting a part of the Property shall be paid to Tenant, and Tenant's Lenders.

15.2    If less than the whole of the Property should be taken by any public or quasi-public authority, except by the City itself, under the power or threat of eminent domain during the Term and this Agreement is not terminated as provided in subsection (a) above, Tenant shall promptly reconstruct and restore the Property, with respect to the

portion of the Property not so taken, as an integral unit of the same quality and character as existed prior to such taking.  The Minimum Rent payable by Tenant following such taking shall be equitably reduced by agreement of City and Tenant in accordance with the reduced economic return to Tenant, if any, which will occur by reason of such taking. The compensation and damages payable for, or on account of, such taking shall be applied to the reconstruction and restoration of the Property by Tenant pursuant to this subsection (b) by application, first, of any sums payable for or on account of the buildings and improvements situated on the Property, and second, of any sums payable for or on account of the Property exclusive of such buildings and improvements.  The remainder, if any, after reconstruction and restoration shall be retained by Tenant and Lender.

15.3    No taking of any leasehold interest in the Property or any part thereof shall terminate or give Tenant the right to surrender this Agreement, nor excuse Tenant from full performance of its covenants for the payment of rent and other charges or any other obligations hereunder capable of performance by Tenant after any such taking, but in such case all compensation and damages payable for or on account of such taking shall be payable to and be the sole property of Tenant and Lender.

16.    City's Right of Inspection.  City may, at any reasonable time and from time to time during the Term, enter upon the Property for the purpose of inspecting the buildings or improvements now or hereafter located thereon and for such other purposes as may be necessary or proper for the reasonable protection of its interests.

17.    Tenant's Defaults and City's Remedies.  It shall be an event of default hereunder (each an "Event of Default") if (i) default shall be made by Tenant in the punctual payment of any rent or other moneys due hereunder and shall continue for a period of ten days after written notice thereof to Tenant; (ii) default shall be made by Tenant in the performance or observance of any of the other agreements, covenants or conditions of this Agreement on the part of Tenant to be performed and observed and such default shall continue for a period of sixty days after written notice thereof to Tenant, or, in the case of a default which cannot be cured by the payment of money and cannot be cured within sixty days, shall continue for an unreasonable period after such written notice; (iii) Tenant shall abandon the Property; (iv) Tenant shall admit in writing its inability to pay its debts generally as they become due, file a petition in bankruptcy, insolvency, reorganization, readjustment of debt, dissolution or liquidation under any law or statute of the federal government or any state government or any subdivision of either now or hereafter in effect, make an assignment for the benefit of its creditors, consent to, or acquiesce in the appointment of a receiver of itself or of the whole or any substantial part of the Property; (v) a court of competent jurisdiction shall enter an order, judgment or decree appointing a receiver of Tenant or of the whole or any substantial part of the Property, and such order, judgment or decree shall not be vacated, set aside or stayed within sixty days from the date of entry of such order, judgment or decree, or a stay thereof be thereafter set aside; (vi) a court of competent jurisdiction shall enter an order, judgment or decree approving a petition filed against Tenant under any bankruptcy, insolvency, reorganization, readjustment of debt, dissolution or liquidation law or statute of the Federal government or any state government or any subdivision of either now or hereafter in effect, and such order judgment or decree shall not be vacated, set aside or stayed within sixty days from the date of entry of such order, judgment or decree, or a stay thereof

be thereafter set aside; or (vii) under the provisions of any other law for the relief or aid of debtors, a court of competent jurisdiction shall assume custody or control of Tenant or of the whole or any substantial part of the Property, and such custody or control shall not be terminated within sixty days from the date of assumption of such custody or control. Upon the occurrence of any Event of Default by Tenant hereunder, and following expiration of the notices required herein, City shall have the following rights and remedies, in addition to all other rights and remedies of City provided hereunder or by law:

   17.1   The right to terminate this Agreement, in which event Tenant shall immediately surrender possession of the Property, and pay to City all rent and all other amounts payable by Tenant hereunder to the date of such termination;

   17.2   The remedies described in California Civil Code Section 1951.2, including, without limitation, the right to recover the worth at the time of award of the amount by which the unpaid rent for the balance of the Term after the time of award exceeds the amount of such rental loss for the same period that Tenant proves could be reasonably avoided, as computed pursuant to subdivision (b) of section 1951.2 of the California Civil Code;

   17.3   The remedies described in California Civil Code Section 1951.4, including, without limitation, the right to collect, by suit or otherwise, each installment of rent or other sums that become due hereunder, or to enforce, by suit or otherwise, performance or observance of any agreement, covenant or condition hereof on the part of Tenant to be performed or observed; or

   17.4   The right to cause a receiver to be appointed in any action against Tenant to take possession of the Property or to collect the rents or profits therefrom. Neither appointment of such receiver nor any other action taken by City shall constitute an election on the part of City to terminate this Agreement unless written notice of termination is given to Tenant.

