# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

TERANCE FRAZIER, et al.,

       Plaintiffs,

     v.

CITY OF FRESNO, et al.,

       Defendants.

Case No. 1:20-cv-01069-ADA-SAB

FINDINGS AND RECOMMENDATIONS RECOMMENDING GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND SOME CLAIMS AND DENYING MOTION TO STRIKE

(ECF Nos. 61, 62, 65, 66, 70, 71)

**OBJECTIONS DUE WITHIN 21 DAYS**

## I.

## INTRODUCTION

Currently before the Court is a motion to dismiss and motion to strike Plaintiffs' second amended complaint, brought by Defendants City of Fresno, Lee Brand, Jerry Dyer, Wilma Quan, Thomas Esqueda, Georgeanne White, James Schaad, Tim Orman, Garry Bredefeld, and Mike Karbassi (collectively the "City Defendants")[1]. (ECF No. 62.) Based on the moving, opposition, and reply papers, the request for judicial notice and exhibits attached thereto, the operative complaint and the exhibits incorporated and attached thereto, as well as the Court's file, the Court issues the following recommendation that the Defendants' motion to dismiss be granted in part and denied in part, and the motion to strike be denied.

---

[1] For ease of reference, the Court may refer to the arguments in briefing as presented generally by "Plaintiffs" or "Defendants," even though a particular cause of action now does not involve all such parties.

## II.

## BACKGROUND

### A.    Procedural History

Plaintiffs Terance Frazier ("Frazier"), and Central Valley Community Sports Foundation ("CVCSF") filed this action on July 31, 2020.  (ECF No. 1.)  The initial complaint named the City of Fresno (the "City" or "City of Fresno"), Mayor Lee Brand ("Brand"), City Manager Wilma Quan ("Quan"), Assistant City Manager James Schaad ("Schaad"), and Chief of Staff Tim Orman ("Orman") (collectively the "Original City Defendants").  The complaint brought claims for (1) unconstitutional defamation pursuant to 42 U.S.C. § 1983, by all Plaintiffs against all Defendants; (2) First Amendment retaliation pursuant to 42 U.S.C. § 1983, by all Plaintiffs against all Defendants; (3) discriminatory denial of contract rights pursuant to 42 U.S.C. §§ 1981, 1983, by Plaintiff CVCSF against all Defendants; (4) breach of contract by Plaintiff CVCSF against Defendant City; and (5) breach of the covenant of good faith and fair dealing, by Plaintiff CVCSF against Defendant City.  (Compl. ¶¶ 40-77, ECF No. 1 at 13-21.)

The action was initially assigned to District Judge Dale A. Drozd.  On April 15, 2022, District Judge Drozd issued an order granting in part and denying in part Defendants' motion to dismiss.  (ECF No. 24.)  Judge Drozd denied Defendants' challenge to Plaintiff Frazier's standing to bring the first cause of action for unconstitutional defamation and second cause of action for First Amendment retaliation.  (Id. at 9-13.)  Judge Drozd dismissed the Section 1983 defamation claim, with prejudice and without leave to amend, and dismissed Plaintiff CVCSF's third cause of action for discriminatory denial of contract rights against defendants under 42 U.S.C. §§ 1981, 1983, with leave to amend.  (Id. at 17, 21, 24.)  Judge Drozd also granted the motion to dismiss Plaintiffs' state law causes of action, the fourth and fifth causes of action, for failure to comply with the California Government Claims Act, with leave to amend to the extent Plaintiffs could, in good faith, allege facts demonstrating waiver, estoppel, or a tolling period applied.  (Id. at 21-24.)

/ / /

/ / /

On May 6 and 9, 2022, Plaintiffs filed a first amended complaint. (FAC, ECF No. 27.)[2] The FAC named the same former "Original City Defendants," signifying Brand as "former" Mayor, and naming additional Defendants Mayor Jerry Dyer ("Dyer"), City Manager Georgeanne White ("White", City Councilman Garry Bredefeld ("Bredefeld"), City Councilman Mike Karbassi ("Karbassi") (collectively with the Original City Defendants, hereinafter the "City Defendants"). The FAC also named Fresno County District Attorney Lisa Smittcamp ("Smittcamp"). Plaintiffs' FAC only brought two causes of action: (1) First Amendment retaliation pursuant to 42 U.S.C. § 1983, by all Plaintiffs against all Defendants; and (2) discriminatory denial of contract and equal protection rights, pursuant to 42 U.S.C. §§ 1981, 1983, by Plaintiff CVCSF only against all Defendants. (FAC ¶¶ 63-79, ECF No. 27 at 24-29.)

On June 17, 2022, Defendants filed a motion to dismiss the first amended complaint. (ECF No. 31.) The opposition deadline was extended multiple times. (ECF Nos. 34, 37.) On August 24, 2022, this action was reassigned to District Judge Ana de Alba. (ECF No. 39.) On September 12, 2022, the District Judge referred the motion to dismiss to the assigned Magistrate Judge for the preparation of findings and recommendations, and/or other appropriate action. (ECF No. 41.) Following further extensions, a hearing on the motion was held on November 9, 2022. (ECF No. 48.) Following the hearing, on November 25, 2022, Plaintiffs filed a motion for leave to file an amended complaint. (ECF No. 49.) On December 5, 2022, Defendants filed an *ex parte* application to continue the hearing on Plaintiff's motion for leave to amend until after the Court issues a decision on the motion to dismiss. (ECF No. 52.) On December 14, 2022, the Court held a hearing on Defendant's *ex parte* application. (ECF No. 56.) On December 22, 2022, the Court denied the *ex parte* application, and ordered the motion to amend be set for hearing and a briefing schedule was set. (ECF No. 57.) Following opposition briefing, on February 6, 2023, the Court granted Plaintiffs' motion for leave to file an amended complaint. (ECF No. 60.)

On February 7, 2023, Plaintiffs filed the operative second amended complaint. (SAC,

---

[2]  Plaintiffs re-filed the FAC on May 9, 2022, following notice that the incorrect electronic event entry was used in docketing the FAC. (See ECF Nos. 26, 27.)

ECF No. 61.)  On February 21, 2023, Defendants filed the motion to dismiss and strike the SAC that is currently pending before the Court.  (Defs.' Mot. Dismiss ("Mot"), ECF No. 62.)[3]  On February 22, 2023, the District Judge referred the motion to dismiss to the assigned Magistrate Judge for the preparation of findings and recommendations, and/or other appropriate action. (ECF No. 63.)  On the same date, the Court reset the motion for hearing before the assigned Magistrate Judge for April 26, 2023.  (ECF No. 64.)  On March 7, 2023, Plaintiffs filed an opposition to the motion to dismiss.  (Pls.' Opp'n Mot. ("Opp'n"), ECF No. 65.)  On March 17, 2023, Defendants filed a reply brief.  (Defs.' Reply ("Reply"), ECF No. 66.)

The Court held a hearing on April 26, 2023, at which, counsel Kevin Little and David Weiland appeared on behalf of the Plaintiffs, and counsel Joseph Rubin appeared on behalf of the City Defendants.  (ECF No. 67.)  On April 27, 2023, the Court dismissed Defendant Lisa Smittcamp as a Defendant pursuant to the Plaintiffs' notice of voluntary dismissal.  (ECF No. 69.)  Pursuant to the matters discussed at the hearing, on May 2, 2023, Defendants filed a statement clarifying which claims are alleged against which Defendants, and on the same date, Plaintiffs filed a notice of joinder agreeing with the Defendants' filing.  (ECF Nos. 70, 71.)

### B.   Causes of Action and Factual Allegations

Plaintiffs' second amended complaint names the same Defendants as the FAC, and brings the following causes of action: (1) First Amendment retaliation pursuant to 42 U.S.C. § 1983, on behalf of all Plaintiffs against all Defendants; (2) discriminatory denial of contract and equal protection rights pursuant to 42 U.S.C. §§ 1981, 1983, by Plaintiff CVCSF against all Defendants; (3) violation of the Bane Act, California Civil Code § 52.1, for free speech retaliation, on behalf of all Plaintiffs against all Defendants; (4) violation of California Civil Code §§ 51.5, 52 (the Unruh Act), for discriminatory business dealings by all Plaintiffs against all Defendants; and (5) breach of contract under California state law by Plaintiff CVCSF only, against the Defendant City of Fresno only.  (SAC ¶¶ 65-104, ECF No. 61 at 23-33.)  While this

---

[3] For ease of reference throughout this order, the Court will refer to the page number that is entered by the CM/ECF system into the parties' principal brief, not the parties' pagination, and use the generic abbreviations "Mot." "Opp'n" or "Reply" rather than "Mem." in referring to the principal briefing material, even if referring to a separate memorandum of points and authorities.

is how the causes of action were alleged in the complaint, through concessions in briefing, and as clarified at the hearing and post-hearing filings, as explained in greater detail below, the City of Fresno is the only Defendant to the second, fourth, and fifth causes of action, and the Original City Defendants are no longer subject to the third cause of action.  (See ECF Nos. 70, 71.)

Plaintiff Frazier is a longtime real estate investor, entrepreneur, philanthropist, community activist based in the Central Valley, a retired professional baseball player, an alumnus of California State University, Fresno, has "helped restore thousands of distressed properties in the City of Fresno . . . has ownership interests in numerous major commercial venues [including] . . . the subject Granite Park development . . . [and] has spearheaded many efforts to revitalize downtown Fresno."  (SAC ¶ 3.)  Plaintiff CVCSF is a California nonprofit public benefit corporation founded in 2015, with its principal place of business in Fresno, California.  Frazier serves in volunteer capacity as the President, Chief Executive Officer and Chief Financial Officer of CVCSF.  CVCSF is a minority-founded entity, and its goals are to provide sports and entertainment facilities and programs for the citizens of the Central Valley. (SAC ¶ 4.)

The City of Fresno is the owner of a recreational complex commonly known as Granite Park, located at 3978 N. Cedar Avenue in Fresno, California.  (SAC ¶ 5.)  Effective December 7, 2015, CVCSF entered into a twenty-five-year Ground Lease with the City of Fresno regarding Granite Park.  (SAC ¶ 18, Ex. A, ECF No. 61 at 35-59.)  The Ground Lease provided the City with substantial benefits as at the time Granite Park was a large, unused public property, and was costing the City hundreds of thousands of dollars annually to maintain.  (SAC ¶ 19.)  CVCSF pledged to make up to $2.7 million in capital improvements to remedy deferred maintenance problems, and assured that it would not cost the City anything other than a yearly $62,500 lease credit.  At conclusion of the Ground Lease term, title to any improvements would revert to the City free and clear of any liens or expenses.  The Ground Lease provided a potential for additional financial benefit to the City from income derived from billboard and signage rights, and concession receipts.  The Ground Lease contemplated no payments of public monies to CVCSF and hence contained no requirements pertaining to financial documentation, disclosures,

1   or audits.

2      The City agreed to make reasonable efforts to provide recycled water, known as "purple

3   water" for irrigation of Granite Park, which consists primarily of multiple baseball and soccer

4   fields that otherwise would have to be irrigated by CVCSF at significant expense.  (SAC ¶ 20.)

5   The City also agreed to be responsible for infrastructure improvements needed to make purple

6   water available.   The purple water provisions in the Ground Lease were material – indeed,

7   essential -- to CVCSF's decision to enter into the agreement, since the long-term cost of

8   obtaining water for Granite Park's multiple grass playing fields from other sources is quite

9   considerable.

10      Under the Ground Lease, CVCSF has an outright option to purchase Granite Park, as well

11   as a right of first refusal to purchase it.  (SAC ¶ 21.)  However, these valuable purchase rights

12   would be eliminated by CVCSF's default under the Ground Lease.

13      CVCSF and the City also entered into a Service Agreement for recreational services and

14   programming at Granite Park.  (SAC ¶ 22, Ex. B, ECF No. 61 at 60-77.)  CVCSF agreed to bear

15   the cost of any required maintenance, recreational activities, or programs at Granite Park, except

16   the City would pay $150,000 annually toward these expenses, significantly less than the City had

17   been spending to maintain Granite Park.  (SAC ¶ 23.)  The scope of services for CVCSF agreed

18   to be responsible included providing year-round sports and recreational programming for City

19   residents and sponsored users at no cost, in compliance with the City's specifications; and paying

20   the cost of and screening, hiring, and employing adequate staffing for these activities.  CVCSF

21   also agreed to maintain adequate financial records related to its expenses for at least three years

22   or longer if otherwise required by law.

23      CVCSF raised more than $2 million for capital improvements, including substantial

24   personal funds from Frazier; complied with its sports and recreational programming obligations,

25   despite a lack of cooperation from the City's Parks and Recreation Department; complied with

26   its maintenance and security obligations, again without any cooperation and despite the failure to

27   make any effort to purple water; and the City of Fresno also failed to cooperate in granting

28   permits for proposed billboards and signage on the site, which further decreased anticipated

1   revenue.  (SAC ¶ 24.)

2   "Due in no small part to the City of Fresno's failures to comply with its contractual

3   obligations in good faith, CVCSF incurred larger than anticipated losses, and [i]n mid-2018, Mr.

4   Frazier – acting on behalf of CVCSF – exercised his First Amendment right to petition the

5   government for redress and requested that the City of Fresno renegotiate the Service Agreement

6   to increase its annual fee thereunder to $300,000."  (SAC ¶ 25.)  The primary reason for the

7   request was the cost of procuring water for Granite Park had not been lessened by the anticipated

8   provision of purple water from the City of Fresno, and there had been no anticipated billboard or

9   signage revenue.

10  In response, the City requested an audit of CVCSF's operational records pertaining to

11  Granite Park.  (SAC ¶ 26.)  Later interactions revealed this audit request was spearheaded by

12  Brand, Quan, Schaad, and Orman, with the purported purpose to justify the requested increase in

13  the annual Service Agreement payment.  However, these Defendants insisted the audit be

14  weaponized with the objective of uncovering proof of unlawful or unethical conduct by Frazier,

15  rather than assessing Granite Park, and instructed the City Auditor – contrary to standard audit

16  procedures – to forego randomized sampling and instead utilize subjective sampling, placing the

17  entire audit in question.

18  CVCSF promptly provided several years of records, and in order to expedite, provided

19  records that had not been fully reviewed or finalized by its accountant or attorneys, because it

20  was so evident that the Granite Park was unprofitable.  (SAC ¶ 27.)  The unreviewed financial

21  information provided was not perfect, but substantiated Granite Park was running a genuine and

22  substantial deficit.  In response, the City prepared a draft audit in November 2018 that invited

23  responses to various provisional findings.  (SAC ¶ 28.)  CVCSF conceded the expedited

24  information needed to be refined and finalized and therefore withdrew its request to renegotiate

25  in a November 26, 2018 letter.  (SAC ¶ 29.)  The letter proposed CVCSF and City auditors work

26  together "to develop and maintain the set of procedures, controls and reports that would allow a

27  qualified opinion to be rendered at a future date, " and included updated financial statements and

28  documentation CVCSF proposed to review with the City, however, no further collaboration

occurred pertaining to the draft audit.  (SAC ¶¶ 29, 30.)  In late November 2018, Plaintiffs were informed the audit would be "placed on hold" for six months, and as a result, CVCSF's pending responses to the draft audit inquiries, which would have shown that the audit was erroneous in several respects, were never finalized or submitted to the City.  (SAC ¶ 30.)

Around the same time as the draft audit, Frazier was involved in a lawsuit with a former Fresno restauranteur, Sammy Franco, to whom Frazier had loaned approximately $300,000 for a restaurant investment.  (SAC ¶ 31.)  As reprisal for Frazier's suing him for this debt in August 2018, Mr. Franco immediately took on Frazier through social media, and in January 2019, knowing an audit of the Granite Park operations was pending, Mr. Franco submitted a Public Records Act ("PRA") request with the City requesting a copy of the audit report.[4]  Members of the City Auditor's Office, including Assistant Controller Mavet Mora ("Mora"), expressed concern regarding the release of the draft audit to Brand, Quan, Schaad, and Orman, but those concerns were disregarded.  (SAC ¶ 33.)  Instead, these Defendants insisted the draft audit be deemed final, even though the process was ongoing and was suspended.  Mora later revealed in her own complaint that she was opposed to the release of the draft audit because it was not final, and suffered retaliation as a result.  The City Council appointed a third-party investigative law firm to evaluate Mora's claims which uncovered facts showing representatives of the Mayor's and City Manager's Office had altered the language and conclusions of the City Auditor and had concealed those alterations from the City Council, including in the draft audit of the Granite Park project.

The purpose of deeming the audit final was so that it could be hastily disclosed pursuant to the PRA.  (SAC ¶ 34.)  Brand, Quan, Schaad, and Orman knew the provisional findings in the draft audit were based on a substandard methodology and the process requesting clarifying

---

[4]  Plaintiffs proffer that under California Government Code § 36525(b)(2), any work product or any draft audit report, like the City's pending audit of CVCSF, is not considered a public record eligible to be disclosed, and the release of any interim, draft version of an audit to the public and representing that its conclusions are final is by definition false and misleading.  See Cal. Gov't Code § 36525 ("All books, papers, records, and correspondence of the city auditor pertaining to the auditor's work are public records subject to Division 10 . . . "[h]owever, none of the following items or papers of which these items are a part may be released to the public by the city auditor, or the auditor's employees: . . .(2) Papers, correspondence, memoranda, or any substantive information pertaining to any audit not completed.").

1   information had been discontinued by the City, and thus no good faith reason to believe the draft

2   audit results had been finalized, or that finalized results would be the same as the provisional

3   findings, and knew release would be damaging to Plaintiffs.  (SAC ¶¶ 34-35.)

4        The draft audit was disclosed by the City to Mr. Franco, who immediately posted it and

5   its false findings on social media attacking Frazier and CVCSF's Granite Park project, and soon

6   thereafter, the draft audit was prominently reported in the Fresno Bee.  (SAC ¶ 36.)  Even

7   assuming the draft could have been released under applicable law, there was an option of

8   providing Plaintiffs advance notice so they could file a reverse PRA action to enjoin its release

9   until the legality thereof could be tested, but Plaintiffs were not provided such opportunity, and

10   by the time they learned of the release, it was too late to raise any formal legal challenge and

11   Plaintiffs' extrajudicial protests were ignored.  (SAC ¶ 37.)  The January 2019 release had

12   negative economic impacts on Plaintiffs as Frazier has been denied loans for other projects based

13   upon bad press, and CVCSF has lost tournament revenue dues.  (SAC ¶ 38.)  Requests to Brand,

14   Quan, Schaad, Orman and the City, for the release of a public statement advising that CVCSF is

15   in good standing regarding its lease obligations were repeatedly refused, although the Fresno

16   City Attorney, Douglas Sloan, stated in both closed and public City Council meetings sessions

17   that CVCSF is in substantial compliance.  (SAC ¶ 39.)

18        In early 2019, Brand, Quan, Schaad, Orman and the City, referred the draft audit to the

19   Fresno County District Attorney's Office for "investigation" without disclosing the draft nature

20   of the audit and the substandard methodologies.  (SAC ¶ 40.)  The referral was leaked to the

21   press causing additional damages and Frazier, both individually and on behalf of CVCSF, has

22   consistently decried the leaking of the draft audit and the subsequent investigations as baseless,

23   inappropriate, and discriminatory.

24        In a meeting on March 5, 2019, the draft audit was invoked by Schaad as "proof" of

25   CVCSF's noncompliance with the Ground Lease and Service Agreement; promised follow-up

26   meetings with Brand, Quan, Schaad, Orman and the City for the purpose of reviewing the

27   agreements have not come to fruition; and these Defendants have consistently in the last three

28   years attempted to create capricious grounds for asserting defaults by seeking unrealistic and

unnecessary projections of the Granite Park project's future development.  (SAC ¶ 41.)  Despite the pledge, the City has since disclosed that the purple water provision was at all pertinent times infeasible and cost prohibitive, and the City has no system for delivering purple water from its wastewater treatment plant to other sites.  (SAC ¶ 42.)  In September 2019, a City spokesperson stated: "The [Ground Lease] also says the city will provide recycled water through a purple pipe system WHEN AVAILABLE.  It is not currently available in that area and the cost to bring it from the Wastewater Treatment Facility would cost millions of dollars."  (Id.)  In reliance on the City's negotiation representations and the terms of the Ground Lease, Plaintiffs have spent $200,000 per year on water for Granite Park, as well as the cost of building connections to the City of Fresno's purple water.

Plaintiffs learned Brand, Quan, Schaad, Orman and the City, had a collective agenda to try to reclaim Granite Park in order to lease it to the Fresno Football Club ("FFC"), a minor league affiliate of Major League Soccer that is owned by members of the majority race.  (SAC ¶ 43.)  Brand and Orman were actively involved in trying to procure Granite Park for FFC.  Brand, Quan, Schaad, Orman and other City of Fresno staff, all met with FFC representatives numerous times regarding Granite Park and had been observed driving around the Granite Park area surveying the complex, despite the City's contractual commitment to CVCSF for another 20 years, and CVCSF's purchase rights under the Ground Lease.

Since January 2019, Frazier, on his own behalf and on behalf of CVCSF, has been critical of the Defendants' actions, and such criticisms have been met with continuing and increased resistance, opposition, discrimination, and retaliation.[5]  (SAC ¶ 44.)  In July 2019, despite request, the City "refused to do what was necessary" to process an intended application for Recreational Infrastructure Revenue Enhancement (RIRE) funds from the State of California, with no explanation.  (SAC ¶ 45.)  In August 2020, the City of Fresno refused to assist in the initiation and processing of a Pacific Gas & Electric grant that could have substantially decreased the amount of energy bills corresponding to Granite Park.  (SAC ¶ 46.)  Also in August 2020,

---

[5]  Plaintiffs proffer that the examples of discrimination and retaliation by the City and individual Defendants are multitudinous, and that paragraphs 45 and after contain only a partial summary.  (SAC ¶ 45.)

1   when the Republican National Committee requested disclosure of the draft audit, the City gave

2   Frazier and CVCSF the meaningless option of taking steps to prevent disclosure, even though the

3   draft audit was already in the public domain by that point, and Plaintiffs were not previously

4   provided such opportunity.  (SAC ¶ 47.)  Plaintiffs are informed and believe this "inaction" and

5   "action" was at the direction of Brand, Quan, Former Orman "and/or" Schaad, on behalf of and

6   as policy makers for the City.  (SAC ¶¶ 45-47.)  Also in August 2020, the same Defendant(s)

7   attempted to intervene in a closed session of the City Council to participate in discussions of the

8   handling of this federal lawsuit, although as defendants they had a clear conflict of interest, and

9   Plaintiffs submitted a complaint to the California Fair Political Practices Commission (FPPC),

10  which resulted only in further discrimination and retaliation.  (SAC ¶ 48.)

11      In February 2021, Frazier had agreed in principle with United Health Centers to develop

12  land in the southwest area of the City of Fresno; United Health Centers planned to open new

13  locations in southwest and southeast Fresno; the southeast Fresno location has been developed

14  on schedule, but the southwest location was stalled after Esqueda told company representatives

15  they should not get involved in projects with Frazier.  (SAC ¶ 49.)  Dyer similarly told

16  developers to avoid doing business with Frazier, stating "where there's smoke there's fire."  In

17  February and March of 2021, the City withheld $44,498.56 in funds that were payable to

18  CVCSF, which were needed to pay PG&E bills for Granite Park, with the stated reason being

19  baseless and resulting in a notice of lease default being submitted by CVCSF on March 5, 2021,

20  and the notice resulting in more discrimination and retaliation.  (SAC ¶ 50.)  Plaintiffs are

21  informed and believe this "inaction" was at the direction of Defendants Dyer, Esqueda, and/or

22  Orman, on behalf of and as policy makers for the City.

23      In approximately May 2021, Dyer was overheard in City Hall discussing a plan to have

24  the lease terminated and/or CVCSF declared in default, at a time when the City was purportedly

25  engaging in negotiations to amend the lease and settle this lawsuit.  (SAC ¶ 51.)  On June 21,

26  2021, the City agreed in principle to amend the Ground Lease and settle this lawsuit, and

27  requested the proposals be signed prior to the June 24, 2021, session of the City Council to vote

28  on the upcoming fiscal year's budget.  (SAC ¶ 52, Ex. C, ECF No. 61 at 78-101.)  The proposal

provided an excellent resolution for the City, since the contemplated disbursements would have been no more than what it would have had to pay itself to improve, maintain and run the park over the period of the Ground Lease, while also settling a potentially expensive lawsuit.  (SAC 52.)  Representatives of the City represented the proposal had the support of the majority of the City Council, with approval of the City budget only requiring majority vote, whereas any special disbursement outside of the City's budget, requires approval by two-thirds.  (SAC ¶ 53.)  However, the same date as the tendering and signing, Esqueda – despite personally participating in the negotiations that resulted in the tentative settlement – contacted District Attorney Smittcamp and sought her assistance in removing the approval of the proposal from the June 24, 2021 City Council agenda.  Plaintiffs are informed and believe these actions were at the direction of Defendants Dyer, Esqueda, Orman, Bredefeld, and Karbassi, on behalf of the City and as policy makers, and that Smittcamp assisted in these actions based on the Plaintiffs' criticisms of the legitimacy of the 2019 draft audit investigation by her office, both informally and in this lawsuit, and also to assist other Defendants in continuing to discriminate and retaliate against Plaintiffs.

On June 23, 2021, the day before the City Council vote, Smittcamp issued a press release and sent letters to the members of the City Council and other officials announcing her office was investigating alleged "potential Brown Act violations by members of the Fresno City Council related to dealings involving Granite Park."  (SAC ¶ 54, Ex. D, ECF No. 61 at 102-104.)  No allegations were specified, nor was it explained why mere allegations were deemed sufficient to make public, with the press release and letter taking the unprecedented step of requesting the City Council postpone consideration of any issues related to Granite Park pending the investigation.  Because of this, the items were removed from the June 24 agenda.  Plaintiffs are informed and believe these actions were at the direction of Dyer, Esqueda, Orman, Bredefeld, and/or Karbassi, on behalf of and as policy makers for the City.  Concurrent with the press release, Bredefeld made his own press release characterizing the proposal as an "egregious betrayal of the taxpayer" despite the clear benefit to the City.  Plaintiffs are further informed and believe Smittcamp assisted in these actions based on the Plaintiffs' criticisms of the legitimacy of

1  the 2019 draft audit investigation and to assist other Defendants in continuing to discriminate and

2  retaliate.

3        Beginning in approximately the fall of 2021, City officials began working to encourage

4  CVCSF's lenders to issue notices of default so that it could in turn find CVCSF defaulted.  (SAC

5  ¶ 55.)  Plaintiffs are informed and believe that these efforts are ongoing and the City has actively

6  sought to enlist other parties to assume CVCSF's debt and replace it as tenant of Granite Park.

7  In November 2021, a commercial building owned by Frazier was consumed by arson fire and the

8  City insisted Frazier immediately pay for cleanup and asbestos remediation, or otherwise would

9  be billed an exorbitant cost.  (SAC ¶ 56.)  Plaintiffs are informed and believe these actions were

10  at the direction of Dyer, Esqueda, Orman, Bredefeld, and Karbassi, on behalf of and as policy

11  makers for the City.  (SAC ¶¶ 55-56.)

12        In January 2022, City officials advised the owner of a company that stages a music

13  festival that the company would have "a hard time" obtaining approval for its festival at Granite

14  Park, although the festival had been held there in past years, and as a result of discouragement by

15  City officials and the efforts of Bredefeld to move the festival to Woodward Park, the event was

16  to be held week at Woodward Park instead of at Granite Park in May of 2022.  (SAC ¶ 57.)  The

17  loss of this event, despite the tentative commitment of the company to hold it at Granite Park

18  again, resulted in a significant loss of revenue.  Plaintiffs are informed and believe these actions

19  were at the direction of defendants Dyer, Esqueda, White, Orman, Bredefeld, and Karbassi, on

20  behalf of and as policy makers for the City.

21        On March 2, 2022, Smittcamp issued another press release announcing her office's

22  investigation related to Granite Park was closed, but more prominently mentioning the purported

23  ongoing nature of a federal investigation regarding the draft audit.  (SAC ¶ 58, Ex. E, ECF No.

24  61 at 105-109.)  Plaintiffs proffer the United States Department of Justice has a longstanding

25  policy of not disclosing the status of ongoing investigations, so it is questionable how Smittcamp

26  would be privy to such information, or why she saw fit to disclose it in a press release; and that it

27  is unknown why the federal government would be interested in any issue related to a draft audit

28  that determined the existence of – at most -- minor accounting issues that would hardly influence

1    any creditor and which do not suggest any illegal intent.  (SAC ¶ 58.)   Plaintiffs are informed

2    and believe that to the extent any federal investigation ever existed it was at the urging of City

3    officials intending to harm, discriminate and retaliate against Plaintiffs, and that these actions

4    were at the direction of Dyer, Esqueda Orman, White, Bredefeld, and/or Karbassi, on behalf of

5    and as policy makers for the City; and that Smittcamp assisted in these actions based on the

6    Plaintiffs' criticisms and to assist other Defendants in continuing to discriminate and retaliate

7    against Plaintiffs.

8           The March 2, 2022, press release also improperly proposed the City charter be amended

9    to give Dyer, Smittcamp's close friend, authority to hire and fire the City Attorney.  (SAC ¶ 59.)

10   No City in California has such an arrangement, which would centralize excessive power in

11   Dyer's office and give him the authority to weaponize the City Attorney against other branches

12   of local government and employees; and Plaintiffs are informed and believe that Smittcamp

13   made this proposal in part to make it easier for Dyer and other Defendants to discriminate and

14   retaliate against Plaintiffs.  Dyer has repeatedly stated that if he had the authority he would have

15   already defaulted Plaintiffs and taken back Granite Park.  Plaintiffs are informed and believe

16   these actions were at the direction of Dyer, Esqueda, Orman, White, Bredefeld, and/or Karbassi,

17   on behalf of and as policy makers for the City, and that Smittcamp assisted.

18          In March and April 2022, the City also engaged in a pattern of harassment, releasing

19   media statements regarding "non-controversial compliance issues" to the media in an effort to

20   damage Plaintiffs, specifically, the City –Dyer, White, Bredefeld, and Karbassi – each made

21   repeated indignant statements to the media regarding the alleged absence of insurance and

22   alcohol insurance coverage and a related contention that CVCSF was in default.  (SAC ¶ 60.)

23   However, Granite Park was at all times insured and there was only a minor endorsement change

24   that was required in the Commercial General Liability policy, and liquor liability coverage was

25   always part of the Granite Park insurance coverage.  The City capriciously required difficult to

26   obtain additional excess coverage that it does not require of other City tenants who sell

27   significantly more alcohol.  The City continued to harass Plaintiffs regarding "non-issues" in

28   April and May 2022, although not yet publicly, specifically taking issue with alleged

consumption of personal alcoholic beverages by Granite Park visitors, despite the existence of appropriate prohibitory signage and no indication of laxity on behalf of Granite Park staff, who have no police powers; and with special event parking, once again in the absence of any indication of noncompliance or bad faith by Plaintiffs.  (SAC ¶ 61.)  Plaintiffs are informed and believe these actions were at the direction of Dyer, Esqueda, Orman, White, Bredefeld, and/or Karbassi, on behalf of and as policy makers for the City.  (SAC ¶ 60-61.)

Finally, in May 2022, White contacted Frazier on behalf of CVCSF with specious complaints about parking usage at Granite Park; in June 2022, Frazier received a public nuisance notice regarding an unrelated property located at 704 H Street, which reflected treatment different from how the City addressed other similar properties, including one owned by the City itself; in August 2022, an unrelated large project in which Frazier was involved was rejected by the City, and Bredefeld specifically said in a public meeting that he would not approve *any* project in which Frazier was involved; in September 2022, with minimal notice, the City tore down the 704 H Street building, although similar condition buildings owned by the City and other persons remain standing; and Frazier was also billed exorbitant remediation costs by the City without having the opportunity to obtain his own contractors at more reasonable rates. (SAC ¶ 62.)

Plaintiffs allege all of the foregoing conduct has occurred during a time when the City has otherwise aggressively encouraged new development and the improvement of both public and private properties; the current stated policy of the City is "to honor developers' time and budgets, and to work together to 'get to yes' "; Dyer's administration, similar to preceding administrations, has had a public and cozy relationship with majority race developers, such as Darius Assemi, Cliff Tutelian and Leland Parnagian; Karbassi has accepted the maximum individual donation from Assemi, with whom he also co-hosts a radio show, for his Assembly campaign; White is president of a Kashian family charitable foundation, although Kashian is a prominent majority race local developer who regularly does business with the City; no other developer, and certainly not one of another race who has declined to exercise his protected First Amendment rights to criticize and petition for redress, has been treated similarly; and no other

1  developer has been publicly undermined and had issues pertaining to him referred for federal and
2  local investigations, much less publicly.  (SAC ¶ 63.)

3                                         **III.**

4                                **LEGAL STANDARD**

5          **A.      Motion to Dismiss**

6          Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss on
7  the grounds that a complaint "fail[s] to state a claim upon which relief can be granted."  A
8  motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint.  Navarro
9  v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  In deciding a motion to dismiss, "[a]ll allegations
10  of material fact are taken as true and construed in the light most favorable to the nonmoving
11  party."  Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337–38 (9th Cir. 1996).  The pleading
12  standard under Rule 8 of the Federal Rules of Civil Procedure does not require " 'detailed factual
13  allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me
14  accusation."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v.
15  Twombly, 550 U.S. 544, 555 (2007)).  In assessing the sufficiency of a complaint, all well-
16  pleaded factual allegations must be accepted as true.  Iqbal, 556 U.S. at 678-79.  However,
17  "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory
18  statements, do not suffice."  Id. at 678.  To avoid a dismissal under Rule 12(b)(6), a complaint
19  must plead "enough facts to state a claim to relief that is plausible on its face."  Twombly, 550
20  U.S. at 570.

21          In deciding whether a complaint states a claim, the Ninth Circuit has found that two
22  principles apply.  First, to be entitled to the presumption of truth the allegations in the complaint
23  "may not simply recite the elements of a cause of action, but must contain sufficient allegations
24  of underlying facts to give fair notice and to enable the opposing party to defend itself
25  effectively."  Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).  Second, so that it is not unfair
26  to require the defendant to be subjected to the expenses associated with discovery and continued
27  litigation, the factual allegations of the complaint, which are taken as true, must plausibly
28  suggest an entitlement to relief.  Starr, 652 F.3d at 1216.  "Dismissal is proper only where there

is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." Navarro, 250 F.3d at 732 (citing Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir.1988)).

Courts freely grant leave to amend a complaint which has been dismissed. See Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."); Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986) ("If a complaint is dismissed for failure to state a claim, leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency."); Lopez v. Smith, 203 F.3d 1122, 1130 (9th Cir. 2000) (same).

**B.      Motion to Strike**

"The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).  A motion to strike may be granted where "it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." Wilkerson v. Butler, 229 F.R.D. 166, 170 (E.D. Cal. 2005) (quoting LeDuc v. Kentucky Central Life Ins. Co., 814 F.Supp. 820, 830 (N.D.Cal.1992)).  The function of a "motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." Wilkerson, 229 F.R.D. at 170 (quoting Sidney–Vinstein v. A.H. Robins Co., 697 F.2d 880, 885 (9th Cir.1983)).

"Granting a motion to strike may be proper if it will make the trial less complicated, or if the challenged allegations are so unrelated to plaintiff's claims as to be unworthy of any consideration as a defense and whose presence in the pleading will be prejudicial to the moving party." Garcia ex rel. Marin v. Clovis Unified Sch. Dist., No. 1:08-CV-1924 AWI SMS, 2009 WL 2982900, at *23 (E.D. Cal. Sept. 14, 2009).  However, motions to strike "should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." Neveau v. City of Fresno, No. 104CV06490OWWJLD, 2005 WL 8176468, at *7 (E.D. Cal. Oct. 17, 2005) (quoting Colaprico v. Sun Microsystems, Inc., 758 F. Supp. 1335, 1339 (N.D. Cal. 1991)).

"Motions to strike are disfavored and infrequently granted." Nat. Res. Def. Council v.

Kempthorne, 539 F. Supp. 2d 1155, 1162 (E.D. Cal. 2008); see also Neilson v. Union Bank of California, N.A., 290 F. Supp. 2d 1101, 1152 (C.D. Cal. 2003) ("Motions to strike are generally regarded with disfavor because of the limited importance of pleading in federal practice, and because they are often used as a delaying tactic."). "Where allegations, when read with the complaint as a whole, give a full understanding thereof, they need not be stricken." LeDuc v. Kentucky Cent. Life Ins. Co., 814 F. Supp. 820, 830 (N.D. Cal. 1992) (citing Bloombury Woolen Co. v. Moosehead Woolen Mills, 109 F. Supp. 804, 806 (D. Me. 1953)). "Under the liberal federal pleading rules notice and clarity of claims is all that is required." LeDuc, 814 F. Supp. at 830 (citing Colaprico, 758 F. Supp. at 1337).

## IV.

## DISCUSSION

Defendants' motion seeks to dismiss: (A) Plaintiffs' second cause of action for Section 1981 and 1983 discriminatory denial of contract rights for failure to state facts sufficient to constitute a cause of action; (B) Plaintiffs' fifth cause of action for breach of contract for failure to comply with the California Government Claims Act; (C) Plaintiffs' third cause of action for violation of the Bane Act as CVCSF lacks standing, the claim is barred against the originally named Defendants for failure to comply with the California Government Claims Act, and because Defendants fail to state sufficient facts to state a cause of action; and (D) Plaintiffs' fourth cause of action for violation of the Unruh Act for failure to state sufficient facts to constitute a cause of action, and because the claim is barred against the originally named Defendants for failure to comply with the Government Claims Act.

**A.    The Court Recommends Granting Defendants' Motion to Dismiss the Second Cause of Action for Section 1981 and 1983 Discriminatory Denial of Contract Rights and Denial of Equal Protection with Leave to Amend**

1.    General Legal Standards

Section 1981 prohibits discrimination in the making and enforcement of contracts, providing that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like

punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a); see Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 609, 107 S. Ct. 2022, 2026, 95 L. Ed. 2d 582 (1987) ("Although § 1981 does not itself use the word 'race,' the Court has construed the section to forbid all 'racial' discrimination in the making of private as well as public contracts." (quoting Runyon v. McCrary, 427 U.S. 160, 168, 174–175, 96 S.Ct. 2586, 2593, 2596–2597, 49 L.Ed.2d 415 (1976))). "[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). These rights "are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c).