   17.5   City's remedies contained in Subsections 17 through and including 17.4 shall be subject to any stay order issued by a bankruptcy court.

18.   Nonwaiver. If any action or proceeding is instituted or if any other steps are taken by City or Tenant, and a compromise part payment or settlement thereof shall be made, either before or after judgment, the same shall not constitute or operate as a waiver by City or Tenant of any agreement, covenant or condition of this Agreement or of any subsequent breach thereof.  No waiver by City or Tenant of any default under this Agreement shall constitute or operate as a waiver of any subsequent default hereunder, and no delay, failure or omission in exercising or enforcing any right, privilege, or option under this Agreement shall constitute a waiver, abandonment or relinquishment thereof or prohibit or prevent any election under or enforcement or exercise of any right, privilege, or option hereunder. No waiver of any provision hereof by City or Tenant shall be deemed to have been made unless and until such waiver shall have been reduced to writing and signed by City or Tenant, as the case may be.  The receipt by City of rent with knowledge of any default under this Agreement shall not constitute or operate as a waiver of such default. Payment by Tenant or receipt by City of a lesser amount than the stipulated rent or other sums due City shall operate only as a payment on account of such rent or other sums.  No endorsement or statement on any check or other remittance or in any

10

communication accompanying or relating to such payment shall operate as a compromise or accord and satisfaction unless the same is approved in writing by City, and City may accept such check, remittance or payment without prejudice to its right to recover the balance of any rent or other sums due by Tenant and pursue any remedy provided under this Agreement or by law.

19.    No Merger.

19.1    There shall be no merger of the leasehold estate created by this Agreement with any other estate in the Property, including the fee estate, by reason of the fact that the same person may own or hold the leasehold estate created by this Agreement, or an interest in such leasehold estate, and such other estate in the Property, including the fee estate, or any interest in such other estate; and no merger shall occur unless and until City, Tenant and any Lender shall join in a written instrument effecting such merger and shall duly record the same.

19.2    No termination of this Agreement shall cause a merger of the estates of City and Tenant, unless City so elects and any such termination shall, at the option of City, either work a termination of any sublease in effect or act as an assignment to City of Tenant's interest in any such sublease.  Notwithstanding the foregoing, in the event of the termination of this Agreement and the execution of a new lease with Lender or its nominee, the termination of this Agreement shall neither work a merger of estates nor a termination of any subleases in effect unless Lender so elects.

20.    No Partnership.  It is expressly understood and agreed that City does not, in any way or for any purpose by executing this Agreement, become a partner of Tenant in the conduct of Tenant's business, or otherwise, or a joint venturer or a member of a joint enterprise with Tenant.  Design, construction and site preparation for improvements and repairs at the Property as well as ongoing operations and staffing will be at Tenant's sole cost and expense.  City may assist Tenant with grant opportunities which from time to time become available.

21.    Covenants Run With Land.

21.1    The agreements, covenants and conditions in this Agreement contained are and shall be deemed to be covenants running with the land and the reversion and shall be binding upon and shall inure to the benefit of City and Tenant and their respective successors and assigns and all subsequent lessors and lessees respectively hereunder.

21.2    All references in this Agreement to "Tenant" or "City" shall be deemed to refer to and include successors and assigns of Tenant or City, respectively, without specific mention of such successors or assigns.

22.    Notices.  Except as otherwise provided hereunder; any notice or communication to City, Tenant or Lender shall be in writing and be mailed by certified mail, postage prepaid. Notices or communications shall be addressed to City at:

11

City of Fresno

2600 Fresno Street
Fresno, California 93721
Attention: City Manager

or such other address or addresses as City shall from time to time designate, or to such agent of City as it may from time to time designate, by notice in writing to Tenant. Notices or communications shall be addressed to Tenant at:

Management Visions, LLC.
2141 Tuolumne Street, Suite M
Fresno, California 93721
Attention: Terance Frazier, President

With a copy to:

Coleman & Horowitt, LLP.
499 East Shaw Avenue, Suite 116
Fresno, CA 93704

or such other address or addresses as Tenant shall from time to time designate, or to such agent of Tenant as it may from time to time designate, by notice in writing to City. Notices or communications to Lender shall be addressed to Lender at such address as Lender shall from time to time designate by notice in writing to City. Any notice mailed in the manner above set forth shall be deemed to have been received unless returned to the sender by the post office.