The Supreme Court has held that 42 U.S.C. § 1983 "provides the exclusive federal damages remedy for the violations of the rights guaranteed by § 1981 when the claim is pressed against a state actor." Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 735, 109 S. Ct. 2702, 2723, 105 L. Ed. 2d 598 (1989). Section 1983 provides a cause of action for the violation of Plaintiff's constitutional or other federal rights by persons acting under color of state law. Nurre v. Whitehead, 580 F.3d 1087, 1092 (9th Cir 2009); Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006); Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002). The statute provides: "Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. 42 U.S.C. § 1983. "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." Crowley v. Nevada ex rel. Nevada Sec'y of State, 678 F.3d 730, 734 (9th Cir. 2012) (citing Graham v. Connor, 490 U.S. 386, 393-94 (1989)) (internal quotation marks omitted).[6]

---

[6] Section 1983 requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by Plaintiff. See Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976). To state a claim under section 1983, a plaintiff must demonstrate that each defendant personally participated in the deprivation of his rights. Iqbal, 556 U.S. at 677; Simmons v. Navajo County, Ariz., 609 F.3d 1011, 1020-21 (9th Cir. 2010); Ewing v. City of Stockton, 588 F.3d 1218, 1235 (9th Cir.

1     As the parties acknowledge and focus their arguments on, the Supreme Court recently

2  held in Comcast that as to a claim under § 1981, "[t]o prevail, a plaintiff must initially plead and

3  ultimately prove that, but for race, it would not have suffered the loss of a legally protected

4  right." Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 206 L. Ed. 2d 356, 140 S. Ct.

5  1009, 1019 (2020).  The Supreme Court also noted that McDonnell Douglas burden shifting

6  cannot save a complaint where it fails to allege essential elements.  Id. ("[O]nly the burden of

7  production ever shifts to the defendant, never the burden of persuasion . . . [s]o McDonnell

8  Douglas can provide no basis for allowing a complaint to survive a motion to dismiss when it

9  fails to allege essential elements of a plaintiff's claim.") (citations omitted); see also Astre v.

10  McQuaid, 804 F. App'x 665, 667 (9th Cir. 2020) ("Although the district court also properly

11  concluded that Astre sufficiently pleaded that McQuaid acted with racially discriminatory

12  purpose, the district court erroneously invoked the burden-shifting framework . . . [t]o be clear,

13  the McDonnell Douglas framework is a summary judgment 'evidentiary standard, *not* a pleading

14  requirement[,]' . . . [and] . . . this court has made clear that the evidentiary strictures

15  of McDonnell Douglas do not determine the sufficiency of a § 1981 claim." (quoting

16  Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002))).[7]

17  _____

18  2009); Jones, 297 F.3d at 934.  Thus, to state a claim, a plaintiff must allege facts demonstrating the existence of a
link, or causal connection, between each defendant's actions or omissions and a violation of his federal rights.

19  Lemire v. California Dep't of Corr. and Rehab., 726 F.3d 1062, 1074-75 (9th Cir. 2013); Starr v. Baca, 652 F.3d
1202, 1205-08 (9th Cir. 2011).  The Ninth Circuit has held that "[a] person 'subjects' another to the deprivation of a

20  constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's
affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which
complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).  "Under Section 1983, supervisory

21  officials are not liable for actions of subordinates on any theory of vicarious liability."  Crowley v. Bannister, 734
F.3d 967, 977 (9th Cir. 2013) (citation and internal quotation marks omitted); see also Iqbal, 556 U.S. at 676;

22  Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1020–21 (9th Cir.2010); Ewing v. City of Stockton, 588 F.3d 1218,
1235 (9th Cir. 2009); Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002).  "A supervisor may be liable only if (1)

23  he or she is personally involved in the constitutional deprivation, or (2) there is 'a sufficient causal connection
between the supervisor's wrongful conduct and the constitutional violation.' "  Crowley, 734 F.3d at 977 (citation

24  and internal quotation marks omitted).  "Under the latter theory, supervisory liability exists even without overt
personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy

25  itself is a repudiation of constitutional rights and is the moving force of a constitutional violation."  Id.; see also
Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A supervisor is only liable for constitutional violations of his

26  subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to
prevent them."); accord Starr v. Baca, 652 F.3d 1202, 1205–06 (9th Cir. 2011); Corales v. Bennett, 567 F.3d 554,

27  570 (9th Cir. 2009).

28  [7]  In McDonnel Douglas, the Supreme Court stated: "[t]he complainant in a Title VII trial must carry the initial
burden under the statute of establishing a prima facie case of racial discrimination . . . [t]he burden then must shift to

1    In the opposition brief, Plaintiffs first proffer the elements for a Section 1981 claim as

2 follows: "To state a racial discrimination claim under Section 1981, a plaintiff business entity

3 must allege: (1) it is racial minority-owned or operated; (2) the defendant had an intent to

4 discriminate on the basis of race; and (3) the discrimination concerned one or more of the

5 activities enumerated in the statute (i.e., the making and enforcing of a contract)." (Opp'n 20,

6 citing <u>Yoshikawa v. Seguirant</u>, 41 F.4th 1109, 1116-17 (9th Cir. 2022), <u>reh'g en banc granted,</u>

7 <u>opinion vacated,</u> 59 F.4th 998 (9th Cir. 2023).)  First, the Court notes the <u>Yoshikawa</u> court did

8 not so lay out the elements in this fashion, but the Plaintiffs' presentation does not appear

9 incorrect.[8]  However, absent from this statement of elements is a commonly included fourth

10 element.  <u>See</u> <u>Mirkooshesh v. Elie</u>, No. 22-CV-07615-WHO, 2023 WL 2652240, at *4 (N.D.

11 Cal. Mar. 26, 2023) ("Although the Ninth Circuit in <u>Lindsey</u> considered a fourth element—'that

12 such services remained available to similarly situated individuals who were not members of the

13 plaintiff's protected class'—as other courts in this District have noted, the court has not expressly

14 adopted it." (citing <u>Lindsey v. SLT Los Angeles, LLC</u>, 447 F.3d 1138, 1145 (9th Cir. 2006);

15 <u>Hall-Johnson v. City & Cnty. of San Francisco</u>, No. 21-CV-07770-SI, 2022 WL 16579305, at *4

16 (N.D. Cal. Nov. 1, 2022))).

17    Plaintiffs do not expressly dispute the fourth factor is an express element or relevant

18 method of establishing plausibility.  Indeed, Plaintiffs in opposition state: "Plaintiffs also allege

19 discriminatory conduct by each of the defendants, as well as facts showing that similarly situated

20 non-minority developers received more favorable treatment and received the actual benefit of the

21 purported pro-business stance taken by the defendants in other contexts." (Opp'n 21, citing SAC

22

---

23  the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection."  <u>McDonnell</u> <u>Douglas Corp. v. Green</u>, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973).

24  [8]  The closest iteration of these elements appear to be focused on non-entities, and perhaps Plaintiff extended or pulled the elements implicitly from the <u>Yoshikawa</u> opinion to apply to an entity with an imputed racial identity.  <u>See</u>
25  <u>Malone v. Vevea</u>, No. 116CV01380AWIJLT, 2017 WL 5973397, at *1 (E.D. Cal. Jan. 19, 2017) ("To state a claim under § 1981, 'a plaintiff must establish that (1) he or she is a member of a racial minority; (2) the defendant
26  intended to discriminate against plaintiff on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., the right to make and enforce contracts, sue and be sued,
27  give evidence, etc.).' " (quoting <u>Peterson v. State of California Dept. of Corrections and Rehabilitation</u>, 451 F.Supp.2d 1092, 1101 (E.D. Cal. 2006))); <u>see also</u> <u>S. California Hous. Rts. Ctr., Inc. v. Villa Caprice, L.P.</u>, No. CV
28  17-8560 PA (AGRX), 2018 WL 6016137, at *2 (C.D. Cal. Feb. 23, 2018) (same).

¶¶ 24-63.)   The Court finds a comparator theory is likely best understood as one theory or method of alleging or establishing a plausible claim of racial discrimination.  See Moore v. Nat. Life Inc., No. 219CV02185JADDJA, 2021 WL 2546270, at *2 (D. Nev. June 18, 2021) ("Like a Title VII employment-discrimination claim, a § 1981 racial-discrimination claim requires evidence that: (1) the plaintiff belongs to a protected class, (2) she was performing according to her employer's legitimate expectations, (3) she suffered an adverse[-]employment action, and (4) similarly situated employees were treated more favorably, *or other circumstances surrounding the adverse employment give rise to an inference of discrimination*.") (emphasis added) (citations and quotation marks omitted); Hameen v. Dollar Tree Stores Inc., No. CV-22-00751-PHX-JJT, 2022 WL 17416768, at *2-3 (D. Ariz. Dec. 5, 2022) ("A plaintiff in a discrimination case can satisfy his or her burden to plead discriminatory intent by alleging 'overt acts coupled with some direct evidence that the defendants' conduct was motivated by racial animus[,]' . . . [however] [i]n the absence of direct evidence, a plaintiff can show discriminatory intent by presenting sufficient circumstantial evidence to support an inference of intentional discrimination . . . [and] [e]vidence that a similarly situated individual outside of the plaintiff's protected class received more favorable treatment than the plaintiff can raise an inference of intentional discrimination." (quoting Evans v. McKay, 869 F.2d 1341, 1345 (9th Cir. 1989) (other citations omitted))); De La Fuente v. DNC Servs. Corp., No. CV 18-336 (RC), 2019 WL 1778948, at *7–8 (D.D.C. Apr. 23, 2019) ("To support a comparator theory at the motion to dismiss stage, a plaintiff must allege facts that plausibly support an inference of discrimination under that standard."); Jones v. E. Airlines, LLC, No. CV 20-1927, 2021 WL 2456650, at *7 (E.D. Pa. June 16, 2021) ("For example, an inference of discrimination can be supported by allegations that similarly situated individuals outside the plaintiff's class were treated more favorably.") (citation and quotation marks omitted).

Whether a separate element or one method of establishing an inference supporting a plausible allegation, for the reasons explained below, the Court finds Plaintiffs have not alleged or state a claim under Comcast's but-for standard.  See Mirkooshesh, 2023 WL 2652240, at *4 ("At bottom, to prevail on a section 1981 claim, 'a plaintiff must initially plead and ultimately

1  prove that, but for race, it would not have suffered the loss of a legally protected right[,]' . . .

2  [t]he complaint does not allege that the plaintiffs were denied the right to contract for services or

3  that but for the plaintiffs' race, they would not have suffered the loss of a legally protected right .

4  . . [a]nd if the plaintiffs are required to plead that such services were available to similarly

5  situated individuals who are not Iranian, the complaint is void of any such allegations." (citing

6  Lindsey, 447 F.3d at 1145; Comcast, 140 S. Ct. at 1019)).

7         2.     Yoshikawa Currently Under En Banc Consideration by Ninth Circuit

8         Of note, the Ninth Circuit's opinion in Yoshikawa, cited generally by Plaintiffs, was

9  vacated on February 13, 2023, approximately one month before the opposition brief was filed, in

10  order for the Ninth Circuit to rehear the matter en banc pursuant to Federal Rule of Appellate

11  Procedure 35(a) and Circuit Rule 35-3.  Yoshikawa, 41 F.4th 1109, reh'g en banc granted,

12  opinion vacated, 59 F.4th 998.

13         In the case, the defendant-appellant argued "Yoshikawa's undisputed violation of

14  building regulations creates an absolute defense to any claim of but-for causation," as "[i]f a

15  complaint identifies independent non-discriminatory reasons for an alleged contractual

16  impairment, a § 1981 claim is rendered implausible."  Yoshikawa, 41 F.4th at 1116-17 (quoting

17  Opening Brief for Defendant-Appellant at 12; Sharifi Takieh v. Banner Health, 515 F. Supp. 3d

18  1026, 1035 (D. Ariz. 2021), aff'd sub nom. Takieh v. Banner Health, No. 21-15326, 2022 WL

19  474170 (9th Cir. Feb. 16, 2022)).  The Ninth Circuit first rejected the argument that the district

20  court did not apply the but-for causation standard from Comcast, noting the district court cited

21  the opinion and standard, and had concluded "[i]t may be the case that the Project violated the

22  City's ordinances _and_ that Seguirant discriminated against Plaintiff in enforcing those ordinances

23  _because of_ racial animus."  Id. (second emphasis added by Ninth Circuit) (quoting Yoshikawa v.

24  City & Cnty. of Honolulu, 542 F. Supp. 3d 1099, 1112 (D. Haw. 2021)).  The Ninth Circuit held

25  the "district court correctly determined that it is legally possible for an individual to commit a

26  technical violation of a regulation and for enforcement of that regulation still to be

27  discriminatory if the government would not have enforced the regulation in that manner _but for_

28  the plaintiff's race."  Id. (emphasis in original) (citing Elliot-Park v. Manglona, 592 F.3d 1003,

1  1006–09 (9th Cir. 2010)).   More generally as to these principles, the Ninth Circuit made the

2  following observations regarding the defendant-appellee's arguments, in that if accepted, it

3  would mean "a plaintiff would lose on a § 1981 claim as long as the defendant provided some

4  justification for the discriminatory act":

5
6
7
8
9
10

> Emphasizing the statute's close relationship to the Fourteenth
> Amendment, the Court explicitly stated that the statute targeted the
> enforcement of "facially neutral" laws applied with discriminatory
> intent in the post-war South. *Gen. Bldg. Contractors*, 458 U.S. at
> 385–87, 102 S.Ct. 3141. To hold, then, that any violation of a
> facially neutral law provides an absolute shield to § 1981 would
> defeat a central principle of the statute. Rather, the statute's history
> strongly suggests that sufficiently persuasive evidence of
> discriminatory enforcement can demonstrate but-for causation
> under § 1981, even in an as-applied challenge.

11
12
13
14
15
16
17
18
19
20
21

> Moreover, we have long understood that a law may be fair on its
> face but grossly unfair in its enforcement. The classic case is *Yick
> Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).
> Yick Wo operated a laundry in San Francisco. The city ordinance
> provided that no person could operate a laundry in San Francisco
> without obtaining consent from the board of supervisors, "except
> the same be located in a building constructed either of brick or
> stone." *Id.* at 357, 6 S.Ct. 1064 (statement of facts). Yick Wo
> alleged that more than 150 persons of Chinese ancestry were
> arrested for operating their laundries, while some 80 others
> operating "under similar conditions, [we]re left unmolested." *Id.* at
> 359, 6 S.Ct. 1064. Citing the Fourteenth Amendment and what is
> now § 1981(a), the Court held that "[t]hough the law ... be fair on
> its face, and impartial in appearance," it may be "applied and
> administered by public authority with an evil eye and an unequal
> hand." *Id.* at 373–74, 6 S.Ct. 1064. Such maladministration was a
> "denial of equal justice" within the meaning of the Fourteenth
> Amendment. *Id.* at 374, 6 S.Ct. 1064. Yoshikawa's allegations, if
> proven, therefore establish but-for causation, and the district court
> did not err in concluding they support a denial of Seguirant's
> motion to dismiss.

22  Yoshikawa, 41 F.4th at 1117-18.

23   The statements made in the vacated opinion could be considered significant as to the

24  Ninth Circuit's interpretation and application of the holding in Comcast, with one court

25  observing that in the vacated opinion, "[i]n applying Comcast, however, the Ninth Circuit has

26  explicitly rejected the sole but-for causation test and instead recognized that a plaintiff must

27  merely present evidence showing discrimination *because of* race—where race is a but-for cause."

28  Evans v. Valley Elec. Ass'n, Inc., No. 220CV000986ARTVCF, 2023 WL 184124, at *13 (D.

1   Nev. Jan. 13, 2023) (emphasis in original) (citing Yoshikawa, 41 F.4th at 1117)).  This is

2   coupled with the significance of the matter being under en banc consideration.  See Fed. R. App.

3   P. 35(a)(1)-(2) ("An en banc hearing or rehearing is not favored and ordinarily will not be

4   ordered unless: **(1)** en banc consideration is necessary to secure or maintain uniformity of the

5   court's decisions; or **(2)** the proceeding involves a question of exceptional importance.").

6           It did not appear the parties were strictly aware of the pending en banc decision at the

7   time of the hearing held on the instant motion, and Plaintiffs maintain the complaint allegations

8   meet the Comcast but-for cause standard.  The Court issues the following recommendations

9   based on the status of law as stated in Comcast and other relevant caselaw, absent any potentially

10  relevant decision forthcoming from the en banc Ninth Circuit.   Nonetheless, the Court

11  recommends that if an en banc decision issues while this recommendation is pending

12  consideration before the District Judge, the issue of whether supplemental briefing and

13  supplemental findings and recommendations is necessary be re-referred to the assigned

14  Magistrate Judge, upon request by either party on the docket following issuance of the en banc

15  decision.  The assigned Magistrate Judge would then consider whether supplemental briefing is

16  proper after hearing from all parties, and determine whether to issue supplemental or modified

17  recommendations based thereon.

18          3.       The Parties' General Arguments and the Court's Previous Dismissal Order

19          Again, as clarified at the hearing and post-hearing filings, Plaintiffs are not pursuing this

20  cause of action against any individual Defendants, but rather against the City only as the

21  contracting party.  (ECF Nos. 70, 71.)

22          Plaintiffs argue the elements for a Section 1981 claim are met, emphasizing both

23  Plaintiffs: allege they are within a protected class (SAC ¶¶ 3, 4); allege that developers and

24  persons doing business with the City of Fresno were given preferable treatment (SAC ¶ 63);

25  allege discriminatory conduct by each of the Defendants; and allege facts showing similarly

26  situated non-minority developers received more favorable treatment and the benefit of the

27  purported pro-business stance taken by the Defendants in other contexts (SAC ¶¶ 24-63).

28  (Opp'n 20-21.)  As to but-for causation, Plaintiffs contend Defendants ignore ample supporting

allegations, directing the Court to paragraphs 76 and 77 of the SAC.

In reply, Defendants first contend Plaintiffs do not cite to the correct language from the complaint in their opposition. Defendants are correct the quoted portion of paragraph 76 contained in the current opposition does not include the following final clause that does appear in the SAC: "These private rights of action are enforceable against public actors and public entities under the *Jett* rule through 42 U.S.C. § 1983**, and, with respect to the alleged deprivations of equal protection, under section 1983 generally**." (SAC ¶ 76 (emphasis added to clause not reproduced in the opposition).) This additional language *did* appear in the FAC ¶ 74, and thus it appears Plaintiffs may have pulled the language that does not include the final clause from the initially filed complaint, rather than the FAC or SAC. (See Compl. ¶ 61, ECF No. 1 at 18:7-12.) Additionally, it appears Plaintiffs, while citing SAC ¶ 77 in the opposition, actually quoted the language from paragraph 62 from the initially filed complaint.

Defendants in reply argue that to the extent the language actually quoted by Plaintiff in opposition is from the original complaint, the Court has already referenced and found such allegations to be deficient. (Reply 6.) That appears true. Thus, the question appears to be, while Plaintiffs did not actually quote the changed allegations and rather quoted the initially filed complaint, is whether the additional allegations actually contained in the SAC necessarily change the outcome under the but-for analysis. To provide better context to Judge Drozd's order on the initial complaint and motion to dismiss, the Court now excerpts the changes with emphasis added below, as between the originally considered initial complaint, and the now operative SAC that Plaintiffs intended to direct the Court to:

> 76.  CVCSF, as a minority-founded non-profit entity, has right under 42 U.S.C. § 1981 to equality in the making and enforcement of contracts, which includes rights pertaining to the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. **Mr. Frazier, both as a minority and an individual singled out without any rational basis, has equal protection rights against government mistreatment.** These private rights of action are enforceable against public actors and public entities under the *Jett* rule through 42 U.S.C. § 1983**, and, with respect to the alleged deprivations of equal protection, under section 1983 generally.**

77.  The facts attendant to the above-alleged misconduct show that racial **and individual** animus was the but-for cause thereof. Specifically, there has not been a similarly situated Caucasian or majority owned business subject to audit for requesting renegotiation of an agreement that was clearly nowhere near as profitable as anticipated. There also has not been a **weaponized** audit of a project managed by a similarly situated Caucasian or majority owned business that in reality was an effort to document law or ethics violations. Nor has any similarly situated Caucasian or majority owned business had an incomplete, substandard draft audit published that was likewise damaging in nature. There also has not been a similarly situated Caucasian or majority owned business that has had an investigation suspended by the City of Fresno nonetheless referred to the Fresno County District Attorney's Office **and United States Attorney's Offices** for possible criminal investigation. There also has not been a Caucasian or majority owned business with a similar 25-year contract that was attempted to be broken in favor of a business owned by persons of another race. **Further,** there has not been a Caucasian or majority owned business similarly **harassed and** disparaged in the media on the basis of an incomplete investigation and other untruths that were known to be similarly harmful to the subject's reputation and business prospects**, or based on typical business compliance issues that are typically handled discreetly and without publicity. Finally, there has been no other developer in Fresno of any race or any other identity, who has been the subject of repeated disparagement intended to discourage third parties from doing business with him.** These circumstances strongly suggest that race was not merely the motivating factor behind the defendants' actions – it was the but-for cause therefor. **These facts also show that Mr. Frazier's "class of one" status as an individual being singled out was the but-for case of the mistreatment alleged herein above.**

(SAC ¶¶ 76, 77 (emphasis added in relation to Compl. ¶¶ 61-62, ECF No. 1 at 18-19).).  The order on the first motion to dismiss in this action held as follows as to the Section 1981/1983 claim:

The court acknowledges that the scourge of racial discrimination does not only rear its insidious head through "statements involving bigotry . . . or discussions involving race." (Doc. No. 6-1 at 27); *see Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 386 (5th Cir. 2017) . . . However, the allegations of plaintiffs' complaint do not adequately assert that race was the but-for cause of defendants' conduct. The claimed lack of a "similarly-situated Caucasian or majority owned business" subject to the same exact conduct by defendants under this very specific set of circumstances is not a sufficient basis upon which to bring such a claim, where under the allegations of the complaint it is unclear whether there even exists a "similarly-situated Caucasian or majority owned business" to which plaintiff CVCSF could meaningfully draw a comparison. (Doc. No. 1 at ¶ 62); *compare Body by Cook, Inc.*, 869 F.3d at 387 ("Plaintiffs

make only generalized allegations regarding Defendants' alleged disparate treatment of [plaintiff] versus non-minority-owned shops. These allegations are not specific enough to plead discriminatory intent. They fail to identify specific instances when [plaintiff] was refused a contract but a similarly situated non-minority owned body shop was given a contract."), *with Bivett Brackett v. American Airlines Group, Inc.*, No. 4:21-cv-02681-HSG, 2022 WL 282529, at *4 (N.D. Cal. Jan. 31, 2022) (finding that the plaintiff had "thinly but plausibly" stated a claim for a violation of 42 U.S.C. § 1981 where she alleged that agents of the defendant airline prevented her from boarding a flight despite allowing Caucasian and Hispanic passengers to board the same flight with luggage the same size as plaintiff's).

According to plaintiffs, "Mr. Frazier and CVCSF also learned that [defendants] had a collective agenda to try to reclaim Granite Park in order to lease it to the Fresno Football Club ("FFC"), a minor league affiliate of Major League Soccer." (Doc. No. 1 at ¶ 37.) Plaintiff CVCSF alleges that defendants "actively sought to break [the contracts between the parties] in favor of entering into a competing arrangement with FFC." (*Id.* at ¶ 70.) Plaintiff CVCSF implies (without explicitly naming FFC) that FFC was at the time "owned by persons of another race," but does not allege the racial identity of FFC's ownership or present any specific allegations that FFC's ownership's different racial identity motivated defendants' actions. (*Id.* at ¶ 62.)

As pled, plaintiff CVCSF's allegations that defendants did not adequately perform their contractual duties because they instead wished to contract with another entity—even when construed in the light most favorable to plaintiff—do not suggest that but-for defendants' racial animus, defendants would have conducted themselves differently in their dealings with plaintiff CVCSF. Rather, without more, these allegations suggest only a plausible inference that race could have played "some role" in defendants' decision-making process, which is insufficient to meet the requisite but-for causation standard. *See Comcast*, 140 S. Ct. at 1013; *see also Newman v. Google LLC*, No. 3:20-cv-04011-LHK, 2021 WL 2633423, at *6 (N.D. Cal. June 25, 2021) ("Plaintiffs' personal belief of discrimination, without any factual support, is insufficient to satisfy federal pleading standards.") (internal quotation omitted). Thus, plaintiff CVCSF has not sufficiently pled a cause of action for discriminatory denial of contract rights against defendants under 42 U.S.C. §§ 1981, 1983 and, accordingly, the court will dismiss this claim.

(ECF No. 24 at 20-21.)

Now challenging the SAC, Defendants argue CVCSF is attempting to turn a standard contract/tort action into a federal discrimination action, and the allegations that Frazier is African-American and was an officer of CVCSF does not turn CVCSF's claim into a constitutional one under Section 1981. See Black Agents & Brokers Agency, Inc. v. Near N. Ins.

28

1  Brokerage, Inc., No. 2:01 CV 419 PS, 2004 U.S. Dist. LEXIS 17945, at *25 (N.D. Ind. June 7,

2  2004) (in adjudicating motion for summary judgment, stating "[e]qually unavailing is the

3  argument that just because BABA was owned by African-Americans is in itself evidence of an

4  intent to discriminate."); see also Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 292, 50 L.

5  Ed. 2d 251 (1976) ("Medical malpractice does not become a constitutional violation merely

6  because the victim is a prisoner.").  The Court turns to consider more specific arguments.

7          4.      The Court Finds Plaintiffs have not Stated a Claim under Section 1981

8          a.      No Allegations of Intentional Discrimination by the Individual Defendants

9          Defendants first argues CVCSF brought this cause of action against the City and nine

10  individual City Defendants, but have not presented sufficient individual allegations to support a

11  claim of intentional discrimination.  However, as noted above, as confirmed in post-hearing

12  filings, the parties have agreed the sole Defendant to this cause of action is the City.  (See ECF

13  Nos. 70, 71.)  Nonetheless, the Court briefly discusses the argument as relevant to the collective

14  individual allegations as potentially attributable to the Defendant City.

15          Defendants direct the Court to general law pertaining to the requirements for specific

16  affirmative acts by each individual Defendant under Section 1983, and the law holding that

17  supervisory personnel are generally not liable under the theory of respondeat superior.  (Mot. 12

18  n.3.)  The Court summarized this general law above, supra note 7.  See, e.g., Monell, 436 U.S.

19  658.  Defendants argue CVCSF has not adequately alleged race was the "but for" cause of any

20  constitutional wrongdoing by any City Defendant, emphasizing courts are not required to accept

21  as true allegations that are conclusory, unwarranted deductions of fact, or unreasonable

22  inferences, and will not assume plaintiffs can prove facts not alleged, or that a defendant has

23  violated a law in a way not alleged.

24          While the individual City Defendants are not defendants to this cause of action, the Court

25  finds the lack of any individualized allegations pertaining to racial animus, and general lack of

26  direct allegations of specific actions by specific Defendants, support the Court's findings below

27  as to the claim against the City.  See In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1055 (9th Cir.

28  2008) ("The court need not, however, accept as true allegations that contradict matters properly

1  subject to judicial notice or by exhibit [and] [n]or is the court required to accept as true

2  allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable

3  inferences." (quoting Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001)));

4  Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters, 459

5  U.S. 519, 526, 103 S. Ct. 897, 902, 74 L. Ed. 2d 723 (1983) ("As the case comes to us, we must

6  assume that the Union can prove the facts alleged in its amended complaint . . . however, [it is

7  not] proper to assume that the Union can prove facts that it has not alleged or that the defendants

8  have violated the antitrust laws in ways that have not been alleged.").

9      The Court now turns to the additional lines of argument from Defendants that are

10  ultimately reinforced by the lack of sufficient individualized specific allegations of racial animus

11  or discrimination that would support an individualized claim.

> **a.   The Absence of Direct Allegations of Racial Animus or Mention of Plaintiffs'
> Racial Identity by Defendants Weighs in Favor of Granting Dismissal**

14      More specifically, Defendants argue there are no factual allegations that any of the City

15  Defendants systematically discriminated against minority-owned corporations or businesses; no

16  factual allegations of any racially insensitive statements by any City Defendant; no allegation

17  that any City Defendant was involved in any discussion with CVCSF involving race; and not

18  even an allegation each City Defendant was aware that CVCSF was a minority-owned business.

19  The Court has summarized the timeline of all events and allegations above.  Given the Court's

20  review of all specific allegations, taking all individual allegations collectively as applied to the

21  City overall in the light most favorable to Plaintiffs, the Court finds the lack of any direct or

22  specific allegations of racial animus weighs in favor of finding there are insufficient factual

23  allegations to support a plausible inference that but-for Plaintiffs' racial identity the acts as

24  alleged would not have occurred (SAC ¶¶ 25-63, 74-81).  See Benton v. Moreno-Benton, No.

25  5:15-CV-00588-CAS EX, 2015 WL 2380745, at *6 (C.D. Cal. May 18, 2015) ("Plaintiffs do not

26  allege a pattern of discrimination, actions indicating bias, or other facts that would support an

27  inference that Primecare intentionally discriminated against Benton on the basis of his race . . .

28  [i]nstead, Benton states that he is a member of a racial minority, and, on that basis alone, asserts

1  that Primecare's alleged actions were racially motivated [but] [s]uch threadbare allegations do

2  not suffice to support an inference of purposeful discrimination."); see also Sharifi Takieh v.

3  Banner Health, 515 F. Supp. 3d 1026, 1047–48 (D. Ariz. 2021) (granting dismissal despite

4  allegations of "multiple [discriminatory statements allegedly made by some of the individual

5  Defendants."), aff'd sub nom. Takieh v. Banner Health, No. 21-15326, 2022 WL 474170 (9th

6  Cir. Feb. 16, 2022), cert. denied, 214 L. Ed. 2d 30, 143 S. Ct. 117 (2022); Jarvis, 2022 WL

7  1663568, at *5 (comparing that "specific allegations of direct evidence of racial discrimination

8  by state police were therefore sufficient to withstand a motion to dismiss a § 1981 claim [in one

9  case] . . . . [however] [h]ere in contrast, Jarvis alleges only his subjective belief that one bank

10  employee's rejection of his check and refusal to open an account was because of his race."); c.f.

11  My Future Consulting, Inc. v. Volt Mgmt. Corp., No. 821CV00341JLSADS, 2022 WL 2189504,

12  at *3 (C.D. Cal. Mar. 17, 2022) (finding plaintiffs pleaded sufficient facts whereby reasonable

13  jury could infer defendant discriminated on the basis of race based on allegations that included

14  defendant's "employee made racists remarks to MFC during their interactions regarding MFC's

15  participation in the program . . . [and noting] [t]hat cronyism is a different, plausible explanation

16  does not prevent the Court from drawing the reasonable inference in Plaintiffs' favor that racial

17  discrimination accounts for this conduct.").

18       The Court believes this initial finding is in accord with the previous order of dismissal,

19  and does not find additional factual details or later-in-time allegations change this initial finding.

20  (See ECF No. 24 at 18-21 (after summarizing arguments pertaining to a lack of direct racial

21  animus allegations, stating "[t]he court acknowledges that the scourge of racial discrimination

22  does not only rear its insidious head through 'statements involving bigotry . . . or discussions

23  involving race[,]' " before turning to consider whether comparator and other allegations could

24  support a plausible claim).)   The Court turns to consider whether the factual allegations

25  circumstantially support the claim.  See Hameen, 2022 WL 17416768, at *3 ("Plaintiff concedes

26  that he has no direct evidence of discrimination but argues that he has alleged sufficient facts to

27  establish circumstantial intentional race discrimination.").

28  / / /

**b. Plaintiffs' Own Allegations and Defendants' Request for Judicial Notice Concerning the City's Involvement with Other of Frazier's Entities also Weigh in Favor of Granting Motion to Dismiss**

Defendants argue that the SAC includes many allegations that are contrary to the assertion that race was a determining factor in the contractual dealings with Plaintiffs, directing the Court to the following examples: (1) the City entered into both contracts on December 7, 2015 with knowledge of Frazier's involvement with CVCSF and his minority status (SAC ¶¶ 18, 22, Exs. A-B)[9]; (2) CVCSF continues to occupy the leased property under the lease (SAC ¶¶ 18-62); (3) CVCSF continues to receive a $150,000.00 annual fee under the Service Agreement (SAC, Ex. B); (4) under the Service Agreement, CVCSF agreed to maintain adequate financial records related to its expenses for at least three years (SAC ¶¶ 22-23, Ex. B); (5) under the Service Agreement, the City had the right to audit and pursued that right (SAC ¶ 26, Ex. B, p. 5)[10]; (6) in response to the audit request, CVCSF provided unreviewed financial information which was not perfect, and conceded the information needed to be refined and finalized (SAC ¶¶ 28-29); (7) Fresno City Attorney Douglas Sloan publicly stated in an open City Council meeting that CVCSF was in substantial compliance with the Lease and Service Agreement (SAC ¶ 39); and (8) the City released the audit in response to a Public Records Act Request (SAC ¶ 31). (Mot. 13-14.)

The City Defendants submit the documents that are subject to their request for judicial notice further negate any implication of racial animus: (1) on or about October 30, 2014, the City selected a company in which Frazier had an ownership interest for a development project (RJN, Exs. A, B); (2) on or about January 8, 2015, the City approved an exclusive negotiation agreement with an entity in which Frazier had an ownership interest (RJN, Exs. B, C); (3) on or

---

[9] Defendants proffer that, for example, both contracts were signed by Frazier as chairman and founder of CVCSF. (Mot. 13 n.4.) The Court notes this is *somewhat* in conflict with Defendants highlighting that there are no allegations that each City Defendant was aware CVCSF was a minority-owned business, however, in either regard is supportive of Defendants' position. (Mem. 13.)

[10] Plaintiffs' complaint states the "Ground Lease contemplated no payments of public monies to CVCSF and hence contained no requirements pertaining to financial documentation, disclosures, or audits." (SAC ¶ 19.) Plaintiffs do not dispute there were audit rights under the Service Agreement, and also state in the complaint that under the "Service Agreement, CVCSF also agreed to maintain adequate financial records related to its expenses for at least three years or longer if otherwise required by law." (SAC ¶ 23.)

about July 30, 2015, the City granted the relinquishment of property rights pursuant to a request by Noyan Frazier Properties, LLC, an entity in which Frazier has an ownership interest (RJN, Exs. E, F); (4) on or about February 25, 2016, the City provided funds to Noyan Frazier Capital, LLC (RJN, Exs. D, G); (5) on or about June 9, 2016, the City, in partnership with one of Frazier's companies, pursued an application to the Affordable Housing and Sustainable Communities Program in the amount of $5,738,730.00 (RJN, Exs. D, H); (6) on or about June 21, 2018, the City approved an amendment to an agreement between the City and Noyan Frazier Capital, LLC (RJN, Exs. D, I); (7) on or about August 15, 2019, the City approved an additional $659,298.00 in funding to an entity in which Frazier had an ownership interest pursuant to its request (RJN, Exs. J, K); (8) on September 18, 2019, the City approved a permit application by an entity in which Frazier had an ownership interest (RJN, Exs. B, L); (9) on or about April 9, 2020, City extended exclusive development rights to an entity in which Frazier had an ownership interest (RJN, Exs. K, M); (10) on or about November 19, 2020, the City extended a development agreement at the request of an entity in which Frazier had an ownership interest (RJN, Exs. K, N); (11) on or about April 8, 2021, the City approved a sales agreement with an entity in which Frazier had an ownership interest (RJN, Ex. O); and (12) on or about August 19, 2021, the City approved an amendment to a development agreement in which Frazier had an ownership interest (RJN, Exs. K, P).  (Mot. 14-15.)

The Court shall grant the request for judicial notice of Exhibits A-P, despite Plaintiffs' objections.[11]

---

[11]  Under the Federal Rules of Evidence, a court may take judicial notice of a fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Judicial notice may be taken "of court filings and other matters of public record."  Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 n.6 (9th Cir. 2006); Lee, 250 F.3d at 689; Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); Bennett v. Medtronic, Inc., 285 F.3d 801, 802 n.2 (9th Cir. 2002).  Here, Plaintiffs argue a court can only judicially notice the existence of a document, not the truth of its contents, and if the Defendants want to rebut the Plaintiffs' allegations and have the Court reject them as untrue, an evidentiary motion, not a pleading motion such as under rule 12(b)(6) is required.  See Hsu v. Puma Biotechnology, Inc., 213 F.Supp.3d 1275, 1280-1282 (C.D.Cal. 2016).  However, in the previous order of dismissal, the Court already granted a similar request for judicial notice, and rejected Plaintiffs' essentially identical argument based on the same citation to Hsu. (See ECF No. 24 at 19 n. 8 ("While plaintiffs oppose defendants' request for judicial notice, they do not allege that any of defendants' exhibits contain falsehoods or are otherwise fraudulent, they make no specific arguments for why defendants' request is a 'clearly inappropriate application of judicial notice,' and the case they cite in support of their contention is inapplicable.").)  In the absence of any specific arguments pertaining to the documents, the Court

The Court finds the allegations and judicially noticed documents weigh in favor of Defendants.  The Court believes this initial finding is in accord with the previous order of dismissal, and does not find additional factual details or later-in-time allegations change the outcome.  (See ECF No. 24 at 18-21 (after summarizing arguments pertaining to a lack of direct racial animus allegations, allegations in complaint indicating non-racial animus, and granting request for judicial notice, stating "the scourge of racial discrimination does not only rear its insidious head through 'statements involving bigotry . . . or discussions involving race[,]' " before turning to consider whether comparator and other allegations could support a plausible claim).)