23.    Limitation of City's Liability. In the event of any transfer of City's interest in this Agreement, , except in the event of a default in the covenants or obligations by the transferee, the City (and in case of any subsequent transfer, the then transferor) shall be automatically freed and relieved from and after the date of such transfer of all personal liability for the performance of any covenants or obligations on the part of City contained in this Agreement thereafter to be performed; provided, however, that any funds in the hands of City or the then transferor at the time of such transfer, in which Tenant has an interest shall be turned over to the transferee and any amount then due and payable to Tenant by City or the then transferor under any provision of this Agreement shall be paid to Tenant; and provided, further, that upon any such transfer, the transferee shall expressly assume, subject to the limitations of this Section, all of the agreements, covenants and conditions in this Agreement to be performed on the part of City, it being intended hereby that the covenants and obligations contained in this Agreement on the part of City shall, subject as aforesaid, be binding on each lessor, and its successors and assigns. Notice of such transfer by City shall be provided in advance to Tenant.

24.    Estoppel Certificates.    Tenant or City, as the case may be, will execute, acknowledge and deliver to the other and/or to Lender, promptly upon request, its certificate certifying (a) that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that this Agreement is in full force and effect, as modified, and stating the modifications), (b) the dates, if any, to which the Minimum Rent, Percentage Rent, and other monetary obligations have been paid, (c) whether there are

12

then existing any charges, offsets or defenses against the enforcement by City of any agreement, covenant or condition hereof on the part of Tenant to be performed or observed (and, if so, specifying the same), and (d) whether there are then existing any defaults by Tenant in the performance or observance by Tenant of any agreement, covenant or condition hereof on the part of Tenant to be performed or observed and whether any notice has been given to Tenant of any default which has not been cured (and, if so, specifying the same). Any such certificate may be relied upon by a prospective purchaser, mortgagee or trustee under a deed of trust of the Property or any part thereof.

25.    Holding Over.  This Agreement shall terminate without further notice upon the expiration of the Term, and any holding over by Tenant after the expiration of the Term shall not constitute a renewal hereof or give Tenant any rights hereunder or in or to the Property, except as otherwise herein provided, it being understood and agreed that this Agreement cannot be renewed, extended or in any manner modified except in writing signed by City and Tenant.

26.    Default Interest.  In the event that City or Tenant shall fail to pay any monetary obligations owed to the other hereunder within ten days of the date that such amounts are due and payable, each shall pay to the other, in addition to such amounts, interest thereon computed at an annual rate of 2% above the "prime rate" of interest, or the maximum interest rate permitted by law, whichever is less, from the first day of the month in which such monetary obligation was payable to the date of actual payment thereof by one to the other.

27.    Severability.  In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement, but this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had not been contained herein.

28.    Time of the Essence.  Time is of the essence of each and all of the agreements, covenants, and conditions of this Agreement.

29.    Attorney Fees.  In the event of any action or proceeding at law or in equity between City and Tenant to enforce any provision of this Agreement or to protect or establish any right or remedy of either party hereunder, the unsuccessful party to such litigation shall pay to the prevailing party all costs and expenses, including reasonable attorney fees, incurred therein by such prevailing party, and if such prevailing party shall recover judgment in any such action or proceeding, such costs, expenses and attorney fees shall be included in and as a part of such judgment.

30.    Integration.  This instrument constitutes the entire agreement between City and Tenant with respect to the subject matter hereof and supersedes all prior offers and negotiations, oral or written.

31.    Amendments.  This Agreement may not be amended or modified in any respect whatsoever except by an instrument in writing signed at the time of modification by City, Tenant, and, if required by any Lender, by Lender. The Parties agree there shall be no further modifications of this Agreement during the initial Term.

32.    Governing Law.   This Agreement shall be governed by and construed in accordance with the laws of the State of California.  Venue shall be Fresno County.

33.    Option to Purchase. [Prior provisions are deleted.]

34.    Tenant's Right of First Refusal.  In the event Landlord desires to sell the Property, or any portion of its interest in the Property, and has received an acceptable bona fide offer to purchase the Property or such interest (the "Offer"), Landlord shall give Notice of Intent to Sell to Tenant, together with an executed copy of the Offer setting forth all of the terms of the proposed purchase and identifying the prospective purchaser.  Tenant shall have the right to purchase the Property or such interest on the same terms and conditions as set forth in the Offer.  If Tenant elects to exercise its right, it shall give Landlord written notice of such election within sixty days after receipt of the Notice of Intent to Sell.  If Tenant fails to exercise its right within such sixty day period, (a) Landlord shall be free to accept an offer to sell the Property or interest therein on the terms set forth in the Offer at any time within ninety days after the expiration of such sixty day period, and (b) Tenant shall, upon request, deliver to Landlord a written acknowledgement of Tenant's failure to exercise the option and Landlord's right to sell the Property or interest therein pursuant to this section.