### d.     Allegations of Comparators are Insufficient to Establish Inference of Discrimination to Support Plausible Section 1981 Cause of Action

Defendant suggests that in an attempt to allege that race was a determining factor with respect to any wrongful action taken by the City, two councilmembers, two Mayors, three City Managers, and two City Administrators over a seven-year period, Plaintiff appears to rely on allegations of comparators being treated differently, and claiming he was a "class of one."  (Mot. 17; SAC ¶ 77.)  Defendants argue the comparator allegations are deficient to properly allow the Court to conclude "but for" causation based on race was plausible as: (1) CVCSF does not specifically identify another entity as a comparator; (2) CVCSF does not provide sufficient factual allegations that any comparator had a non-minority racial identity and/or otherwise adequately describes the racial composition of its ownership; (3) CVCSF does not provide any

---

finds no persuasive reason why it should not grant a similar request given the previous holding in this action in adjudicating the previous motion to dismiss.  (See ECF No. 24 at 19 n. 8 ("An online biography of plaintiff Frazier on a private company's webpage is not a matter of public record and cannot be "accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b). Similarly, the online biography is not incorporated by reference into plaintiffs' complaint[,] . . . [a]ccordingly, the court denies defendants' request for judicial notice of the online biography of Mr. Frazier and grants defendants' request for judicial notice of the remaining exhibits.").  Therefore, the Court grants the Defendants' request for judicial notice. The Court acknowledges there may be some issue of weight or relevance that these documents have to this action, however, even if the Court were to decline taking judicial notice of certain documents, such as other contracts not part of this action, the Court emphasizes it does not rely on these judicially noticed documents as determinative to the ultimate recommendation in this action, and would reach the same conclusion based on the events surrounding *this* contract and the allegations concerning *this* contract in the complaint.  The existence of these documents provides additional weight behind Defendants' arguments, nonetheless.

1  factual allegations that the ten City Defendants were aware of the racial identity of the
2  comparator businesses and/or of its ownership; ( 4) CVCSF does not articulate any actions with
3  respect to these comparators in a similar time frame and/or any details about the comparators'
4  business operations; (5) CVCSF does not allege any specific instances of conduct and/or any
5  similarity in contract provisions, including the audit provisions; (6) there are simply no
6  allegations that the comparators engaged in similar conduct; and (7) CVCSF does not provide
7  any factual allegations regarding Defendants' contractual relationships with these comparators.
8  (Mem. 16.)  The Court agrees with Defendants.

9       Defendants are correct that courts have required that a plaintiff demonstrate similarity of
10 comparators in all material respects.  "The alleged comparator entity 'need not be identical, but
11 must be similar in material respects.' "  Ent. Studios Networks, Inc. v. McDonald's Corp., No.
12 CV214972FMOMAAX, 2021 WL 6618469, at *2 (C.D. Cal. Nov. 30, 2021) (quoting Earl v.
13 Nielsen Media Rsch., Inc., 658 F.3d 1108, 1114 (9th Cir. 2011)).  "Materiality depends on the
14 context and is a question of fact that 'cannot be mechanically resolved.' "  Earl, 658 F.3d at 1114
15 (quoting Hawn v. Exec. Jet Mgmt., Inc., 615 F.3d 1151, 1157 (9th Cir. 2010)).  In Squaw Valley,
16 on an equal protection claim, the Ninth Circuit has described comparator evidence as comparing
17 "apples to apples."  Squaw Valley Dev. Co. v. Goldberg, 375 F.3d 936, 945 (9th Cir. 2004)
18 ("[I]n any equal protection analysis, it is necessary to identify the class or group being
19 discriminated against . . . Squaw Valley contends it is being singled out from all other
20 dischargers [but] presents no evidence that any other discharger is of comparable size, has a
21 comparable history of non-compliance, engages in a comparable level of activity on its land, and
22 has a comparable history of administrative action being ineffective [thus] [a]s the district court
23 repeatedly stated, Squaw Valley is not comparing 'apples to apples.' " (citing Freeman v. City of
24 Santa Ana, 68 F.3d 1180, 1187 (9th Cir. 1995))); see also Earl, 658 F.3d at 1114 ("Earl has
25 presented specific and substantial evidence that Nielsen did not terminate significantly younger
26 recruiters with similar histories of multiple policy violations.").

27      A comparison of the original complaint and the SAC reveals one substantive addition
28 pertaining to the comparator FFC that was discussed in the original dismissal order.  Plaintiffs

1  "learned" that Brand, Quan, Schaad, Orman, and the City "had a collective agenda to try to

2  reclaim Granite Park in order to lease it to the Fresno Football Club ("FFC"), a minor league

3  affiliate of Major League Soccer **that is owned by members of the majority race.**"  (Compare

4  Compl. ¶ 37, with SAC ¶ 43 (emphasis added as to additional language in SAC).)  Plaintiffs

5  make general allegations that there was a meeting and surveying of the area before the company

6  "fold[ed] in October 2019."  Id.

7      Again, Judge Drozd's order observed that "CVCSF implies (without explicitly naming

8  FFC) that FFC was at the time 'owned by persons of another race,' but does not allege the racial

9  identity of FFC's ownership or present any specific allegations that FFC's ownership's different

10  racial identity motivated defendants' actions."  (ECF No. 24 at 21, citing Compl. ¶ 62.)  The

11  reference to paragraph 62 in the initial complaint refers to the allegation therein that "[t]here also

12  has not been a Caucasian or majority owned business with a similar 25-year contract that was

13  attempted to be broken in favor of a business owned by persons of another race."  (Compl. ¶ 62,

14  ECF No. 1 at 18.)  That sentence remains unchanged in the SAC.  (See SAC ¶ 77.)

15      The Court also notes additional allegations in paragraph 63 that may be considered an

16  attempt at highlighting comparators, or at least as allegations of general treatment of business

17  and the purported pro-business stance on one hand and alleged disparate treatment of Frazier and

18  CVCSF:

19          All of the foregoing misconduct has occurred during a time when
            the City of Fresno has otherwise aggressively encouraged new
20          development and the improvement of both public and private
            properties. To the contrary, the current stated policy of the City is
21          "to honor developers' time and budgets, and to work together to
            'get to yes.'" Mayor Dyer's administration, similar to preceding
22          administrations, has had a public and cozy relationship with
            majority race developers, such as Darius Assemi, Cliff Tutelian
23          and Leland Parnagian. Councilman Karbassi has accepted the
            maximum individual donation from Mr. Assemi, with whom he
24          also co-hosts a radio show, for his Assembly campaign. City
            Manager White is president of a Kashian family charitable
25          foundation, although Mr. Kashian is a prominent majority race
            local developer who regularly does business with the City. No
26          other developer, and certainly not one of another race who has
            declined to exercise his protected First Amendment rights to
27          criticize and petition for redress, has been treated similarly. No
            other developer has been publicly undermined and had issues
28          pertaining to him referred for federal and local investigations,

36

1              much less publicly.

2 (SAC ¶ 63.)

3        While Plaintiffs now allege FFC is "owned by members of the majority race" (SAC ¶

4 43), and make some generalized allegations that Dyer's administration has had a cozy

5 relationship with majority race developers (SAC ¶ 63), the Court finds that is not enough factual

6 information to satisfy the comparator standards, at least in order to establish a plausible inference

7 of racial discrimination. De La Fuente, 2019 WL 1778948, at *7 ("To support a comparator

8 theory at the motion to dismiss stage, a plaintiff must allege facts that plausibly support an

9 inference of discrimination under that standard."). There are still no "specific allegations that

10 FFC's ownership's different racial identity motivated defendants' actions." (ECF No. 24 at 21.)

11 Plaintiffs have not specifically identified the racial makeup of the ownership of FFC, aside from

12 generally stating they are of the majority race. In other words, it is not clear FFC has a corporate

13 racial identity, based on Plaintiffs' vague proffer that the company is owned by members of the

14 majority race. See Cholla Ready Mix, Inc. v. Civish, 382 F.3d 969, 978 (9th Cir. 2004)

15 ("Cholla's complaint does not allege that Cholla has an imputed racial identity and does not

16 explain how the company suffered from racial discrimination . . . complaint devotes itself

17 primarily to arguing that defendants were motivated by the religious significance of the Butte,

18 without alleging any facts from which one could infer that anyone's race in any way motivated

19 the state defendants' actions."). The Court does not believe the additional allegations

20 summarized and highlighted above as compared to the initial complaint, whether considered

21 comparators or otherwise, make any meaningful difference in establishing the plausibility of

22 Plaintiffs' allegations for purposes of the Section 1981 claim. Even setting aside the racial

23 identity of the council members or FFC, the Court does not find FFC to be a comparator

24 sufficient here, nor the developers, based on the lack of factual allegations in the complaint to

25 establish them as comparators. The Court now turns to additional caselaw that supports this

26 conclusion specifically as to comparators, and that also support the Court's ultimate

27 recommendation based on all of the collective reasons discussed here and above.

28        Cited by the defendant-appellant in Yoshikawa, in Takieh, the Ninth Circuit in an

1  unpublished opinion, with certiorari denied, upheld the district court's granting of dismissal of

2  the Section 1981 claim.   There, the Arizona Supreme Court issued a decision in the matter

3  relating to whether substantial evidence supported termination of a physician contract, and

4  because the plaintiff "incorporated the Arizona Superior Court's decision into his First Amended

5  Complaint (FAC), the decision is relevant to our determination of whether Dr. Sharifi's claims

6  are plausible."  Takieh v. Banner Health, No. 21-15326, 2022 WL 474170, at *1–2 (9th Cir. Feb.

7  16, 2022), cert. denied, 214 L. Ed. 2d 30, 143 S. Ct. 117 (2022).   The Ninth Circuit agreed the

8  plaintiff failed to state a plausible § 1981 claim under Comcast as the "court's decision

9  [incorporated therein] articulated three non-discriminatory grounds for the termination of Dr.

10  Sharifi's PSA: patient care issues, alteration of medical records, and disruptive behavior [and]

11  [t]hese non-discriminatory reasons render the allegation that race was the but-for cause of the

12  termination of Dr. Sharifi's PSA implausible."  Id.   The Ninth Circuit additionally upheld the

13  granting of dismissal based on lack of similarly situated comparators, finding "[t]he allegations

14  regarding disparate treatment of Dr. Sharifi as compared to non-Arab physicians fail to establish

15  that race was a but-for cause of the revocation of Dr. Sharifi's PSA because the non-Arab

16  physicians were not 'similarly situated' to Dr. Sharifi [as] [s]pecifically, none of these physicians

17  generated patient care issues, altered medical records, *and* exhibited disruptive behavior."  Id.

18  Here, Plaintiffs have not sufficiently alleged FFC, and to the extent Plaintiffs references other

19  majority race developers, are similarly situated to CVCSF.  (ECF No. 24 at 20-21 ("CVCSF's

20  allegations that defendants did not adequately perform their contractual duties because they

21  instead wished to contract with another entity—even when construed in the light most favorable

22  to plaintiff—do not suggest that but-for defendants' racial animus, defendants would have

23  conducted themselves differently in their dealings with plaintiff CVCSF . . . without more, these

24  allegations suggest only a plausible inference that race could have played "some role" in

25  defendants' decision-making process.").)

26      Further, unlike the complaint here, the plaintiff in Takieh actually alleged direct

27  discriminatory statements, and the court still found the allegations not plausible.  See Takieh,

28  515 F. Supp. 3d at 1047–48 ("Sharifi's causation allegations are also based, in part, on multiple

statements allegedly made by some of the individual Defendants.").  The district court noted "[d]iscriminatory intent and but-for causation, however, are separate elements of a § 1981 claim," and therefore "the fact a defendant had discriminatory intent does not necessarily imply that racial animus was the but-for cause of the defendant's action." (citing Astre, 804 F. App'x at 666–67)).  The Court found the presence of other allegations that form alternative bases for intent, as well as other allegations being vague and speculative, led to finding the allegations of discriminatory comments did not plausibly suggest plaintiff's race was the but-for cause. Takieh, 515 F. Supp. 3d at 1047–48 (as for "Defendants alleged to have made discriminatory remarks  . . . the FAC alleges that those Defendants were motivated by previous, personal interactions . . . [t]hus, to the extent [these defendants] acted with racial animus, Dr. Sharifi has not plausibly alleged that his race was the but-for cause.").

Defendants again emphasize Body by Cook, utilized by the Court in the previous dismissal order.  See Body by Cook, Inc. v. State Farm Mut. Auto. Ins., 869 F.3d 381 (5th Cir. 2017).  There the plaintiffs alleged that, despite their qualifications, Body by Cook and Robert Cook have 'been refused entry into the [Direct Repair Programs,] and lesser qualified or similarly situated, non-minority owned body shops have been granted access.' " Id. at 384.  The Fifth Circuit found that "[w]ith respect to most Defendants, Plaintiffs make only generalized allegations regarding Defendants' alleged disparate treatment of Body by Cook versus non-minority-owned shops," and held such "allegations are not specific enough to plead discriminatory intent [and] fail to identify which Defendant discriminated or specific instances when Body by Cook was refused a contract but a similarly situated non-minority owned body shop was given a contract." Id. at 387.  "Accordingly, as to most Defendants, Plaintiffs fail[ed] to plead discriminatory intent." Id.  On the other hand, the Fifth Circuit held that allegations were more specific and sufficient as to defendant State Farm in that plaintiffs alleged "a State Farm representative visited and inspected Body by Cook and found that it met all of State Farm's qualifications for being a Direct Repair Shop, but that State Farm declined to allow Body by Cook to participate in the Direct Repair Program," as well as a specific allegation as to a comparator in that "State Farm told Body by Cook that it was not admitting body shops into its

1   Direct Repair Program but State Farm then admitted a non-minority-owned body shop with

2   inferior equipment that did not meet State Farm's 'qualifications.' "   Id.   The Fifth Circuit

3   concluded "[t]hese allegations that similarly situated body shops were treated differently than

4   Body by Cook and allowed into State Farm's Direct Repair Service program make plausible the

5   inference that the difference in treatment was because of Body by Cook's minority-owned

6   status."   Id.

7          This Court, and others, find Body by Cook provides a reasonable example of where a

8   court can appropriately distinguish comparator facts as either establishing or not establishing

9   plausible allegations.   Here, the Court finds the comparator allegations pertaining to FFC and

10  other majority race developers are not specific enough to establish a plausible inference of racial

11  discrimination.   In Body by Cook, plaintiffs were expressly denied entrance into a specific

12  contract program in the face of admitting a non-minority body shop that did not actually meet the

13  minimum qualifications for the program.   The allegations as to Frazier and CVCSF are more like

14  those that were dismissed in Body by Cook.   See De La Fuente, 2019 WL 1778948, at *7-8

15  (noting the two different findings in Body by Cook as in line with D.C. Circuit holdings, and

16  finding allegations failed to rise above the mere possibility of discrimination, as "apart from

17  Secretary Clinton, he never identifies, or even nebulously describes, a similarly situated white

18  candidate who executed a joint fundraising agreement and received access to the Voter Data File

19  . . . Mr. De La Fuente does not allege that he was similarly situated to Secretary Clinton or

20  Senator Sanders [and] [n]or could he; Secretary Clinton and Senator Sanders had far greater

21  political experience, fundraising success, and public support (as reflected in polling data) [and]

22  [e]ven taking [the] factual allegations as true, the Court cannot infer that Defendants acted with

23  discriminatory intent, because Mr. De La Fuente does not plausibly allege that he was treated

24  differently than similarly situated white candidates."); Albert v. GEICO Gen. Ins. Co., No. 18-

25  CV-113 (SRN/ECW), 2019 WL 2016807, at *6–7 (D. Minn. Jan. 16, 2019) (holding "like the

26  insufficient allegations in Iqbal and Body by Cook, Albert's conclusory allegations are

27  unsupported by any other alleged facts that support an inference of intentional discrimination . . .

28  [and] do not explain or suggest how GEICO's conduct was motivated by racial animus or

intentionally discriminatory[,]" where plaintiff alleged GEICO's conduct was motivated by racial animus . . . that '[t]hroughout the duration of the parties' contractual relationship, GEICO intentionally, and willfully provided Plaintiff discriminatory premium rates' [], that 'GEICO retaliated by intentional termination of the contractual relationship on May 31, 2017 . . . [and] aggregate effect of GEICO's acts . . . based and motivated by racial animus . . . placed him in a dissimilar circumstances [sic] with persons of a different race—Caucasians; whom GEICO would never have treated similarly.' "), report and recommendation adopted, No. 18-CV-113 (SRN/ECW), 2019 WL 1058251 (D. Minn. Mar. 5, 2019), aff'd, 784 F. App'x 978 (8th Cir. 2019).

Here, there is only an allegation that some Defendants sought to contract with FFC as to Granite Park instead of CVCSF.  There is no allegation that, for example, FFC attempted to renegotiate a contract, or was in an ongoing contractual dispute with the City and the City treated FFC differently from the Plaintiffs, which was apparently the root of the alleged discrimination and retaliation.  Similarly, Plaintiffs general allegations that no other majority race developers were subject to similar treatment is not sufficient.  See Takieh, 2022 WL 474170, at *2 ("[T]he non-Arab physicians were not 'similarly situated' to Dr. Sharifi [as] [s]pecifically, none of these physicians generated patient care issues, altered medical records, *and* exhibited disruptive behavior.").  Thus, the allegations regarding disparate treatment as compared to FFC or other developers, fail to demonstrate that race was a but-for cause of the actions Plaintiffs complain, see id., and concludes there are insufficient factual allegations regarding comparators to establish any plausible basis that FFC or other developers were similarly situated in all material respects or for believing that race was the determining factor for any of the City Defendants' actions that can be imputed to the City of Fresno to establish but-for causation in the face of the allegations as a whole.[12]  Body by Cook, 869 F.3d at 384; Ent. Studios Networks, 2021 WL 6618469, at *2

---

[12]  In this regard, while the City is the sole remaining Defendant as to this cause of action, Defendants emphasize, many of the allegations against the individual City Defendants were based on information and belief.  This carries some weight, as the Court summarized numerous allegations that were alleged on information and belief as to certain Defendants.  Given the lack of direct racial discriminatory allegations on behalf of any individuals, the above allegations that indicate the City was willing to work and contract with Frazier on the development, as well as the judicially noticed documents indicating the City worked with him on other ventures, the allegations based on information and belief do tend to diminish finding it plausible that race was the but-for cause.  See Solis v. City of

1   (where plaintiffs alleged defendant contracted with "similarly situated, white-owned networks,"

2   and "[i]n particular . . . allege[d] that 'ESN Lifestyle Networks target similar audiences as the

3   white-owned networks that McDonald's contracts with for advertising.[,]' " the court held there

4   were "few details regarding the comparator networks," and that "plaintiffs' allegations lack the

5   specificity necessary to establish that the comparator networks are similarly situated."); <u>Benton</u>,

6   2015 WL 2380745, at *6 ("Plaintiffs do not allege a pattern of discrimination, actions indicating

7   bias, or other facts that would support an inference that Primecare intentionally discriminated

8   against Benton on the basis of his race.").

9       For all of the above reasons, the Court recommends Defendants' motion to dismiss the

10  second cause of action be granted.  The Court recommends granting leave to amend only to the

11  extent Plaintiffs believe in good faith they can plead additional factual material that could satisfy

12  the legal standards and deficiencies identified above.  <u>See</u> Fed. R. Civ. P. 15(a)(2) <u>Lopez</u>, 203

13  F.3d at 1130.

14  / / /

15  / / /

16

---

17  <u>Fresno</u>, No. 1:11-CV-00053 AWI, 2012 WL 868681, at *9 (E.D. Cal. Mar. 13, 2012) ("Alleging on information and
    belief that other unnamed individuals filed complaints in identical situations and received, in essence, opposite
18  treatment, is not enough to state a plausible claim for relief under a 'class of one' Equal Protection theory[;]
    Plaintiffs' SAC does not identify sufficient facts to determine whether the unnamed individuals were prima facie
19  identical to Plaintiff in all relevant respects [an] [a]s noted in the Court's two prior orders, Plaintiff again does not
    allege a specific instance in which a similarly situated person was treated differently by Officer Fries and Detective
20  Gomez." (citing <u>King v. New York State Div. of Parole</u>, 260 Fed. Appx. 375, 379–80 (2d Cir.2008) (concluding that
    because plaintiff "failed to identify a single individual with whom he can be compared for Equal Protection
21  purposes," his class of one equal protection claim was properly decided))).

22  Finally, Defendants direct the Court to out of circuit decisions that have expressed reservations regarding the use of
    comparator evidence, especially when a plaintiff is using a "class of one" theory.  Plaintiffs have not provided a
23  direct response in opposition to the "class of one" argument, and the Court agrees that the Plaintiffs' allegations do
    not support a "class of one" theory.  <u>See</u> <u>Lauth v. McCollum</u>, 424 F.3d 631, 632–33 (7th Cir. 2005) ("The reason the
24  case has gotten as far as it has is the uncertainty that attends 'class of one' equal protection cases . . . cases in which
    the plaintiff does not claim to be a member of a class that the defendant discriminates against, but argues only that
25  he is being treated arbitrarily worse than some one or ones identically situated to him [however,] [i]f that is the law
    and any unexplained or unjustified disparity in treatment by public officials is therefore to be deemed a prima facie
26  denial of equal protection, endless vistas of federal liability are opened."); <u>Macone v. Town of Wakefield</u>, 277 F.3d
    1, 10 (1st Cir. 2002) ("If disgruntled permit applicants could create constitutional claims merely by alleging that
27  they were treated differently from a similarly situated applicant, the correctness of virtually any state permit denial
    would become subject to litigation in federal court." (quoting <u>Vill. of Belle Terre v. Boraas</u>, 416 U.S. 1, 12, 94 S.Ct.
28  1536, 39 L.Ed.2d 797 (1974) (Marshall, J., dissenting))).

**B.** **The Court Recommends Defendants' Motion to Dismiss the Breach of Contract Claim for Failure to Comply with the California Government Claims Act be Granted without Leave to Amend**

The fifth cause of action is for breach of contract brought by Plaintiff CVCSF against Defendant City of Fresno.  (SAC ¶¶ 100-104; see also ECF Nos. 70, 71.)  Defendants move to dismiss the claim arguing Plaintiffs failed to comply with the California Government Claims Act.

1.   General Legal Standards, Previous Order of Dismissal, and Primary Arguments

Under the California Government Claims Act ("GCA"),[13] "no suit for money or damages may be brought against a public entity on a cause of action for which a claim is required to be presented in accordance with Chapter 1 . . . until a written claim therefor has been presented to the public entity and has been acted upon by the board, or has been deemed to have been rejected."  Cal. Gov't Code § 945.4.

Defendants move to dismiss the breach of contract claim arguing Plaintiffs have ignored the Court's previous order of dismissal that dismissed the state law claims for failure to comply with the GCA, and instead try to rely on a subsequent government claim to support a breach of contract claim that was filed nearly 2 years after the initial complaint.  (Mot. 20.)  Defendants submit that even if the Court were to allow Plaintiffs to circumvent the prior order, the subsequent claim filed May 9, 2022, also fails to satisfy the GCA because it relies and attaches the FAC, but no claim for breach of contract was identified in the FAC.  Plaintiffs respond that much has happened since the Court's ruling, including additional actions that constitute breach of contract; argue the relevant facts were included in the government claim for damages, with identical paragraphs in the FAC, and the breach of contract claim is based on those actions which had not occurred at the time of the filing of the original complaint.  Plaintiffs argue the goal of the GCA is to give the government enough information to consider settlement of the matter, and

---

[13]  Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal., 730 F.3d 1111, 1124 (9th Cir. 2013) ("Consistent with the California Supreme Court, we 'adopt the practice of referring to the claims statutes as the Government Claims Act, to avoid the confusion engendered by the informal short title Tort Claims Act.' " (quoting City of Stockton v. Superior Court, 42 Cal.4th 730, 68 Cal.Rptr.3d 295, 171 P.3d 20, 23 (2007))); Shead v. Vang, No. 109CV00006AWISKOPC, 2015 WL 6082429, at *2 (E.D. Cal. Oct. 15, 2015) ("The Government Claims Act was formerly known as the California Tort Claims Act.").

1    is not dependent on legal theories.  Defendant replies each legal theory must be in GCA, and at a
2    minimum request no damages prior to May 9, 2021.

3            Pursuant to the GCA, the filing of a timely claim pursuant with the public entity is a
4    condition precedent to the filing of a lawsuit against a public entity or its employees.  Le Mere v.
5    L.A. Unified School Dist., 35 Cal.App. 5th 237, 246 (Cal. Ct. App. 2019) (GCA "establishes
6    certain conditions precedent to the filing of a lawsuit against a public entity . . . a plaintiff must
7    timely file a claim for money or damages with the public entity . . . [and] [t]he failure to do so
8    bars the plaintiff from bringing suit against that entity.") (internal citations omitted).  "Only after
9    the public entity's board has acted upon or is deemed to have rejected the claim may the injured
10   person bring a lawsuit alleging a cause of action in tort against the public entity."  Id. (internal
11   citations omitted); see also Mangold v. California Pub. Utilities Comm'n, 67 F.3d 1470, 1477
12   (9th Cir. 1995) ("The California Tort Claims Act requires, as a condition precedent to suit
13   against a public entity, the timely presentation of a written claim and the rejection of the claim in
14   whole or in part.") (internal citations and quotation marks omitted); State of California v.
15   Superior Court, 32 Cal. 4th 1234, 1243, 90 P.3d 116, 122 (2004) ("In light of this overwhelming
16   case law and history, we conclude that a plaintiff must allege facts demonstrating or excusing
17   compliance with the claim presentation requirement[,] [o]therwise, his complaint is subject to a
18   general demurrer for failure to state facts sufficient to constitute a cause of action."); Clarke v.
19   Upton, 703 F. Supp. 2d 1037, 1044 (E.D. Cal. 2010) ("The six month period set forth in Section
20   945.6(a)(1) is mandatory and strict compliance is required.").

21           "A suit for 'money or damages' includes all actions where the plaintiff is seeking
22   monetary relief, regardless whether the action is founded in 'tort, contract or some other theory.'
23   " Hart v. Alameda County, 76 Cal. App. 4th 766, 778 (1999) (citation omitted); see also City of
24   Stockton, 42 Cal. 4th at 738 ("Contract claims fall within the plain meaning of the requirement
25   that 'all claims for money or damages' be presented to a local public entity.").

26           Plaintiffs do not appear to dispute the factual proffer by Defendant, and the description of
27   the exhibits contained in their request for judicial notice of the documents pertaining to
28   Plaintiffs' GCA claims submitted in 2019 and 2022.  Turning to those documents, as Defendants

note, in the original GCA claim in 2019, the submission specifically indicated that it was seeking "contract damages including breach of the covenant of good faith and fair dealing." (See RJN, Exs. Q & R, ECF No. 62-2 at 117-120.) The Court notes that the factual allegations contained in these filings are slim, mainly referencing the release of the audit report as the breach, and does not for example, reference the allegations pertaining to best efforts to obtain purple water for Granite Park. (Id.)

In the previous order of dismissal dated April 15, 2022, generally as to all state law claims, Judge Drozd found such claims barred by the statute of limitations for failure to comply with the GCA, and granted leave to amend under certain parameters:

> The exhibits submitted by defendant City of Fresno reflect that the City of Fresno's rejection letter was placed in the mail on August 15, 2019. (Doc. No. 6-2, Exh. I, at 41.) Therefore, the six-month time period was triggered on that date and plaintiff CVCSF's state law claims submitted as part of the complaint filed in this court on July 31, 2020 are untimely. (See Doc. No. 1.)

> The court will therefore dismiss plaintiff CVCSF's fourth and fifth causes of action. The court will, however, grant plaintiffs leave to amend in this regard if they can, in good faith, allege facts demonstrating that waiver, estoppel, or a tolling period applies to the six-month filing deadline here. Julian v. City of San Diego, 183 Cal. App. 3d, 176 (1986) ("Failure to commence an action within the prescribed period constitutes a valid ground for dismissal, absent waiver, estoppel, or a tolling period.").

(ECF No. 24 at 22-24 (footnote omitted).) The fourth and fifth causes of action in the initial complaint were for breach of contract, and breach of the covenant of good faith and fair dealing.

Following the Court's dismissal of the breach of contract claim, Plaintiffs submitted the May 9, 2022, GCA claim. The 2022 GCA claim attached the FAC, which only alleged two causes of action under Section 1983. (See RJN, Ex. T, ECF No. 62-2 at 124-229.) The 2022 GCA claim form does not contain any specific facts or claims, instead directing to "see the attached federal complaint filed on 5-6-2022 – Factual Allegations section," and where asked to describe the injury or damages, again refers to the complaint, but instead states "Damages alleged therein," rather than referring to the factual allegation section. (Id. at 125.) Thus, Defendants submit that the 2022 GCA claim does not reference any "contract damages," a date

of breach, or indicate Plaintiff is pursuing a claim for breach of contract.  Defendants further emphasize that the 2022 GCA claim does not assert any of the charging allegations for breach of contract that were in the complaint (Compl. ¶¶ 68-71) or SAC (SAC ¶¶ 101-104).

Defendants correctly emphasize that in the previously filed FAC, Plaintiffs made no attempt to replead the breach of contract claim.  (See FAC, ECF No. 27.)  The FAC filed on May 9, 2022, only contained causes of action for: (1) First Amendment Retaliation; and (2) discriminatory denial of contract and equal protection rights.  (FAC ¶¶ 63-79, ECF No. 27 at 24-29.)

Defendants direct the Court to paragraphs 68-71 of the initial complaint.[14]  Plaintiff's initial breach of contract cause of action alleged as follows:

> 67.  Plaintiffs incorporate the foregoing paragraphs as if set forth herein.
>
> 68.  CVCSF and the City of Fresno were parties to two related contracts, the Ground Lease and the Service Agreement, as described above and as attached in Exhibits A and B.
>
> 69.  CVCSF complied with its contractual obligations and duties, and none of the City of Fresno's contractual obligations or duties were excused.
>
> 70.  The City of Fresno, acting through its employees and agents who are named herein as individual and fictitious defendants, breached its contractual obligations and duties in all of the following ways: (a) it did not make good faith efforts to provide purple water to the Granite Park project, which as a result increased CVCSF's operating costs substantially; (b) it did not make good faith efforts to participate in recreational programming at Granite Park, which resulted in lower revenue for CVCSF; (c) it did not make a good faith effort to cooperate in the process of allowing revenue-producing billboards and signage on the Granite Park site; and (d) it did not abide in good faith with the lengthy terms of the agreements and instead actively sought to break them in favor of entering into a competing arrangement with FFC, which impaired CVCSF's quiet enjoyment.
>
> 71.  As a result of the City of Fresno's contractual breached, CVCSF was damaged, and the City of Fresno's misconduct was a substantial factor in causing its harm. CVCSF invested well over $2,000,000 in the Granite Park project, but nonetheless had its contractual expectations and benefits frustrated and undermined by

---

[14]  While Defendants did not include paragraph 67, the Court does, as it considers the incorporation of the previous factual allegations in the complaint where relevant.

the City of Fresno.

(Compl. ¶¶ 67-71, ECF No. 1 at 19-20.)

Defendants argue the Court previously granted Defendants' motion to dismiss the above claim as time-barred, granting twenty-one (21) days to amend; the FAC did not contain a breach of contract claim; and the SAC was filed approximately 10 months after the initial dismissal. Therefore, Defendants contend the exact same allegations that were previously dismissed are incorporated into the SAC.   (Compare Compl. ¶¶ 12-39, with SAC ¶¶ 18-44.)   Defendants further emphasize that the charging allegations are also essentially identical (Compl. ¶¶ 68-71, SAC ¶¶ 101-104), noting the only difference is by adding certain language to ¶ 103 " . . . and by continually seeking to obtain CVCSF's default . . ."  (SAC ¶ 103.)

Defendants are largely correct, however, the variances are slightly different than described, in that the word "competing" is changed to "conflicting" and in the manner of stating what is essentially the same substantive content.  Specifically, the initial portion in the complaint read: ". . . .and (d) it did not abide in good faith with the lengthy terms of the agreements and instead actively sought to break them in favor of entering into a competing arrangement with FFC, which impaired CVCSF's quiet enjoyment."  (Compl. ¶ 70, ECF No. 1 at 20.)  The SAC reads: ". . . and (d) it did not abide in good faith with the lengthy terms of the agreements and instead actively sought to break them, including by attempting to enter into a conflicting arrangement with FFC and by continually seeking to obtain CVCSF's default, which has impaired CVCSF's quiet enjoyment."  (SAC ¶ 103, ECF No. 6 at 33.)

In response, Plaintiffs emphasize the following allegations in the SAC that demonstrate additional actions that constitute breach of contract:

> 50.   In February and March of 2021, the City of Fresno withheld $44,498.56 in funds that were payable to CVCSF, which were needed to pay PG&E bills for Granite Park. The stated reason for this withholding was baseless and resulted in a notice of lease default being submitted by CVCSF on March 5, 2021. This notice only resulted in further discrimination and retaliation against Mr. Frazier and CVCSF. Plaintiffs are informed and believe this inaction was at the direction of defendants Mayor Dyer, Former City Manager Esqueda, and/or Former Chief of Staff Orman, on behalf of and as policy makers for the City of Fresno.

1

2

3

4

5

6

7

> 55.   Beginning in approximately the fall of 2021, officials from the City of Fresno began working to encourage CVCSF's lenders to issue notices of default as to loans related to Granite Park, so that it could in turn find that CVCSF defaulted on the Ground Lease. Plaintiffs are informed and believe that these efforts are ongoing, and that the City of Fresno has actively sought to enlist other parties to assume CVCSF's debt and replace it as the tenant of Granite Park. Plaintiffs are informed and believe these actions were at the direction of defendants Mayor Dyer, Former City Manager Esqueda, Former Chief of Staff Orman, Councilman Bredefeld, and Councilman Karbassi, on behalf of and as policy makers for the City of Fresno.

8

9

10

11

12

(SAC ¶¶ 50, 55.)  The Court notes that the text of SAC ¶ 50 appears verbatim in the text of FAC ¶ 49, and that the text of SAC ¶ 55 appears verbatim in the text of FAC 54.  Defendants reply that Plaintiffs ignore the breach of contract claim was previously dismissed and the exact same allegations are incorporated.  (Compare Compl. ¶ 1-2, 4-39, 50-71, with SAC ¶¶ 1-5, 8, 11, 12, 18-44, 64-80.)

13

2.    The Court finds the Legal Authority Weighs in Favor of Dismissal

14

15

16

17

18

19

20

21

Turning to the legal arguments, Defendants submit that a theory of recovery that is not included in a GCA claim may not thereafter be maintained, Fall River Joint Unified Sch. Dist. v. Superior Ct., 206 Cal. App. 3d 431, 434, 253 Cal. Rptr. 587 (Ct. App. 1988), and argue a cause of action for breach of contract was not reflected in the recent GCA claim, and additionally, the claim does not assert the required information, such as the date of the alleged breach, to satisfy GCA Section 910.  See Gong v. City of Rosemead, 226 Cal. App. 4th 363, 374, 171 Cal. Rptr. 3d 881, 889 (2014) ("It is well-settled that claims statutes must be satisfied even in [the] face of the public entity's actual knowledge of the circumstances surrounding the claim.").

22

23

24

25

Looking only to the face of the statute as relied on by Defendants, and not yet considering the issue here regarding the previous order of dismissal, it is not clear whether the information contained in the attached FAC would or would not satisfy the general standards stated therein:

26

27

28

> A claim shall be presented by the claimant or by a person acting on his or her behalf and shall show all of the following:
>
> (a) The name and post office address of the claimant.

(b) The post office address to which the person presenting the claim desires notices to be sent.

(c) The date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted.

(d) A general description of the indebtedness, obligation, injury, damage or loss incurred so far as it may be known at the time of presentation of the claim.

(e) The name or names of the public employee or employees causing the injury, damage, or loss, if known.

(f) The amount claimed if it totals less than ten thousand dollars ($10,000) as of the date of presentation of the claim, including the estimated amount of any prospective injury, damage, or loss, insofar as it may be known at the time of the presentation of the claim, together with the basis of computation of the amount claimed. If the amount claimed exceeds ten thousand dollars ($10,000), no dollar amount shall be included in the claim. However, it shall indicate whether the claim would be a limited civil case.

Cal. Gov't Code § 910.

Plaintiffs respond the purpose of the GCA is to provide the public entity sufficient information to enable it to adequately investigate claims and to settle them, if appropriate, without the expense of litigation, and a claim form need not specify every act or omission that allegedly caused the injury. This is an accurate description of some of the policy goals behind the law, as the Court describes below. Plaintiffs argue all that is required is that "the facts underlying each cause of action in the complaint must have been fairly reflected in a timely claim," so long as there is not a "complete shift in allegations" of the lawsuit. See Stockett v. Ass'n of Cal. Water Agencies Joint Powers Ins. Auth., 34 Cal. 4th 441, 446, 99 P.3d 500, 503 (2004). In Stockett, the Supreme Court of California explained this principle as applied to two wrongful termination theories:

The parties disagree as to whether Stockett's tort claim provided JPIA with sufficient notice of two wrongful termination theories Stockett asserted at trial: that he was fired for opposing Malone's conflict of interest, and that he was fired for exercising the right to free speech in his statements to Smart's. JPIA argues that Stockett's claim was insufficient under section 910, subdivision (c) to support the new theories. Stockett contends he is not precluded from raising additional reasons at trial for his termination because he was not required, in order to comply with section 910, to claim

> more than that JPIA's agents wrongfully terminated him, while giving the basic circumstances of that occurrence. We agree with Stockett that his claim was sufficient under the Tort Claims Act to give JPIA notice of all theories of wrongful termination.
>
> As noted above, section 945.4 requires each cause of action to be presented by a claim complying with section 910, while section 910, subdivision (c) requires the claimant to state the "date, place, and other circumstances of the occurrence or transaction which gave rise to the claim asserted." If the claim is rejected and the plaintiff ultimately files a complaint against the public entity, the facts underlying each cause of action in the complaint must have been fairly reflected in a timely claim. (*Nelson v. State of California* (1982) 139 Cal.App.3d 72, 79, 188 Cal.Rptr. 479.) "[E]ven if the claim were timely, the complaint is vulnerable to a demurrer if it alleges a factual basis for recovery which is not fairly reflected in the written claim." (*Ibid.*)
>
> The claim, however, need not specify each particular act or omission later proven to have caused the injury. (*Blair v. Superior Court, supra,* 218 Cal.App.3d at p. 225, 267 Cal.Rptr. 13.) A complaint's fuller exposition of the factual basis beyond that given in the claim is not fatal, so long as the complaint is not based on an "entirely different set of facts." (*Stevenson v. San Francisco Housing Authority* (1994) 24 Cal.App.4th 269, 278, 29 Cal.Rptr.2d 398.) Only where there has been a "complete shift in allegations, usually involving an effort to premise civil liability on acts or omissions committed at different times or by different persons than those described in the claim," have courts generally found the complaint barred. (*Blair v. Superior Court, supra,* at p. 226, 267 Cal.Rptr. 13.) Where the complaint merely elaborates or adds further detail to a claim, but is predicated on the same fundamental actions or failures to act by the defendants, courts have generally found the claim fairly reflects the facts pled in the complaint. (*White v. Superior Court* (1990) 225 Cal.App.3d 1505, 1510–1511, 275 Cal.Rptr. 706.)