35.    Release and Estoppel.  The parties shall execute a general release and estoppel, attached hereto as Exhibit C.

36.    This Agreement shall be effective when it and the attached Release are approved by Council, fully executed by all parties, Council has appropriated necessary funds for the required payments, and payments are made.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

CITY:
CITY OF FRESNO, a municipal
corporation


By: _____
       Thomas Esqueda, City Manager

CVCSF:
CENTRAL VALLEY COMMUNITY
SPORTS FOUNDATION, a California
non-profit corporation

By: _____
       Terance Frazier, President

Tenant:

MANAGEMENT VISIONS, LLC., a
California limited liability company

By: _____

Its: _Managing Member_

14

ATTEST:
BRIANA PARRA,
Interim City Clerk

By_____
　　　(Deputy)

APPROVED AS TO FORM:

DOUGLAS T. SLOAN
City Attorney

By_____
　　　Katherine B. Doerr
　　　Chief Assistant City Attorney

APPROVED AS TO FORM:

By_____
　　　David J. Weiland
　　　Attorney for CVCSF and MANAGEMENT VISIONS, LLC. (Tenant)

Exhibit A: Description of the Property
Exhibit B: Insurance Requirements
Exhibit C: Release and Estoppel
Exhibit D: List of Payables
Exhibit E: Joint Statement
Exhibit F: Digital Billboard Agreement

EXHIBIT A (will be supplemented with legal description)





EXHIBIT B

## INSURANCE REQUIREMENTS

### Granite Park

#### Minimum Scope of Insurance

Coverage shall be at least as broad as:

1. The most current version of Insurance Services Office (ISO) Commercial General Liability Coverage Form CG 00 01, which shall include insurance for "bodily injury," "property damage" and "personal and advertising injury" with coverage for premises and operations, products and completed operations, fire legal liability and contractual liability (including, without limitation, indemnity obligations under the Agreement).

2. Property insurance with a Cause of Loss – Special or All Risk Form. Only required of Tenant and not of Tenant's consultants, contractors, or subcontractors. Workers' Compensation insurance as required by the California Labor Code and Employer's Liability Insurance.

#### Minimum Limits of Insurance

Tenant shall maintain limits of liability of not less than:

1. General Liability:

   $2,000,000 per occurrence for bodily injury and property damage
   $2,000,000 per occurrence for personal and advertising injury
   $2,000,000 aggregate for products and completed operations
   $2,000,000 general aggregate applying separately to the work performed under the Agreement

2. Property: Limits of insurance in an amount equal to the full (100%) replacement cost (without deduction for depreciation).

3. Employer's Liability:

   $1,000,000 each accident for bodily injury
   $1,000,000 disease each employee
   $1,000,000 disease policy limit

#### Umbrella or Excess Insurance

In the event Tenant purchases an Umbrella or Excess insurance policy(ies) to meet the "Minimum Limits of Insurance," this insurance policy(ies) shall "follow form" and afford no less coverage than the primary insurance policy(ies).

#### Deductibles and Self-Insured Retentions

Tenant shall be responsible for payment of any deductibles contained in any insurance policies required hereunder and Tenant shall also be responsible for payment of any self-insured retentions. Any deductibles or self-insured retentions must be declared to, and approved by, the City's Risk Manager or his/her designee. At the option of the City's Risk Manager or his/her designee, either (i) the insurer shall reduce or eliminate such deductibles or self-insured retentions as respects City, its officers, officials, employees, agents and volunteers; or (ii) Tenant shall provide a financial guarantee, satisfactory to City's Risk Manager or his/her designee, guaranteeing payment of losses and related

investigations, claim administration and defense expenses. At no time shall City be responsible for the payment of any deductibles or self-insured retentions.

*Other Insurance Provisions*

The General Liability insurance policy is to contain, or be endorsed to contain, the following provisions:

1. City, its officers, officials, employees, agents and volunteers are to be covered as additional insureds.

2. The coverage shall contain no special limitations on the scope of protection afforded to City, its officers, officials, employees, agents and volunteers.

3. Tenant's insurance coverage shall be primary and no contribution shall be required of City.

The Property insurance policy is to contain, or be endorsed to contain, the following provisions:

1. City shall be named as a loss payee.

2. The coverage shall contain:

    (i)     No coinsurance penalty.
    (ii)    No limitations or exclusions for vacancy.
    (iii)   No special limitations on the scope of protection afforded to City.

The Workers' Compensation insurance policy is to contain, or be endorsed to contain, the following provision:  Tenant and its insurer shall waive any right of subrogation against City, its officers, officials, employees, agents and volunteers.