*Stockett*, 34 Cal. 4th at 447.  Thus, the Supreme Court of California first appeared to distinguish between Section 945.4 as to causes of action, and Section 910 as to the facts provided underlying each cause of action.  Earlier in the decision, the Supreme Court of California also explained the interplay between the provisions: "Government Code section 945.4 provides that 'no suit for money or damages may be brought against a public entity on a cause of action for which a claim is required to be presented in accordance with ... Section 910 ... until a written claim therefore has been presented to the public entity and has been acted upon by the board, or has been deemed to have been rejected by the board[,]' " while "Section 910, in turn, requires that the claim state the 'date, place, and other circumstances of the occurrence or transaction which gave

1  rise to the claim asserted' and provide '[a] general description of the ... injury, damage or loss

2  incurred so far as it may be known at the time of presentation of the claim.' " Stockett, 34 Cal.

3  4th at 445 (footnote omitted) (alterations in original).

4  The main takeaway appears to be that a claimant's GCA claim will be sufficient if only

5  adding elaborative or further facts to a cause of action that was already sufficiently described.

6  Significantly, the Supreme Court of California appears to distinguish between notice of a "cause

7  of action" and providing sufficient factual details of that cause of action, as the Court

8  "conclude[ed] the claimant is not barred from asserting additional wrongful dismissal theories in

9  his complaint where, as here, the notice of claim informs the public entity of the employment

10  termination cause of action giving rise to the claim **and** provides sufficient detail for

11  investigation by the public entity." Id. at 443 (emphasis added); see also id. at 446 ("We agree

12  with Stockett that his claim was sufficient under the Tort Claims Act to give JPIA notice of all

13  theories of wrongful termination."). Thus, the court considered there to be a distinction between

14  "wrongful dismissal theories" supporting the underlying cause of action, in that the theories of

15  liability supported the wrongful termination cause of action.

16  In that regard, both parties cite to Fall River and the standard described in there.

17  Plaintiffs describe the case in the following manner:

18
19
20
21
22
23

> As California courts have made clear, the legal theories in the
> subsequent lawsuit must be based on the *facts described* in the
> claim for damages presented to the public entity, but the causes of
> action later pled need not itself be specified in the claim. "[I]f the
> plaintiff relies on more than one theory of recovery against the
> governmental agency, *each theory must be reflected in the facts*
> described in the claim. (*Fall River Joint Unified School Dist. v.
> Superior Court*, 434 (1988) (The factual circumstances set forth in
> the written claim must correspond with the facts alleged in the
> complaint and ultimately submitted to the jury).

24  (Opp'n 23-24 (emphasis in original).) The Court attempted to search a case that stated the

25  italicized proposition and could not. There is no ending quotation mark in the Plaintiffs'

26  opposition brief. Thus it appears the quotation may have been altered by Plaintiffs in error,

27  perhaps as a result of an unfinished development of an argument in relation to the actual

28  verbatim quote. To be clear, the full quote from Fall River reads as follows:

> Furthermore, "If a plaintiff relies on more than one theory of recovery against the [governmental agency], each cause of action must have been reflected in a timely claim. In addition, the factual circumstances set forth in the written claim must correspond with the facts alleged in the complaint; even if the claim were timely, the complaint is vulnerable to a demurrer [or motion for judgment on the pleadings] if it alleges a factual basis for recovery which is not fairly reflected in the written claim.' (*Nelson v. State of California* (1982) 139 Cal.App.3d 72, 79 [188 Cal.Rptr. 479].

Fall River, 206 Cal. App. 3d at 434. Therefore, significantly, the Fall River court utilized the term "cause of action," not theory, as Plaintiffs briefing suggests. The quotation as contained in Nelson is, aside from slight alterations, accurately contained in Fall River. See Nelson v. State of California, 139 Cal. App. 3d 72, 79, 188 Cal. Rptr. 479 (Ct. App. 1982); see also Gong, 226 Cal. App. 4th at 376 (noting each cause of action must be reflected in a timely claim, and that in "addition, the factual circumstances set forth in the written claim must correspond with the facts." (quoting Watson v. State of California, 21 Cal. App. 4th 836, 842, 26 Cal. Rptr. 2d 262 (1993))).

Nonetheless, the Court considers whether Fall River may indeed be using the term "theories" differently from the manner used in Stockett, as perhaps Plaintiffs were in the midst of altering the quotation or addressing the fact the Fall River court may be interpreted as conflating theory with cause of action. For the reasons below, the weight of authority, and multiple practical and policy reasons as applied to the particular circumstances of this case, counsel the Court to find Plaintiffs should not be able to reassert their breach of contract claim here in their SAC, and to recommend Defendants' motion to dismiss be granted.

Looking to the language used in Fall River and Nelson, it is significant the courts first explain that if a plaintiff relies on more than one theory of recovery, each cause of action must have been reflected in a timely claim; and *additionally*, the factual circumstances set forth in the written claim must correspond with the facts alleged in the complaint. See Fall River, 206 Cal. App. 3d at 434 ("*In addition*, the factual circumstances set forth in the written claim must correspond with the facts alleged in the complaint." (emphasis added) (quoting Nelson, 139 Cal. App. 3d at 79)). The Court finds a "theory of recovery" is not necessarily a "cause of action,"

1    and different than a "factual basis of recovery," as supported by the holding by the California

2    Supreme Court in <u>Stockett</u>, and as held by district courts citing <u>Fall River</u> and <u>Nelson</u>, including

3    in this district.  <u>See</u> <u>Stockett</u>, 34 Cal. 4th at 446 ("[H]is claim was sufficient . . . to give JPIA

4    notice of all theories of wrongful termination."); <u>Jadwin v. Cnty. of Kern</u>, No. 1:07CV00026-

5    OWWDLB, 2009 WL 926844, at *11 (E.D. Cal. Apr. 3, 2009) ("Not only must 'each cause of

6    action'—as that term is used in California jurisprudence—be reflected in a timely claim, 'the

7    factual circumstances set forth in the written claim must correspond with the facts alleged in the

8    complaint.' " (quoting <u>Nelson</u>, 139 Cal.App.3d at 79)); <u>Tillery v. Lollis</u>, No. 1:14-CV-02025-

9    KJM-BAM, 2015 WL 4873111, at *8 (E.D. Cal. Aug. 13, 2015) ("The additional allegations

10   here do not plead an 'entirely different' set of **facts**, nor do they present a different **cause of**

11   **action**, shift liability, or allow for **recovery** not already noticed in the letter." (quoting <u>Fall</u>

12   <u>River</u>, 206 Cal. App. 3d at 435) (emphasis added)); <u>Fisher v. Cnty. of San Bernardino</u>, No.

13   EDCV1800700JGBKKX, 2018 WL 7508481, at *5 (C.D. Cal. July 27, 2018) (where plaintiff

14   "essentially argue[d] that because he put Defendants on notice of a false arrest claim, he

15   automatically put Defendants on notice of assault and battery," finding no authority for that

16   proposition, and holding because "[t]he elements of false arrest are different from the elements

17   of battery and assault[,] Plaintiff must clearly assert each cause of action in the claim." (citing

18   <u>Jadwin</u>, 2009 WL 926844, at * 8)).

19          While the terms  "theory of recovery" or "cause of action," could be argued to have been

20   somewhat conflated in some manner, it appears that like wrongful termination in <u>Stockett</u>,

21   breach of contract is generally its own cause of action, not a different theory of recovery for a

22   different cause of action.  "Under California law, the violation of a 'primary right' gives rise to

23   only *one* cause of action, but potentially several different theories of recovery."  <u>Jadwin</u>, 2009

24   WL 926844, at *30-31 (emphasis in original); <u>Goins v. Cnty. of Merced</u>, No. 1:13-CV-01245

25   AWI SKO, 2014 WL 3362254, at *7 (E.D. Cal. July 9, 2014) (same).  "Different theories of

26   recovery are not separate primary rights."  <u>Goins</u>, 2014 WL 3362254, at *7 ("The primary right

27   protected by FEHA is the right to be free from invidious discrimination and from retaliation for

28   opposing discrimination." (citing <u>Manufactured Home Communities, Inc. v. City of San</u>

1  Jose, 420 F.3d 1022, 1032 (9th Cir. 2005))).

2      As the Supreme Court of California explained, the primary right is indivisible into

3  multiple causes of action, and is distinct from a "legal theory," or a "remedy":

4          The primary right theory is a theory of code pleading that has long
           been followed in California. It provides that a "cause of action" is
5          comprised of a "primary right" of the plaintiff, a corresponding
           "primary duty" of the defendant, and a wrongful act by the
6          defendant constituting a breach of that duty. (*McKee v. Doud*
           (1908) 152 Cal. 637, 641 [93 P. 854].) The most salient
7          characteristic of a primary right is that it is indivisible: the
           violation of a single primary right gives rise to but a single cause
8          of action. (*Slater v. Blackwood* (1975) 15 Cal.3d 791, 795 [126
           Cal.Rptr. 225, 543 P.2d 593].) A pleading that states the violation
9          of one primary right in two causes of action contravenes the rule
           against "splitting" a cause of action. (*Wulfjen v. Dolton* (1944) 24
10         Cal.2d 891, 894-895 [151 P.2d 846].)

11         As far as its content is concerned, the primary right is simply the
           plaintiff's right to be free from the particular injury suffered.
12         (*Slater v. Blackwood*, *supra*, 15 Cal.3d 791, 795.) It must therefore
           be distinguished from the *legal theory* on which liability for that
13         injury is premised: "Even where there are multiple legal theories
           upon which recovery might be predicated, one injury gives rise to
14         only one claim for relief." (*Ibid.*) The primary right must also be
           distinguished from the *remedy* sought: "The violation of one
15         primary right constitutes a single cause of action, though it may
           entitle the injured party to many forms of relief, and the relief is
16         not to be confounded with the cause of action, one not being
           determinative of the other." (*Wulfjen v. Dolton*, *supra*, 24 Cal.2d
17         891, 895-896, italics deleted.)

18  Crowley v. Katleman, 8 Cal. 4th 666, 681–82, 881 P.2d 1083 (1994); see also Jadwin, 2009 WL

19  926844, at *11 ("Alleging 'additional motivations and reasons for [a] single action of wrongful

20  termination' adds legal theories to a complaint, not causes of action . . . [t]he primary right

21  asserted in Stockett was to be free from wrongful termination of employment in violation of

22  public policy." (quoting Stockett, 34 Cal.4th at 448)).

23      The Court notes the dissent in Crowley averred that within the primary right of a

24  wrongful termination suit (the cause of action in Stockett), different theories of breach of

25  contract may be different legal theories for that primary right.  See Crowley, 8 Cal. 4th at 698

26  (Arabian, J., dissenting) ("[I]n framing the complaint in a civil case, counsel often may be

27  uncertain which *theory* of liability has the best chance of succeeding as the lawsuit unfolds; the

28  plaintiff in, say, a wrongful termination of employment suit might allege multiple alternative

1    theories of relief—rescission, breach of a written contract, breach of an oral contract, breach of

2    an implied-in-fact contract, and wrongful termination in violation of public policy—as

3    supporting the vindication of a single right.").  Similarly, the Ninth Circuit in an unpublished

4    opinion found that, for purposes of res judicata, that the plaintiff's "breach of contract and civil

5    rights claims concern the same primary right as the unlawful detainer action MCCDC had filed

6    against Ann." Ann v. Tindle, 321 F. App'x 619, 619–20 (9th Cir. 2009) (citing Fed'n of Hillside

7    & Canyon Assns. v. City of Los Angeles, 126 Cal. App. 4th 1180, 24 Cal. Rptr. 3d 543, 557

8    (2004)).  The Ninth Circuit found "Ann's claims concern the same primary rights decided in the

9    unlawful detainer action: her rights to the apartment [and] [that] [b]ringing civil rights and

10   breach of contract claims involves pleading a different theory of recovery, but addresses the

11   same injury." 321 F. App'x at 619–20; United States ex rel. Hyatt v. Mirza, No. 2:17-CV-2125

12   KJM-KJN, 2018 WL 6653319, at *5 (E.D. Cal. Dec. 19, 2018) ("Hyatt's retaliatory eviction

13   claim under California Civil Code § 1942.5 ("Count VI") is also barred by res judicata, because

14   it also arises from the same primary right that was adjudicated in the unlawful detainer action:

15   Ms. Hyatt's rights to the apartment." (citing Ann v. Tindle, 321 F. App'x at 619–20));

16   Balasubramanian v. San Diego Cmty. Coll. Dist., 80 Cal. App. 4th 977, 992, 95 Cal. Rptr. 2d

17   837 (2000) ("The determinative factor in applying the primary right theory was the harm

18   Balasubramanian suffered . . . [a]lthough her theory in federal court was discrimination and her

19   theory in state court was breach of contract, both actions involved the primary right to be

20   employed by District.").

21          However, the Court finds that breach of contract can, and is *generally*, considered its own

22   cause of action.  Under the primary right analysis, the Supreme Court of California has found a

23   breach of contract can constitute the violation of a primary right.  See Mycogen Corp. v.

24   Monsanto Co., 28 Cal. 4th 888, 906, 51 P.3d 297, 308 (2002) ("We conclude that both Mycogen

25   I and Mycogen II were based on the violation of the same primary right, Monsanto's breach of

26   contract."); see also Abbott v. 76 Land & Water Co., 161 Cal. 42, 47–48, 118 P. 425, 427–28

27   (1911) ("This is the necessary result of the application of the well-settled principle that an entire

28   claim, arising either upon a contract or from a wrong, cannot be divided and made the subject of

several suits."); <u>Fed'n of Hillside</u>, 126 Cal. App. 4th at 1203 ("[T]he California Supreme Court in [<u>Mycogen</u>] held that a breach of contract gives rise to a single cause of action, all of the remedies for which must be sought in a single action, even if a particular item of damage has not yet been sustained."); <u>Fujifilm Corp. v. Yang</u>, 223 Cal. App. 4th 326, 332, 167 Cal. Rptr. 3d 241, 245 (2014) ("[B]ecause breaching a contract inflicts harm on a legally protected interest different from tortious conduct that renders uncollectable a judgment arising from the breach of contract, two different primary rights arise.").

Plaintiffs argue the facts set forth in the SAC either occurred or continued after the dismissal of the Plaintiff's prior breach of contract claim, and all those facts were included in the Plaintiffs' May 2022 claim for damages that preceded the filing of the SAC.  Plaintiffs provide no caselaw relating to the GCA, amending a complaint or a GCA claim, nor even caselaw relating to the GCA and breach of contract generally.  In <u>Mycogen</u>, the court's discussion regarding ongoing breach and continuing breach has some relevance to the Plaintiffs' arguments. <u>See Mycogen</u>, 28 Cal. 4th at 905 ("It is well established that a judgment in an action for breach of contract bars a subsequent action for additional relief **based on the same breach**.") (emphasis added); <u>see also Fed'n of Hillside</u>, 126 Cal. App. 4th at 1203 ("The [Mycogen] court held that the plaintiff's primary right was the right to be free from all of the injuries arising from a particular breach of contract, and distinguished cases where separate and distinct contract covenants were breached at different times.").

Thus, a different contractual breach, even if the same contract between the same parties, *can* be a separate injury or primary right, and as discussed below, if Plaintiffs properly presented the first GCA claim and the claim was not previously dismissed, or if Plaintiffs properly presented the second GCA claim, Plaintiffs would have likely been able to amend the complaint here to allege continuing or further breach, or been within their rights to file a different lawsuit, as indicated by the fact the above cases relate to res judicata.  However, based on the caselaw discussed above, and for additional reasons explained below, even if the underlying facts were presented in the second GCA claim, the FAC attached to the GCA did not contain a breach of contract claim, and the Court finds that weighs against finding Plaintiffs have the right to bring

1  the subsequent breach of contract claim under the circumstances present in *this case*.

2  Given the previous dismissal of the breach of contract claim in the initial complaint based

3  on the first GCA claim, and given the second GCA claim only attached the FAC which did not

4  contain a breach of contract cause of action, attempting to restate a breach of contract cause of

5  action in the SAC, even if based on some factual allegations alleged to have occurred after the

6  filing of the initial complaint and contained in the FAC, is improper and the failure to comply

7  with the GCA in the first instance is not cured through the later amended complaint.  See Harvey

8  v. City of S. Lake Tahoe, No. CIV S-10-1653 KJM, 2011 WL 3501687, at *9 (E.D. Cal. Aug. 9,

9  2011) ("Though plaintiff subsequently filed a first amended complaint on September 20, 2010,

10  well after the date he argues he filed a claim with the police department, his cause of action

11  would not have accrued until *after* filing the original complaint in this case [and] Plaintiff may

12  not recover from this defect in later pleadings."); Olson v. Palm Drive Hosp., No. C-11-4606

13  MMC, 2012 WL 440559, at *3 (N.D. Cal. Feb. 10, 2012) ("Such legislative intent [as explained

14  by the Supreme Court of California] to limit a government entity's waiver of sovereign immunity

15  to 'rigidly delineated circumstances,' as reflected in the Legislature's provision for a limited

16  number of statutory exceptions to the claim presentation requirement . . . counsels against

17  judicial recognition of non-statutory exceptions in the absence of a strong reason therefor."

18  (citing Williams v. Horvath, 16 Cal.3d 834, 838, 129 Cal.Rptr. 453, 548 P.2d 1125 (1976))).

19  The Court notes there is indeed a mechanism for amending a GCA claim.  See Janis v.

20  California State Lottery Com., 68 Cal. App. 4th 824, 833, 80 Cal. Rptr. 2d 549, 554 (1998).  In

21  Janis, plaintiff contended a "Section 8880.4 Claim [was] not a 'new' government claim" but

22  instead "an "Amended Government Claim" because it [was] factually related to the claims

23  contained in the original government claim [and] [thus] proper and timely because it relates back

24  to the original claim filed in June 1996, *before* Janis filed the civil action."  Id.  The court held

25  against plaintiff, finding that "[c]ontrary to Janis's contention, the Section 8880.4 Claim does not

26  qualify as an 'amended claim' under section 910.6" as "[t]he original government claim centered

27  on the allegation CSL deceived and misled the public by promoting an illegal game [an]

28  allegation [] unrelated to the claim CSL breached a duty to return 50 percent of Keno proceeds to

the public as prizes." Id.  The court held "Janis's Section 8880.4 Claim, stands alone." Id.  The court noted it "involves factual **and** legal issues separate and independent of the original claims and thus it does not constitute an amended claim." Id. (emphasis added).

The provision applies to amendments before a decision on the claim is made, and additionally the amendment must relate to the same transaction or occurrence that gave rise to the original claim:

> (a) A claim may be amended at any time before the expiration of the period designated in Section 911.2 or before final action thereon is taken by the board, whichever is later, if the claim as amended relates to the same transaction or occurrence which gave rise to the original claim. The amendment shall be considered a part of the original claim for all purposes.
>
> (b) A failure or refusal to amend a claim, whether or not notice of insufficiency is given under Section 910.8, shall not constitute a defense to any action brought upon the cause of action for which the claim was presented if the court finds that the claim as presented complied substantially with Sections 910 and 910.2 or a form provided under Section 910.4.

Cal. Gov't Code § 910.6(a)-(b).  While not addressed by the parties, the requirements of the amendment mechanism appear to counsel against what Plaintiffs are attempting to do here.  If the later alleged breaches could be argued to flow from the same transaction or occurrence as the earlier breaches, Plaintiffs would have been required to amend before the expiration of the relevant time period, but even if they failed to do so, if the first GCA "complied substantially," the failure to amend as related to the same transaction or occurrence, would not be fatal.  Id. This caveat is similar to the holdings above allowing some factual variance as related to the same transaction or occurrence, that has been sufficiently described in the first instance under the GCA provisions.  However here, the first breach of contract cause of action was dismissed for failure to comply with the GCA in the first instance, and thus, if flowing from the same transaction or occurrence, the second GCA claim would not be proper to resurrect the claim under the particular circumstances here, given the failure to timely file a complaint after the first GCA claim rejection.  Additionally, if not related to the same transaction or occurrence, Plaintiffs would have been required to submit an additional GCA claim, and for the reasons explained herein, the Court finds it improper in this case, although it is not clear if Plaintiffs could have

1  filed a separate lawsuit.

2  The Court finds the discussion and holding in <u>Santa Ana Police Officers Association</u>,

3  which relied on <u>Jadwin</u> and <u>Harvey</u>, partially analogous, to the situation at hand.  <u>Santa Ana</u>

4  <u>Police Officers Ass'n v. City of Santa Ana</u>, No. SACV151280DOCDFMX, 2016 WL 11507032,

5  at *5–6 (C.D. Cal. Feb. 1, 2016), <u>rev'd and remanded,</u> 723 F. App'x 399 (9th Cir. 2018)

6  ("Plaintiffs-Appellants fail to allege that the written claim was 'acted upon' or 'deemed to have

7  been rejected' by the City . . . [h]owever, it is not clear that amendment would be futile.").  In the

8  case, "Plaintiffs filed the original Complaint in state court on January 22, 2014 – over a

9  year *prior* to the date they presented a claim to the City." <u>Id.</u> at *5.  Therefore, "Plaintiffs' claim

10  was not 'acted upon ... or ... deemed to have been rejected' by the public entity before the instant

11  litigation proceeded," and the city never had the "opportunity to 'investigate claims and to settle

12  them, if appropriate, without the expense of litigation.' " <u>Id.</u> (first quoting Cal. Gov't Code §

13  945.4, then quoting <u>Stockett</u>, 34 Cal. 4th at 446).  The court held "Plaintiffs' failure to submit a

14  timely claim prior to the initial Complaint cannot be cured by new claims added in amended

15  complaints." 2016 WL 11507032, at *6.

16  Practical and policy considerations sway the Court to Defendants' position, even though

17  in a different set of circumstances, it may have been proper for Plaintiffs to allege further

18  breaches or later breaches in an amended complaint, or to file the separate GCA claim based on

19  completely separate breaches and a subsequent different lawsuit.  <u>See</u> <u>Fed'n of Hillside</u>, 126 Cal.

20  App. 4th at 1202–03; <u>Mycogen</u>, 28 Cal. 4th at 907-908.  In this regard, in a general sense, the

21  Court asks: should a plaintiff that files a complaint for breach of contract, that then has such

22  cause of action dismissed for failure to timely bring the complaint based on the GCA claim filed

23  on such breach, be then later allowed in that *same* lawsuit, to submit another GCA claim,[15] and

24  allege a further breach of that same contract, and file an amended complaint resurrecting a

25  breach of contract claim based on the same contract, but alleged on later (or continuing)

26  breaches?  The Court finds the answer should be no.

27

28  [15]  Even assuming the breach of cause action was included in the second GCA claim, which here, the Court finds the cause of action was not, and provides additional grounds supporting dismissal.

On one hand in support of this practical answer, the Court generally considers that if allowed, a plaintiff in any breach of contract action that has, perhaps been before the court for months or years, may very well be likely to argue further breaches of such contract during the course of litigation.  In other words, given the parties are in litigation, performance of a still operative contract may commonly be difficult, as parties may feel they are justified in altering or withholding performance during the pendency of the action, and until disputes over terms or performance are no longer in dispute.

On the other hand this could perhaps support an incentive suggesting a defendant can continue to breach a contract, where as here a court has already found a breach of contract cause of action to be beyond the permissible time period under the GCA.  However, in this regard, the Court finds the strict policy rationales underlying the GCA, discussed above and below, provide the correct answer here, and weigh toward not allowing a claimant to do so.  Additionally, the Court considers that in such a case where there is an ongoing or later breach of contract, where the contract is the subject of a timely brought complaint based on a proper GCA filing, amendment of the complaint should be allowed, or some sort of continuing damages analysis would apply as flowing from the original breach.

Thus, rather than allowing an amended complaint resurrect a dismissed breach of contract claim based on a later GCA claim and later alleged breach (ignoring the arguments concerning whether the second claim included the breach of contract cause of action), it seems the more proper route would be for the plaintiff to file a separate lawsuit based on that second GCA claim, which if a separate and distinct breach and not simply flowing from the initial breach, would not be barred by res judicata.  See Fed'n of Hillside, 126 Cal. App. 4th at 1202–03; Mycogen, 28 Cal. 4th at 907-908.  Here, Plaintiffs took the steps to file another GCA claim, and thus presumably could have filed an additional lawsuit for breach of contract, and then, perhaps could have the cases related or consolidated.  However, the Court notes that could create its other issues in that the breach of contract claim, on its own, may need to be filed in state court.

Therefore, while the second musing *is* a concern, the Court finds the first carries greater weight, at least as to the particular circumstances here, and for all of the various considerations

discussed herein.  See Le Mere, 35 Cal. App. 5th at 247 ("In Murray plaintiff filed a timely pre-litigation claim which the public entity rejected; she then commenced legal action . . . was later permitted to amend her properly filed complaint to add post-complaint misconduct [but] [t]hat is not the situation here [as] [t]he public entity in Murray had the opportunity to settle Murray's claims without litigation; LAUSD never had that opportunity here." (citing Murray v. Oceanside Unified Sch. Dist., 79 Cal. App. 4th 1338, 1345, 95 Cal. Rptr. 2d 28 (2000))); Lopez v. S. Cal. Permanente Med. Grp., 115 Cal. App. 3d 673, 677, 171 Cal. Rptr. 527 (Ct. App. 1981) ("[T]he attempted amendment, proffered two and a half years after the filing of the only claim submitted and which sought to allege a cause of action not mentioned in that claim, was improper and that any further claim was barred as untimely.").

Having found based on its review of the applicable caselaw, as well as policy and related practical concerns as applied to the particular facts of this case, that Defendants' motion to dismiss should be granted, the Court now turns to the cases that Plaintiffs rely on, which also relate to practical concerns of the Court.  In this regard, the cases Plaintiff rely on appear to focus on torts.  The Court believes generally, in an action for a tort such as negligence, the event occurs once on a specific date such as an accident, or at least during a discrete period of time, such as relating to negligent medical care.  This has been recognized in the context of the GCA. See Doe 1 v. City of Murrieta, 102 Cal. App. 4th 899, 921, 126 Cal. Rptr. 2d 213 (2002) ("White involved tort, not contract liability [and] the court held that the tort causes of action and the governmental claims were predicated on the same fundamental facts[,] [however] [i]n contrast, here, plaintiffs' contract claims involved significant facts that were not mentioned in the government claim [and] [t]here was no mention of the charter agreement, that it had been breached, or the terms breached." (citing White v. Superior Ct., 225 Cal. App. 3d 1505, 275 Cal. Rptr. 706 (Ct. App. 1990))).

Plaintiffs cite Blair v. Superior Ct., 218 Cal. App. 3d 221, 223–24, 267 Cal. Rptr. 13, 15 (Ct. App. 1990).  In Stevenson, the court succinctly summarized how Blair involved an "example of an acceptable variance" related to a tort claim that occurred on one date, and the factual variance only involved a potential cause of the tort:

> An example of an acceptable variance is found in *Blair v. Superior Court* (1990) 218 Cal.App.3d 221 [267 Cal.Rptr. 13]. The court in that case described the complaint as one that did not represent a "complete shift in allegations." (*Id.*, at p. 226.) *Blair* concerned an automobile accident in which the driver lost control on an icy highway, left the road and collided with a tree. The claim against the Department of Transportation stated that the accident was caused by negligent maintenance and construction of the highway, as well as failure to apply sand to the highway. (*Id.*, at p. 223.) The complaint added allegations that there was no warning of the ice on the road, that there was no guard rail where the road crossed a stream, and that the slope of the road was such as to cause a car striking ice on the road to slide off into the trees. (*Id.*, at p. 224.) The court held that the plaintiff was not required to state the legal cause of the accident in the claim and that the allegations of the complaint were premised on the same foundation set forth in the claim. (*Id.*, at pp. 225-226.) The court stated that cases which found a fatal variance between the claim and the complaint involved a "complete shift in allegations, usually involving an effort to premise civil liability on acts or omissions committed at different times or by different persons than those described in the claim." (*Id.*, at p. 226.)

Stevenson v. San Francisco Hous. Auth., 24 Cal. App. 4th 269, 277–78, 29 Cal. Rptr. 2d 398 (1994) (citing Blair, 218 Cal. App. 3d at 223–226).[16]  In this regard, the Court finds the reference to "acts or omissions committed at different times or by different persons," is somewhat analogous to making a claim for a later breach of contract based on different acts or omissions at different times, or by different persons, such as the later-added City Defendants versus the originally named City-Defendants here.  Further, Blair relied on the second prong of Nelson, *i.e.* after the "[i]n addition" language.  Blair, 218 Cal. App. 3d at 223–24 ("When a civil action is brought following denial of a government tort claim 'the written claim must correspond with the facts alleged in the complaint; even if the claim were timely, the complaint is vulnerable to a demurrer if it alleges a factual basis for recovery which is not fairly reflected in the written claim.' " (quoting Nelson, 139 Cal.App.3d at 79)).  The Blair court did not rely on the prong of

---

[16]  The Court notes that the Stevenson court's opinion states at on point: "In other cases, courts have found that apparent differences between the complaint and the claim were merely the result of a plaintiff's addition of factual details *or additional causes of action* [and] [t]his type of variance is not fatal where the basic facts are set out in the claim." Stevenson, 24 Cal. App. 4th at 277.  Although this language in Stevenson pertaining to causes of action may support Plaintiffs' position, here, even if the Court were to accept an additional cause of action may be stated if the facts are in the complaint, the Court finds it improper to include the breach of contract claim because it was already dismissed for failure to comply with the GCA, *and* was omitted as a cause of action in the FAC attached to the second GCA claim.

1   the Nelson statement that reads: "If a plaintiff relies on more than one theory of recovery against

2   the State, each cause of action must have been reflected in a timely claim."   Nelson, 139 Cal.

3   App. 3d at 79.

4          Plaintiff's reliance on Perry does not sway the Court's analysis, as it only looked to

5   additional legal theories, or like Blair, the cause of the negligence claim.   See Perry v. City of

6   San Diego, 80 Cal. App. 2d 166, 168–69, 181 P.2d 98 (1947) ("Plaintiff argues that the claim is

7   sufficient in stating that the structure suddenly and without warning collapsed as negligence must

8   be implied in permitting the structure to get into such a dangerous and defective condition that

9   such an accident could have happened . . . [t]he claim must be held to be sufficient . . . [as] it

10  seems clear that California courts have taken a reasonably liberal view of the claim statutes.");

11  Blair, 218 Cal. App. 3d at 224–25 ("According to defendant, the sole theory of legal cause of the

12  accident asserted in the claim is the state's failure to prevent or remedy the accumulation of ice

13  on the highway . . . defendant argues, the allegations in the complaint relating to the lack of

14  guard rails, slope of the road, and failure to warn must be stricken as matter not asserted in the

15  claim. We disagree. We do not read the claim so narrowly, nor do we think the law requires that

16  the claim contain the degree of specificity defendant would have us enforce.").   Significantly, the

17  Blair court explained that "[w]hile an allegation as to the legal cause of an accident may be an

18  element of the tort which must be pled in a complaint, section 910 does not impose upon an

19  injured claimant an obligation to include it in the claim."   Blair, 218 Cal. App. 3d at 225.   Thus

20  here, Blair and Perry could perhaps be properly applied in Plaintiffs' favor if, for example, the

21  Plaintiffs simply omitted an element of the breach of contract claim or factual cause underlying

22  the alleged breach, rather than omitting the breach of contract claim as a whole, in that it was

23  omitted from the attached FAC in conjunction with the previous dismissal of the breach of

24  contract claim for failure to comply with the GCA.

25          To reiterate, the Court does not intend to hold what information concerning a breach of

26  contract claim must be contained in an initial GCA claim.   Nonetheless here, the Court finds in

27  favor of Defendants based on the weight of authority and the specific facts concerning the initial

28  dismissal, in relation to the second GCA claim submitted.   These circumstances particularly

1   counsel against finding the Plaintiffs' 2022 GCA claim permits the breach of contract cause of

2   action in the SAC.  Most significantly as to the policy and purposes underlying the GCA, with

3   the previous breach of contract claim dismissed, the Court is wholly skeptical how the

4   government could reasonably be put on notice of a breach of contract claim, even if based on a

5   new breach, when the FAC does not include such cause of action.  While in other circumstances,

6   the appropriate result may be more debatable, here, the absence of the claim in the attached FAC,

7   coupled with the previous dismissal, would lead the government not being on notice that Plaintiff

8   intended to then file a SAC that did contain a breach of contract cause of action.  See Doe 1, 102

9   Cal. App. 4th at 920–21 ("The claim requirement serves the important function of allowing the

10  public entity to investigate the claim and to settle meritorious lawsuits . . . [t]o these ends, a

11  claim filed in anticipation of litigation must set forth **all the legal and factual bases** that will be

12  asserted in any subsequent lawsuit . . . plaintiffs' government claims do not mention the charter

13  agreement or any contract breach [and thus] Plaintiffs' government claims cannot be construed

14  to include the breach of contract causes of action since they are insufficient to put defendants on

15  notice of such claims.") (emphasis added); Weil v. Raisin City Elementary Sch. Dist., No.

16  121CV00500AWIEPG, 2021 WL 4033271, at *11 (E.D. Cal. Sept. 3, 2021) ("[N]othing in the

17  complaint suggests that Weil *ever* presented a government claim to Defendants that was based on

18  the same breach of contract theory that is found in her pleaded cause of action.") (emphasis in

19  original); Jadwin, 2009 WL 926844, at *13 ("The breaching of KMC's bylaws, or the defaming

20  of Plaintiff's character, is different wrongful conduct than unlawfully retaliating against Plaintiff

21  for engaging in whistleblowing . . . []although a complaint can add further detail to a claim,

22  Plaintiff's Second Amended complaint asserts a basis for recovery that was not fairly described

23  in his Claim."); Stampfli v. Susanville Sanitary Dist., No. 220CV01566WBSDMC, 2021 WL

24  2457379, at *10 (E.D. Cal. June 16, 2021) ("As the court noted in Le Mere, '[f]iling a

25  government claim while simultaneously attempting to prosecute a cause of action based on that

26  claim... does not satisfy the purpose of the Government Claims Act.' " (quoting Le Mere, 35 Cal.

27  App. 5th at 248)); Harvey, , 2011 WL 3501687, at *9 ("Furthermore, even if plaintiff did present

28  claims to the police department on July 8, 2010, . . . he did so *after* the date on which he filed the

1   initial complaint in this action, June 29, 2010, [and] [t]hough plaintiff subsequently filed a first

2   amended complaint on September 20, 2010, well after the date he argues he filed a claim with

3   the police department, his cause of action would not have accrued until *after* filing the original

4   complaint in this case [and] Plaintiff may not recover from this defect in later pleadings.")

5   (emphasis in original).

6         Based on the above analysis, and the Plaintiffs' briefing and arguments presented at the

7   hearing, the Court finds amendment would be futile.   Accordingly, the Court recommends

8   granting Defendants' motion to dismiss the breach of contract cause of action without leave to

9   amend.

10        **C.     The Court Recommends Defendants' Motion to Dismiss the Bane Act Claim
                   be Granted with Leave to Amend**

11

12        In the SAC, Plaintiffs Frazier and CVCSF bring the third cause of action pursuant to the

13  Bane Act, California Civil Code § 52.1, against all Defendants.  (SAC ¶¶ 82-91.)

14        California Civil Code § 52.1 provides a cause of action for violations of constitutional

15  and statutory rights.  McFarland v. City of Clovis, 163 F. Supp. 3d 798, 806 (E.D. Cal. 2016)

16  (citing Rivera v. County of L.A., 745 F.3d 384, 393 (9th Cir.2014)).   "The essence of a § 52.1

17  claim is that 'the defendant, by the specified improper means (i.e., threats, intimidation or

18  coercion), tried to or did prevent the plaintiff from doing something he or she had the right to do

19  under the law or to force the plaintiff to do something that he or she was not required to do under

20  the law.' "  McFarland, 163 F. Supp. 3d at 806 (quoting Jones v. Kmart Corp., 17 Cal.4th 329,

21  334, 70 Cal.Rptr.2d 844, 949 P.2d 941 (1998); Shoyoye v. County of L.A., 203 Cal.App.4th 947,

22  955–56, 137 Cal.Rptr.3d 839 (2012)).   "Therefore, there are two distinct elements for a § 52.1

23  claim: (1) intentional interference or attempted interference with a state or federal constitutional

24  or legal right, and (2) the interference or attempted interference was by threats, intimidation or

25  coercion."   McFarland, 163 F. Supp. 3d at 806 (citing Allen v. City of Sacramento, 234

26  Cal.App.4th 41, 67, 183 Cal.Rptr.3d 654 (2015)).

27        Defendants move to dismiss the Bane Act claim arguing: (1) the claim as against the

28  originally named City Defendants is barred by the failure to comply with the California

Government Claims Act; (2) Plaintiff CVCSF does not have standing to maintain a Bane Act claim; and (3) Plaintiffs have not alleged sufficient facts to support a Bane Act claim against the City Defendants.  (Mot. 21-24.)  For the reasons explained below, the Court recommends the motion to dismiss be granted, and Plaintiffs' Bane Act claim be dismissed with leave to amend.