All policies of insurance required hereunder shall be endorsed to provide that the coverage shall not be cancelled, non-renewed, reduced in coverage or in limits except after 30 calendar day written notice by certified mail, return receipt requested, has been given to City.  Upon issuance by the insurer, broker, or agent of a notice of cancellation, non-renewal, or reduction in coverage or in limits, Tenant shall furnish City with a new certificate and applicable endorsements for such policy(ies).  In the event any policy is due to expire during the work to be performed for City, Tenant shall provide a new certificate, and applicable endorsements, evidencing renewal of such policy not less than 15 calendar days prior to the expiration date of the expiring policy.

Acceptability of Insurers

All policies of insurance required hereunder shall be placed with an insurance company(ies) admitted by the California Insurance Commissioner to do business in the State of California and rated not less than "A-VII" in Best's Insurance Rating Guide.

Verification of Coverage

Tenant shall furnish City with all certificate(s) and applicable endorsements effecting coverage required hereunder.  All certificates and applicable endorsements are to be provided to the City's Risk Manager or his/her designee prior to City's execution of the Agreement and before work commences.

EXHIBIT C

# SETTLEMENT, RELEASE, AND ESTOPPEL

Parties:

> The City of Fresno, a municipal corporation; Lee Brand; Wilma Quan; Tim Orman; James Schaad
>
> Central Valley Community Sports Foundation (CVCSF), a California nonprofit corporation
>
> Management Visions, LLC., a California limited liability company (Tenant)
>
> Terance Frazier, an individual

Scope of Release: Claims arising from or relating to the lease and operation of Granite Park, including occupancy, maintenance, use, renovation, and improvement of the property or performance of or failure to perform the original Lease dated December 7, 2015, as amended October 28, 2016 ("Original Lease"), and the Service Agreement dated December 7, 2015 ("Original Service Agreement"), as well as set forth in the pending action *Terance Frazier; Central Valley Community Sports Foundation v. City of Fresno; Lee Brand; Wilma Quan; James Schaad; Tim Orman* (E.D. Cal) Case No. 1:20-cv-01069-DAD-SAB. All parties and all claims are to be dismissed with prejudice and released, within ten days of the close of escrow, referenced below. The parties expressly agree to bear their own costs and attorneys' fees and to waive recovery of their fees and costs that they may be entitled to pursuant to any contractual or statutory provision based on either state or federal law.

The Original Service Agreement shall be terminated with no further obligation by any party.

The City shall pay to CVCSF the total sum of $2,337,101, which shall reflect payment for unpaid loans incurred and accounts payable owed by CVCSF, the proceeds of which were utilized for Granite Park improvements and operations, as set forth in the attached Exhibit D. Such payment shall be made within 30 days following the full execution of this Settlement, Release, and Estoppel and CVCSF providing complete documentation to the satisfaction of the City Manager of all debts and expenses listed. In exchange, CVCSF and the City shall be provided acknowledgements of full payment and release of all claims, liens, and encumbrances. Funds shall be paid into a trust account with CVCSF's and Tenant's law firm, Coleman & Horowitt, LLP., pursuant to mutually agreed upon instructions, and released to CVCSF upon receipt of invoices, statements, or other documentation that debts and accounts payable were incurred for capital improvements, maintenance, or operations of Granite Park, satisfactory to the City Manager of the expenses set forth in Exhibit D, and upon proof of payment of the outstanding debts and accounts payable set forth in Exhibit D.

It is the intention of the parties that this Agreement constitutes a complete and final compromise and settlement of any and all actions, causes of action, suits, liabilities, claims, demands, obligations, rights, agreements, promises, or liens by or against the parties prior to execution of this Agreement. In furtherance of this intention, the parties acknowledge they are familiar with California Civil Code Section 1542 which provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THIS RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR

Parties Initials: _____   _____      _____   _____

The parties hereby waive and relinquish any rights or benefits which they currently have or currently may have under California Civil Code Section 1542 to the fullest extent that it may lawfully waive rights and benefits thereunder pertaining to the subject matter of this Agreement. In connection with such waiver and relinquishment, the parties hereby acknowledge they are aware that they may hereafter discover facts in addition to or different from those which it now knows or believes to be true with respect to the subject matter of this Agreement,  but it is the intention of the parties to hereby fully, finally, and forever settle and release all the disputes, actions, causes of action, suits, liabilities, claims, demands, obligations, rights, agreements, promises, or liens, known or unknown, suspected or unsuspected, which may now exist or concerning the subject matter of this Agreement.  The parties acknowledge the significance and consequences of this waiver of California Civil Code Section 1542 and that even if they should eventually suffer additional damages arising out of the matters released herein, then they will not be able to make a claim for those damages.  Further, the parties acknowledge they intend these consequences even as to claims for damages that may exist as of the date of this release but which the parties do not know exist, and which, if known, would materially affect the parties' decision to execute this release, regardless of the parties' lack of knowledge or whether the parties' lack of knowledge is the result of ignorance, oversight, error, negligence, or any other cause.