1.      The Government Claims Act

Defendants move to dismiss the Bane Act claim as against the originally named City Defendants as barred by the failure to comply with the California Government Claims Act.

The Court incorporates the legal standards from the preceding breach of contract section concerning the GCA.  Plaintiffs do not dispute the GCA applies to Bane Act claims, and the Court finds it does apply.  See Est. of McDaniel v. Cnty. of Kern, No. 115CV01320JAMJLT, 2015 WL 7282881, at *3 (E.D. Cal. Nov. 18, 2015) (dismissing Bane Act cause of action for failure to comply with GCA); Inman v. Anderson, 294 F. Supp. 3d 907, 925 (N.D. Cal. 2018) ("[B]ecause Plaintiff's FAC contains no indication that Plaintiff presented a written claim for damages to the County, Plaintiff's Bane Act cause of action against the County—insofar as it seeks damages—is barred by the Government Claims Act."); Harris v. Escamilla, 736 F. App'x 618, 621–22 (9th Cir. 2018) ("We nonetheless affirm the district court's dismissal of this claim because Harris has not alleged that he submitted an administrative claim before bringing this lawsuit, as required by the Government Claims Act . . . [and] [a]lthough the Bane Act claim was not originally dismissed for this reason, we may affirm on any basis supported by the record.").

Defendants argue the Bane Act claim against the originally named City Defendants is barred because Plaintiffs served the GCA claim against the original Defendants on July 3 and 17, 2019, obtained notice of rejection on August 15, 2019, and did not file the original lawsuit until July 31, 2020, over 11 months later.  Plaintiffs respond that for the same reasons set forth in the preceding section, Defendants' arguments concerning the GCA lack merit as the facts set forth in the SAC either occurred or continued after the dismissal of the prior state claims, and all those facts were included in the Plaintiffs' May 2022 claim for damages that preceded the filing of the SAC.  However, "Plaintiffs concede that Bane Acts claims alleged against *individual defendants* who acted and/or left the City prior to May 2021 are subject to dismissal as to those individual

1  defendants, but not as to the City of Fresno." (Opp'n 25 n.2.)  In reply, Defendants submit this

2  means, as reflected in the SAC, the originally named individual City Defendants: Lee Brand,

3  Wilma Quan, Jim Schaad, and Tim Orman, at Paragraphs 18-50 of the SAC.  (Reply 13.)

4  Defendants take issue with excluding the City of Fresno from this concession, arguing the same

5  reasoning applies to the City of Fresno.  (Id.)

6        For similar but not the same reasons as discussed in the preceding section, the Court finds

7  in favor of Defendants.  Given the Court's findings above as to the GCA caselaw pertaining to

8  alleging a cause of action within the submitted GCA, the Court considers there could be an

9  argument that the Bane Act claim altogether should be dismissed for failure to comply with the

10  GCA as the FAC attached to the 2022 GCA claim also did not include a Bane Act cause of

11  action, like the SAC did.  See, e.g., Jadwin, 2009 WL 926844, at *11; Nelson, 139 Cal.App.3d

12  at 79.  However, Defendants only argue that Plaintiffs' Bane Act claim against the originally

13  named City Defendants is barred.  (Mot. 21.)  Thus, the Court declines to further consider the

14  issue for such reason, and additionally because the Court's recommendation as to breach of

15  contract involved multiple overlapping legal, factual, policy, and practical considerations in

16  relation to the previous dismissal and practical notice to the City of Fresno, finding the breach of

17  contract claim was improperly *reasserted*.  The Bane Act claim was not initially asserted and

18  dismissed, and further is based on a claim of free speech retaliation, similar to the first cause of

19  action under Section 1983 for First Amendment Retaliation, which was alleged in the FAC.

20        The Court does agree with the Defendants that the same rationale that applies to the

21  originally named *individual* City Defendants, should be equally available to the City of Fresno,

22  at least as to the allegations that Plaintiffs concede are time-barred to as to the individual City

23  Defendants.  (See Opp'n 25 n.2 ("prior to May 2021").)  Accordingly the Court recommends

24  Plaintiffs' Bane Act claim as to Defendants Lee Brand, Wilma Quan, Jim Schaad, and Tim

25  Orman, as well as against the City as to events that occurred prior to May of 2021 in the

26  complaint, be dismissed.  The Court finds striking is unnecessary, as the entire Bane Act claim is

27  recommended to be dismissed for additional reasons explained below, with leave to amend with

28  the recommendation any amendment only allege the Bane Act based on events during the

conceded, and recommended as to the City, allowable time period.[17]

2.    Defendants' Challenge that CVCSF lacks "Standing" Under the Bane Act

Defendants argue Plaintiff CVCSF does not have standing to maintain a Bane Act claim, as the text of the Bane Act provides that it protects "individuals" who are subjected to threats, intimidation, and coercion, in pursuing constitutional rights, and provides a remedy to "any individual" so impacted, Cal. Civ. Code § 52.1(b)-(c).  (Mot. 22.)  Defendants thus submit that the Bane Act does not apply to corporate plaintiffs.  Plaintiffs did not directly refute this aspect of the motion nor did they concede such point.

For the reasons explained below, the Court finds the weight of the legal authority and practical considerations underlying the legislative scheme, tilt in favor of granting Defendants' motion.  To be clear however, the Court does not view the Defendants' challenge and the Court's conclusion as resting on principles of standing, in a general Article III sense.[18]  See Valentine v. NebuAd, Inc., 804 F. Supp. 2d 1022, 1026 (N.D. Cal. 2011) ("NebuAd does not premise its argument on constitutional principles, however, and casts no doubt on Plaintiffs' standing as a constitutional matter [but] [r]ather, NebuAd asserts that Plaintiffs lack standing as a matter of statutory construction.").  While Defendants frame their motion as a standing challenge, and Plaintiffs have provided no substantive response in opposition, the Court views the issue more properly framed as a statutory construction issue, or more directly, a statutory eligibility issue.  Thus, "[t]he question before the Court is exclusively one of statutory interpretation: did the California Legislature intend to" allow a corporate entity to bring a claim for a Bane Act

---

[17]  The Court notes that Defendants in their alternative motion for dismissal or striking, requested striking/dismissing the following language/claims: "[a]ny claim for breach of contract that accrued prior to May 9, 2021 based on the GTCA; and . . . [a]ll allegations of wrongdoing under the Bane Act and Unruh Act that took place prior to July 17, 2019 based on the GTCA."  (ECF No. 62 at 3.)  Additionally, as to the Unruh Act, in reply briefing, Defendants state that any allegations that took place prior to July 17, 2019, cannot provide a basis for relief.  This is apparently a greater allowable time period than the concession by Plaintiffs as to the Bane Act.  The parties may clarify any such discrepancy, such as if there was meant to be a difference between the concession as to the Bane Act versus the Unruh Act as to the allowable time period, through meet and confer or objections.

[18]  See Spokeo, Inc. v. Robins, 578 U.S. 330, 338, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016) ("The doctrine developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood . . . the 'irreducible constitutional minimum' of standing consists of three elements . . . [t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.") (citations omitted).

1  violation?  See Valentine, 804 F. Supp. 2d at 1026–27 ("The question before the Court is

2  exclusively one of statutory interpretation: did the California Legislature intend to limit the right

3  of action under the CIPA and the CCCL to in-state plaintiffs?").  In other words, is CVCSF, as a

4  corporation, eligible to bring a claim under the Bane Act?

5       While the Court's analysis is one of statutory interpretation, the interpretation of the

6  statute does relate to principles of standing under California law.  See Valentine, 804 F. Supp. 2d

7  at 1026 ("Standing rules for actions based upon statute may vary according to the intent of the

8  Legislature and the purpose of the enactment." (quoting Angelucci v. Century Supper Club, 41

9  Cal.4th 160, 175, 59 Cal.Rptr.3d 142, 158 P.3d 718 (2007))); see also Midpeninsula Citizens for

10  Fair Hous. v. Westwood Invs., 221 Cal. App. 3d 1377, 1389, 271 Cal. Rptr. 99 (Ct. App. 1990)

11  ("Nonetheless we are bound by statutory limitations on standing where they plainly apply [and]

12  [i]f the Legislature has specifically provided by statute for judicial review under certain

13  circumstances, the inquiry as to standing must begin and end with a determination whether the

14  statute in question authorizes an action by a particular plaintiff."); Reid v. Johnson & Johnson,

15  780 F.3d 952, 958 (9th Cir. 2015) ("The district court appeared to dismiss Reid's claims for relief

16  for lack of standing under California's standing requirements for the UCL, FAL, and CLRA

17  [and] [t]o establish standing to bring a claim under these statutes, plaintiffs must meet an

18  economic injury-in-fact requirement, which demands no more than the corresponding

19  requirement under Article III of the U.S. Constitution.").  At bottom here given Defendants'

20  precise challenge, the question is one of CVCSF's eligibility under the statute, as intended by the

21  California legislature.  See Midpeninsula Citizens, 221 Cal. App. 3d at 1389 ("[T]he inquiry as

22  to standing must begin and end with a determination whether the statute in question authorizes

23  an action by a particular plaintiff.").

24       "A federal court interpreting a California statute applies California's rules of statutory

25  interpretation."  Kahn v. Outrigger Enterprises, Inc., No. 213CV03802SVWJCX, 2013 WL

26  12136379, at *4 (C.D. Cal. Oct. 29, 2013) (quoting Wang v. Asset Acceptance, LLC, 681 F.

27  Supp. 2d 1143, 1147 (N.D. Cal. 2010).  "Under California law, the 'basic rule of statutory

28  construction is ... that courts are bound to give effect to statutes according to the usual, ordinary

import of the language employed in framing them.' " Kahn, 2013 WL 12136379, at *4 (quoting

In re Goldman, 70 F.3d 1028, 1029 (9th Cir. 1995).  As the Supreme Court of California stated:

> We apply well-settled principles of statutory construction. Our task is to discern the Legislature's intent. The statutory language itself is the most reliable indicator, so we start with the statute's words, assigning them their usual and ordinary meanings, and construing them in context. If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs. On the other hand, if the language allows more than one reasonable construction, we may look to such aids as the legislative history of the measure and maxims of statutory construction. In cases of uncertain meaning, we may also consider the consequences of a particular interpretation, including its impact on public policy.

Wells v. One2One Learning Found., 39 Cal. 4th 1164, 1190, 141 P.3d 225, 236 (2006).  The

Court now turns to the text of the statute.

The Bane Act refers to the potential plaintiff as an "individual," but the defendant(s) as a

"person or persons":

> (b) If a person or persons, whether or not acting under color of law, interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General, or any district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California, in order to protect the peaceable exercise or enjoyment of the right or rights secured. An action brought by the Attorney General, any district attorney, or any city attorney may also seek a civil penalty of twenty-five thousand dollars ($25,000). If this civil penalty is requested, it shall be assessed individually against each person who is determined to have violated this section and the penalty shall be awarded to each individual whose rights under this section are determined to have been violated.

Cal. Civ. Code § 52.1(b).  As explained by a California Court of Appeal under another statutory

scheme, the term individual typically denotes a natural person, and thus the court found it

significant that such statutory scheme employed that term:

> Section 527.8, subdivision (a), is specifically directed to unlawful violence and credible threats of violence made by an "individual": "Any employer, whose employee has suffered unlawful violence or a credible threat of violence from *any individual* ... may seek a temporary restraining order and an injunction on behalf of the

employee prohibiting further unlawful violence or threats of violence by that *individual*." (Italics added.) We look to the " 'usual and ordinary meaning' of the statutory language in order to discern legislative intent." (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 571, 21 Cal.Rptr.3d 331, 101 P.3d 140; see *Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 990, 73 Cal.Rptr.2d 682, 953 P.2d 858 [in resolving questions of statutory interpretation, the court "must attempt to effectuate the probable intent of the Legislature, as expressed through the actual words of the statutes in question"; the first step " ' "is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning. [Citations.]" ' "].) In ordinary usage the word "individual" denotes a natural person not a group, association or other artificial entity. (See Webster's Third New International Dictionary (2002 ed.) p. 1152 [giving a primary definition of "individual" as "a single human being as contrasted with a social group or institution"].) This commonsense interpretation of the word "individual" in section 527.8, subdivision (a), is reinforced by section 527.8, subdivision (g), which specifies either party may be represented by counsel or may "appear[ ] on his or her own behalf," a provision that could not apply to a corporate entity such as ADL–LA. (See *Gamet v. Blanchard* (2001) 91 Cal.App.4th 1276, 1284, fn. 5, 111 Cal.Rptr.2d 439 ["a corporation may not represent itself, except in a small claims proceeding"]; **\*\*646** *Merco Constr. Engineers, Inc. v. Municipal Court* (1978) 21 Cal.3d 724, 730–731, 147 Cal.Rptr. 631, 581 P.2d 636 [same].)

City of Los Angeles v. Animal Def. League, 135 Cal. App. 4th 606, 622–23, 37 Cal. Rptr. 3d 632, 645–46 (2006).  In Icon Desert Logistics, the federal district court extended the holding to the Bane Act.  Icon Desert Logistics v. City of Blythe Police Dep't, No. 520CV02225CASJCX, 2020 WL 7229853, at *7 (C.D. Cal. Dec. 7, 2020) ("Icon is a corporate entity that cannot respond to threats or intimidation in its own right and cannot assert a Bane Act claim on Richotte's behalf.") (citing Animal Def. League, 135 Cal. App. 4th at 622–23).

A treatise explains, while also acknowledging the lack of specific caselaw on the point, that the word "individual" in the Bane Act suggests the same interpretation:

The word "individual" in Civ. Code § 52.1, subds. (a)(b) suggests that a Bane Act claim may only be brought by an individual plaintiff, not by a corporation, partnership or other nonhuman. There is no case law on this point. The language "in his or her own name and on his or her own behalf" requires that the Bane Act plaintiff be the person whose rights were violated and thus any claim brought by an individual other than the person whose rights were violated, such as a wrongful death claim, is not cognizable under the Bane Act. [City of Simi Valley v. Superior Court, 111 Cal. App. 4th 1077, 4 Cal. Rptr. 3d 468, 474 (2d Dist. 2003) ("This statute permits an individual to sue for damages where his or her

constitutional rights are violated" and does not permit a wrongful death claim); Bay Area Rapid Transit Dist. v. Superior Court, 38 Cal. App. 4th 141, 44 Cal. Rptr. 2d 887, (1st Dist. 1995) ("The Bane Act is simply not a wrongful death provision"); Gaston v. Colio, 883 F. Supp. 508, 510 (S.D. Cal. 1995) (plaintiffs could not bring a Bane Act claim because they "were not the one whose rights were allegedly violated")]

*Plaintiffs; who may sue; no requirement of a protected characteristic*, Cal. Civ. Prac. Civil Rights Litigation § 3:17.[19]

The Bane Act was enacted in response to the increasing incidence of hate crimes in California. Bender v. Cnty. of Los Angeles, 217 Cal. App. 4th 968, 977, 159 Cal. Rptr. 3d 204, 212 (2013); Reese v. Cnty. of Sacramento, 888 F.3d 1030, 1040 (9th Cir. 2018). "The Bane Act civilly protects individuals from conduct aimed at interfering with rights that are secured by federal or state law, where the interference is carried out 'by threats, intimidation or coercion.' " Reese, 888 F.3d at 1040 (citation omitted). The Court finds the legislative intent and use of the terms person and individual, supports the finding that the Bane Act does not apply to corporate plaintiffs. See Venegas v. Cnty. of Los Angeles, 32 Cal. 4th 820, 842–43, 87 P.3d 1, 13–14 (2004) ("Assembly Bill 2719 explained that '[s]ection 52.1 of the Civil Code guarantees the exercise or enjoyment by *any individual or individuals* of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state *without regard to his or her membership in a protected class* identified by its race, color, religion, or sex, among other things.' " (quoting Cal. Assembly Bill No. 2719 (1999–2000 Reg. Sess.)) (emphasis

---

[19]  The Court notes that both Icon and this treatise rely on the case of Bay Area Rapid Transit Dist. v. Superior Ct., 38 Cal. App. 4th 141, 44 Cal. Rptr. 2d 887 (1995) ("BART"), an oft cited case in the area of wrongful death claims as related to the Bane Act. The Court notes that a general holding that BART is cited for in the treatise and Icon, has been found by this Court to be misapplied in that this Court has held a Bane Act wrongful death claim does pass onto a successor in interest. See Est. of Crawley v. Kings Cnty., No. 1:13-CV-02042-LJO-SAB, 2014 WL 2174848, at *11 (E.D. Cal. May 23, 2014) ("Based upon the foregoing, the Court finds that a cause of action under the Bane Act survives the death of the victim/plaintiff pursuant to California Code of Civil Procedure § 377.20 and passes to the victim's/plaintiff's successor in interest pursuant to California Code of Civil Procedure § 377.30."); Anderson v. Cnty. of Fresno, No. 121CV01134ADASAB, 2023 WL 2761168, at *24 (E.D. Cal. Apr. 3, 2023) ("Thus, the Court finds in accord with Plaintiffs that subsequent decisions in this circuit have clarified the applicability of the decision in BART, and have found that Bane Act claims survive and can be asserted by successors in interest. While Officer Defendants argue Abston should be controlling, there the issue was undisputed, and thus the Court is not persuaded that it should have been the last word on the issue in this district.") (citations omitted) (findings and recommendations pending approval by District Judge). The Court nonetheless still finds Icon and the treatise utilize the holding to reach the correct finding that a Bane Act claim may not be brought by a corporate or other entity.

added by quoting source)).

Holdings pertaining to the term "person" in the Bane Act are somewhat instructive as to whether the Court should consider the term "individual" to encompass a corporation. Courts have held a corporation can be held liable as a defendant for a Bane Act violation through respondeat superior, as well as against entities generally, including state prisons. See M.H. v. Cnty. of Alameda, 90 F. Supp. 3d 889, 897 (N.D. Cal. 2013) ("Because Plaintiffs adequately state a Bane Act claim with respect to Defendant Sancho, her liability also gives rise to respondeat superior liability with respect to Defendant Corizon Health under traditional California common law principles."); Harrington-Wisely v. State, No. B248565, 2015 WL 1915483, at *8 n.8 (Cal. Ct. App. Apr. 28, 2015) (unpublished) ("The government defendants' argument Wisely cannot state a Bane Act claim because state prisons are not business establishments is without merit [as] Civil Code section 52.1, subdivision (b), permits any person whose exercise of rights has been interfered with, or attempted to have been interfered with, by the specified improper means to bring an action for compensatory damages against any individual or entity.").[20]

In A.M., the defendant argued "that it is not a person under the [Bane] Act and therefore cannot be held liable," "because Cal. Civ. Code § 14 defines a person 'as a natural person or a corporation,' [and thus] a school district cannot be a defendant." A.M. v. San Bernardino Cnty. Superintendent of Sch., No. EDCV191944PSGKKX, 2020 WL 1937882, at *4 (C.D. Cal. Feb. 26, 2020). First, the Court agrees the Civil Code defining a person in such way lends to finding the distinction between individual and person in the Bane Act means a corporation cannot assert a Bane Act claim. Cal. Civ. Code § 14(a) ("[T]he word person includes a corporation as well as a natural person."); see also Cal. Civ. Code § 4170 (" 'Person' means a natural person, corporation, government or governmental subdivision or agency, business trust, estate, trust, partnership, limited liability company, association, or other entity."). The A.M. court held the

---

[20] The court appears to incorrectly use the term "any person" rather than "individual" when referring to the claimant, however, specifies "individual *or* entity," as to the potential offender. 2015 WL 1915483, at *8 n.8.

school district was a person.  2020 WL 1937882, at *4 ("While suing a public entity like Defendant raises a potential sovereign immunity issue, the Court does not believe that defining Defendant as a person under the Act and allowing this claim to proceed against it 'would result in an infringement upon sovereign governmental powers' given that the Bane Act explicitly permits suits against those acting under color of law . . . [and] other than pointing out that Cal. Civ. Code § 14 is a general definitions section, Defendant does not explain why the Court should apply its definition of person, as opposed to other Civil Code sections that include government agencies in their definition of person . . . including Defendant in the definition of "person" under the Bane Act is in accord with other courts that have faced this issue . . . [and] the California Supreme Court has applied the Bane Act to government entities.")[21]; see also Sanchez v. City of Fresno, 914 F. Supp. 2d 1079, 1117 (E.D. Cal. 2012) ("No California court has directly interpreted the Bane Act's 'person or persons' language[,] [h]owever, several federal courts interpreting the statute have concluded municipalities do fall within its purview."); Est. of Adkins by & through Adkins v. Cnty. of San Diego, No. 3:18-CV-00371-H-JMA, 2018 WL 1942397, at *6 (S.D. Cal. Apr. 25, 2018) (same).

California caselaw pertaining to general corporate law and piercing the corporate veil weighs in favor of finding the term "individual" does not include corporations.  See Schrage v. Schrage, 69 Cal. App. 5th 126, 150, 284 Cal. Rptr. 3d 279, 300 (2021) ("The stockholder's individual suit, on the other hand, is a suit to enforce a right against the corporation which the stockholder possesses as an individual . . . the injury is one to the plaintiff as a stockholder and to him individually, and not to the corporation.") (citations and internal quotation marks omitted); Greenspan v. LADT, LLC, 191 Cal. App. 4th 486, 510, 121 Cal. Rptr. 3d 118, 137 (2010) ("In certain circumstances the court will disregard the corporate entity and will hold the individual shareholders liable for the actions of the corporation."); Shafford v. Otto Sales Co., 149 Cal. App. 2d 428, 432, 308 P.2d 428, 431 (1957) (a "corporation may exist merely to serve the interests of another—a corporation or an individual.") (citation omitted); Judelson v. Am. Metal

---

[21]  The holding is also relevant to the Defendants' next challenge to the Unruh Act in its discussion of the ability to apply the Bane Act to government defendants.

1   Bearing Co., 89 Cal. App. 2d 256, 262, 200 P.2d 836, 840 (1948) ("On proper proof that a

2   corporation is but the instrumentality through which an individual . . ."); Claremont Press Pub.

3   Co. v. Barksdale, 187 Cal. App. 2d 813, 816, 10 Cal. Rptr. 214, 216 (Ct. App. 1960) ("Failure to

4   issue stock, although not conclusive evidence, is an indication that the operators of a purported

5   corporation are in fact doing business as individuals."); City of San Jose v. MediMarts, Inc., 1

6   Cal. App. 5th 842, 853, 205 Cal. Rptr. 3d 179, 187 (2016) ("In this case, by contrast, it is a

7   corporation, not an individual, that is required to pay the tax."); Holistic Supplements, L.L.C. v.

8   Stark, 61 Cal. App. 5th 530, 542, 275 Cal. Rptr. 3d 791, 798 (2021) ("A personal claim, in

9   contrast, asserts a right against the corporation which the shareholder possesses as an individual

10  apart from the corporate entity.") (internal citations and quotation marks omitted); Auer v. Frank,

11  227 Cal. App. 2d 396, 407, 38 Cal. Rptr. 684, 691 (Ct. App. 1964) ("As hereinbefore pointed

12  out, the trial court found that the contract in question was made between plaintiff and the

13  corporation, and not between plaintiff and defendants 'as individuals'; that in making and

14  entering into said contract defendants 'were acting in a representative capacity and on behalf of

15  said defendant corporation'; that the services and materials were furnished at the instance and

16  request of the corporation and not at the instance and request of defendants 'as individuals'; and

17  that the sum found owing is due from the corporation and not from defendants 'as individuals.'

18  ").

19      Given the discussion of the Supreme Court's decision in Comcast above pertaining to the

20  Section 1981 claim, the Court should note the Ninth Circuit in that case stated the Circuit allows

21  a corporation with an imputed racial identity to bring a Section 1981 claim, but therein used

22  language suggesting that a corporation is not an individual.  Nat'l Ass'n of Afr. Am.-Owned

23  Media v. Charter Commc'ns, Inc., 915 F.3d 617, 622 (9th Cir. 2019) ("Thus, as a '100% African

24  American-owned' company that is a 'bona fide Minority Business Enterprise,' Entertainment

25  Studios can bring a § 1981 claim, even though it is a corporation and not an individual."), cert.

26  granted, judgment vacated, 206 L. Ed. 2d 493, 140 S. Ct. 2561 (2020), and vacated and

27  remanded, 804 F. App'x 710 (9th Cir. 2020), and abrogated by Comcast Corp. v. Nat'l Ass'n of

28  Afr. Am.-Owned Media, 206 L. Ed. 2d 356, 140 S. Ct. 1009 (2020); see also Domino's Pizza,

1   Inc. v. McDonald, 546 U.S. 470, 473 n.1, 126 S. Ct. 1246, 1248, 163 L. Ed. 2d 1069 (2006)

2   ("Since JWM settled its claims and is not involved in this case, we have no occasion to

3   determine whether, as a corporation, it *could* have brought suit under § 1981[,] [w]e note,

4   however, that the Courts of Appeals to have considered the issue have concluded that

5   corporations may raise § 1981 claims."); Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.,

6   368 F.3d 1053, 1058–59 (9th Cir. 2004) ("When a corporation has acquired a racial identity,

7   either as a matter of law or by imputation, then it can be the direct target of discrimination and

8   has standing to pursue a claim under § 1981.").

9          Although Plaintiff mounted no opposition to this aspect of the Defendants' motion to

10   dismiss, the Court considers an argument could be made that like in Comcast, CVCSF has taken

11   on the identity of Frazier, an individual, and thus the holding could suggest the Bane Act could

12   allow certain entities that have taken on an individual's racial identity to maintain a claim.  The

13   Court does not find such potential line of argument persuasive.  In this regard, Section 1981 uses

14   the term "persons" rather than "individual" in referring to the claimant's rights, in comparison to

15   rights of "white citizens."  42 U.S.C. § 1981 ("All persons within the jurisdiction of the United

16   States shall have the same right . . . as is enjoyed by white citizens.").  The Ninth Circuit stated

17   the entity was a "corporation and *not an individual*."   Nat'l Ass'n of Afr. Am.-Owned Media,

18   915 F.3d at 622 (emphasis added).  Further, Section 1981 pertains to contracts, which while not

19   exclusively, are the subject of business and corporations, and thus the Ninth Circuit reasonably

20   extended the statutory term "persons" to corporations with a racial identity in relation to the

21   rights of white citizens in the statute.  The focus on violence, threats and coercion in the Bane

22   Act, in addition to Section 1981 using the term person, as well as the California law principles

23   underlying the law described above, weigh in favor of finding the corporation here does not have

24   standing under the Bane Act.  See Lil' Man In The Boat, Inc. v. City & Cnty. of San Francisco,

25   No. 17-CV-00904-JST, 2017 WL 3129913, at *10–11 (N.D. Cal. July 24, 2017) ("In any event,

26   the Court sees no support for the proposition that economic coercion of the kind at issue here can

27   constitute violence or threats of violence."); Gottschalk v. City & Cnty. of San Francisco, 964 F.

28   Supp. 2d 1147, 1164 (N.D. Cal. 2013) ("She cites no authority indicating that 'economic

1  coercion' . . . may constitute violence or threats of violence within the meaning of either of these

2  statutes.").

3      Additionally, other interpretations of federal law pertaining to the term "individual"

4  support the distinction.  See Mujica v. Occidental Petroleum Corp., 381 F. Supp. 2d 1164, 1175

5  (C.D. Cal. 2005) ("Thus, even though Clinton did not so hold with respect to that specific statute,

6  in general, 'persons' includes corporations while 'individuals' does not." (citing Clinton v. City

7  of New York, 524 U.S. 417, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998))).  Specifically, courts have

8  so held as to the Privacy Act.  See Am. Cargo Transp., Inc. v. United States, No. C05-393JLR,

9  2007 WL 3171423, at *4 (W.D. Wash. Oct. 26, 2007) ("A corporation is not an 'individual'

10 within the meaning of the [Privacy] Act and, therefore, has no standing to bring a claim under

11 the Act."), aff'd, 625 F.3d 1176 (9th Cir. 2010); Cell Assocs., Inc. v. Nat'l Institutes of Health,

12 Dep't of Health, Ed. & Welfare, 579 F.2d 1155, 1157 (9th Cir. 1978) ("It is clear that Cell

13 Associates, a corporation formed in 1974, is not an 'individual' within the meaning of the

14 statute.").  The Bankruptcy Code also makes clear a corporation is not an individual.  See In re

15 Goodman, 991 F.2d 613, 619 (9th Cir. 1993) (" 'individual' means individual, and not a

16 corporation or other artificial entity."); In re Hoover, No. 12-10827-A-13, 2012 WL 8255558, at

17 *9 (Bankr. E.D. Cal. Apr. 23, 2012); In re Circle Five, Inc., 75 B.R. 686, 688 (Bankr. D. Idaho

18 1987) ("A corporation is not an individual within the code and can not incur a consumer debt.");

19 In re JLJ Farms, LLC, No. 20-00713-BPH, 2021 WL 6013537, at *17 (Bankr. D. Idaho Dec. 15,

20 2021) (same).  The code of civil procedure distinguishes between individual and a corporation.

21 See Fed. R. Civ. P. 4(d)(1) ("An individual, corporation, or association that is subject to service

22 under Rule 4(e), (f), or (h) has a duty to avoid unnecessary expenses of serving the summons.").

23 And additionally, the TVPA.  See Bowoto v. Chevron Corp., No. C 99-02506 SI, 2007 WL

24 2349341, at *1 (N.D. Cal. Aug. 14, 2007) ("[T]he Court dismissed plaintiffs' claims under the

25 Torture Victim Protection Act, 28 U.S.C. § 1350 ('TVPA') . . . on the ground that the TVPA

26 only provides for liability against 'individuals,' and that a corporation is not an 'individual' for

27 TVPA purposes."); Mujica, 381 F. Supp. 2d at 1175 ("The Court holds that corporations are not

28 'individuals' under the TVPA based on its reading of the plain language of the statute.").

1    Thus, the Court concludes that in construing the California law, Wells, 39 Cal. 4th at

2   1190, the weight of the authority supports finding the term "individual" under the Bane Act does

3   not encompass a corporation, and therefore Plaintiff CVCSF, as a corporation, cannot maintain

4   the Bane Act claim.

5        3.    The Court finds Plaintiffs have not Alleged Facts to State a Bane Act Claim

6    Assuming CVCSF is dismissed from this claim, and not considering allegations prior to

7   May of 2021, the Court proceeds to Defendants' additional argument that Plaintiffs have not met

8   the elements for a Bane Act claim.  The Court first considers Defendants' argument the Bane Act

9   was intended to only address egregious interferences with constitutional rights, where the act of

10   interference must itself be deliberate or spiteful, beyond any tort such as negligence.

11    In Shoyoye, the California Court of Appeal stated that "[w]hile we are not prepared to

12   and need not decide that every plaintiff must allege violence or threats of violence in order to

13   maintain an action under section 52.1 . . . we conclude that the multiple references to violence or

14   threats of violence in the statute serve to establish the unmistakable tenor of the conduct that

15   section 52.1 is meant to address [and] [t]he apparent purpose of the statute is not to provide relief

16   for an overdetention brought about by human error rather than intentional conduct."  Shoyoye v.

17   Cnty. of Los Angeles, 203 Cal. App. 4th 947, 959, 137 Cal. Rptr. 3d 839, 848 (2012).  The

18   Shoyoye court explained that "when section 52.1 was amended in 1990 . . . the Legislature also

19   considered, but rejected, a proposal to delete the language requiring interference 'by threats,

20   intimidation, or coercion.' "   Id. ("A bill analysis prepared by the Department of Justice

21   commented that "[a]s a general proposition, statutory or common law remedies are already

22   available to redress interference with rights protected by state or federal constitutions or laws

23   (e.g., tort).").  Thus, the court found "§ 52.1 focuses specifically on the *additional* element

24   present especially in hate violence, viz., putting persons in fear of their safety," and that "[i]t is

25   the element of threat, intimidation, or coercion that is being emphasized."  Id. (emphasis in

26   original).

27    In Cornell, the California Court of Appeal found that "[p]roperly read, the statutory

28   phrase 'threat, intimidation or coercion' serves as an aggravator justifying the conclusion that the

1    underlying violation of rights is sufficiently egregious to warrant enhanced statutory remedies,

2    beyond tort relief.' " Cornell v. City & Cnty. of San Francisco, 17 Cal. App. 5th 766, 800, 225

3    Cal. Rptr. 3d 356, 383 (2017).  "Accordingly, Cornell held that 'the egregiousness required by

4    Section 52.1 is tested by whether the circumstances indicate the arresting officer had a specific

5    intent to violate the arrestee's right to freedom from unreasonable seizure.' " Reese v. Cnty. of

6    Sacramento, 888 F.3d 1030, 1043 (9th Cir. 2018) (quoting Cornell, 225 Cal. Rptr. 3d at 383-84).

7    However, in the context of an unlawful arrest, Cornell held there is no requirement that such

8    "threat, intimidation, or coercion," be additionally "transactionally 'independent' from a properly

9    pleaded—and proved—unlawful arrest." Cornell, 17 Cal. App. 5th at 800.  The Ninth Circuit

10   noted Cornell concluded: "Shoyoye was limited to cases involving mere negligence[,]" that

11   "[n]othing in the text of the statute requires that the offending 'threat, intimidation or coercion'

12   be 'independent' from the constitutional violation alleged," and "the use of excessive force can

13   be enough to satisfy the 'threat, intimidation or coercion' element of Section 52.1." Reese, 888

14   F.3d at 1043 (citations omitted); Warzek v. Valley State Prison, No. 120CV00027ADAGSAPC,

15   2023 WL 2655612, at *32 (E.D. Cal. Mar. 27, 2023) (same); Gifford v. Hornbrook Fire Prot.

16   Dist., No. 2:16-CV-0596-JAM-DMC, 2021 WL 4168532, at *28 (E.D. Cal. Sept. 14, 2021)

17   (same).

18          Thus, based on Cornell, the Ninth Circuit  "dr[e]w two conclusions as to the necessary

19   showing for an excessive force claim under the Bane Act[:] First, the Bane Act does not require

20   the 'threat, intimidation or coercion' element of the claim to be transactionally independent from

21   the constitutional violation alleged[;] . . . Second, the Bane Act requires a 'a specific intent to

22   violate the arrestee's right to freedom from unreasonable seizure.' " Reese, 888 F.3d at 1043

23   (quoting Cornell, 225 Cal.Rptr.3d at 382–83).

24          Against that general backdrop, Defendants argue speech alone by the Defendants is not

25   enough to satisfy the statute without violence or a threat of violence. See Cal. Civ. Code §

26   52.1(k) ("Speech alone is not sufficient to support an action brought pursuant to subdivision (b)

27   or (c), except upon a showing that the speech itself threatens violence . . .").  Additionally,

28   Defendants frame the complaint as alleging the Defendants interfered with Plaintiffs' First

1   Amendment rights to renegotiate contracts; to protest the release of a draft audit; to file a lawsuit;
2   to complain to the FPPC; and to assert defaulting conduct under the contracts.   (SAC ¶ 84.)
3   Defendants argue the relationship between the parties is akin to a vendor for First Amendment
4   analysis, and therefore the speech must involve a matter of public concern.   Plaintiffs did not
5   directly dispute this as the applicable standard in opposition.   Defendants argue that the
6   purported expressive activity involving Plaintiffs, as alleged, amounts to a private dispute or
7   grievance between the City and Plaintiffs, and does not address a matter of public concern.
8   Plaintiffs did not directly address in opposition that their speech, petitioning, or expressive
9   conduct involves a matter of public concern.

10          "When a business vendor operates under a contract with a public agency, we analyze its
11   First Amendment retaliation claim under § 1983 using the same basic approach that we would
12   use if the claim had been raised by an employee of the agency."   Alpha Energy Savers, Inc. v.
13   Hansen, 381 F.3d 917, 923 (9th Cir. 2004) (citing Bd. of County Comm'rs, Wabaunsee County,
14   Kan. v. Umbehr, 518 U.S. 668, 684–85, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996)); see also
15   Tutor-Saliba-Perini, J.V. v. Los Angeles Cnty. Metro. Transportation Auth., No. CV 13-6795-
16   GHK (EX), 2014 WL 12560806, at *2 (C.D. Cal. Mar. 4, 2014) ("The Ninth Circuit has
17   unequivocally stated that the public concern requirement applies to government contractors and
18   government employees with equal force." (citing Alpha Energy, 381 F.3d at 923)).
19   "Accordingly, the contractor must establish that (1) it engaged in expressive conduct that
20   addressed a matter of public concern; (2) the government officials took an adverse action against
21   it; and (3) its expressive conduct was a substantial or motivating factor for the adverse action."
22   Alpha Energy, 381 F.3d at 923 (citing Roe v. City of San Diego, 356 F.3d 1108, 1112 (9th
23   Cir.2004)).

24          a.      **Public Concern**

25          "If a plaintiff cannot allege that its petitioning activity touched on matters of public
26   concern, the analysis ends at the first step."   Tutor-Saliba-Perini, 2014 WL 12560806, at *2
27   (citing Desrochers v. City of San Bernadino, 572 F.3d 703, 708-09 (9th Cir. 2009); Gearhart v.
28   Thorne, 768 F.2d 1072, 1073 (9th Cir. 1985)).   Courts use differing terms as to the connection to

1  public concern.  See, e.g., id. ("touched on matters of public concern"); Alpha Energy, 381 F.3d

2  at 923 ("expressive conduct that addressed a matter of public concern").  In Desrochers, the

3  Ninth Circuit "appl[ied] the fairly considered standard . . . because that appears to be the

4  language the Supreme Court employed in Connick."  Desrochers, 572 F.3d at 710 n.4 (citing

5  Connick v. Myers, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)).  The Ninth

6  Circuit acknowledged "[a]t times, we have phrased the question differently, finding employee

7  speech unprotected 'unless it substantially involved matters of public concern.' "  Desrochers,

8  572 F.3d at 710 n.4 (quoting Johnson, 48 F.3d at 422) (citing, e.g., Alpha Energy, 381 F.3d at

9  925).  However, this Court notes that in Connick, the Supreme Court also used various terms.