The parties agree the release contained herein is unconditional and shall not be subject to modification, termination, or rescission.

CITY OF FRESNO, a municipal corporation

By: _____
    Thomas Esqueda, City Manager

CENTRAL VALLEY COMMUNITY SPORTS FOUNDATION, a California non-profit corporation

By: _____
    Terance Frazier, President

MANAGEMENT VISIONS, LLC., a California limited liability company

By: _____
    Terance Frazier, ~~President~~ Managing Member

_____
    Terance Frazier, an individual

APPROVED AS TO FORM:
DOUGLAS T. SLOAN
City Attorney

By_____
    Katherine B. Doerr
    Chief Assistant City Attorney

APPROVED AS TO FORM:

By_____
    David J. Weiland
    Attorney for CVCSF, Tenant, and Frazier


APPROVED AS TO FORM:

By_____
    Kevin Little
    Attorney for CVCSF, Tenant, and Frazier

# EXHIBIT D

## Debts and Accounts Payable

| | | |
|---|---|---|
| Briner | $285,000 | Baseball & Soccer Fields Maintenance |
| CCC of New York | $1,053 | Paychex collections |
| Dale G Mell | $8,040 | soccer field building project. Invoice #3831 |
| 4 Creeks | $6,000 | Advertising Aug, Sept, Oct, Nov |
| City of Fresno | $109,000 | Balance on Utilities Account |
| CA Dept Tax and Fee | $27,857 | as of 1/30/2021 |
| Fresno County Tax Collector | $32,855 | Parcel Number 438-022-01T |
| PGE | $23,404 | COF & April Services |
| Payables Total: | $493,209 | |
| | | |
| CDFI Loan | $1,369,370 | Original Construction Loan |
| MJTJ, LLC | $69,610 | Loan |
| Terance F | $56,019 | Loan |
| EIDL | $149,900 | Disaster Covid-19 Loan |
| PPP | $148,993 | PPP - Loan |
| Aaron Haynes | $50,000 | Mod Box Agreement |
| Debt Total: | $1,843,892 | |
| | | |
| Payables and Debt Total: | $2,337,101 | |

Exhibit E - Joint Statement

The City of Fresno, Central Valley Community Sports Foundation, and Terance Frazier are pleased to announce they have reached an amended agreement that will allow the Granite Park sports complex to continue to thrive and serve the Fresno region. The new agreement structure allows the nonprofit to continue to do what it does best, promoting, marketing, and operating sports and special events, while the City assumes responsibility for the physical operation of the facility.

The parties are confident this arrangement will serve the best interests of taxpayers and benefit the community for years to come.

EXHIBIT D



## COUNTY OF FRESNO
### Lisa A. Smittcamp
### District Attorney

# NEWS RELEASE
**FOR IMMEDIATE RELEASE**
June 23, 2021

## District Attorney's Public Integrity Unit Warns City of Fresno About Possible Brown Act Violations Related to Granite Park Dealings

Today, June 23, 2021, the Fresno County District Attorney's Public Integrity Unit issued a letter to the Fresno City Attorney to warn of allegations being made about potential Brown Act violations by members of the Fresno City Council related to dealings involving Granite Park. While it is important to stress that these are only allegations, the District Attorney's Office takes such matters seriously and will take all warranted steps to investigate Brown Act violations and any other wrongdoing alleged to have been committed by public officials.

A copy of the letter issued to the Fresno City Attorney is attached to this release.

Tips and investigation requests on matters involving public officials or public corruption can be sent to publicintegrity@fresnocountyca.gov.

Any inquiries about this release should be directed to FCDAMedia@fresnocountyca.gov.



**COUNTY OF FRESNO**
Lisa A. Smittcamp
District Attorney

June 23, 2021

Douglas Sloan
City Attorney
City of Fresno
2600 Fresno Street, Room 2031
Fresno, CA 93721

Mr. Sloan,

This office has received allegations of potential law violations by members of the City Council while conducting business for the City of Fresno. These allegations include a potential violation of the Brown Act. Specifically, this allegation involves recent discussions among a majority of Councilmembers concerning forthcoming decisions on Granite Park, a potential violation of Government Code §54953(a).

As you are aware, the Brown Act requires that all meetings of a legislative body of a local agency be open and public. A "meeting", as defined in Government Code §54952.2, means any congregation of a majority of the members of a legislative body at the same time and location, to hear, discuss, deliberate, or take action on any item that is within the subject matter jurisdiction of the legislative body.

This is not the first allegation this office has received pertaining to a potential violation of the Brown Act that has involved Granite Park. We will continue to address these allegations. It is respectively requested that any vote regarding Granite Park be postponed until our investigation is complete.