10  See 461 U.S. at 146 ("When employee expression cannot be fairly considered as relating to any

11  matter of political, social, or other concern to the community, government officials should enjoy

12  wide latitude in managing their offices, without intrusive oversight by the judiciary in the name

13  of the First Amendment."); 461 U.S. at 149 ("Because one of the questions in Myers' survey

14  touched upon a matter of public concern, and contributed to her discharge we must determine

15  whether Connick was justified in discharging Myers."); 461 U.S. at 152 ("We caution that a

16  stronger showing may be necessary if the employee's speech more substantially involved matters

17  of public concern.").  The Ninth Circuit found "[i]f the distinction between 'fairly considered'

18  and 'substantially involved' is more than just semantics, we are satisfied that our decision is

19  correct under either standard."  Desrochers, 572 F.3d at 710 n.4.  The Court will not dwell on the

20  semantics at this juncture.

21      "First and foremost, we consider the content of the speech,"  "the greatest single factor in

22  the Connick inquiry."  Desrochers, 572 F.3d at 710 (first quoting Weeks, 246 F.3d at 1234, then

23  quoting Johnson, 48 F.3d at 424).  "[S]peech on public issues occupies the 'highest rung of the

24  hierarchy of First Amendment values,' and is entitled to special protection."  Connick, 461 U.S.

25  at 145 (quoting N. A. A. C. P. v. Claiborne Hardware Co., 458 U.S. 886, 913, 102 S. Ct. 3409,

26  3425, 73 L. Ed. 2d 1215 (1982)).  The Ninth Circuit has "not articulated a precise definition of

27  'public concern,' " and has repeatedly noted "such inquiry 'is not an exact science.' "

28  Desrochers, 572 F.3d at 709 (first quoting Allen v. Scribner, 812 F.2d 426, 430 (9th Cir.1987),

then quoting Weeks v. Bayer, 246 F.3d 1231, 1234 (9th Cir.2001)).  Therefore, the Ninth Circuit has "forsworn 'rigid multi-part tests that would shoehorn communication into ill-fitting categories,' [] and relied on a generalized analysis of the nature of the speech."  Desrochers, 572 F.3d at 709 (quoting Weeks, 246 F.3d at 1234).

Nonetheless, "[i]t is clear, however, that the essential question is whether the speech addressed matters of 'public' as opposed to 'personal' interest."  Desrochers, 572 F.3d at 709 (quoting Connick, 461 U.S. at 147).  Such "inquiry is purely a question of law," with plaintiffs bearing "the burden of showing that the . . . speech addressed an issue of public concern . . . based on 'the content, form, and context of a given statement, as revealed by the whole record.' " Desrochers, 572 F.3d at 709 (citations omitted); see also Johnson v. Multnomah Cnty., Or., 48 F.3d 420, 422 (9th Cir. 1995) ("Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." (quoting Connick, 461 U.S. at 147-48)).

"Speech involves a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the community.' " Johnson, 48 F.3d at 422 (quoting Connick, 461 U.S. at 146).  "The guarantees of the First Amendment 'share a common core purpose of assuring freedom of communication on matters relating to the functioning of government.' " Johnson, 48 F.3d at 426 (quoting McKinley v. City of Eloy, 705 F.2d 1110, 1114 (9th Cir. 1983)).  "To address a matter of public concern, the content of the [] speech must involve 'issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government.' " Desrochers, 572 F.3d at 710 (quoting McKinley, 705 F.2d at 1114).  "Therefore we have stated that misuse of public funds, wastefulness, and inefficiency in managing and operating government entities are matters of inherent public concern." Johnson, 48 F.3d at 424-25 ("Johnson's allegations range from simple mismanagement,  to misuse of public resources, to potentially criminal behavior . . . Johnson's statements were of precisely this type.") (internal citations and quotation marks omitted).

"On the other hand, speech that deals with individual personnel disputes and grievances

and that would be of no relevance to the public's evaluation of the performance of governmental agencies is generally not of public concern." Desrochers, 572 F.3d at 710 (quoting Coszalter v. City of Salem, 320 F.3d 968, 973 (9th Cir.2003) (quotation marks omitted)).  Thus, "speech limited to 'an employee grievance concerning internal office policy' is unprotected." Desrochers, 572 F.3d at 710 (quoting Connick, 461 U.S. at 154).  "The same is true of 'speech that relates to internal power struggles within the workplace,' and speech which is of no interest 'beyond the employee's bureaucratic niche.' " Desrochers, 572 F.3d at 710 (quoting Tucker v. Cal. Dep't of Educ., 97 F.3d 1204, 1210 (9th Cir.1996)) (footnote omitted); see also Rendish v. City of Tacoma, 123 F.3d 1216, 1221 (9th Cir. 1997) ("Thus, a private office dispute cannot be constitutionalized merely by filing a legal action.").

The Ninth Circuit has recently provided a broad definition that a "[p]ublic employees' expression is on a matter of public concern if it 'relat[es] to any matter of political, social, or other concern to the community,' . . . and not 'upon matters only of personal interest.' " Ballou v. McElvain, 29 F.4th 413, 429 (9th Cir. 2022) (emphasis added by quoting source) (first quoting Barone v. City of Springfield, 902 F.3d 1091, 1102 (9th Cir. 2018), then quoting Rendish, 123 F.3d at 1223).  The Ninth Circuit noted "[s]ome subjects both affect a public employee's personal interests and implicate matters of public concern." Ballou, 29 F.4th at 429 (emphasis in original) ("Rendish held that unlawful discrimination is such a matter, recognizing that 'the public has an interest in unlawful discrimination' in City government, and that employee speech about such discrimination therefore involves matters of public concern even if it arises out of a personal dispute." (quoting Rendish, 123 F.3d at 1224)); see also Ballou, 29 F.4th at 429 ("We reiterated this principle in Alpha Energy . . . [which held that when government employees speak about wrongdoing or misconduct by other employees] 'their speech is inherently a matter of public concern.' " (bracketed alteration added) (quoting Alpha Energy, 381 F.3d at 926)).

Again, in the filed opposition brief, Plaintiffs did not specifically proffer any arguments concerning whether the speech qualifies as addressing or relating to a public concern in the filed opposition brief.  Although not stated in the opposition, the Court notes that within the SAC, Plaintiffs, while not using the term public concern, do make allegations relating to the public

1  concern requirement:

> 84.   In making a request for renegotiation of the Ground Lease and Service Agreement in mid-2018, in protesting the release of the draft audit in January 2019, in filing this federal action in 2020, in complaining to the FPPC in 2020, in asserting default against the City of Fresno in 2021, and *in at all times alleged above disputing and criticizing the defendants in the media, in Mr. Frazier and CVCSF were exercising their free speech rights to petition the government for redress, to protest government impropriety, and to criticize government officials.* Under applicable law, the assertion of these rights cannot be the subject of retaliation by government actors.

(SAC ¶ 84 (emphasis added); see also SAC ¶ 87 ("sudden and otherwise inexplicable difference in how Mr. Frazier and CVCSF were treated by the defendants once they began petitioning for redress, complaining of impropriety, and criticizing public officials").)

The Court *could* find the issue essentially waived or unsupported by any direct argument in opposition. See Tutor-Saliba-Perini, 2014 WL 12560806, at *2 ("In its Opposition, TSP does not even try to argue that its lawsuit involved a matter of public concern (nor could it given that the public has no interest in its private contractual dispute).").   However, for the reasons explained below, the Court finds it is not in a position to find there are *no allegations* that relate "to any matter of political, social, or other concern to the community," or that the allegations rest "upon matters *only* of personal interest." Ballou, 29 F.4th at 429 (emphasis in original) (citations omitted).   Rather, the Court finds a stronger basis for dismissal is that Plaintiffs have not stated a claim because Defendants' alleged conduct only amounts to speech under the relevant caselaw, and Plaintiffs have not demonstrated violence or a threat of violence by any Defendants.

However, while the Court ultimately does not recommend dismissal for lack of public concern in Plaintiffs' speech, expressive conduct, or petitioning/litigation, the Court does not mean to find that all of the allegations address public concern.   Rather, it appears much of the allegations would not.   Setting aside for a moment that earlier allegations are subject to dismissal or striking due to noncompliance with the GCA, some allegations on their face do not appear to address the public concern.   Most notably, the primary trigger underlying the dispute appears to be the initial request for renegotiation of the contract, which would likely not be a matter of public concern.   See Tutor-Saliba-Perini, 2014 WL 12560806, at *2 ("[T]he public has no

1   interest in its private contractual dispute."); White Plains Towing Corp. v. Patterson, 991 F.2d

2   1049, 1060 (2d Cir. 1993) ("The vast majority of Cherico's communications to the State Police

3   consisted simply of demands and complaints seeking an increase in towing referrals to WP

4   Towing[;] [t]hese communications stated private commercial grievances that do not appear to

5   relate to any matter of political, social, or other concern to the community and hence could not

6   provide a basis for recovery."); Desrochers, 572 F.3d at 710 ("In a close case, when the subject

7   matter of a statement is only marginally related to issues of public concern, the fact that it was

8   made because of a grudge or other private interest or to co-workers rather than to the press may

9   lead the court to conclude that the statement does not substantially involve a matter of public

10  concern.") (citations omitted).  "Of course, First Amendment retaliation claims based on an

11  individual's own personnel matters should be disfavored, else 'every employment decision

12  bec[o]me[s] a constitutional matter.' "  Bustos v. City of Fresno, No. 120CV00066DADBAM,

13  2020 WL 4748166, at *9 (E.D. Cal. Aug. 17, 2020) (quoting Connick, 461 U.S. at 143).

14       "But that does not mean that plaintiff's claim is foreclosed *solely* because it arises from

15  his own employment grievance."  Bustos, 2020 WL 4748166, at *9 (emphasis in original).

16  Given the importance of the free speech right to the functioning of government, the tenor of the

17  allegations as a whole, and the broad definition of public concern under Ninth Circuit law, the

18  Court finds it cannot recommend dismissal based on the lack of public concern in the alleged

19  speech, expressive conduct, and petitioning.  See Johnson, 48 F.3d at 422 ("Whether an

20  employee's speech addresses a matter of public concern must be determined by the content,

21  form, and context of a given statement, *as revealed by the whole record*." (quoting Connick, 461

22  U.S. at 147-48) (emphasis added)); Ballou, 29 F.4th at 429 (public concern relates "to any matter

23  of political, social, or other concern to the community," and "the public has an interest in

24  unlawful discrimination in City government, and [] employee speech about such discrimination

25  therefore involves matters of public concern even if it arises out of a personal dispute.") (internal

26  quotation marks and citations omitted); Bustos, 2020 WL 4748166, at *9 ("First, deeming

27  plaintiff's tort claim a private matter simply because it grieved adverse employment actions

28  taken against him without considering 'the whole record,' would be overly mechanistic and

1   inconsistent with the Ninth Circuit's commands that matters of public concern be defined

2   'broadly,' . . . and be given a 'liberal construction.' " (first quoting Connick, 461 U.S. at 148,

3   then quoting Ulrich v. City & Cnty. of San Francisco, 308 F.3d 968, 978 (9th Cir. 2002), then

4   quoting Roe v. City & County of San Francisco, 109 F.3d 578, 586 (9th Cir. 1997); Johnson, 48

5   F.3d at 425 ("This case is not like Connick, which involved an employment dispute related to

6   internal administrative procedures within a prosecutor's office . . . [but] [r]ather, it is similar to

7   [Givhan] in which a teacher had been fired after complaining to her school's principal about

8   school policies and practices which she perceived as racially discriminatory." (citing Connick,

9   461 U.S. at 140–41; Givhan v. Western Line Consolidated School District, 439 U.S. 410, 412–

10   13, 99 S.Ct. 693, 694–95, 58 L.Ed.2d 619 (1979))).

11        The Court is not prepared to find Plaintiffs' allegations concerning racial discrimination

12   on the part of members of the city government, or concerning the impact of such on the contract

13   at issue, do not address matters of public concern to warrant dismissal on that ground.  The Court

14   concludes this finding "is consistent with California law and with the primary policy concern that

15   every public officer be guided solely by the public interest, rather than by personal interest, when

16   dealing with contracts in an official capacity."  Thomson v. Call, 38 Cal. 3d 633, 650, 699 P.2d

17   316, 326 (1985); see also Vasquez v. City of Bell Gardens, 938 F. Supp. 1487, 1496 (C.D. Cal.

18   1996) ("Plaintiff's alleged speech involved activity by a member of the city council which would

19   violate the Equal Protection Clause of the Fourteenth Amendment, state law regarding contractor

20   licensing, and the municipal code's open-bid requirements . . . [b]ecause this speech involved

21   matters of public concern, it is entitled to constitutional protection [and] [t]his alleged speech

22   addressed a matter of public concern because it related to activity by a member of the city

23   council which would violate state law regarding conflicts of interest and the municipal code's

24   requirement that City contracts be awarded to the lowest bidder.")

25        Litigation must involve a matter of public concern to support the claim.  See Borough of

26   Duryea, Pa. v. Guarnieri, 564 U.S. 379, 386, 131 S. Ct. 2488, 2493, 180 L. Ed. 2d 408 (2011)

27   ("When a public employee sues a government employer under the First Amendment's Speech

28   Clause, the employee must show that he or she spoke as a citizen on a matter of public

1    concern."); <u>Rendish</u>, 123 F.3d at 1222 ("We agree with the Seventh Circuit's analysis and with

2    its conclusion that, in order to be constitutionally protected under either the Speech Clause or the

3    Petition Clause, a public employee's actions must involve a matter of public concern.").  "Just as

4    speech whose content exposes potential government misconduct is speech on a matter of public

5    concern, so too is speech made in the context of litigation brought to expose such wrongful

6    conduct . . . '[s]o long as either the public employee's testimony or the underlying lawsuit meets

7    the public concern test, the employee may, in accord with <u>Connick</u>, be afforded constitutional

8    protection against any retaliation that results.' "  <u>Karl v. City of Mountlake Terrace</u>, 678 F.3d

9    1062, 1069–70 (9th Cir. 2012) (quoting <u>Alpha Energy</u>, 381 F.3d at 927).  Whether litigation

10   addresses a matter of public concern is also not guided by clearly mandated parameters.  "To be

11   sure, the line between a petition addressed to government as the petitioner's employer and one

12   addressed to it as sovereign is not always clear, but it is no more fuzzy than the line between

13   matters of private and matters of public concern."  <u>Borough</u>, 564 U.S. at 407–08 (Scalia, J.,

14   concurring in judgment in part and dissenting in part) (<u>citing, e.g.</u>, <u>Alpha Energy Savers</u>, 381

15   F.3d at 927).

16        Here, the litigation itself could be considered involving matters of public concern in

17   containing allegations of racial discrimination.  The Ninth Circuit has rejected a "narrow view

18   that a 'run-of-the mine single-plaintiff discrimination case' does not meet the public concern test

19   [and] [has] never required that discriminatory conduct or corruption must occur with regularity

20   or any degree of frequency, or exceed some threshold of significance, in order to satisfy the

21   public concern test."  <u>Alpha Energy</u>, 381 F.3d at 926 (citation omitted).  Rather "when

22   government employees speak about corruption, wrongdoing, misconduct, wastefulness, or

23   inefficiency by other government employees, ... their speech is inherently a matter of public

24   concern."  <u>Id.</u> (ellipsis in original) (quoting <u>Ceballos v. Garcetti</u>, 361 F.3d 1168, 1174 (9th

25   Cir.2004)).  The Ninth Circuit emphasized the same "rule applies to invidious discrimination as

26   well—whether it consists of a single act or a pattern of conduct."  381 F.3d at 926.  This is

27   because "[d]isputes over racial, religious, or other such discrimination by public officials are not

28   simply individual personnel matters," but instead "involve the type of governmental conduct that

affects the societal interest as a whole—conduct in which the public has a deep and abiding interest." Id. at 926-27.  "Litigation seeking to expose such wrongful governmental activity is, by its very nature, a matter of public concern."  Id. at 927; see also Clairmont v. Sound Mental Health, 632 F.3d 1091, 1104 (9th Cir. 2011) ("[S]peech alleging that the government engaged in discrimination or other civil rights violations is on a matter of public concern." (citing Alpha Energy Savers, 381 F.3d at 925)); FTR Int'l, Inc. v. Bd. of Trustees of the Los Angeles Cmty. Coll. Dist., No. B242220, 2015 WL 1577128, at *16 (Cal. Ct. App. Apr. 7, 2015) (unpublished) ("We conclude that Katbi's letter dated October 5, 2011, was a matter of public concern because it sought to expose racism, retaliation, corruption and fraud by Payinda in connection with a public project, and because it accused the District of acting in bad faith when rejecting a low bid [and additionally] the letter responded to newspaper articles, which demonstrated that the topic of the FTR Parties' reputation and performance on public contracts was newsworthy." (citing Alpha Energy, 381 F.3d at 926–27); Karl v. City of Mountlake Terrace, 678 F.3d 1062, 1069–70 (9th Cir. 2012) ("This is not a close case . . . [the] testimony rises to the level of a public concern because it was offered in the course of a § 1983 lawsuit alleging violation of constitutional rights . . . allegations that the City and Chief of Police violated his First and Fourteenth Amendment rights clearly implicated the exposure of significant government misconduct, . . . and the allegations involved more than 'a simple reference to government functioning.") (citations and internal quotation marks omitted); Bustos, 2020 WL 4748166, at *9–10 ("[P]laintiff alleges a pattern of racial discrimination against Hispanic employees, including himself . . . [and] 'the way in which an elected official or his appointed surrogates deal with diverse and sometimes opposing viewpoints from within government is an important attribute of public service about which the members of society are entitled to know[,]' . . . [and therefore] [h]ow defendants Dyer and Hall responded to plaintiff's speech therefore involves a matter of public concern." (quoting McKinley, 705 F.2d at 1115)).

The Court does not find it useful to attempt to delineate between certain time periods and the different types or precise content of speech alleged at different times.  Instead, the Court finds dismissal more appropriately grounded on the lack of violence or threat of violence,

1   whether individually or collective actions that can be imputed to the City.

2         **b.**     **Violence, Threat of Violence, and Coercion**

3         Defendants argue Plaintiffs have made no allegations of violence, threats of violence,

4   intimidation or coercion as to the ten City Defendants, and attempt to lump the allegations

5   together in SAC ¶ 85, providing no factual basis as to how each City Defendant participated in

6   these acts, never mind establishing the required threats, intimidation or coercion.  Plaintiffs

7   contend that threatening to deprive someone of his ability to engage in his livelihood, threatening

8   his freedom by having him and his wife investigated by law enforcement, all for petitioning for

9   redress and criticizing how he was being mistreated by the City and its officials, is sufficiently

10  threatening and coercive to support a Bane Act claim.  (Opp'n 27.)  Defendants argue the SAC ¶

11  85 allegations completely ignore other allegations in the SAC, such as: immunities including that

12  an audit was allowed under the contract; the City released the audit in response to a Public

13  Records Act request; any alleged referral to the Fresno County District Attorney is protected

14  under Civil Code Section 47 and Government Code Section 821.6; and the City has an unfettered

15  right to assert its rights under the contract.

16        Plaintiffs argue that because the issue has not been conclusively addressed as to the

17  statutory scheme as a whole, the prevailing conclusion must be that coercion or threats alone,

18  even in the absence of violence, is sufficient to support a Bane Act claim.  See, e.g., Shoyoye,

19  203 Cal. App. 4th at 137 ("[w]hile we are not prepared to and need not decide that every plaintiff

20  must allege violence or threats of violence in order to maintain an action under section 52.1 . . .

21  we conclude that the multiple references to violence or threats of violence in the statute serve to

22  establish the unmistakable tenor of the conduct that section 52.1 is meant to address [and] [t]he

23  apparent purpose of the statute is not to provide relief for an overdetention brought about by

24  human error rather than intentional conduct.").  In this regard, Plaintiffs argue that Defendants

25  ignore threats of prosecution in referring the draft audit for investigation by District Attorney

26  Smittcamp in June of 2021 to avoid impending settlement; the threat to investigate Frazier's

27  wife, a former city council member.  While acknowledging there must normally be more than

28  speech alone, Plaintiffs argue courts in this district and other courts have found a threat of arrest

1  can constitute coercion without a threat of violence.  Defendants reply emphasizing Plaintiffs

2  have not provided sufficient information to charge the ten City Defendants, let alone one

3  individual, and have also ignored arguments that the complaint to a law enforcement agency to

4  pursue investigation is subject to absolute privileges under Civil Code § 47, and Government

5  Code Section 821.6.

6      The Court agrees with Defendants.  The Bane Act provides that: "[s]peech alone is not

7  sufficient to support an action brought pursuant to subdivision (b) or (c), except upon a showing

8  that the speech itself threatens violence against a specific person or group of persons; and the

9  person or group of persons against whom the threat is directed reasonably fears that, because of

10 the speech, violence will be committed against them or their property *and that the person*

11 *threatening violence had the apparent ability to carry out the threat*."  Cal. Civ. Code § 52.1(k)

12 (emphasis added); see also Rocha v. Cnty. of Tulare, No. CV F 13-0796 LJO GSA, 2013 WL

13 5773082, at *4 (E.D. Cal. Oct. 24, 2013) ("To 'prevail on a claim under section 52.1, plaintiff

14 must prove that the defendant(s) interfered (or attempted to interfere) with her rights by threats,

15 intimidations, or coercion (and that the defendant(s) did so other than by speech alone, unless the

16 speech itself threatened violence).' " (quoting Doe By and Through Doe v. Petaluma City School

17 Dist., 830 F.Supp. 1560, 1582 (N.D. Cal. 1993))); Warzek, 2023 WL 2655612, at *32 ("[S]peech

18 alone does not satisfy the threat, intimidation, or coercion requirement unless the speech

19 threatened violence.") (citations omitted); Partanen v. Western United States Pipe Band

20 Association, No. 1:21-CV-00588-BAM, 2021 WL 5145246, at *10 (E.D. Cal. Nov. 4, 2021)

21 ("An allegation of either violence or the threat of violence is only necessary if the alleged

22 violations of the Bane Act are based entirely on speech." (quoting Feiger v. Smith, No. 1:14-cv-

23 01920-DAD-EPG, 2017 WL 431352, at *1 (E.D. Cal. Jan. 31, 2017))).

24     Generally under the Bane Act, setting aside the provision applying to speech and

25 violence, Cal. Civ. Code § 52.1(k), "[i]t is apparently unsettled whether the Bane Act, under

26 Civil Code § 52.1, requires violence or threats of violence to state a claim."  Gifford, 2021 WL

27 4168532, at *29 n.29 (citing Black Lives Matter-Stockton Chapter v. San Joaquin Cty. Sheriff's

28 Office, 398 F. Supp. 3d 660, 680 (E.D. Cal. 2019)); see also Cuviello v. City of Vallejo, No. 16-

1   CV-02584-KJM-KJN, 2020 WL 6728796, at *7–8 (E.D. Cal. Nov. 16, 2020) ("California

2   appellate courts remain undecided on whether a Bane Act claim requires a threat of violence or

3   whether intimidating or coercive speech however nonviolent suffices, and the state Supreme

4   Court has not resolved the question.").   "Some courts, including in published decisions,

5   expressly note that violence or intimidation by threat of violence is required." Gifford, 2021 WL

6   4168532, at *29 n.29 (collecting California Court of Appeal cases). "Other courts have implied

7   or determined that threats, intimidation, and coercion do not *necessitate* violence." Id. (emphasis

8   in original) (collecting cases). "Violence is not mentioned in the sections of § 52.1 authorizing a

9   cause of action . . . [t]he Legislature used the language 'by threat, intimidation, or coercion' and

10  only specified threat of violence as necessary to a claim based on speech." Gifford, 2021 WL

11  4168532, at *29 n.29 (quoting Cal. Civ. Code § 52.1(b)–(c), (k)). "Relevantly, although not

12  explicitly addressing the violence question, the Supreme Court of California also permitted

13  claims under § 52.1 based on assertedly unlawful searches and arrests by law enforcement

14  officers, even though the plaintiffs did not use violence or threats of violence against them." Id.

15  (citing Venegas, 32 Cal. 4th at 827–28).

16      Citing to Black Lives Matter, 398 F. Supp. 3d 660, Plaintiffs contend that threatening to

17  deprive someone of his ability to engage in his livelihood, threatening his freedom by having him

18  and his wife investigated by law enforcement, all for petitioning for redress and criticizing how

19  he was being mistreated by the City and its officials, is sufficiently threatening and coercive to

20  support a Bane Act claim.   The Court disagrees that the allegations in the Plaintiffs' operative

21  complaint are sufficient under the statute, the cases cited by Plaintiffs, and other relevant

22  caselaw.

23      "[F]ederal courts in California have found that a threat of arrest from law enforcement

24  can constitute 'coercion' under the Bane Act, even without a threat of violence." Adjaye v.

25  White, No. CV 20-8940-JGB(E), 2021 WL 4353101, at *8 (C.D. Cal. July 1, 2021) (quoting

26  Cuviello v. City of Vallejo, 2020 WL 6728796, at *8); see also Black Lives Matter, 398 F. Supp.

27  3d at 680–81 ("[C]ourts have consistently held that a threat of arrest from law enforcement can

28  be 'coercion' under the Bane Act, even without a threat of violence per se." (citing Cuviello v.

1  City of Stockton, No. CIV. S-07-1625 LKK, 2009 WL 9156144, at *17 (E.D. Cal. Jan. 26,

2  2009))).   Courts have based these holdings on the reasoning that the "particular coercive power

3  of law enforcement officers has led courts to impose liability when detention, rather than

4  violence, is threatened . . . [as] [t]he threat of detention or arrest is included in the plain meaning

5  of 'coercion.' "  Adjaye, 2021 WL 4353101, at *8 (quoting Cuviello, 2009 WL 9156144, at *17)

6  (collecting cases); Black Lives Matter, 398 F. Supp. 3d at 680 (same).

7        In Black Lives Matter for example, the case involved direct free speech activity taking

8  place in front of the police officers with the authority to arrest.  Essentially, there was a threat of

9  arrest by the officer if the speech continued, and thus there was a direct connection to the

10  physical act of arrest, and the plausible immediate result of detention in a jail.  Because of the

11  particular coercive power of the threat of detention, the Black Lives Matter court held "plaintiffs'

12  claim that defendants . . . prevented them from entering the courthouse on October 30 while

13  acting in their capacities as sheriff's deputies implies a coercion on the part of the deputies that is

14  sufficient to state a Bane Act claim at this stage."  398 F. Supp. 3d at 680–81; see also Gonzalez

15  v. City of Modest-Modesto Police Dep't, No. 120CV01031NONEBAM, 2022 WL 463242, at *4

16  (E.D. Cal. Feb. 15, 2022) (denying motion to dismiss where plaintiff alleged she was "threatened

17  with arrest for asking multiple, repetitive questions of the officers involved in her brother's arrest

18  . . . [and] was threatened with arrest for videotaping and photographing the officers when they

19  refused to respond to her questions.").

20        Cuviello involved a threat of seizure of a bullhorn, not a threat of arrest, by the law

21  enforcement officer:   Cuviello, 2020 WL 6728796, at *9 ("As pled, Officer Koutnik then

22  threatened seizure of plaintiff's bullhorn because he 'had to find another way to stop Cuviello

23  from using a bullhorn' and by doing so he 'acted outside the scope of section 8.56, and his

24  discretionary authority under Vallejo Municipal Code section 1.14.010.' ").  At that time, there

25  was a city enforcement policy of "no arrests," and the officer instead utilized the threat of

26  seizure.  Id.  The court found that "[a]lthough plaintiff's allegations include a threat of seizure as

27  opposed to threats of detention or threats of arrest, '[t]hese facts suffice to permit a conclusion'

28  that Officer Koutnik "threatened" plaintiff with seizure of his bullhorn "so as to deter [him] from

1  lawfully exercising [his] rights." Id. (citations omitted).

2      The Court recommends not extending the holdings in this line of cases to the facts at

3  hand involving possible referral for criminal investigation by City employees, where none of the

4  allegations pertain to a threat of arrest, or seizure, or threat of physical act of violence or

5  coercion by the actual individuals involved, nor immediate action on the part of law enforcement

6  officers acting at the direction of such individuals. See Cal. Civ. Code § 52.1(k) (whom the

7  threat is directed reasonably fears that, because of the speech, violence will be committed against

8  them or their property *and that the person threatening violence had the apparent ability to carry

9  out the threat.*"); Adjaye, 2021 WL 4353101, at *8 ("the "particular coercive power of law

10 enforcement officers has led courts to impose liability when detention, rather than violence, is

11 threatened . . . [as] [t]he threat of detention or arrest is included in the plain meaning of

12 'coercion.' " (quoting Cuviello, 2009 WL 9156144, at *17); Cal. Civ. Code § 47(b); Cabesuela

13 v. Browning-Ferris Indus. of California, Inc., 68 Cal. App. 4th 101, 111, 80 Cal. Rptr. 2d 60, 65

14 (1998) (considering allegations that included an attempt to have plaintiff's parole revoked, as

15 well as "implicitly threatening [plaintiff] with police action, which implied the threat of physical

16 force and government authority perpetrated against the [plaintiff] directly, particularly because

17 the [plaintiff] would be, or might be, be viewed by the authorities as a dangerous parolee," and

18 finding the "allegations only imply that plaintiff might be subjected to violence by the police

19 [and] in no way show actual violence or intimidation by the threat of violence," and thus failed to

20 state a claim under the Bane Act."); Clifford v. Regents of Univ. of California, No. 2:11-CV-

21 02935-JAM, 2012 WL 1565702, at *9–10 (E.D. Cal. Apr. 30, 2012) ("Speech alone is

22 insufficient to support this type of claim; in order to be actionable, the speech itself must threaten

23 violence and place[] the victim in reasonable fear of violence . . . [p]laintiff has not alleged any

24 acts of violence or threats of violence by any University employees [and] [h]is contention that he

25 was 'systematically harassed' is not the equivalent of a violent act or threat of the same."), aff'd,

26 584 F. App'x 431 (9th Cir. 2014).

27      The Court finds the other allegations not directly threatening criminal investigation, also

28 amount only to speech, do not threaten violence under the meaning of the statute, and at most

amount to economic coercion.   The Court finds the analysis in <u>Lil' Man In The Boat</u> to be helpful.  There, Defendants argued the plaintiff alleged only a "verbal threat of economic harm if it did not sign the 2016 Landing Agreement."  2017 WL 3129913, at *10.  "Plaintiff objected to Defendants' characterization of its conduct as speech and describe[d] the following 'coercive and intimidating acts': 'prohibiting Plaintiff from landing at the Port of San Francisco, taking illegal fees, requiring Plaintiff and others to expose themselves to criminal liability.' "  <u>Id.</u>  The court found the first "act" was just speech, as the defendants "*told* Plaintiff that it could not use the North Side Dock if it did not sign the agreement; Plaintiff does not allege that it was actually *prevented* from landing." <u>Id.</u> (emphasis in original).  The court found the other two "acts" could not "have interfered with Plaintiff's First Amendment rights . . . [as] [l]ogically, it cannot be that collecting the landing fees (and thereby supposedly exposing Plaintiff to liability under section 23300) was an act designed to coerce Plaintiff into signing the allegedly unlawful waiver [b]ecause [b]oth the fees and the waiver were part of the same objectionable 2016 Landing Agreement [and] [h]aving to pay the fees was another reason *not* to sign the Agreement and the waiver within it, rather than the other way around." <u>Id.</u> (emphasis in original).  The court concluded plaintiff had made no attempt to allege violence or a threat of violence, instead focusing on argument that defendant engaged in coercive acts and not just speech, and the court saw "no support for the proposition that economic coercion of the kind at issue here can constitute violence or threats of violence." <u>Id.</u> at *11; <u>see also</u> <u>Gottschalk</u>, 964 F. Supp. 2d at 1164 ("She cites no authority indicating that 'economic coercion' or 'character assassination' may constitute violence or threats of violence within the meaning of either of these statutes."); <u>Everett v. City of Los Angeles Cnty.</u>, No. CV1907124CJCRAOX, 2019 WL 13253366, at *3 (C.D. Cal. Oct. 1, 2019) ("As Defendants note, Plaintiff has not alleged that he was threatened with violence in any way [and] [a]t most, he alleges that he was economically coerced [by in part, warning of discipline if did not do certain job duties after claiming medical condition,] by Defendants, but this is insufficient to state a claim."); <u>Minkley v. Eureka City Sch.</u>, No. 17-CV-3241-PJH, 2017 WL 4355049, at *17–18 (N.D. Cal. Sept. 29, 2017) ("Plaintiff argues that this "course of conduct" demonstrates Van Vleck's ability to make good on his verbal 'threat' to

harm her career, making it coercive and intimidating . . . [and] combined with Van Vleck's threat, provides the basis for her Bane Act claim, [and] is not required to satisfy the pleading requirements that would apply were her claim based on speech alone . . . [however,] [a]t most, Van Vleck's comment might be interpreted as a form of economic coercion, but threats of economic coercion do not constitute violence or a threat of violence." (citing Lil' Man In The Boat, 2017 WL 3129913, at *10; Gottschalk, 964 F.Supp. 2d at 1164)); Mayfield v. City of Oakland, No. C-07-0583EMC, 2007 WL 2261555, at *7 (N.D. Cal. Aug. 6, 2007) ("The Court acknowledges Rev. Owens's allegation that he was told to sign a document stating that he would not publicly discuss what was said at the OPACT meeting or otherwise he would be dismissed from the chaplaincy program . . . [t]here is nothing to indicate in its text or legislative history that § 52.1 protects against such purely nonphysical harm as economic sanctions, including dismissal from employment."); Rabkin v. Dean, 856 F. Supp. 543, 546, 552 (N.D. Cal. 1994) ("Plaintiff alleges that the newly-elected majority of the city council has singled her out for adverse salary decisions to punish her for her political associations and activities, and to drive her out of office . . . [a]lthough no California court has interpreted Section 52.1(b), the context of this section makes it clear that the statute is meant to protect against violence or the threat of violence . . . [a]ccordingly, the votes and threats alleged in the complaint are insufficiently threatening to state a claim under this section, and this claim is dismissed with prejudice."); Stanley v. California Highway Patrol, No. C082258, 2018 WL 266695, at *6 (Cal. Ct. App. Jan. 3, 2018) ("Here, the only allegation in the complaint was the posting of two doctored greeting cards above two employees' work stations . . . [and] no factual allegation of any physical threat, intimidation, or coercion, or any evidence or allegation that a threat of violence had been made against Stanley.").

Therefore, for the above stated reasons the Court recommends the motion to dismiss be granted because none of the allegations pertain to a threat of arrest, or seizure, or threat of physical act of violence or coercion by the actual individuals involved, nor immediate action on the part of law enforcement officers acting at the direction of such individuals. See Cal. Civ. Code § 52.1(k). California's immunity provisions provide additional support for this

1  recommendation.

2  **c.      California Immunity Provisions**

3       Finally, the Court finds California Civil Code Section 47, as well as California

4  Government Code Section 821.6, which *Plaintiffs did not address at all in opposition*, provide

5  additional grounds for granting Defendants' motion to dismiss, based on the allegations in the

6  operative complaint.  Section 47 provides that:

7               A privileged publication or broadcast is one made:

8                    (a) In the proper discharge of an official duty.

9                    (b) In any (1) legislative proceeding, (2) judicial
10              proceeding, (3) in any other official proceeding authorized by law,
                or (4) in the initiation or course of any other proceeding authorized
11              by law and reviewable pursuant to Chapter 2 (commencing with
                Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure,
12              except as follows: . . .

13  Cal. Civ. Code § 47(b).  "Except for malicious prosecution, the privilege afforded by § 47(a) is

14  virtually absolute."  Buzayan v. City of Davis, 927 F. Supp. 2d 893, 908 (E.D. Cal. 2013).

15  However, the provision was amended effective January 1, 2021, to state the "subdivision does

16  not make privileged any communication between a person and a law enforcement agency in

17  which the person makes a false report that another person has committed, or is in the act of

18  committing, a criminal act or is engaged in an activity requiring law enforcement intervention,

19  knowing that the report is false, or with reckless disregard for the truth or falsity of the report."

20  Cal. Civ. Code § 47(b)(5).  This means the amended provision would apply to the allegations

21  that are not conceded as time-barred (*i.e.* after May 2021), as discussed above.  To the extent

22  Plaintiffs would argue the Bane Act claim applies to the City for actions occurring before

23  January 1, 2021, in King, the court held Section 47's amended provision could not be applied

24  retroactively, and the immunity defense under Hagberg must be analyzed under the absolute

25  privilege rule.  King v. City of Sacramento, No. 2:20-CV-01326-KJM-DB, 2022 WL 37048, at

26  *3 (E.D. Cal. Jan. 4, 2022) (citing Hagberg v. California Federal Bank, 32 Cal. 4th 350, 361

27  (Cal. 2004); Redick v. Lowe's Home Centers, LLC, No. 1:21-00358-SAB, 2021 WL 3418728, at

28  *4 (E.D. Cal. Aug. 5, 2021)).

Thus generally for any allegations pertaining to events occurring before January 1, 2021, absolute immunity would apply except for a claim of malicious prosecution.[22]  The allegations pertaining to threats relating to potential prosecution are bare, and to the extent that Plaintiffs could argue the immunity is inapplicable under the amended statute because of reckless or knowing false statements made to law enforcement officials after January 1, 2021, the Court finds no specific allegations support stripping such immunity based on the allegations in the complaint.  (See SAC ¶¶ 40, 54, 58.)