Respectfully,

Lisa Smittcamp
District Attorney

Cc: Councilmembers Esmeralda Soria, Mike Karbassi, Miguel Arias, Tyler Maxwell, Luis Chavez, Garry Bredefeld, Nelson Esparza; Mayor, Jerry Dyer; City Manager, Thomas Esqueda

EXHIBIT E

COUNTY OF FRESNO

Lisa A. Smittcamp
District Attorney

# NEWS RELEASE
FOR IMMEDIATE RELEASE
March 1, 2022

## 2019 AUDIT BY THE CITY OF FRESNO REGARDING GRANITE PARK REMAINS WITH THE FEDERAL BUREAU OF INVESTIGATION AND THE UNITED STATES ATTORNEY'S OFFICE

**\*\*\***

## THE FRESNO COUNTY DISTRICT ATTORNEY'S OFFICE WILL NOT PURSUE CHARGES AGAINST CITY COUNCILMEMBERS FOR BROWN ACT OR MUNICIPAL CODE VIOLATIONS

Today, March 1, 2022, the Fresno County District Attorney's Office provided updates to the 2019 City of Fresno Audit and announced that no criminal charges will be filed for violations of the Brown Act or Municipal Code violations that were alleged by complaints made to the DA's Public Integrity Unit.

**2019 Audit by the City of Fresno regarding Granite Park**

In late 2019, the Fresno County District Attorney's Office received a request from a City of Fresno official to conduct a public integrity investigation regarding Granite Park. Before the investigation could be complete, the Federal Bureau of Investigations (FBI) contacted the District Attorney's Office indicating that they would like to take over the investigation, as one of the potential involved parties was a sitting Congressman in the United States House of Representatives. Thus, the local investigation was terminated, and the case was handed over to the FBI and the United States Attorney's Office in the Eastern District of California.

At present, it is the understanding of the District Attorney's Office that the Federal investigation is still ongoing and active.

**Brown Act**

On or about June 21, 2021, the District Attorney's Office received a request to investigate an allegation that Fresno City Councilmember Esmeralda Soria may have violated the Brown Act by asking three other Fresno City Councilman (Councilman Nelson Esparza, Councilman Tyler Maxwell and Councilman Miguel Arias) in a personal office and after a closed session hearing, if a "deal" had been reached between the City of Fresno and Terance Frazier for an operational agreement involving Granite Park. Councilmember Soria is alleged to have asked this question despite specifically recusing herself from the issue due to her personal relationship with Mr. Frazier.

All of the named City Council members were given an opportunity to give a statement to Fresno County DA Investigators, and all declined to do so in a written letter from their joint attorney, Verna Santos.

In reviewing cases for the filing of criminal charges, prosecutors are required to follow certain ethical considerations.

Charges may only be filed when:
    (1) there has been a complete investigation and thorough consideration of all pertinent data;
    (2) there is legally sufficient, admissible evidence of a corpus delicti;
    (3) there is legally sufficient, admissible evidence of the accused's identity as the perpetrator of the crime; and
    (4) the prosecutor has considered the probability of conviction by an objective factfinder hearing the admissible evidence.

In assessing this matter for a potential Brown Act violation, the District Attorney's Office considered the requirements of Government Code section 54959.

To prosecute an individual for a violation of Government Code section 54953, it must be proved beyond a reasonable doubt that:
    (1) a person that was a member of a legislative body;
    (2) willfully attended a meeting of that legislative body;
    (3) at that meeting, action was taken in violation of any provisions of Government Code sections 54950 through 54962; and
    (4) that person specifically intended to deprive the public of information and knew or had reason to know that the public was entitled to the information sought to be withheld.

After carefully reviewing the investigative reports, statements and other confidential information, the Fresno County District Attorney's Office has reached the legal conclusion that the prosecution cannot prove, beyond a reasonable doubt, that Councilmember Esmeralda Soria violated Government Code section 54959.

Several important factors weighed heavily in this decision, including insufficient evidence to establish that Councilmember Soria knew that enough Councilmembers were present in the office to form a majority of the City Council when she asked the question, the lack of any evidence that actions were taken based upon the meeting by a majority of the City Council, and the lack of information that Councilmember Soria specifically intended to deprive the public of information.

Because the subject at issue dealt with a matter about which Councilmember Soria had recused herself, the District Attorney's Office remains troubled by the allegation that Councilmember Soria made such an inquiry. However, based upon the nature of the evidence and confidential information received, the Councilmember's conduct does not support a prosecution given the standard of proof for a criminal offense. As a result, a criminal charge for a violation of the Brown Act will not be filed in this case.