The Court will first describe the state of the law under the absolute privilege standard. The Hagberg decision affirmed that the Section 47 is an absolute privilege that bars all tort causes of action except a claim for malicious prosecution.  32 Cal. 4th at 374.  The Supreme Court of California explained the policy reasons behind the absolute privilege:

> We have explained that the absolute privilege established by section 47(b) serves the important public policy of assuring free access to the courts and other official proceedings. It is intended to " 'assure utmost freedom of communication between citizens and *public authorities whose responsibility is to investigate and remedy wrongdoing.*' " (*Silberg, supra,* 50 Cal.3d at p. 213, 266 Cal.Rptr. 638, 786 P.2d 365, italics added.) We have explained that both the effective administration of justice and the citizen's right of access to the government for redress of grievances would be threatened by permitting tort liability for communications connected with judicial or other official proceedings. Hence, without respect to the good faith or malice of the person who made the statement, or whether the statement ostensibly was made in the interest of justice, "courts have applied the privilege to eliminate the threat of liability for communications made during all kinds of truth-seeking proceedings: judicial, quasi-judicial, legislative and other official proceedings." (*Ibid.*)

32 Cal. 4th at 360–61.  Of significance here, the Hagberg court noted numerous cases had found the privilege applied to complaints to governmental agencies requesting that the agency investigate or remedy wrongdoing.  Id. at 363 (collecting cases).  The court then extended that principle: "[b]y the same token, the overwhelming majority of cases conclude that when a citizen contacts law enforcement personnel to report suspected criminal activity and to instigate law

---

[22] "In California, the malicious prosecution plaintiff must plead and prove that the prior proceeding commenced by or at the direction of the malicious prosecution defendant, was: (1) pursued to a legal termination favorable to the plaintiff; (2) brought without probable cause; and (3) initiated with malice."  Womack v. Cnty. of Amador, 551 F. Supp. 2d 1017, 1031 (E.D. Cal. 2008).

enforcement personnel to respond, the communication also enjoys an unqualified privilege under section 47(b)."   Id. at 364.   The court noted "[t]hese cases explain that a statement urging law enforcement personnel to investigate another person's suspected violation of criminal law, to apprehend a suspected lawbreaker, or to report a crime to prosecutorial authorities is shielded from tort liability to the same extent as a similar statement to administrative enforcement agencies."  Id.

The Court finds further discussions regarding this immunity provision support the Court's findings above regarding the distinction between verbal threats of arrest by someone with the actual authority to effectuate an arrest (a police officer) and a non-officer.  See Black Lives Matter, 398 F. Supp. 3d 660.  Specifically, in discussing the provision, the California Supreme Court explained the differences between pure communication, versus earlier cases that explored circumstances where by conduct, one could aid an unlawful arrest (and the tort of false imprisonment), and thus have relevance to the Court's previous discussion of holdings pertaining to excessive force, and detainment, having an inherent coercively violent component.  See id.; Cornell, 17 Cal. App. 5th 766; Reese, 888 F.3d 1030.  The Hagberg court noted the distinction between malicious conduct and communication:

> These cases, however, did not mention, much less analyze, the privilege established by section 47(b). They explored the limits of the common law tort of false imprisonment and the potential for liability as an aider and abettor of an unlawful arrest by police officers. The cases did not consider the issue in the context of a proceeding in which bad faith actually was alleged. The cases also did not distinguish between malicious *conduct* of a citizen that aided or promoted a peace officer's unlawful arrest, which might support liability, and pure *communication,* which would be protected by the statutory privilege. (See *Kimmel v. Goland, supra,* 51 Cal.3d at p. 211, 271 Cal.Rptr. 191, 793 P.2d 524 [distinguishing injury from "noncommunicative conduct" from injury arising from "communicative acts"].) They did not consider whether a cause of action for false imprisonment based upon pure communication should be permitted even though a claim for *defamation* or any other tort save malicious prosecution would be prohibited by section 47(b) . . .

Hagberg, 32 Cal. 4th at 374.  The privilege applies to all tort claims with the exception of malicious prosecution, and it serves the public purpose of assuring free and open

1   communications with public authorities whose responsibility is to investigate and remedy

2   wrongdoing.  Id. at 360 ("Hence, without respect to the good faith or malice of the person who

3   made the statement, or whether the statement ostensibly was made in the interest of justice,

4   courts have applied the privilege to eliminate the threat of liability for communications made

5   during all kinds of truth-seeking proceedings.") (citation and quotation mark omitted).

6        Cornell, 17 Cal. App. 5th 766, and subsequent cases have held a Bane Act plaintiff need

7   not show threats, coercion, or violence, beyond the allegedly false arrest itself because an arrest

8   is inherently coercive.  As noted above, the Court finds Plaintiffs' reliance on this line of cases is

9   not persuasive under the circumstances here because those cases involved police officers with

10  the direct ability to instantly carry out the arrest or seizure, through force.  Here, the Court finds

11  a meaningful distinction as to the communicative conduct at issue by the City Defendants as

12  compared to the communicative conduct by the police officers in such cases.  This principle is

13  reinforced and demonstrated by the example offered by the California Supreme Court in the

14  context of Section 47, where, a hypothetical burglary victim, suspecting that his stolen property

15  was in a neighbor's home, stood at the door with the police and *personally* threatened physical

16  violence against the neighbor if she did not consent to a warrantless police search of her home.

17  Thus, in that hypothetical, while the defendant himself was not subject to the Fourth

18  Amendment, he could potentially be liable under the Bane Act for using threats, intimidation, or

19  coercion to interfere with his neighbor's ability to assert her Fourth Amendment rights against

20  the police by objecting to a warrantless search:

21          We recognize that because section 52.1 proscribes attempted or
            completed interferences with rights secured by law, it may provide
22          a cause of action based on such rights when a private actor
            interferes with them or attempts to do so by coercion, even if the
23          wrongdoer could not violate them directly. For example, if a
            burglary victim, suspecting that his stolen property lay hidden in a
24          nearby house, stood at the door with the police and threatened to
            injure the homeowner if she did not change her mind and consent
25          to an official and warrantless search of her premises, the
            homeowner might, under section 52.1, be able to sue her neighbor
26          for interfering with her Fourth Amendment rights, assuming for
            purposes of this example that the Fourth Amendment protected her
27          against warrantless searches by the state without her consent under
            the circumstances. For another example, the right to vote (*Burdick
28          v. Takushi* (1992) 504 U.S. 428, 441 [112 S.Ct. 2059, 2067, 119

99

1   L.Ed.2d 245]) includes a right to vote, under the Fifteenth,
2   Nineteenth and Twenty-fourth Amendments to the United States
    Constitution, free of certain burdens (*Ex parte Yarbrough* (1884)
3   110 U.S. 651, 664-665 [4 S.Ct. 152, 158-159, 28 L.Ed.
    274]; *Williams v. Rhodes* (1968) 393 U.S. 23, 29 [89 S.Ct. 5, 9-10,
4   21 L.Ed.2d 24]). To the extent that the right to vote is guaranteed
    by the federal Constitution, or by other "laws" (§ 52.1), a private
5   actor's coercive attempted or completed interference with it might
    be actionable under section 52.1.

6   . . . However rough defendants' treatment of Jones may have been,
    it did not interfere with his ability to assert his rights under those
7   constitutional guaranties. Those rights were not put in jeopardy in
    this dispute, as they might have been if defendants had called the
8   police and then coercively interfered with Jones's Fourth
    Amendment rights when he attempted to exercise them *against the*
9   *police*.

10  Jones v. Kmart, 17 Cal. 4th at 334–35.

11      Finally, Plaintiffs did not address the Defendants' citation to California Government

12  Code Section 821.6.  Under the provision, "[a] public employee is not liable for injury caused by

13  his instituting or prosecuting any judicial or administrative proceeding within the scope of his

14  employment, even if he acts maliciously and without probable cause."  Cal. Gov't Code § 821.6.

15  In the absence of any opposition from Plaintiff regarding this statute, the Court finds it also

16  weighs in favor of granting Defendants' motion to dismiss.  See Leon v. Cnty. of Riverside, 64

17  Cal. App. 5th 837, 846, 279 Cal. Rptr. 3d 261, 267 (2021) ("Our state Court of Appeal has

18  consistently construed section 821.6 as immunizing a public employee from liability for any

19  injury-causing act or omission in the course of the institution and prosecution of any judicial or

20  administrative proceeding, *including an investigation that may precede* the institution of any

21  such proceeding.") (emphasis added); Teasdale v. City of Fullerton, No. G034518, 2006 WL

22  1017280, at *6 (Cal. Ct. App. Apr. 19, 2006) (unpublished) ("As noted in *Kemmerer v. County*

23  *of Fresno* (1988) 200 Cal.App.3d 1426, 1436, the section 821.6 immunity extends not only to

24  prosecuting attorneys (such as Palmer), but to *all* employees of a public entity who are involved

25  in the prosecutorial or investigatory process . . . if the public employees are immune, so too is the

26  public entity [and] [a]ccordingly, all state and common law causes of action against the

27  individual defendants, the City, and *the City Council* are barred by section 821.6.") (emphasis

28  added); Ingram v. Flippo, 74 Cal. App. 4th 1280, 1292, 89 Cal. Rptr. 2d 60, 68 (1999) ("Under

1  California law the immunity statute is given an "expansive interpretation" in order to best further

2  the rationale of the immunity, that is to allow the free exercise of the prosecutor's discretion and

3  protect public officers from harassment in the performance of their duties."); <u>Ciampi v. City of

4  Palo Alto</u>, 790 F. Supp. 2d 1077, 1109 (N.D. Cal. 2011) ("California Government Code § 821.6

5  grants public employees immunity from malicious prosecution claims.").

6        The statute's inapplicability to false arrest or imprisonment, also appears in line with the

7  Court's discussion above concerning verbal threats versus actions by a non law enforcement

8  officer.  <u>See</u> <u>Jones v. Kmart</u>, 17 Cal. 4th at 334–35; <u>Hagberg</u>, 32 Cal. 4th at 374; <u>Black Lives

9  Matter</u>, 398 F. Supp. 3d 660; <u>Gillan v. City of San Marino</u>, 147 Cal. App. 4th 1033, 1050–51, 55

10  Cal. Rptr. 3d 158, 173 (2007) ("The count for violation of Civil Code section 52.1 is based on an

11  arrest without probable cause, as we have stated [however] [b]ecause Government Code section

12  821.6 provides no immunity from liability for false arrest or false imprisonment . . . section

13  821.6 provides no immunity from liability under Civil Code section 52.1 based on an arrest

14  without probable cause . . . [h]ere in contrast, the California Supreme Court has determined that

15  Government Code section 821.6 was not intended to protect public employees from liability for

16  false arrest or false imprisonment.") (citations omitted); <u>Padgett v. City of Monte Sereno</u>, No. C

17  04-03946 JW, 2005 WL 8161831, at *9 (N.D. Cal. Mar. 30, 2005) ("The Court finds that the

18  plain language of Gov't Code § 821.6 provides Defendant [City Manager] Loventhal immunity

19  from liability for any injury caused in prosecuting the civil nuisance action and criminal

20  proceeding[,] Plaintiffs have not provided any reasons as to why the plain language of § 821.6

21  does not apply[,] [and] [m]oreover, the Court . . . finds that Defendant City is also immune by

22  virtue of Section 815.2(b) [which] provides that 'Except as otherwise provided by statute, a

23  public entity is not liable for an injury resulting from an act or omission of an employee of the

24  public entity where the employee is immune from liability.") (citations omitted).

25        Accordingly, for all of the above stated reasons, the Court finds the Defendants' motion

26  to dismiss the Plaintiffs' Bane Act claim should be granted with leave to amend only as to

27  allegations that occurred after May of 2021 (or July 17, 2019, if clarified through stipulation or

28  objections), and only to the extent Plaintiffs believe in good faith they can cure the numerous

deficiencies identified above, in line with the weight of the legal authority implicating Plaintiffs'

allegations are legally insufficient.

### D. The Court Recommends Granting Defendants' Motion to Dismiss the Unruh Act Claim without Leave to Amend

The fourth cause of action is brought pursuant to California Civil Code sections 51.5 and

52, for discriminatory business dealings.  The claim as alleged in the SAC was brought on behalf

of both Plaintiffs Frazier and CVCSF, against all Defendants.  (SAC ¶¶ 92-99, ECF No. 61 at 30-

32.)  However, after briefing and confirmation in post-hearing filings, Plaintiffs have agreed that

the only Defendant as to this cause of action is the City.  (See ECF Nos. 70, 71.)  Thus, the

action is not brought against any of the individual City Defendants.  In the SAC, Plaintiffs allege:

> CVCSF, as a minority-founded non-profit entity, has right under California Civil Code §§ 51.5 and 52 to equality in the making and enforcement of contracts, which includes rights pertaining to the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. Mr. Frazier, both as a minority and an individual singled out without any rational basis, has equal protection rights against government mistreatment. These private rights of action are enforceable against public actors and public entities.

(SAC ¶ 94.)

"The Unruh Act, [California] Civ. Code § 51, is a public accommodations statute that

focuses on discriminatory behavior by business establishments."  Kenney v. City of San Diego,

No. 13CV248-WQH-DHB, 2013 WL 5346813, at *3 (S.D. Cal. Sept. 20, 2013) (quoting Stamps

v. Superior Court, 136 Cal.App.4th 1441, 1452, 39 Cal.Rptr.3d 706 (2006)).  "The Unruh Act's

overarching purpose is 'to create and preserve a nondiscriminatory environment in California

business establishments by banishing or eradicating arbitrary, invidious discrimination by such

establishments.' "  Smith v. BP Lubricants USA Inc., 64 Cal. App. 5th 138, 154, 278 Cal. Rptr.

3d 587, 600 (2021) (quoting White v. Square, Inc., 7 Cal. 5th 1019, 1025, 446 P.3d 276, 278

(2019)).

Section 51 provides in relevant part: "All persons within the jurisdiction of this state are

free and equal, and no matter what their sex, race, color, religion, ancestry, national origin,

disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."  Cal. Civ. Code § 51(b).  Section 51.5 provides in relevant part: "No business establishment of any kind whatsoever shall discriminate against, boycott or blacklist, or refuse to buy from, contract with, sell to, or trade with any person in this state on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51, or of the person's partners, members, stockholders, directors, officers, managers, superintendents, agents, employees, business associates, suppliers, or customers, because the person is perceived to have one or more of those characteristics, or because the person is associated with a person who has, or is perceived to have, any of those characteristics."  Cal. Civ. Code § 51.5(a).  "As used in this section, 'person' includes any person, firm, association, organization, partnership, business trust, corporation, limited liability company, or company."  Cal. Civ. Code § 51.5(b).[23]

"To establish an Unruh Act claim, a plaintiff must show that '[s]he was denied the full and equal accommodations, advantages, facilities, privileges, or services in a business establishment[.]' "  L.L. v. Keppel Union Sch. Dist., No. CV206990DMGJPRX, 2021 WL 4692781, at *3 (C.D. Cal. July 29, 2021) (quoting Wilkins-Jones v. Cnty. of Alameda, 859 F. Supp. 2d 1039, 1048 (N.D. Cal. 2012); Johnson v. Beahm, No. CV 11-0294-MCE-JFM, 2011 WL 5508893 at *4 (E.D. Cal. Nov. 8, 2011)).  "[T]he defendant must be a business establishment."  Absolute USA, Inc. v. Harman Pro., Inc., No. 221CV06410MEMFMAAX, 2023 WL 2064048, at *18 (C.D. Cal. Feb. 14, 2023) (citing Smith, 64 Cal. App. 5th at 154).

Plaintiffs argue that to the extent the Defendants contend the elements of an Unruh Act

---

[23] Section 52 provides for a cause of action and damages.  It provides in part: "Whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51, 51.5, or 51.6, is liable for each and every offense for the actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no case less than four thousand dollars ($4,000), and any attorney's fees that may be determined by the court in addition thereto, suffered by any person denied the rights provided in Section 51, 51.5, or 51.6."  Cal. Civ. Code § 52(a).  Subsection (c) also provides that: "Whenever there is reasonable cause to believe that any person or group of persons is engaged in conduct of resistance to the full enjoyment of any of the rights described in this section, and that conduct is of that nature and is intended to deny the full exercise of those rights, the Attorney General, any district attorney or city attorney, or any person aggrieved by the conduct may bring a civil action in the appropriate court by filing with it a complaint."  Cal. Civ. Code § 52(c).

have not been met, a plaintiff must show: (1) discriminatory treatment; (2) motivated in substantial part by discriminatory animus; (3) harm; and (4) a causal link between the discriminatory action and harm.  See CACI 3060-3061.

1.     The Government Claims Act

The Court incorporates the above discussion of the GCA from the preceding sections IV(B) and IV(C)(1).  Defendants argue that the GCA applies to the Unruh Act, so present the same challenge as above.  Defendants submit that if the previous allegations are excluded under the GCA, there are no more factual allegations to justify an Unruh Act violation against the Original Defendants, and thus at a minimum the Court should strike all allegations of Unruh violation prior to July 17, 2019.  Plaintiffs respond similarly to the preceding sections as to the GCA, emphasizing the law concerns facts, not legal theories.

The Court incorporates the above discussion of the GCA from the preceding sections. Plaintiffs do not dispute that the GCA applies to Unruh Act claims, and the Court finds it does to the extent Plaintiffs seek monetary relief not incidental to any injunctive relief.  See Lozada v. City & Cnty. of San Francisco, 145 Cal. App. 4th 1139, 1166, 52 Cal. Rptr. 3d 209, 226–27 (2006) ("In Gatto . . . we held that the Government Claims Act applied to alleged violations under the Unruh Civil Rights Act . . . where the money damages sought were not incidental or subsidiary to the plaintiff's interest in injunctive relief, despite the similarity of Unruh Civil Rights Act claims to claims for violation of the FEHA (§ 12900 et seq.) and federal civil rights claims under 42 United States Code section 1983, both of which are exempt from requirements of the Government Claims Act." (citing Gatto v. Cnty. of Sonoma, 98 Cal. App. 4th 744, 120 Cal. Rptr. 2d 550 (2002))); Hunt v. City of Los Angeles, No. CV 17-8064 AG (SS), 2019 WL 6831445, at *13 (C.D. Cal. Oct. 24, 2019) ("Both the Bane Act and Unruh Act claims are subject to the Government Claims Act presentation requirements to the extent that they seek money damages."); Rahmaan v. Cmty. Dev. Comm'n of the Cnty. of Los Angeles, No. CV 16-08274-DDP-RAO, 2017 WL 10562664, at *7 (C.D. Cal. Feb. 9, 2017) ("Plaintiff's Unruh Act claim fails because Plaintiff has not alleged that he has filed a timely claim under the GCA."); Jefferson v. City of Fremont, No. C-12-0926 EMC, 2012 WL 1534913, at *4 (N.D. Cal. Apr. 30,

2012) ("Defendants are correct that claims under § 51 of the California Unruh Civil Rights Act are subject to the CTCA's claim presentation requirement.") (citations omitted).

As with the Bane Act and breach of contract, the Court finds in favor of Defendants. Given the Court's findings above as to the GCA caselaw pertaining to alleging a cause of action within the submitted GCA, the Court again considers there could be an argument that the Unruh Act claim altogether should be dismissed for failure to comply with the GCA as the FAC attached to the 2022 GCA claim also did not include an Unruh Act cause of action, like the SAC. See, e.g.., Jadwin, 2009 WL 926844, at *11; Nelson, 139 Cal.App.3d at 79.   However, Defendants only argue that the claim against the originally named City Defendants is barred, and for the same reasons stated above, does not further consider that issue.  (Mot. 22.)  Similar to the Bane Act claim, the Court finds striking is unnecessary, as the entire Unruh Act claim is recommended to be dismissed for additional reasons explained below, however *without* leave to amend.[24]

2.   The Court Recommends the Bane Act Claim Should be Dismissed as the City of Fresno is not a Business Establishment

Second, Defendants argue Plaintiffs cannot maintain a cause of action under Civil Code 51.5, as Section 51.5 is only enforceable against a business establishment, as recently confirmed by the California Supreme Court.  See Brennon B. v. Superior Ct., 13 Cal. 5th 662, 678–79, 513 P.3d 971, 980–81 (2022).

Plaintiffs respond that a public entity acting in commerce, as opposed to acting in a governmental capacity, may be subject to suit under the Unruh Act, proffering the Supreme Court of California stated that a public entity or sub-agency thereof may qualify as a "business establishment" under the Unruh Act when it "effectively operate[s] as a business or a commercial enterprise or 'engage[s] in behavior involving sufficient 'businesslike attributes.' " Brennon, 13 Cal.5th at 681-682 (quoting Carter v. City of Los Angeles, 224 Cal. App. 4th 808,

---

[24]  To the extent the District Judge is inclined to grant leave as to the Unruh Act claim, Defendants appear to only request dismissal of allegations prior to July 17, 2019, and would recommend granting leave to amend this claim only as to allegations after such time.

825, 169 Cal. Rptr. 3d 131, 144 (2014)).  Plaintiffs argue the City of Fresno here was engaged in a real estate transaction, *i.e.*, a Ground Lease and related Service Agreement with a local developer, and was not, like the school district in <u>Brennon</u>, engaging in traditional supervisory and educational functions central to its mission.  At minimum, Plaintiffs implead the Court should allow this claim to proceed through discovery in order to enable Plaintiffs to obtain discovery regarding the nature of the City of Fresno's actions, *i.e.*, whether it was acting as a typical public entity or engaging in commerce.  However as noted above, the parties have agreed the City of Fresno is the only Defendant to this cause of action because, in part, Plaintiffs concede the Unruh Act claim against individual City of Fresno employees are subject to dismissal because such individual employees would only be agents of a qualifying business establishment, not business establishments themselves.

While Defendants in reply state Plaintiffs provide no caselaw in support of their position, Defendants also did not provide any specific caselaw in reply, beyond <u>Brennon</u>, such as pertaining generally to landlords (residential or commercial), or caselaw specific or analogous to government entities engaging in a role similar to that of a commercial landlord, pre or post-<u>Brennon</u>.  Given the recent decision in <u>Brennon</u>, and because the parties provided no specific case law applying the decision to a similar fact pattern as here, the Court proceeds to review the state of the law preceding the <u>Brennon</u> decision, to determine what impact it has on the current state of law more generally.  For the reasons explained below, based on the Court's research, the Court finds the weight of authority supports Defendants, particularly after the holding in <u>Brennon</u>.  Overall, the Court believes <u>Brennon</u> is better read as a presumption against finding a government entity is acting in commerce, and without more from Plaintiffs here, their general request to proceed into discovery should be rejected, and the Court recommends the claim should be dismissed without leave to amend.

### a.    Expansive Interpretation Before <u>Brennon</u>

Prior to the decision in <u>Brennon</u>, courts applied an expansive interpretation of the Unruh Act as to the meaning of "business establishment."    <u>See, e.g.</u>, <u>R. v. Nulick</u>, No. 115CV01378JAMEPG, 2016 WL 2756738, at *5 (E.D. Cal. May 12, 2016) ("[T]he text of the

1   Unruh Act clearly states that discrimination is barred '*in* all business establishments,' not *by* all

2   business establishments . . . only defines *who* is protected and where they shall be free from

3   discrimination; it does not define--and limit--*what* persons are liable for such discrimination . . .

4   52(c) describes how to bring a civil action whenever '*any* person or group of persons is engaged

5   in conduct of resistance to the full enjoyment of any of the rights hereby secured[,]' . . . [and]

6   supports the conclusion that 'the term business establishments must properly be interpreted in the

7   broadest sense reasonably possible.' " (first quoting <u>Gibson v. Cty. of Riverside</u>, 181 F. Supp. 2d

8   1057, 1090 (C.D. Cal. 2002); then quoting <u>Harrison v. City of Rancho Mirage</u>, 243 Cal.App.4th

9   162, 173 (2015))).

10          Courts found that "[a]n entity qualifies as a business establishment for purposes of the

11   Unruh Act when it 'appears to have been operating in a capacity that is the functional equivalent

12   of a commercial enterprise.' " <u>Cooley v. City of Los Angeles</u>, No. 218CV09053CASPLA, 2019

13   WL 3766554, at *6 (C.D. Cal. Aug. 5, 2019) (quoting <u>Warfield v. Peninsula Golf & Country</u>

14   <u>Club</u>, 10 Cal. 4th 594, 622 (1995)).  "[B]ecause the Unruh Act was intended to extend the reach

15   of California's prior public accommodation statute, entities lacking a business-related purpose

16   may also be a 'business establishment' for the purposes of the Unruh Act if 'the entity's

17   attributes and activities demonstrate that it is the functional equivalent of a classic place of public

18   accommodation or amusement.' " <u>Cooley</u>, 2019 WL 3766554, at *6 (quoting <u>Curran v. Mount</u>

19   <u>Diablo Council of the Boy Scouts</u>, 17 Cal. 4th 670, 697 (1998)).  In <u>Cooley</u>, the court found

20   there were "no allegations in the complaint that support an inference that the area cleanings are a

21   business-like activity," and instead it appeared the "City conduct[ed] area cleanings as a public

22   service."  2019 WL 3766554, at *6.

23          Courts have considered various factors when determining whether to apply the Unruh Act

24   to organizations such as non-profit associations, as operating as an equivalent to a business

25   establishment, "including: (a) what, if any, business benefits one may derive from membership;

26   (b) the number and nature of paid staff; (c) whether the organization has physical facilities; (d)

27   what are the purposes and activities of the organization; (e) the extent to which the organization

28   is open to the public; (f) whether there are any fees or dues for participation or membership; and

1  (g) the nature of the organization's structure." <u>Inland Mediation Bd. v. City of Pomona</u>, 158 F.

2  Supp. 2d 1120, 1151 (C.D. Cal. 2001) (citing <u>Harris v. Mothers Against Drunk Driving</u>, 40

3  Cal.App.4th 16, 46 Cal.Rptr.2d 833, 834–35 (1995)).  "In [<u>O'Connor</u>], the California Supreme

4  Court applied a similar set of factors in concluding that a condominium homeowners' association

5  possessed 'sufficient businesslike attributes to fall within the Act's reference to [business

6  establishments].' " <u>Inland Mediation</u>, 158 F. Supp. 2d at 1151–52 (quoting <u>O'Connor v. Village</u>

7  <u>Green Owners Assn.</u>, 33 Cal.3d 790, 796, 191 Cal.Rptr. 320, 662 P.2d 427 (1983)).

8        As for the extension to government entities specifically, courts considered prior to

9  <u>Brennon</u>, that "an entity such as a city or county must be acting as a business establishment when

10  the alleged wrongful acts occurred." <u>C.O. v. Cnty. of Kern</u>, No. 120CV1338JLTBAKEPG, 2022

11  WL 286544, at *5 (E.D. Cal. Jan. 31, 2022) ("Given the complete dearth of factual allegations

12  regarding how Plaintiff believes the County acted as a business establishment at the time of the

13  alleged wrongful acts, the Court is unable to find the County was operating as a 'business

14  establishment' such that liability may be imposed under the Unruh Act."); <u>Belinski v. City of</u>

15  <u>San Bernardino</u>, No. CV088571PSGMANX, 2010 WL 11596645, at *3 (C.D. Cal. Jan. 27,

16  2010) ("Case law cited by the City supports its contention that some of an entity's operations

17  may qualify as the operations of a business establishment that would bring the entity within

18  reach of the Act, while others may not, depending on the nature of the transactions at issue . . .

19  Plaintiff does not allege to have transacted any business with the City in the course of using the

20  bus system, nor does Plaintiff allege that the City engaged in any commercial activity relating to

21  the bus system.").

22        Activities relating to legislative processes, permitting processes, and other regulatory

23  processes, were generally held not to equate to the government acting as a business

24  establishment.  In <u>S.G.</u>, the court held the complaint did "not explain why the City should be

25  treated as a 'business establishment,' " found "it is not apparent that the City's CEQA and

26  construction approval processes are comparable to public accommodations," and therefore "even

27  applying a broad interpretation of the term 'business establishments,' the TAC does not

28  adequately allege that, with respect to the conduct at issue, the City is a 'business establishment'

to which the Unruh Act applies." S.G. v. City of Los Angeles, No. LACV1709003JAKPJWX, 2020 WL 8837146, at *13 (C.D. Cal. Feb. 21, 2020); see also Iloputaife v. City of Beaumont, No. EDCV211452JWHAGR, 2022 WL 17586673, at *10 (C.D. Cal. June 24, 2022) ("The Unruh Act does not apply to cities unless they were functioning as a business establishment when the allegedly wrongful acts occurred . . . Plaintiff[s] have not explained how the City could be deemed to act as a business establishment with respect to the permitting process for Plaintiffs' modifications to their residence."), report and recommendation adopted, No. EDCV211452JWHAGR, 2022 WL 17584228 (C.D. Cal. Dec. 9, 2022). In Insight Psychology on the other hand, the court found plaintiffs' claims were "not based solely on Costa Mesa 'enacting legislation[,]' [but] . . . also based on the alleged discrimination Plaintiffs endured in Costa Mesa's permitting and reasonable accommodation processes [] and in Costa Mesa's subsequent code enforcement activities [] which are quasi-adjudicatory (not legislative) in nature." Insight Psychology & Addiction, Inc. v. City of Costa Mesa, No. SACV2000504JVSJDEX, 2020 WL 7222088, at *8 (C.D. Cal. Oct. 2, 2020) (denying the city's motion to dismiss Unruh Act claim).

Thus, pre-Brennon, somewhat reductively, a government entity could be considered a business establishment under the Unruh Act if it was acting as a business establishment.

### b. Landlords Generally

Generally, the Unruh Act can apply to landlords renting residential housing, as a business establishment. See Hubert v. Williams, 133 Cal. App. 3d Supp. 1, 3–4, 184 Cal. Rptr. 161, 162–63 (App. Dep't Super Ct. 1982) ("[W]e hold that under the Unruh Act, landlords may not refuse to rent an apartment to a homosexual solely because of that person's sexual preference[;] . . . [t]he term 'business establishment' has been uniformly construed as including rental housing."); Swann v. Burkett, 209 Cal. App. 2d 685, 694–95, 26 Cal. Rptr. 286, 291–92 (Ct. App. 1962) ("[T]he Legislature intended in sections 51 and 52 to cover 'housing' and its interpretation of the words 'business establishments' seems clearly to apply to the situation in the case at bench . . . used the words 'all' and 'of every kind whatsoever' in referring to business establishments covered by the Unruh Act . . . [and] [w]hile it is possible that renting a triplex may not heretofore

have been considered generally as a 'business' it would appear that in construing section 51 the Supreme Court did so in context with the purpose the Legislature had in mind and the evil which the Legislature intended to meet; namely, discrimination because of race, etc.") (citations omitted).   In the context of residential housing, prospective tenants are "customers" for the landlord "business establishment":

> In evaluating the legality of the challenged exclusionary policy in this case, we must recognize at the outset that in California, unlike many other jurisdictions, the Legislature has sharply circumscribed an apartment owner's traditional discretion to accept and reject tenants on the basis of the landlord's own likes or dislikes. California has brought such landlords within the embrace of the broad statutory provisions of the Unruh Act, Civil Code section 51. Emanating from and modeled upon traditional "public accommodations" legislation, the Unruh Act expanded the reach of such statutes from common carriers and places of public accommodation and recreation, e.g., railroads, hotels, restaurants, theaters and the like, to include "all business establishments of every kind whatsoever." (See generally Horowitz, *The 1959 California Equal Rights in "Business Establishments" Statute—A Problem in Statutory Application* (1960) 33 So.Cal.L.Rev. 260, 272–294.)

> For nearly two decades the provisions of the Unruh Act, in light of its broad application to "all business establishments," have been held to apply with full force to the business of renting housing accommodations. [citations] Indeed, in the case at bar, Marina Point apparently concedes that, like other business establishments that deal with the public, its freedom or authority to exclude "customers," i.e., prospective tenants, from the goods and services it offers, i.e., rental units, is limited by the provisions of the Unruh Act.

Marina Point, Ltd. v. Wolfson, 30 Cal. 3d 721, 730–31 & n.4 , 640 P.2d 115, 120–21 (1982) ("Section 51 presently provides: 'All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry or national origin are entitled to the full and equal accommodations, advantages, facilities, privileges or services in all business establishments of every kind whatsoever.' "); see also Action Apartment Ass'n v. Santa Monica Rent Control Bd., 94 Cal. App. 4th 587, 620, 114 Cal. Rptr. 2d 412, 436 (2001), as modified (Jan. 3, 2002) ("They filed suit under the Unruh Act, which generally prohibits arbitrary conduct by business establishments, including landlords." (citing Marina Point, 30 Cal. 3d at 730–31)).

As for commercial landlords, in an unpublished opinion, a California court of appeal

noted "commercial landlords cannot act illegally or against public policy," that "[f]or example,
section 51, subdivision (b), of the Unruh Civil Rights Act prohibits discrimination by business
establishments," and "[a] landlord exercising sole discretion in considering an assignment cannot
make the decision based on illegal grounds."  Nevada Atl. Corp. v. Wrec Lido Venture, LLC,
No. G039825, 2008 WL 5065977, at *6 (Cal. Ct. App. Dec. 2, 2008) (unpublished).  In Roth, the
plaintiff, a doctor of podiatry, argued Rhodes, an operator of a medical building, violated the
Unruh Act as a commercial landlord that operated a business establishment, by refusing to lease
offices to plaintiff on the basis of a policy of only leasing to medical doctors.  Roth v. Rhodes, 25
Cal. App. 4th 530, 537, 30 Cal. Rptr. 2d 706, 709 (1994).  While assuming the Unruh applies to
protect certain classifications of people from discrimination, the court found there could be
legitimate business interests in the exclusion here:

> Furthermore, apparently referring to classifications other than
> those statutorily protected, *Harris* notes, "the California appellate
> cases have also recognized that legitimate business interests may
> justify limitations on consumer access to public accommodations."
> (*Id.* at p. 1162, 278 Cal.Rptr. 614, 805 P.2d 873.) Such a legitimate
> business interest is obvious here. Operators of commercial
> buildings have legitimate reasons to designate the purposes for
> which they wish to let them by limiting their tenants to certain
> trades or professions or with respect to the type of merchandise
> sold. If a shopping mall is intended to appeal to a particular
> segment of the market, it serves no social or economic purpose for
> the law to demand tenants not in keeping with this objective, be
> granted leases. If operators of an office building perceive a niche in
> the market for a particular type of tenant, no useful purpose is to be
> served by our interfering with their economic decision to so limit
> the tenancy. It may well be that the very prestige which Roth
> attributes to Rhodes' medical building, and on which Roth desires
> to trade, is in part the result of Rhodes' leasing policies. Unless
> legally prohibited discrimination results, a court should not
> insinuate itself into the market place to prohibit Rhodes from
> maintaining such policies as have resulted in the commercial
> success attributed to him by Roth.

Roth, 25 Cal. App. 4th at 539.  Ultimately, the court found that "[t]he election to practice a
particular profession represents a professional and, frequently, an economic choice, rather than a
personal characteristic of the type enumerated in the act," and therefore held that "discrimination
in leasing office space based on profession, as long as it is not a strat[a]gem designed to disguise
discrimination based on personal characteristics protected under the Unruh Civil Rights Act, is

not prohibited under the act."  Id.; see also Semler v. Gen. Elec. Cap. Corp., 196 Cal. App. 4th 1380, 1394, 127 Cal. Rptr. 3d 794, 804 (2011) ("In the wake of Harris, the Courts of Appeal have held that . . . a commercial landlord could refuse to rent office space to a podiatrist on the ground that the office building was intended to provide space for medical doctors." (citing Roth, 25 Cal. App. 4th at 538-39)); Sisemore v. Master Fin., Inc., 151 Cal. App. 4th 1386, 1407–08, 60 Cal. Rptr. 3d 719, 736–37 (2007) (In Roth, the "court concluded that restrictions by a commercial landlord limiting tenants to certain occupations do not run afoul of the Act as long as the restrictions are not used as a pretext to exclude persons having personal characteristics protected under the Act.").

In Sowoco, the court noted that the "Unruh Act protects 'clients, patrons or customers,' or a '[P]laintiff ... in a relationship with the offending organization similar to that of the customer in the customer-proprietor.' "  Sowoco v. Roadway Package Sys., Inc., No. 2:07 CV 662 GEB GGH, 2007 WL 2288300, at *2 (E.D. Cal. Aug. 8, 2007) (quoting Strother v. S. Cal. Permanente Med. Group, 79 F.3d 859, 873-74 (9th Cir.1996)).  There, in an inverse of the situation here, the plaintiff was the landlord for FedEx.  "FedEx argue[d] Plaintiff's claim under the Unruh Act, in which Plaintiff alleges that FedEx intentionally breached its contractual obligations to Plaintiff because one of Plaintiff's partners is of Arabic descent, must be dismissed because a landlord is not protected under the Unruh Act for discrimination by a tenant."  Id.  Plaintiff countered that the Act should interpreted broadly to provide protection against all discrimination.  Id.  The court found that under the Unruh Act, a "landlord constitutes a business establishment within the meaning of the Unruh Act and therefore, is not the equivalent of a client, patron, or customer under the Act."  Id. (citing O'Connor v. Vill. Green Owners Ass'n, 33 Cal.3d 790, 796, 191 Cal.Rptr. 320, 662 P.2d 427 (1983)).  Given the plaintiff was the landlord and not the tenant, the court dismissed the claim against FedEx.  Id.

To perhaps add to the confusion of the interplay between homeowner associations acting as business establishments, and the relevance of that line of holdings to the current issue, see O'Connor, 33 Cal.3d at 796, pre-Brennon, a federal court found that a private organization, while acting like a landlord and a business establishment for Unruh Act purposes, did not mean

the entity was a state actor for purposes of Section 1983.  Yan Sui v. Southside Towing, No. SACV1001973JAKAJW, 2012 WL 13048510, at *5 (C.D. Cal. June 5, 2012) ("The California Supreme Court reasoned that the homeowners' association 'performs all the customary business functions which in the traditional landlord-tenant relationship rest on the landlords' shoulders[,]' . . . includ[ing] employing a professional property management firm, obtaining insurance for the benefit of all owners, maintaining and repairing common areas, establishing and collecting assessments from all owners to pay for its undertakings, and adopting and enforcing rules and regulations . . . O'Connor, . . . does not address the issue whether a homeowners' association is a state actor or acting under color of law for purposes of a section 1983 claim[,] [h]owever, its conclusion that a homeowners' association is analogous to a landlord and is a 'business establishment' under the Unruh Civil Rights Act undermines plaintiffs' reliance on cases characterizing homeowners' associations as quasi-governmental entities." (quoting ." O'Connor, 33 Cal.3d at 796, report and recommendation adopted, No. SACV 10-1973 JAK AJW, 2012 WL 2564778 (C.D. Cal. June 29, 2012), aff'd, 582 F. App'x 731 (9th Cir. 2014); see also id. (noting under state law, homeowners' associations are sometimes treated as landlords, sometimes as "minigovernments," sometimes as businesses, and sometimes as corporations) (quoting James F. O'Toole Co. v. Los Angeles Kingsbury Ct. Owners Assn., 126 Cal. App. 4th 549, 553, 23 Cal. Rptr. 3d 894, 897 (2005) ("The relationship between individual homeowners and the managing association of a common interest development is complex . . . and their respective rights depend upon the nature of the particular dispute.").