Nonetheless, based upon an analysis of the other code sections with the Brown Act, including Government Code Section 54960, the appropriate response in this situation, where there is insufficient proof of illegal action taking place but there was a potential violation of the procedural provisions of the Brown Act, is to remind the Councilmember to be cognizant of when other members of the legislative body may be present,

such that a majority is constituted, and to **refrain from discussing matters within their subject matter jurisdiction.**

**The Fresno County District Attorney's Office Public Integrity Unit has sent letters to numerous elected officials since its inception in 2015, reminding them of their ethical and legal responsibilities as elected officials, and will continue to enforce these laws when the required evidence is obtained.**

A letter of this kind will be sent to Councilmember Soria based on the allegation made advising her of the law, once again.

## Personal Protective Equipment (PPE) Investigation

The Fresno County District Attorney's Office has also reviewed and investigated an allegation regarding the procurement and distribution of Personal Protective Equipment (PPE) by Fresno City Councilmembers, and will not pursue violations of Fresno Municipal Code Section 4-107(e), based on an insufficiency of the evidence associated with the lack of cooperation from a witness in the DA's investigation.

City Councilmembers have authority under the Fresno Municipal Code and Resolution 2017-67 for each Councilmember to enter into purchase contracts, for up to $50,000, without a competitive process. Pursuant to Municipal Code Section 4-107(e), however, it is prohibited to split contracts to avoid Charter and Municipal Code limits – with the Charter bid threshold being $143,000 at the time of the purchases currently in question.

To prosecute an individual for a violation of Fresno Municipal Code Section 4-107(e), the prosecution must prove beyond a reasonable doubt that an individual made a purchase, either in the form a single contract exceeding $50,000, or in a series of contracts with the specific intent to avoid Charter bidding thresholds. Numerous other municipal codes and resolutions deal with the purchase and bidding process for contracts in excess of the Councilmember purchasing authority.

Fresno Municipal Code 4-107(e) does not, by itself, contain any provision with regards to punishment for any violations. While a violation could conceivably be punished under Government Code section 36900, which provides that violations of a city ordinance is a misdemeanor, the same code also provides that violation of a city ordinance may be prosecuted by city authorities in the name of the People of the State of California or redressed by civil action. This is important because while the District Attorney and the City Attorney are co-equal actors regarding their legal ability to prosecute violations of city ordinances, this does not mean that the two agencies are equal regarding the practical considerations of enforcing a city's municipal code.

While the City Attorney works closely with individual Councilmembers in implementing their vision, guiding them in what they can or cannot legally do in the pursuit of their civic goals, the District Attorney is a separate entity and therefore should not and cannot act as an unofficial council member or as check on their actions absent substantial evidence of criminality.

The PPE allegation is instructive in this regard. After a careful review of the evidence gathered in this case, including investigative reports, witness statements, and the existing documentation, which included the purchase orders in this case, the District Attorney's Office discovered that individual Councilmembers had made purchases of PPE from MPG Global, some more than once, and that one Councilmember had overspent the delegated purchasing authority in once instance by $18,024.25. However, it was determined that <u>city authorities knew about the purchases</u>, that they were allowed to go through, and that no disciplinary

action was taken against the Councilmember who had exceeded his purchase authority, other than to be reminded that purchases over $50,000 and under $143,000 must be made through the Purchasing Manager. Finally, the product which was ordered from MPG Global was confirmed to have been received and distributed in the various Councilmember districts at various events.

The authority of the District Attorney is limited in scope and does not extend to matters of civic governance unless there are violations of the law. In this case, the District Attorney's Office is also mindful of the extraordinary circumstances of the time-period surrounding these purchases, which were for items that were in short supply and extreme demand during the COVID-19 pandemic. While there appears to be a violation of the Fresno Municipal Code, these actions were known to city authorities, a co-equal actor with the District Attorney's Office with regard to violations of the municipal code. The matter appeared to have been addressed in the form of reminders about the parameters of each Councilmember's purchasing authority. Therefore, considering the separate roles of the District Attorney and the City Attorney, the District Attorney's Office is declining to pursue charges for a violation of Municipal Code Section 4-101.

District Attorney Lisa Smittcamp stated, ***"It would be beneficial for the people of the City of Fresno if the Fresno City Council, the Fresno Mayor/Staff, and the Fresno City Attorney's Office would consider re-establishing their legal advisement process. Currently, the sitting Fresno City Attorney is hired and fired by the City Council that he/she appointed to serve. An inherent conflict can be assumed from this format. Similar to other important City Administrative positions, it would be well-advised for the City Council to consider changing the City of Fresno Charter to have the City Attorney be hired by the City Manager and Mayor, and be approved by the City Council."***

The Fresno County District Attorney's Office will have no further comment on this matter.

**