Thus, generally, it appears a commercial landlord can be considered a business establishment for purposes of the Unruh Act.

### c.    The Court Finds Pre-Brennon and Post-Brennon Caselaw as Applied to Role of City of Fresno as Alleged Counsel in Favor of Dismissal

In Nevarez, the court considered city owned and operated golf courses under the expansive language of the statute as then interpreted pre-Brennon:

> Based on the expansive language of the statute, the requirement to interpret "of every kind whatsoever" in the broadest sense reasonably possible, and that the original version of the bill

included "private or *public* groups, organizations, associations, business establishments, schools, and *public facilities*," *O'Connor*, 33 Cal. 3d at 795, the Court concurs that the City is not categorically excluded from the reach of the Unruh Act simply because it is a public entity. Additionally, based on either standard – exhibiting business attributes or providing a place of public accommodation or amusement – the City's golf courses constitute "business establishments" under the Unruh Act. Similar to the non-profit hospital in *O'Connor*, presumably the City pays staff to work at the golf courses, cares for extensive physical facilities, and charges fees to those who use the facilities. Additionally, similar to the club in *Isbister*, the golf courses are public recreational facilities and, thus, are places of public accommodation or amusement. Therefore, the Court finds that Plaintiffs may state a claim against the City under the Unruh Act and thus denies the City's motion on this ground.

*Nevarez v. City & Cnty. of San Francisco*, No. 19-CV-06155-SK, 2020 WL 13610416, at *4 (N.D. Cal. Feb. 12, 2020). The Court finds such case to be a reasonable application of the law given the level of involvement in operating a golf course as similar to operating a private business that is open to the public and providing a good or service for a fee, and significantly also as a place of public accommodation or amusement, in a manner that could be discriminatory as grounded in the underlying goals of the act targeting discrimination in business establishments. Therefore, the Court believes this is an appropriate point to consider some of the specific facts here, as *Nevarez*'s application to a city ran golf course provides what appears to be the most relevant application of considerations underlying the statutory scheme as interpreted in caselaw, particularly pre-*Brennon*.

For example here, if the City of Fresno were actually operating a public park, like Granite Park, that has baseball fields that are open for public use, perhaps with fees to children or adult baseball leagues, (groups that may be private or public themselves), and the park has private employees paid by the city, the Court in *Nevarez* may very well likely deny the City's motion to dismiss. On the other hand, if the City of Fresno is essentially operating only in a capacity as a landlord leasing only the land for such purposes, such leasing Granite Park to a private company to develop and utilize may not rise to the level of the golf course as ran by the city in *Nevarez*. *See also Willie Rubin v. City of Inglewood*, No. CV 20-319-MWF-E, 2020 WL 5413026, at *4 (C.D. Cal. July 17, 2020) ("Plaintiff's current allegations do not sufficiently establish that

Inglewood was acting as a business entity in helping put on the Festival [as] [while] Plaintiff alleges that the Festival was a "business establishment," that Inglewood "presents" the Festival with Rice, that Inglewood "sponsors" the Festival, that Inglewood provides "services" for the Festival, and that Inglewood promotes the Festival on its website," "[b]ased on these allegations and Plaintiff's arguments, any event sponsor, marketer, or provider of staff or furniture could be liable under the Unruh Act.").

Here, the Ground Lease Agreement provides that the City of Fresno is owner of record of Granite Park, that Tenant CVCSF "wishes to develop the Property as a regional recreational asset providing a wide array of recreational opportunities and valuable public activity space, including baseball fields, volleyball courts, and associated commercial development," and "Landlord wishes to lease a portion of the Property to Tenant . . . together with all rights, privileges, and easements appurtenant thereto." (ECF No. 61 at 36.) Section 9.1 and 9.1.1 of the Ground Lease Agreement provide that "Tenant shall . . . at its own cost and expense and without any cost or expense to Landlord . . . [a]ssume all maintenance, security, repair, landscaping, and associated costs for the Premises." (ECF No. 61 at 39.) Section 10.1 provides "Tenant shall have the right at any time and from time to time during the Term to make such improvements to the Premises and such changes and alterations, structural or otherwise, to any buildings, improvements, fixtures and equipment now or hereafter located on the Property as Tenant shall deem necessary or desirable." (ECF No. 61 at 40.)

Thus, at the baseline under the express terms of the Ground Lease Agreement, the City is acting essentially only as a landlord or owner of the leased property. It appears that, comparing the facts to Nevarez, it is CVCSF that wishes to develop and operate the public recreational facilities and exhibiting most of the business establishment attributes, not the City of Fresno. However, of note, as explained in the complaint, the City of Fresno is to provide $150,000.00 toward expenses:

> Essentially, under the Service Agreement, CVCSF agreed to bear the cost of any required maintenance, recreational activities, or programs at Granite Park, except that the City of Fresno would pay an annual fee of $150,000 toward these expenses. This $150,000 annual fee was significantly less than the City of Fresno had been

1
2
3
4
5
6
7

> spending to maintain Granite Park in a minimal way for the prior several years, and it was recognized that amount would not come close to covering the total expenses to be incurred. The scope of services for which CVCSF agreed to be responsible included providing year-round sports and recreational programming for City of Fresno residents and sponsored users at no cost, and in compliance with the City of Fresno's specifications. CVCSF was also responsible for paying the cost of and screening, hiring, and employing adequate staffing for these activities. Under the Service Agreement, CVCSF also agreed to maintain adequate financial records related to its expenses for at least three years or longer if otherwise required by law.

8   (SAC ¶ 23.)  Thus, the City of Fresno was to provide some general financial support for the goal

9   of operating Granite Park in such manner, in support of providing recreation to City of Fresno

10  residents.  However, CVCSF was responsible for the hiring, running, planning, and operation of

11  Granite Park.  Based on these facts, even before Brennon, the Court would likely find the

12  disconnect between the City providing some finances, and acting essentially *only* as the lessor, is

13  more akin to a governmental function of encouraging private business development on city-

14  owned land for the benefit of residents of the city, and not acting as the business establishment

15  itself, or place of public recreation or amusement itself.

16      O'Connor is an oft cited case, and discussed in Brennon.   There, a homeowner

17  association ("HOA") was found to be a business establishment in its manner of acting in the

18  capacity as a traditional landlord, under the pre-Brennon manner of analysis:

19
20
21
22
23
24
25
26
27
28

> The Village Green Owners Association has sufficient businesslike attributes to fall within the scope of the act's reference to "business establishments of every kind whatsoever." Contrary to the association's attempt to characterize itself as but an organization that "mows lawns" for owners, the association in reality has a far broader and more businesslike purpose. The association, through a board of directors, is charged with employing a professional property management firm, with obtaining insurance for the benefit of all owners and with maintaining and repairing all common areas and facilities of the 629-unit project. It is also charged with establishing and collecting assessments from all owners to pay for its undertakings and with adopting and enforcing rules and regulations for the common good. In brief, the association performs all the customary business functions which in the traditional landlord-tenant relationship rest on the landlord's shoulders. A theme running throughout the description of the association's powers and duties is that its overall function is to protect and enhance the project's economic value. Consistent with the Legislature's intent to use the term "business establishments" in

> the broadest sense reasonably possible (*Burks v. Poppy Construction Co., supra,* 57 Cal.2d at p. 468, 20 Cal.Rptr. 609, 370 P.2d 313), we conclude that the Village Green Owners Association is a business establishment within the meaning of the act.

O'Connor v. Vill. Green Owners Assn., 33 Cal. 3d 790, 796, 662 P.2d 427, 431 (1983).  The case involved an extension of the Unruh Act to a nonprofit private organization, not a government entity.  See D'Lil v. Stardust Vacation Club, No. CIV-S-00-1496DFL PAN, 2001 WL 1825832, at *6–7 (E.D. Cal. Dec. 21, 2001) (noting "[t]here is no exemption for non-profit, private organizations under the Unruh Act where the private organization operates 'as the functional equivalent of a commercial enterprise.' " (quoting Warfield, 10 Cal.4th 594, 621–23, 42 Cal.Rptr.2d 50, 66–68 (1995); O'Connor, 33 Cal.3d at 796).   Considering the case nonetheless, on one hand, the City of Fresno here is engaging in the basic role of a landlord, in leasing the land under the Ground Lease Agreement.   On the other hand, Tenant CVCSF is actually the party under the Ground Lease Agreement that is charged with the type of roles that the O'Connor court found significant in finding the association there was acting in the traditional landlord role.   See Brennon, 13 Cal. 5th at  679–80 ("In [O'Connor] the court concluded that a nonprofit homeowners association was subject to the Act because 'the [homeowners] association *performs all the customary business functions* [e.g., employing a property management firm, obtaining insurance, collecting assessments, and enforcing rules] which in the traditional landlord-tenant relationship rest on the landlord's shoulders ... [and because the HOA's] *overall function is to protect and enhance the project's economic value.*' " (emphasis added by quoting source) (quoting O'Connor, 33 Cal. 3d at 796)).

Considering O'Connor and the practical and policy goals underlying its analysis, as related to the Nevarez and its reasonable extension of the application of the Unruh Act to the city ran golf course, the Court finds the relevant facts would counsel against finding the City of Fresno acting as a business establishment.  See Absolute USA, Inc. v. Harman Pro., Inc., No. 221CV06410MEMFMAAX, 2023 WL 2064048, at *18 (C.D. Cal. Feb. 14, 2023) ("The Unruh Act only applies to business establishments that are generally open to the public, and mandates that those establishments serve all persons without arbitrary discrimination." (quoting Smith v.

1   BP Lubricants USA Inc., 64 Cal. App. 5th 138, 149 (2021))).   Shortly before the decision in

2   Brennon issued, a district court noted that "[a] business establishment is one that is 'classically

3   'public' in its operation,' or any that is open to a 'broad segment of the population,' " but the

4   question of "[w]hether a government institution can be a 'business establishment' has not been

5   conclusively decided."   S.G. v. City of Los Angeles, No. LACV1709003JAKPJWX, 2020 WL

6   8837146, at *13 (C.D. Cal. Feb. 21, 2020) (first quoting Isbister v. Boys' Club of Santa Cruz,

7   Inc., 40 Cal. 3d 72, 84, 707 P.2d 212, 219 (1985); then citing Harper v. Lugbauer, No. C 11-

8   01306 JW, 2012 WL 1029996, at *5 (N.D. Cal. Mar. 15, 2012)); see also Isbister, 40 Cal. 3d at

9   76 ("This state's law . . . has long prohibited arbitrary discrimination in places of public

10  accommodation or amusement . . . the term 'business establishment' was meant to embrace,

11  rather than reject, that well established principle . . . [and] there can be no doubt that the facility

12  operated by the Boys' Club comes within the scope of that principle: its recreational facilities are

13  open to the community generally but closed to members of a particular group . . . [and the

14  recreational facilities] are the Club's principal activity and reason for existence.").   In this regard,

15  the court in Inland Mediation found the association distinguishable from the HOA in O'Connor,

16  and the club in Ibister, in the extent and type of business attributes, and in the manner of being

17  open to the public:

18          Putting aside the argument that the "transformation of such a
            loosely knit protective association into a 'business' is stretching the
19          concept of an entrepreneurial venture beyond all reason," Id. at
            802, 191 Cal.Rptr. 320, 662 P.2d 427 (Mosk, J., dissenting), it is
20          clear that K–KAPS possessed none of the managerial
            responsibilities that the association in O'Connor possessed. While
21          the uncontroverted evidence establishes that K–KAPS did, at all
            times, have a director (first Layton, then Keagy), there is no
22          evidence that the association ever had a board of directors vested
            with any authority to act on behalf of the association's members,
23          let alone to enter into contractual arrangements with property
            management firms and providers of homeowners' insurance.
24          Moreover, Plaintiffs have provided no evidence that the K–KAPS
            association ever adopted binding rules and regulations for its
25          members, or that it even had the authority to do so.

26          K–KAPS also differed markedly from other organizations that
            have been held to constitute business establishments under the Act.
27          For example, in Isbister v. Boys' Club of Santa Cruz, Inc., 40
            Cal.3d 72, 77, 82–83, 219 Cal.Rptr. 150, 707 P.2d 212 (1985), the
28          California Supreme Court held that even though the defendant

boys' club was a charitable, non-profit organization, the club was nonetheless a business establishment, within the meaning of the Unruh Act, because it was a corporate entity that had a paid staff and operated a large clubhouse that was open to the public. Another court reached a similar result in *Rotary Club of Duarte v. Board of Directors,* 178 Cal.App.3d 1035, 224 Cal.Rptr. 213 (1986). There, the court held that the Rotary Club also qualified as a business establishment under the Act because of its vast, worldwide staff and its practice of disseminating a variety of international publications in which club members could purchase space for business advertisements. *Id.* at 1053–55, 224 Cal.Rptr. 213.

Because K–KAPS did not operate its own physical premises, but instead conducted its meetings in City Hall meeting rooms available to the public, and because the association was never incorporated and did not engage in any widespread dissemination of written material, neither *Isbister* nor *Rotary Club* are persuasive in the present case. Much more illustrative is the holding in *Harris v. M.A.D.D.* . . .

. . . Unlike M.A.D.D., K–KAPS had no paid staff. Indeed, not even Keagy received compensation for serving as the association's director. Unlike M.A.D.D., K–KAPS had no branch offices. In fact, the record demonstrates that the association had no *home* office, but instead met in the public meeting rooms at City Hall. Unlike M.A.D.D., K–KAPS communicated to its membership only via periodic newsletters, the "business benefits" of which were almost certainly negligible. Finally, the evidence clearly establishes what percentage of K–KAPS members paid dues: none; plaintiffs have provided no evidence that K–KAPS ever charged its members a fee to participate in association activities.

In sum, Plaintiffs have simply provided no evidence from which a jury could conclude that K–KAPS was a "business establishment" within the meaning of Section 51 of the California Civil Code.

Inland Mediation, 158 F. Supp. 2d at 1152.

Although a closer call pre-Brennon, particularly given the lack of caselaw pertaining to government entities acting as a lessor of land in a simple sense, based on the above pre-Brennon authority, the Court would find the City of Fresno was not acting as a business establishment in leasing land to Plaintiff. The Court finds post-Brennon, the facts here and authority now weigh heavily in favor of dismissal. The Court now shall discuss the line of cases leading to the decision in Brennon, and the Brennon decision.

Shortly before Brennon, an opinion from this district issued finding "[a]s a threshold matter, the court finds R.N.'s school is a 'business establishment' under the Unruh Act, while

1    recognizing there is a split among district courts within the Ninth Circuit on the question, and the

2    California Supreme Court has not resolved it."  R.N. by & through Neff v. Travis Unified Sch.

3    Dist., No. 220CV00562KJMJDP, 2020 WL 7227561, at *10 (E.D. Cal. Dec. 8, 2020).  The court

4    explained why it held as such:

> The analysis in *Zuccaro* does not consider that a public school is
> "readily distinguishable" from city sidewalks or a county animal
> shelter, which do not have the same "quintessential character of
> providing public accommodations and services to students" as do
> public schools. *Whooley v. Tamalpais Union High School Dist.*,
> 399 F.Supp.3d 986, 998 (N.D. Cal. Jul. 30, 2019) (quoting *Yates v.
> East Side Union High School Dist.*, No. 18-CV-02966-JD, 2019
> WL 721313 at *2 (N.D. Cal. Feb. 2019)); *see also Walsh v.
> Tehachapi Unified School Dist.*, 827 F. Supp. 2d 1107, 1123 (E.D.
> Cal. Oct. 28, 2011) (holding a public school "constitutes a
> 'business establishment' " because the California Supreme Court
> "has determined that the Legislature intended the term 'business
> establishment' to be interpreted 'in the broadest sense reasonably
> possible.' ") (quoting *Isbister v. Boys' Club of Santa Cruz, Inc.*, 40
> Cal.3d 72, 78 (1985)); *D.K. ex rel. G.M. v. Solano Cty. Office of
> Educ.*, No. 2:08CV00534 MCE DAD, 2008 WL 5114965, at *6
> (E.D. Cal. Dec. 2, 2008) ("SCOE is a business establishment
> within the meaning of Cal. Civ. Code § 51"). Additionally, finding
> that a public school qualifies as a "business establishment" under
> the Unruh Act aligns the Unruh Act's jurisdiction with that of the
> ADA, which also applies to public schools. *Yates*, 2019 WL
> 721313, at *3 (citing *K.M. ex rel. Bright v. Tustin Unified Sch.
> Dist.*, 725 F.3d 1088, 1094 n.1 (9th Cir. 2013) ("[A] violation of
> the ADA is, per se, a violation of the Unruh Act.") (additional
> citations omitted)); *Sullivan v. Vallejo City Unified School Dist.*,
> 731 F. Supp. 947, 952–53 (E.D. Cal. Mar. 1, 1990) ("In like
> fashion, since public schools were among those organizations
> listed in the original version of the Unruh Act, it must follow that
> for purposes of the Act they are business establishments as well.").
> Here, the court reaches the same conclusion and finds TUSD and
> SCOE constitute "business establishments" under the Unruh Act.

21   R.N., 2020 WL 7227561, at *10.

22       The Supreme Court of California in Brennon noted that "federal courts have split on the

23   question of whether public school districts are business establishments under the Unruh Civil

24   Rights Act . . . with the majority concluding that public school districts *are* subject to the Act."

25   Brennon, 13 Cal. 5th at 683 (emphasis in original).  The court ultimately found that "Zuccaro has

26   the better view," as "[u]nlike other district court cases, the Zuccaro court carefully examined our

27   decision in Curran and found it made clear that 'the entity at issue [must] resemble an ordinary

28   for-profit business," and that a public school "is practically the antithesis of a for-profit

1  enterprise.' " Id. at 684 (citations omitted).

2  The Brennon court emphasized that while courts had relied on the expansive interpretive

3  language, "[n]othing 'suggests that the term all business establishments of every kind whatsoever

4  was intended to encompass *all* of the entities or activities listed in the initial bill,' " and while the

5  phrase "must be interpreted as broadly as reasonably possible, its scope remains limited to

6  entities acting as private business establishments."  Brennon, 13 Cal. 5th at 677–78 (quoting

7  Warfield, 10 Cal. 4th at 615).  The court explained the legislative history clearly weighed against

8  an expansive interpretation of the Unruh Act that would generally reach governmental entities:

> In addition, the Legislature is capable of bringing government
> entities within the scope of specific legislation when it intends to
> do so, and it *has* done so with other antidiscrimination legislation.
> (See, e.g., *Wells*, *supra*, 39 Cal.4th at pp. 1190–1191, 48
> Cal.Rptr.3d 108, 141 P.3d 225 [discussing application of the Fair
> Employment and Housing Act (FEHA) to public entities].) In the
> context of the Unruh Civil Rights Act, however, "the statutory list
> of [covered entities] contains no words or phrases most commonly
> used to signify public school districts, or, for that matter, any other
> public entities or governmental agencies." (*Id.* at p. 1190, 48
> Cal.Rptr.3d 108, 141 P.3d 225.) The Act does not — as *does*
> FEHA, for example — define the covered entities to include "the
> state or any political or civil subdivision of the state, and cities."
> (Gov. Code, § 12926, subd. (d).) As we have previously explained,
> "[t]he specific enumeration of state and local governmental entities
> in one context [such as the Fair Employment and Housing Act],
> but not in the other [here, the Unruh Civil Rights Act], weighs
> heavily against a conclusion" that the coverage provisions should
> be understood as identical. (*Wells*, at p. 1190, 48 Cal.Rptr.3d 108,
> 141 P.3d 225.) That is especially true where, as here, the statutes'
> coverage provisions were drafted by the very same Legislature
> during the same legislative session; the legislative history is, thus,
> strong evidence that the Legislature crafted language for FEHA to
> explicitly cover governmental entities, while simultaneously
> crafting language for the Unruh Civil Rights Act that sets forth
> *different* coverage.

23  Brennon, 13 Cal. 5th at 678.  Based on this legislative history as compared to FEHA, the

24  California Supreme Court concluded the history showed the Unruh Act "is focused on the

25  actions of private actors."  Id.  Indeed, the court noted the "predecessor statute was enacted in

26  response to the curtailment of the federal government's ability to legislate on the conduct of

27  *private entities*, and we find nothing in the legislative history of the Act to indicate that it

28  drastically expanded California's public accommodation law by imposing liability on public

entities, such that it would cover the conduct challenged here."  Id. at 678-79 ("[W]e reject the contention that the mere inclusion of 'schools' in earlier versions of the bill establishes that public schools are business establishments under the Act.").   The court concluded that "in passing the Unruh Civil Rights Act, the Legislature enacted a law directed at entities operating as private businesses."  Id. at 679; see also Qualified Patients Assn. v. City of Anaheim, 187 Cal. App. 4th 734, 763–64, 115 Cal. Rptr. 3d 89, 110–11 (2010) ("Emanating from and modeled upon traditional public accommodations legislation, the Unruh Act expanded the reach of such statutes from common carriers and places of public accommodation and recreation, e.g., railroads, hotels, restaurants, theaters and the like, to include 'all business establishments of every kind whatsoever.' " (quoting Marina Point, Ltd. v. Wolfson, 30 Cal. 3d 721, 731, 640 P.2d 115, 120 (1982))).

Having rejected the contention that the previous version of the statute and liberal interpretive scheme meant public schools are business establishments, the Brennon court turned to case law.  The court noted that although previous cases did not resolve the issues presented here, because they involved private entities rather than public entities, what the cases did "ultimately make clear is that — in order to be a 'business establishment' under the Act — an entity must operate as a business or commercial enterprise when it discriminates." 13 Cal. 5th at 679.  The court found this body of caselaw suggested that the Unruh Act, like its predecessor statute, was not directed at "school districts when they are acting to fulfill their educational role."  Id. at 680-81.

Rather, "[i]n parsing the boundaries of what constitutes a 'business establishment,' our cases have focused on attributes — performing business functions, protecting economic value, operating as the functional equivalent of a commercial enterprise, etc. — that are not shared by public school districts engaged in the work of educating students."  Id. at 681.  When public schools act "in their core educational capacity, public school districts do not perform 'customary business functions,' nor is their 'overall function ... to protect and enhance ... economic value.' " Id. (quoting O'Connor, 33 Cal.3d at 796 (emphasis added by quoting source)).  The court found that "[t]he task of educating students does not involve regularly conducting business transactions

with the public, or receiving 'financial benefits from regular business transactions'; nor does it involve 'operating in a capacity that is the functional equivalent of a commercial enterprise.' " 13 Cal. 5th at 681 (quoting Warfield, 10 Cal.4th at 621).

The Brennon court did not make a holding as to government entities generally, but examined the state of the caselaw and its impact on the decision as to the school district. The court noted "such cases further indicate that to be a 'business establishment' under the Act an entity must effectively operate as a business or a commercial enterprise or 'engage[ ] in behavior involving sufficient 'businesslike attributes.' " Brennon, 13 Cal. 5th at 681–82 (citations omitted). The court noted several decisions from California Courts of Appeal "have concluded that government bodies do not function as 'business establishments' when they enact legislation.," but acknowledged "[h]owever, these cases do not address whether a state entity might, in other contexts, function as a business establishment for purposes of the Act." Id. at 682 (citations omitted).

Further, while there is not yet more directly on-point post-Brennon caselaw, cases applying Brennon have found state prisons are not a "business establishment" for purposes of the Unruh Act and other law. Beverly v. Cnty. of Orange, No. 22-55080, 2022 WL 14003695, at *1 (9th Cir. Oct. 24, 2022) ("Her claim under the Unruh Civil Rights Act, Cal. Civ. Code § 51, failed because jails are not a "business establishment" within the meaning of the act." (citing Carter v. City of Los Angeles, 169 Cal. Rptr. 3d 131, 144; Brennon, 513 P.3d at 984 n.8)), cert. denied sub nom. Beverly v. Orange Cnty. Sheriff, 143 S. Ct. 816 (2023), reh'g denied sub nom., No. 22-6366, 2023 WL 2959555 (U.S. Apr. 17, 2023); Martinez v. City of Clovis, No. F082914, 2023 WL 2820092, at *36 (Cal. Ct. App. Apr. 7, 2023) (applying holding in Brennon to conclude FEHA provision Cal. Gov't Code § 12955.8 term "business establishment" does not encompass a governmental entity like the city); see also Cal. Gov't Code § 12955.8(2) ("For purposes of this subdivision, the term "business establishment" shall have the same meaning as in Section 51 of the Civil Code [Unruh Act]."); Walker v. Sec'y of Corr., No. 221CV0364TLNACP, 2023 WL 184934, at *4 (E.D. Cal. Jan. 13, 2023) ("Plaintiff's Unruh Act claim fails because a prison is not considered a 'business establishment' within the meaning of

the act.") (citations omitted); <u>Haley v. Calif. Dep't of Rehab.</u>, No. CV 22-8126-SB(E), 2022 WL 17184562, at *4 (C.D. Cal. Nov. 22, 2022) ("A state agency such as the Department is not a 'business establishment' within the meaning of section 51(b) [and] [a]lthough the Unruh Act provides that 'a violation of the right of any individual under the [ADA]' also violates the Unruh Act, . . . that provision likewise does not apply to state agencies.") (citations omitted); <u>Horton v. Narbaitz</u>, No. 22-CV-03174-WHO, 2023 WL 2563078, at *15 (N.D. Cal. Mar. 16, 2023) ("To the extent that it alleges a violation of section 51, the City and individual defendants each argue that the claim cannot proceed because they are not business establishments . . . Horton does not challenge this assertion in opposing the City's motion, nor does he proffer any case law or other authority suggesting that a public utility company may be held liable under the Unruh Act.").

As the California Supreme Court emphasized, the legislative history demonstrates the Unruh Act "is focused on the actions of private actors."  <u>Id.</u> at 678; <u>see also</u> <u>Willie Rubin</u>, No. 2020 WL 5413026, at *4 ("[W]hile Plaintiff cites to *federal* cases applying the Unruh Act to cities, Plaintiff fails to cite a single California court doing the same [and] [o]n the other hand, several California courts have determined that the Unruh Act does *not* apply to cities.") (emphasis in original) (citations omitted).  Based on the facts here, the Court finds the City of Fresno's role as lessor under the relevant agreements and as alleged by Plaintiffs, as summarized above, "does not involve regularly conducting business transactions with the public," and its payments as lessor does not equate to "receiving financial benefits from regular business transactions." <u>Brennon</u>, 13 Cal. 5th 682.  The Court does not find it is "operating in a capacity that is the functional equivalent of a commercial enterprise." <u>Id.</u>  The City of Fresno's overall function was not to "protect and enhance … economic value" of the Granite Park commercial enterprise, but was leasing the land to enhance the life and well-being of the residents of the City of Fresno by leasing land to the business enterprise operating Granite Park. <u>Id.</u> at 681 (quoting <u>O'Connor</u>, 33 Cal.3d at 796); <u>see also</u> <u>D'Lil v. Stardust Vacation Club</u>, No. CIV-S-00-1496DFL PAN, 2001 WL 1825832, at *6–7 (E.D. Cal. Dec. 21, 2001) ("The Stardust operates as the functional equivalent of a hotel by allowing members of the general public to rent its rooms for a fee . . . the Stardust's rental program is fundamentally commercial and is not designed to further

the social or moral values of its time-share owners."); <u>Nevarez</u>, 2020 WL 13610416, at *4; <u>Willie Rubin</u>, No. 2020 WL 5413026, at *4.  In this regard, the City of Fresno's role was more akin to that of being the owner of a public park.  If the Court were to rule differently given the facts here, the Unruh Act would be expanded to apply to a situation where the City is essentially only allowing a business enterprise to operate by leasing a portion of City land for a purpose related to enhancing the lives of its citizens, and would restrict the City's ability to contract for things such as simple goods and services that a company may provide at a public park.  In other words, the City of Fresno here, but any city hypothetically, would be unable to lease a portion of a park or property for a business enterprise to operate within that property or park without coming under the purview of the Unruh Act, and the Court does not believe the Unruh Act, as now interpreted by the California Supreme Court, was intended to have such broad reach to a government entity simply for encouraging or allowing a business enterprise to use public land.

Accordingly, the Court finds Defendants' motion to dismiss the Unruh Act claim should be granted because the only remaining Defendant, the City of Fresno, was not acting as a business establishment as required under the statute and relevant authority from the Supreme Court of California.  The Court recommends denying leave to amend as the Court does not believe Plaintiffs can allege additional facts that could counsel against the weight of the authority above, particularly the tenor of the recent decision of the Supreme Court of California, and the legislative history underlying the statute.[25]

### 3.   Insufficient Facts to Support Unruh Act Claim

For the same reasons argued as to the Section 1981 claim above, Defendants argue there are insufficient racial animus on the part of the City Defendants.  As indicated above, the parties have clarified in opposition and in post-hearing filings, that the Unruh Act claim is only alleged against the City of Fresno.  (<u>See</u> ECF Nos. 70, 71.)  In reply, Defendants emphasize that because

---

[25]  In weighing whether leave to amend is appropriate, the Court also considers Plaintiffs' suggestion discovery is necessary on this issue to determine whether the City of Fresno was acting as a business establishment.  The Court finds that given the tenor of the California Supreme Court decision and associated law above, the facts alleged in the complaint, as well as the contracts incorporated therein, Plaintiffs' vague suggestion that discovery is necessary weighs in favor of denying leave to amend, as the request demonstrates there are no additional facts currently available that would change the above analysis, and thus the Court finds amendment would be futile.

1  of the failure to timely file a lawsuit under the GTCA upon notice in 2019, any allegation that

2  took place prior to July 17, 2019, cannot provide a basis for relief.  (Reply 17.)

3      The parties agree that the elements for an Unruh Act claim include: "(i) defendant denied

4  plaintiff full and equal accommodations, advantages, facilities, privileges, or services; (ii) that a

5  substantial motivating reason for defendant's conduct was plaintiff's membership in a protected

6  class; (iii) that plaintiff was harmed; and (iv) that defendant's conduct was a substantial factor in

7  causing plaintiff's harm."  Nia v. Bank of Am., N.A., 603 F. Supp. 3d 894, 906 (S.D. Cal. 2022)

8  (citations omitted); see also Judicial Council Of California Civil Jury Instruction 3061; Obeng-

9  Amponsah v. Don Miguel Apartments, No. CV 16-1054-R, 2019 WL 1744854, at *3–4 (C.D.

10  Cal. Mar. 12, 2019).  Thus, the parties agree that the substantial motivating factor standard

11  applies to the Unruh Act claim unlike the but-for causation standard for the Section 1981 claim.

12  (See Mot. 25-26; Opp'n 28.)  Plaintiffs argue that unlike the section 1981 claim discussed above,

13  an Unruh Act plaintiff need only show that discrimination was a "substantial motivating reason"

14  and it can be one of a combination of motives, and there are enough factual allegations to satisfy

15  the more lenient state pleading requirements.  Defendants also argue that with respect to Section

16  51.5, plaintiffs must also establish the Defendants discriminated against, boycotted, blacklisted

17  or refused to contract with Plaintiffs.  See Cal. Civ. Code § 51.5(a) ("No business establishment

18  of any kind whatsoever shall discriminate against, boycott or blacklist, or refuse to buy from,

19  contract with, sell to, or trade with any person in this state on account of any characteristic listed

20  or defined in subdivision (b) or (e) of Section 51[.]"); Nia, 603 F. Supp. 3d at 906.

21      "[T]he 'substantial motivating factor' accounts for the possibility of both discriminatory

22  and non-discriminatory motives."  Elliott v. Versa CIC, L.P., No. 16-CV-0288-BAS-AGS, 2019

23  WL 414499, at *15 (S.D. Cal. Feb. 1, 2019) (citations omitted).  While this may be a more

24  lenient standard, "[a] complaint must include 'some factual context that gives rise to a plausible

25  inference of discriminatory intent.' "  Nia, 603 F. Supp. 3d at 906 (quoting Duronslet v. Cty. of

26  Los Angeles, 266 F. Supp. 3d 1213, 1217 (C.D. Cal. 2017)).

27      The Court finds that for the same reasons as explained above as to the Section 1981

28  claim, and thus even considering all of the allegations in the SAC, as well as the more lenient

standard under the Unruh Act, Plaintiffs have not alleged sufficient facts to state an Unruh Act claim.  See Acevedo v. City of Farmersville, No. 118CV01747LJOSAB, 2019 WL 3003996, at *16 (E.D. Cal. July 10, 2019) ("Plaintiff does not plead any particularized facts to support that the 'motivating reason for Defendants' conduct was its perception of Plaintiff's sexual orientation, race, ancestry, and/or national origin[,]' [and while] Plaintiff pleads that 'his ethnicity made him an easy and/or susceptible target to discrimination and abuse by Defendant,' [he] does not allege any particularized facts in support this statement, and, in any event, being a susceptible target for discrimination and abuse is insufficient on its own to establish an Unruh Act violation."); Austin v. Zhang, No. 20-CV-05445-RS, 2022 WL 1570482, at *3 (N.D. Cal. May 18, 2022) ("Austin's claims under 42 U.S.C. § 1981 and the Unruh Act, along with his claim for defamation, fail for the same reasons as his similar claims against Green Dot.  For his section 1981 claim, Austin has failed to plead facts which allege intentional discrimination by BANA or that the purported discrimination involved activity protected by the statute.  As for the Unruh Act claim, Austin has failed to allege facts to establish that BANA intentionally discriminated against him or that his protected characteristic was a motivating factor for the denial of a refund."), aff'd, No. 22-15955, 2023 WL 3580338 (9th Cir. May 22, 2023) ("The district court properly dismissed Austin's claims against Bank of America and Green Dot because Austin failed to allege facts sufficient to show that defendants denied his refund requests because of race."); Hernandez v. Sutter W. Cap., No. C 09-3658 CRB, 2010 WL 539133, at *6 (N.D. Cal. Feb. 8, 2010) ("As for American Mortgage and JPMorgan Chase, the Complaint fails even to allege how these defendants [became] aware of Plaintiff's race[;] [the] banks funded the loan, but the Complaint does not allege that any representative of either of these defendants met Plaintiff, nor that they were informed of his race . . . an action under the Unruh Act requires that a defendant's conduct be motivated by its perception of the plaintiff's national origin."); c.f. Absolute USA, Inc. v. Harman Pro., Inc., No. 221CV06410MEMFMAAX, 2023 WL 2064048, at *19 (C.D. Cal. Feb. 14, 2023) ("Here, SAC alleges that the Harman Defendants' 'substantial motivating factor' in terminating the Agreement is that Razipour is 'from the [M]iddle [E]ast, specifically from Iran[,]' . . . [and] also contends that it is implied that Schoen wanted to

1  terminate the Agreement because he stated that 'all you ... Arabs and Iranians need to be

2  terminated.' ")

3          The Court recommended denying leave to amend in the preceding section, and thus leave

4  to amend as to this deficiency is not recommended.  However, if the District Judge is inclined to

5  grant leave to amend to plead additional facts to establish the City was acting as a business

6  establishment, the Court would also recommend granting leave to amend to plead additional

7  facts to establish intentional discrimination under the Unruh Act, subject to the limitation of

8  disallowing allegations prior to July 17, 2019.   See Obeng-Amponsah v. Don Miguel

9  Apartments, No. CV 16-1054-R, 2019 WL 1744854, at *3–4 (C.D. Cal. Mar. 12, 2019)

10  ("Plaintiff alleges that Defendants engaged in discrimination on the basis of Plaintiff's age,

11  source of income, race, and nationality . . . that Defendants demanded a deposit of $2,240 at the

12  start of his lease when a deposit of only $500 was required of other tenants . . . that he and his

13  co-tenants met the income requirement provided in the rental agreement . . . [and] that his rent

14  was increased from $1,190 to $1,415 per month effective March 1, 2016 and that that amount

15  was higher than the rent being charged to other tenants for similar one-bedroom units . . .

16  [h]owever, the Complaint contains no facts suggesting that any of these actions were taken with

17  the intent to discriminate or even that Plaintiff's age, source of income, race, or nationality was a

18  motivating factor in relation to Defendants' actions [and] Plaintiff cannot rely merely on

19  conclusory allegations of discriminatory intent."), rev'd and remanded sub nom. Obeng-

20  Amponsah v. Genovese, 807 F. App'x 741 (9th Cir. 2020) ("The district court sua sponte

21  dismissed Obeng-Amponsah's action as a sanction eight days after the amended complaint was

22  due. However, the district court failed to consider less drastic alternatives to dismissal with

23  prejudice and failed to warn Obeng-Amponsah that the action would be dismissed if he failed to

24  comply with the court's order.").

25                                           **V.**

26                                  **RECOMMENDATION**

27          For all of the above explained reasons, IT IS HEREBY RECOMMENDED that:

28          1.      Defendants' request for judicial notice be GRANTED;

                                            128

2.      Defendants' motion to dismiss the second cause of action for discriminatory denial of contract rights under 42 U.S.C. §§ 1981, 1983, be GRANTED with leave to amend under the parameters and legal standards discussed above;

3.      Defendants' motion to dismiss the fifth cause of action for breach of contract be GRANTED without leave to amend, for failure to comply with the California Government Claims Act;

4.      Defendants' motion to dismiss the third cause of action for violation of California's Bane Act, be GRANTED with leave to amend, under the parameters and legal standards discussed above[26]; and

5.      Defendants' motion to dismiss the fourth cause of action for violation of California's Unruh Act be GRANTED, without leave to amend.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304. Within **twenty-one (21) days** of service of these recommendations, any party may file written objections to the findings and recommendations with the Court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The District Judge will review the Magistrate Judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **June 21, 2023**

UNITED STATES MAGISTRATE JUDGE

---

[26] Subject to the parties' clarifying through objection or stipulation whether there was meant to be a difference between the concession as to the Bane Act time period versus the Unruh Act.